Page 1

```
 1              UNITED STATES DISTRICT COURT
 2             FOR THE DISTRICT OF COLUMBIA
 3
 4    - - - - - - - - - - - - - - x
 5    PAMULA ROBINSON,           :
 6          Plaintiff           :
 7    vs.                       :   Case No: 1:05cv01212
 8    JOHN W. SNOW,             :
 9    SECRETARY OF THE TREASURY, :
10          Defendant           :
11    - - - - - - - - - - - - - - x
12                    Washington, D.C.
13                    September 12, 2006
14
15
16  Whereupon,
17              PAMULA ROBINSON
18  the witness, called for examination by counsel for the
19  Defendant, pursuant to notice and agreement of counsel as to
20  time and place, at 501 3rd Street, Washington, D.C., where
21  were present on behalf of the parties:
22
23
24
25
```

Page 2

```
 1  APPEARANCES:
 2          On Behalf of the Plaintiff:
 3          CHARLES W. DAY, JR., Esquire
 4          1101 17th Street, N.W.
 5          Washington, DC  20036-4716
 6          202-496-0400
 7
 8          On Behalf of the Defendant:
 9          MARK NEBEKER, Esquire
10          JENNIFER VERGNE, Esquire
11          555 4th Street, N.W.
12          Tenth Floor
13          Washington, DC  20530
14          202-514-7230
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1              I N D E X
 2  WITNESS:       EXAMINATION:           PAGE:
 3  Pamula Robinson    Mr. Nebeker - Direct      4
 4                     Mr. Day - Cross          132
 5                     Mr. Nebeker - Redirect   143
 6
 7              E X H I B I T S
 8  EXHIBIT NO:     DESCRIPTION:           PAGE:
 9     1          Complaint                 31
10     2          Qualification Record      34
11     3          Letter re eligibility     36
12     4          Complaint - Treasury Dept. 39
13     5          Unsworn Declaration Robinson 43
14     6          Plaintiff's Responses     53
15     7          Unsworn Declaration Robison 62
16     8          Unsworn Declaration Sprott 67
17     9          Position Description      69
18    10          Wenzel Memorandum         71
19    11          Robison Memorandum        73
20
21
22
23
24
25
```

Page 4

```
 1              P R O C E E D I N G S
 2                  (10:00 a.m.)
 3  Whereupon,
 4              PAMULA ROBINSON
 5  was called as a witness and after having been first duly
 6  sworn, was examined and testified as follows:)
 7              DIRECT EXAMINATION
 8  BY MR. NEBEKER:
 9      Q   Good morning, Ms. Robinson.  I'm Mark Nebeker.  I
10  believe we've met before and I was just going to go over some
11  ground rules if I may this morning and ask if you could do
12  your best to follow them.  If I ask a question and you have
13  any difficulty understanding it, either because the volume of
14  my voice wasn't loud enough or the words didn't make any sense
15  to you, I'm going to ask you if you would please to ask me to
16  restate or rephrase the question so that we can be sure you
17  understand it.  Think you can do that?
18      A   I believe I can.
19      Q   Okay.  Thank you.  And will you do that?
20      A   I will certainly try to do that.
21      Q   Thank you.
22          MR. NEBEKER:  Also, before we started we had agreed
23  that this deposition will not run the full seven hours.  We're
24  going to be reserving at least a couple of hours in case we
25  need to go over the second phase of discovery and continue the
```

## Page 17

1  would have 15, each of you would have 15 or so trainees?
2      A  Right.
3      Q  If those trainees had difficulty understanding the
4  accounting procedures, they would come to you?  Is that
5  correct?
6      A  Yes.
7      Q  Go ahead.  If you're not finished with your answer,
8  be complete.
9      A  Well, yes, but we should have been able to identify
10  that ourselves.
11      Q  Prior to being a manager for the tax auditor group,
12  where were you employed at the IRS?
13      A  I was a manager for the tax auditor group.  Before
14  that I was a manager of the training group.
15      Q  Prior to the manager --
16      A  Prior to that.
17      Q  -- of the training group had you been --
18      A  Tax --
19      Q  -- employed with --
20      A  -- auditor.
21      Q  And what was your series?
22      A  546, maybe.
23      Q  You're not sure?
24      A  Not sure, no.
25      Q  And as a -- are you sure about the --

## Page 18

1      A  -- 526.
2      Q  Are you sure it was a title tax auditor?
3      A  Yes.
4      Q  And what years were you a tax auditor with the IRS?
5      A  1974 until I became the manager of the training
6  group.
7      Q  Well, which was when?
8      A  Oh, I think, did we go through 1984?  I think that
9  may be what it was.
10      Q  See, I had manager of the tax auditor group probably
11  '84 to '87.
12      A  Okay, that was three years, okay.
13      Q  So how long as the manager of the training group?
14      A  I think that was two years.
15      Q  Okay.  So what would you say those two year span
16  that you were the manager of the training group?
17      A  So they would have been from 4 through 6.
18      Q  '84 to '86?
19      A  Yes, I believe so.  That's really foggy.
20      Q  And as a tax auditor what did you do?
21      A  We audited tax returns, individuals and businesses.
22      Q  Did you do tax computations at that point?
23      A  Yes.
24      Q  And as you define the term, what does that mean to
25  do tax computation?

## Page 19

1      A  Once we determined what items needed to be adjusted.
2  For instance, if the taxpayer claimed a dependent -- and we
3  determined that they did not qualify for that dependent, then
4  we would have to do a computation which would result in how
5  much the person owed as a result of that dependent being
6  disallowed.
7      Q  I understand.  Did you do any tax computation work
8  as the manager of the training group?
9      A  No.  We may have supervised, making sure the
10  computations were correct.
11      Q  And as a manager for the tax auditor group, did you
12  do any tax computations?
13      A  No.
14      Q  As the appeals officer in the 930 series from '87 to
15  '89, did you do any tax computations?
16      A  Yes.
17      Q  And how would that tax computation work be done?
18      A  I would determine what items we were reversing from
19  the prior determination and examination and then compute how
20  much the adjusted amount the taxpayer owed.
21      Q  What period of your time would you say you spent
22  when you were in the 930 series as an appeals officer doing
23  tax computation work?
24      A  Oh, 25 percent of the time.  We had to do it on
25  every case that there was an adjustment to.  Well, maybe not

## Page 20

1  25 percent but every case had to have a computation.
2      Q  So it could take more time to decide the bigger
3  issue and then the end of the matter you had to do the
4  calculation based upon the decisions that you had made?
5      A  Correct.
6      Q  And let's see, as the -- from the program analyst,
7  then, that was appeals officer in the 930 series, and when you
8  were the program analyst in the 345 series did you do much tax
9  computation work?
10      A  No.  Well, I need to think what programs I had, but
11  no.
12      Q  And in the program analyst at the 343 series did you
13  do much tax computation work?
14      A  No.
15      Q  And that brings us up to today, right, to your
16  current position in the 343 series is the program analyst,
17  correct?
18      A  Correct.
19      Q  And you don't do a lot of tax computation work in
20  that --
21      A  Correct.
22      Q  -- position?  Are you more of a manager at this
23  point?
24      A  No.
25      Q  How would you describe what you do?

## Page 37

1    Q   And is that your signature on the first page of
2    Exhibit 4?
3    A   Yes.
4    Q   You see on page 2 of Exhibit 4, it says name and
5    telephone number of EEO counselor Jean Schley-Burrell, B-u-r-
6    r-e-l-l?  I may have mispronounced the first part of the last
7    name, S-c-h-l-e-y.  Does that refresh your recollection about
8    any communications you had about not being deemed eligible for
9    the vacancy announcement at issue in your case?  I guess what
10   I'm trying to figure out is, you were trying to remember if
11   you spoke to somebody about the non-selection or the
12   determination that you were not eligible.
13   A   No.
14   Q   Could it have been the EEO counselor you're thinking
15   of?
16   A   No.
17   Q   Okay.
18   A   No, wouldn't have been.
19   Q   Who else do you think you spoke with -- well, first
20   of all, did you speak with an EEO counselor?
21   A   Yes.
22   Q   Okay.  Did you speak with anybody else at the IRS
23   about the non-selection or the determination that you were not
24   eligible for the position at issue in your complaint?
25   A   I cannot remember who I spoke with.  I, I recall

## Page 38

1    getting clarification on why I didn't qualify.
2    Q   Because you --
3    A   Because I had performed the job for four years and
4    so I -- and I don't remember who I spoke with.  I don't know
5    if it may have been -- I don't know, I don't remember.
6    Q   Do you remember what that person said?
7    A   I remember an explanation I, you know, haven't
8    gotten work because of the series, the 512 series, and I
9    hadn't been in that series.
10   Q   Do you recall whether the person you spoke with was
11   one of your supervisors?
12   A   I don't recall.
13   Q   Do you remember any conversations with any of your
14   supervisors about the vacancy at issue in your complaint?
15   A   My direct supervisor was not the person who had
16   advertised this position.
17   Q   So did you have any -- who was your direct
18   supervisor?
19   A   Jeffrey Allison, I believe.
20   Q   Did you have any conversations with Mr. Allison
21   about the vacancy that is at issue in your complaint?
22   A   I may have.  I'm not sure.
23   Q   Do you remember the substance of any such
24   conversation?
25   A   No, I don't remember.

## Page 39

1    Q   Do you remember any communications with anybody else
2    in your supervisory chain of command regarding the vacancy
3    announcement at issue in your complaint at any time?
4    A   No.
5    Q   Okay.  When you got the clarification about the
6    basis for determining that you were not eligible for vacancy
7    announcement at issue in your complaint, could it have been
8    from somebody in your Personnel office or your Human Resources
9    office?
10   A   It may have been.
11   Q   Do you have any recollection of having any
12   communications with people in the Personnel or Human Resources
13   office at the IRS about the vacancy at issue in the complaint?
14   A   No.
15   Q   Can you tell me everything you can about what you
16   were informed about the basis for you not being eligible for
17   the vacancy announcement at issue in your complaint?
18   A   Because I had not worked in a job series that the
19   position had been announced --
20   Q   Anything -- any other details given to you about
21   that?
22   A   No.
23   Q   And you don't remember who it was that told you
24   that?
25   A   No.

## Page 40

1    MR. NEBEKER:  Let me ask you to mark this one as
2    Exhibit Number 5, I think we're up to.
3    (Robinson Deposition Exhibit Number 5 marked for
4    identification.)
5    BY MR. NEBEKER:
6    Q   When you've had a chance to look over Exhibit Number
7    5, would you identify for us what that is.
8    A   It is an unsworn declaration.
9    Q   And is this -- was this unsworn declaration signed
10   by you?
11   A   Yes.
12   Q   And do you believe the information contained in this
13   unsworn declaration to be true and accurate to this day?
14   A   Yes.
15   Q   Can you tell me the circumstances under which --
16   how, how did this get created?
17   A   How did what get created?
18   Q   How did the document, Exhibit 5, get created?
19   A   Okay.
20   Q   Did you type it?  Did someone else type it?
21   A   I don't remember.  I don't remember, I don't
22   remember.
23   Q   Do you remember being asked the questions that
24   appear on the document and giving responses?
25   A   Yes.

Page 61

1    Q  Didn't see page 5. Fifteen, did you have an
2  opportunity to read each of the 15?
3    A  Yes.
4    Q  Okay. And did you have an opportunity to read his
5  responses to each of the 15?
6    A  Yes.
7    Q  Okay. Referring back to Exhibit 5, in your response
8  to question number 4, you state, "Are you aware of any other
9  similarly situated employee whom you believe was treated
10  differently than yourself as it relates to eligibility
11  criteria for the position at issue in your complaint?"
12    A  You're asking --
13    Q  When you respond to question number 4 --
14    A  Okay.
15    Q  -- in Exhibit 5, you identified Slaughter, Wright,
16  Stipes and Cichaski as people whom you believe were treated
17  differently because of their race. Is that right?
18    A  Yes.
19    Q  Okay. And what I'm trying to find out is in the
20  time that's gone by since you filled out your statement are
21  you aware of anybody else whom you believe was treated
22  differently than you because of their race in the selection to
23  the GS-14 position within the IRS?
24    A  Not that I can recall right now.
25    Q  Okay.

Page 62

1    A  May I have that break?
2    Q  Certainly, certainly.
3    COURT REPORTER: We're off the record.
4    (Whereupon, a brief recess was taken.)
5    COURT REPORTER: We're back on the record.
6    MR. NEBEKER: Let's see. What's the last exhibit
7  that --
8    MS. VERGNE: The unsworn declaration of Robison.
9    MR. NEBEKER: Thank you. Let me mark this as
10  Deposition Exhibit 8, please.
11    (Robinson Deposition Exhibit Number 8 marked for
12  identification.)
13    BY MR. NEBEKER:
14    Q  Ms. Robinson, when you've had a chance to look over
15  Deposition Exhibit Number 8, I wonder if you could just tell
16  me what that is?
17    (Long pause.)
18    THE WITNESS: It appears to --
19    BY MR. NEBEKER:
20    Q  Ms. Robinson, have you had an opportunity to read
21  through the whole document, Exhibit Number 8?
22    A  Yes.
23    Q  Okay. Can you tell us what that is?
24    A  It's an unsworn declaration.
25    Q  Is this of Carson C. Sprott?

Page 63

1    A  Yes.
2    Q  Okay. Did you have an opportunity to read through
3  each of the areas of inquiry being made of Mr. Sprott and to
4  his responses?
5    A  Yes.
6    Q  And do you have any facts that would -- upon which
7  you would rely to disagree with any of the statements made by
8  Mr. Sprott in Exhibit 8?
9    MR. DAY: Objection, over broad. You may answer.
10    THE WITNESS: No.
11    BY MR. NEBEKER:
12    Q  Do you believe it's accurate, Exhibit --
13    A  I don't know.
14    Q  -- Number 8?
15    A  I'm assuming it would be.
16    Q  Okay. Do you --
17    MR. DAY: Don't assume. Just testify to what you
18  know.
19    THE WITNESS: Okay. No, I don't know.
20    BY MR. NEBEKER:
21    Q  Okay. And I guess the important thing is that I was
22  trying to figure out is are you aware of facts that would
23  suggest that he's wrong in his answers to any of these
24  questions?
25    A  No.

Page 64

1    Q  Okay. Number 3. he specifically says that --
2  describe his relationship with you and the duration of that
3  relationship and he says, "I do not have a relationship,
4  personal or professional, with the complainant," which I
5  believe is you. Is that correct?
6    A  Yes.
7    Q  Okay. And is it correct that he did not and does
8  not have a relationship, personal or professional, with you?
9    A  Correct.
10    Q  Okay. Had you ever met Mr. Sprott prior to applying
11  to the position described in vacancy announcement APB-03-
12  138MM?
13    A  No.
14    Q  Do you -- have you had occasion to meet Mr. Sprott
15  or have any dealings with Mr. Sprott between the time that you
16  submitted your application for that vacancy announcement and
17  the time that you learned that you had been deemed not to be
18  qualified for the vacancy announcement APB-03-138MM?
19    A  No.
20    Q  Do you have any reason to believe that Mr. Sprott
21  knew your race when he was assessing the applicants who
22  applied for vacancy announcement APB-03-138MM?
23    A  No, I don't.
24    MR. NEBEKER: Let me ask that we mark this as
25  Deposition Exhibit Number 9.

|  | Page 65 |
|---|---|

1     (Robinson Deposition Exhibit Number 9 marked for
2 identification.)
3     BY MR. NEBEKER:
4     Q   By the way, with respect to Exhibit Number 8, did
5 you have an opportunity to read each of the 10 different topic
6 areas that Mr. Sprott was responding to?
7     A   Yes.
8     Q   Do you see Plaintiff's Exhibit Number 9?
9     A   Yes.
10    Q   I'm sorry, Robinson Deposition Exhibit Number 9, and
11 can you tell us what that is?
12    A   It's a position description.
13    Q   And is that the position description for the program
14 analyst, GS-343-13 position that you currently hold?
15    A   Yes.
16    Q   Does it fairly and accurately depict the position
17 that you hold?
18    A   Yes.
19    Q   This is, if I understand correctly, dated 1993,
20 Exhibit 9, is it not?
21    A   Yes.
22    Q   And has your position description changed at all
23 since 1993?
24    A   No, I have not gotten a different position
25 description.

|  | Page 66 |
|---|---|

1     Q   Okay.  Is it still reasonably accurate in describing
2 what you do?
3     A   Reasonably.
4     MR. NEBEKER: Let me ask that we mark this as 9?
5     COURT REPORTER: 10.
6     MR. NEBEKER: Oops, sorry, 10, Deposition Exhibit
7 Number 10.
8     (Robinson Deposition Exhibit Number 10 marked for
9 identification.)
10    BY MR. NEBEKER:
11    Q   Ms. Robinson, have you seen Deposition Exhibit
12 Number 10 before?
13    A   Yes.
14    Q   Can you just tell us what it is?
15    A   It's a memoranda from -- oh, from Bob Wenzel, the
16 deputy commissioner to the chief.
17    Q   And is --
18    A   -- National Taxpayer Advocate -- okay --
19 commissioners.
20    Q   And is it dated February 27th, 2002?
21    A   Yes.
22    Q   Okay.  Any reason to doubt that this is a true and
23 accurate copy of a memorandum issued by the deputy
24 commissioner of Internal Revenue no February 27th, 2002?
25    A   No.

|  | Pag : 67 |
|---|---|

1     Q   Do you have an understanding as to why the, the memo
2 was issued?
3     A   I believe it was to -- that the GS-343 positions be
4 announced.
5     Q   And you see in the paragraph number b. at the bottom
6 of page 1, it talks -- it says, "Until further notice, I am
7 initiating a temporary freeze on the establishment of any new
8 positions or back filling any vacant position in the GS-343
9 and/or related occupational series at all grade levels."  Do
10 you see that?
11    A   Yes.
12    Q   Okay.  Do you have any reason to believe that Mr.
13 Wenzel was attempting to discriminate against you or against
14 members of your race when he issued the February 27th, 2002
15 memo?
16    A   No.
17    Q   Did you have an understanding as to what the purpose
18 of having the freeze was?
19    A   My understanding -- well, I mean, I didn't -- I just
20 briefed through this so you're saying as from reading this'
21    Q   Or from any other information you got while you've
22 been employed with the IRS, do you know why he did this?
23    A   I heard.
24    Q   What did you hear?
25    A   I heard because the position was vague.

|  | Pag  68 |
|---|---|

1     Q   Okay.  Do you have any reason to doubt that that was
2 the reason why it was -- there was a freeze imposed?
3     A   No.
4     MR. NEBEKER: That was 10, right?  Let me ask that
5 this one be marked as 11.
6     (Robinson Deposition Exhibit Number 11 marked for
7 identification.)
8     BY MR. NEBEKER:
9     Q   When you've had a chance to look over Deposition
10 Exhibit Number 11, if you would just identify that for us,
11 please.
12    (Pause.)
13    BY MR. NEBEKER:
14    Q   Have you had a chance to look over Exhibit Number
15 11, ma'am?
16    A   Yes, I looked over it.
17    Q   Okay.  Do you have any reason to doubt that this was
18 -- this is a true and accurate copy of a memorandum from David
19 Robison, Chief of the Appeals -- is it section or division?
20    A   What is it called now?  Function.
21    Q   Okay.  The Chief of Appeals in seeking approval to
22 authorize that Appeals be removed from the provisions of the
23 service-wide hiring freeze, any reason to doubt that's what
24 this document is?
25    A   Oh, no.

Page 69

1   Q  Okay. So if I'm not mistaken then, May 23, about,
2 on or about May 23, 2003, Dave Robison, who was your chief,
3 asked for permission to be removed from the provisions that
4 had imposed a service-wide hiring freeze in the 343 series.
5 Is that correct?
6   A  If that's what you've drawn from this.
7   Q  Okay. Do you have any reason to doubt that that's
8 what this is?
9   A  No.
10   Q  Okay. And then it's got, down there where Bob
11 Wenzel would approve it, it's got the S mark for signed and
12 then it's dated June 9th, 2003, correct?
13   A  Correct.
14   Q  So do you have any reason to doubt that on or about
15 June 9th of 2003, Bob Wenzel approved the request that Appeals
16 be removed from the provisions of the service-wide hiring
17 freeze of the 343 series?
18   A  No.
19   Q  Okay. Do you have any reason to believe that on
20 June 9th, 2003, the action taken was in any way taken to
21 discriminate against you by virtue of your race?
22   A  No.
23   Q  Do you have any reason to doubt the accuracy of the
24 other information contained in this May 23, 2003 memo, Exhibit
25 11?

Page 70

1   A  No.
2   Q  Do you have Exhibit 6 in front of you? It's the --
3 I think it's the exhibit I think you'll see there,
4 Complainant's responses to Complainant's First Set of
5 Discovery Requests?
6   A  Yes.
7   Q  On page 8 of Complainant's Responses, you have
8 indicated that there were 343 series employees converted. Can
9 you describe what you mean by that?
10   A  At some point, and I'm not sure when it was, Appeals
11 converted to some people from the 343 series to other series.
12   Q  I see. So for instance, say I go from a 343 to a
13 930 series?
14   A  Correct.
15   Q  Okay. And do you have any reason to doubt that
16 these, one, two, three, four, five, six, seven people that
17 you've identified as having gone from a 343 series to another
18 series, do you have any reason to doubt that those people had
19 performed in the new series, say the 930 series or the 512
20 series prior to being converted to that series?
21     MR. DAY: Objection, calls for speculation. You can
22 answer.
23     THE WITNESS: I'm not sure if all of them have.
24     BY MR. NEBEKER:
25   Q  Okay. Let me ask it this way. Do you know if

Page 71

1 Marion Rieder had performed in the 930 series position before
2 being converted from the 343 to the 930 series?
3   A  I don't know.
4   Q  Do you know whether Sandy Cohen had been in a 930
5 series or a 512 series before being converted into a series of
6 the 343 series?
7   A  No.
8   Q  Do you know the work history of Gene Perdue such
9 that you could indicate whether or not Gene Perdue was a 930
10 Appeals officer prior --
11   A  Yes, because he and I were 930s together.
12   Q  Okay. And so, if he had been changed from a 343
13 series to 930 series, that would make sense because he had had
14 prior service in the 930 series. Is that fair to say?
15   A  Yes.
16   Q  And Michele Topol?
17   A  I don't know.
18   Q  Do you know anything about the -- well, I guess let
19 me finish the question or ask a complete question. Do you
20 know Michele Topol's work history?
21   A  No.
22   Q  Okay. Do you know Jim Skunda's work history?
23   A  Yes.
24   Q  Okay. And can you tell me whether Jim Skunda had
25 worked in any other, say a professional series like the 930

Page 72

1 series or the 512 --
2   A  Yes, he has.
3   Q  -- series prior to being moved to the professional
4 series for the 343?
5   A  He was an Appeals officer.
6   Q  Okay. And what was the Appeals officer position?
7   A  We, as Appeals officers, did taxpayer hearings.
8   Q  Okay. And as a -- do you know what series that
9 would have been?
10   A  930. That is what the 930 series is.
11   Q  That's what I wanted to know.
12   A  Before the conversion.
13   Q  So he was a 930, then became a 343, and then became
14 a 930 again?
15   A  Correct.
16   Q  Okay. And Jacqueline Harris?
17   A  I don't know.
18   Q  Do you know if she had any prior experience in
19 specifically the 930 series?
20   A  I don't know.
21   Q  And do you know anything about the history of
22 Charles Dazols prior to being transformed from a 343 series to
23 a professional series?
24   A  No.
25   Q  And then, the following paragraph in your response

Page 73

1  you say, "Complainant believes the following white employees
2  were promoted to GS-14 position and as a result they were
3  treated differently than Plaintiff." Do you know if any of
4  those people were GS-14s -- I take it this four people,
5  Slaughter, White, Stipes and Cichaski were in Appeals. Is
6  that right?
7      A  Correct.
8      Q  Okay. And do you know how many of them were in
9  Appeals -- were at the GS-14 level before they came into
10  Appeals?
11     A  I don't believe any of them.
12     Q  And what specifics can you give me about Robert
13  Slaughter's work history?
14     A  Robert Slaughter came from — I believe he has a
15  collection background.
16     Q  And what is it that you base your belief that he was
17  not a GS-14 when he came into Appeals?
18     A  Because when he came in he worked with me as a 13.
19     Q  Had you seen his paperwork before?
20     A  No.
21     Q  His SF-50, or anything else that indicated what his
22  particular grade was?
23     A  No, but we discussed it.
24     Q  And then what about Joan, is it White or Wright?
25     A  Wright.

Page 74

1      Q  W-r-i-g-h-t?
2      A  Yes.
3      Q  What can you tell us about Joan Wright's work
4  history prior to coming to Appeals?
5      A  I don't know. I didn't know her before.
6      Q  Okay. And Kathy Stipes?
7      A  I don't know.
8      Q  What can you tell me about her work history before
9  coming to Appeals?
10     A  I can't tell you anything.
11     Q  And Jean Cichaski, what can you tell me about Jean
12  Cichaski's work history prior to coming to Appeals?
13     A  I don't know.
14     Q  So the information you have then would be on Robert
15  Slaughter, that he had been a 13 when he arrived in Appeals.
16  Is that right?
17     A  I believe so.
18     Q  Do you recall when Mr. Slaughter arrived in Appeals?
19     A  No, I can't give you a date.
20     Q  Can you give us a decade?
21     A  Not right offhand.
22     Q  If you had to rely on something to assure yourself
23  of the date he arrived in the GS level he held, would you rely
24  on the -- well, his official personnel folder and the records
25  in there?

Page 75

1      A  Would I rely on it?
2      Q  Yes.
3      A  If I saw it?
4      Q  Yes.
5      A  Sure.
6      Q  That would, that would be a safe way to, to gather
7  the information, would it not?
8      A  Right.
9      Q  Okay. Now, Ms. Robinson, do you believe that David
10  Robison intentionally discriminated against you on account of
11  your race?
12     A  I, well, I believe that he as the chief of the
13  office allowed the atmosphere of racial discrimination to
14  continue.
15     Q  Did you ever speak to Mr. Robison about the racial
16  discrimination that you perceived in the Appeals section or
17  the Appeals office?
18     A  No.
19     Q  Do you know of anyone who did raise with Mr. Robison
20  their belief that there was a sense of racism in Appeals?
21     A  I do not recall anyone specifically at this time.
22  The office fostered that there was a belief, not only with
23  myself but many blacks in that office, so I don't know if
24  someone else may have spoken with him about it.
25     Q  Who are the other blacks in the office that you

Page 76

1  believe felt that there was racial discrimination being
2  practiced in Appeals?
3      A  Oh, okay. Darlene Marshall, Alese (phonetic) -- I'm
4  trying to think of what her last name is. I may want to get
5  the -- Fearington.
6      Q  Can you give us a best guess?
7      A  F-e-a-r-i-n-g-t-o-n.
8      Q  Is it F-a or F-e?
9      A  F-e-a-r.
10     Q  Thank you.
11     A  Dorsena Bowen, I believe it may be, may be --
12  Mildred, that may not be her name. I need to give you -- I'm
13  trying to recall what her name is.
14     Q  We'll leave her last name blank for now. Are there
15  any others because I'm going to go back over them and ask you
16  --
17     A  That's all I'll name right now.
18     Q  Okay. Now, Darlene Marshall, can you tell us what
19  facts she -- you believe she has that would support the
20  conclusion that there was racial discrimination being
21  practiced in Appeals?
22     A  Well, I mean, I can't give you all the facts that
23  she may have but I know in discussions with her it's the
24  general treatment, the difference in the promotions in the
25  office, the general treatment where blacks are treated

## Page 97

1 where it says you've identified Beverly Ortega Babers as the
2 official responsible for selecting Ms. Jones for the position
3 at issue? Okay. So do you believe then that Ms. Babers was
4 the one that made the selection of Ms. Jones for the position
5 advertised in vacancy announcement APB-03-138MM?
6    A  I think there's something that -- in there that said
7 that. I just read it.
8    Q  Okay.
9    A  Was it there, -- Robison's unsworn deposition or
10 whatever declaration --
11    Q  I know he said he didn't do it but I know --
12    A  I think he said she did.
13    Q  Do you have any reason to doubt that she did it?
14    A  No.
15    Q  Okay. And do you have any reason to believe that
16 Ms. Babers discriminated against you on the basis of race when
17 she selected Ms. Jones, that she intentionally discriminated
18 against you based upon race?
19    A  I can't answer that.
20    Q  Is that because you don't have the facts?
21    A  I -- okay, ask the question again.
22    Q  I want to make sure the reason you couldn't answer
23 it isn't because I pronounced it wrong.
24    A  Okay.
25    Q  Let me, let me restate it. Do you have any specific

## Page 98

1 facts upon which you can rely for the conclusion that Ms.
2 Babers intentionally discriminated against you on account of
3 race in making the selection decision to fill the position
4 announced in vacancy announcement APB-03-138MM?
5    A  No, I do not have facts.
6    Q  And do you have any specific facts to support a
7 similar conclusion with respect to Mr. David Geber?
8    A  Do I have facts to support it?
9    Q  Yes, that Mr. Geber somehow played a role in filling
10 the vacancy announcement APB-03-138MM and that he
11 intentionally discriminated against you on account of your
12 race in doing so?
13    A  Do I have a facts meaning do I have paper in hand,
14 something to prove it? Is that what you mean by facts?
15    Q  Or are you aware of any knowledge you have from
16 anywhere that would prove that Mr. Geber discriminated against you for
17 filling the position and he did so -- he filled it with Ms.
18 Jones because of your race or her race?
19    A  I don't know if I know how to answer that question.
20 I guess what I'm trying to figure out is what facts
21 do you have that would suggest that Mr. Geber discriminated
22 against you in filling the position announced in vacancy
23 announcement APB-03-138MM?
24    A  Should I, at this point --
25    Q  Just sitting here today, what do you know of that

## Page 99

1 would show --
2    A  Oh --
3    Q  -- that Mr. Geber --
4    A  Well --
5    Q  -- was a discriminator when he played whatever role
6 he played in filling that vacancy announcement?
7    A  Well, Mr. Geber knew that I had performed the job
8 for four years -- well, for several years. Mr. Geber knew
9 that I performed the job and performed it well. He gave me a
10 memo from someone who had -- a letter of -- accommodation from
11 someone because of some of the services I performed while he
12 was my manager because for a short period of time while I had
13 the position, he was my manager so he knew my qualifications.
14       He knew that I did the job. He knew that I did the
15 job well. He knew I was black. He knew I qualified for the
16 position. I believe he had a role in determining what job
17 series that job was announced under to make sure on paper it
18 appeared that I didn't qualify for it.
19    Q  Okay. And what do you base that on?
20    A  What do I base the fact --
21    Q  Yeah, what facts do you have to suggest that Mr.
22 Geber played a role in selecting how the vacancy announcement
23 -- the series for which the vacancy announcement APB-03-138MM
24 would be advertised?
25    A  Because that's generally how it's done. I mean,

## Page 100

1 well, I'm, you know, I'm trying -- I don't have a history of
2 appeals and when they changed job series but the person who
3 the job would -- the person who would be working the job would
4 probably have a lot to input on what series of job would fall
5 out on.
6    Q  And would it change your belief about how much of a
7 role he could play if he were told you can't fill it at the
8 GS-14 level in a 343 series?
9       MR. DAY: Objection, calls for speculation. Go
10 ahead.
11       THE WITNESS: No, that wouldn't change it.
12       BY MR. NEBEKER:
13    Q  And why not?
14    A  Because it could have been changed to something that
15 wasn't that specific. The position was and is an analyst
16 position. It's not a revenue agent position. The position is
17 the analyst over the position, not a person working --
18    Q  And is this based upon how you would fill the
19 position? Is that --
20    A  Yes.
21    Q  -- how you would fill a position?
22    A  Well, yes.
23    Q  Okay. And is it that you disagreed with the way the
24 position was in fact filled? You think that what you're saying?
25 filled with a program analyst. Is that what you're saying?

Page 101

1  A  It's a program analyst position.

2  Q  And it -- you think it would be better filled with

3  somebody in a 343 series?  Is that correct?

4  A  It is a program analyst position.  The position has

5  never changed.  The only thing that was changed is how they

6  classified -- not even how they classified it.  Is the number

7  of the job -- none of the positions, nobody's job changed

8  throughout this process.  The only thing that changed was what

9  number they put on it.

10  Q  Did the -- didn't the, the position description

11  change somewhat?

12  A  They may have made -- they probably -- if they had

13  to write it up, they had to write something --

14  Q  Right.  And your --

15  A  -- because a 512 revenue agent position is not what

16  that job is, so they had to change it in order to make a fit

17  or nobody in the office would have qualified for it.

18  Q  And the --

19  A  In fact --

20  Q  And by making it the 512, they made it a less vague

21  description, did they not?

22  A  No, I don't know.

23  Q  The position description.

24  A  No, I don't believe so at all.  Matter of fact, I

25  don't believe after that person held it anybody else in the 5

Page 102

1  series held that job.  Everybody else in our office who

2  handled -- could work that job, but either 930s or 343s.

3  Q  Well, a 930 is a technical position as well, is it

4  not?

5  A  No.  The 930 is an appeals officer position, but

6  when they changed the series of the 343s to a 930, the

7  position didn't change.  The 930 -- they had to have written

8  up a different position description that as well because a 930

9  position, a true 930 position is an appeals officer, someone

10  who works cases, handles disputes, which none of us do.

11  Q  At the 512 series, is it true that there was a

12  requirement that one have tax computation abilities at the

13  next lower level?

14  A  No, no it don't.  A 512 position is a revenue agent

15  position.

16  Q  And you don't believe that a revenue agent position

17  has any difference from a 343 series position with respect to

18  any need for tax computation abilities.  Is that true?

19  A  No.  A revenue agent position is a position help in

20  examination.  Not even Appeals -- you know, we may have had

21  one or two 512s.  A revenue agent, what a revenue agent does

22  in the field is they audit business tax returns is what a

23  revenue, a true revenue agent position is.  Now, Appeals may

24  have adapted the 512 position to then put other people in, but

25  a revenue agent position isn't a position that Appeals had,

Page 103

1  generically had.  It's an examination.  It's a person who

2  people who examine business returns.

3  Q  Are you familiar with all the requirements of the

4  position description in the 512 series?  Can you rattle them

5  off please?

6  A  I think they have -- well, that changes over the

7  years so now, I don't know what it is now.

8  Q  Is it fair to say that it may have a more technical

9  requirement than the position description for the 343 series?

10  A  It may require more accounting.

11  Q  Okay.  And could it also, could it also be thought

12  of as requiring more tax computation work?

13  A  No.

14  Q  And do you have any reason to believe that the 512

15  series was -- any specific facts to support the conclusion

16  that the 512 series was selected in this case so that you

17  couldn't apply for the position?

18  A  Right.  Do I have facts to support it?

19  Q  Yes.

20  A  No.

21  Q  Now, with respect to Ms. Jones, do you have any idea

22  whether she was known to Mr. Sprott prior to applying to the

23  position at issue in this case?

24  A  No, I don't know.

25  Q  Do you have any reason to doubt that Sheila Jones

Page 104

1  had performed at the 512 -- in the 512 series at the 13 level

2  for more than a year?

3  A  No.

4  Q  What can you tell us about Sheila Jones'

5  qualifications for the position at issue in this case?

6  A  I can't tell you about her qualifications.

7  Q  Did you work with her after she took the position?

8  A  No.

9  Q  Are you aware of any instances where Mr. Geber

10  secured permission to hire someone while there was a hiring

11  freeze in the 343 series such that he hired or promoted a

12  white employee to a 343 position at the 14 level?

13  A  No.

14  Q  I'm looking at Exhibit 6, which is your discovery

15  responses.  On page 10, it says, "Any person Defendant

16  selected for the GS-512-14 position who did not have at least

17  one year of prior experience at the GS-13 level within a 512

18  series position was treated differently than plaintiff."  This

19  is in answer to interrogatory number 2, I believe, on page 10.

20  Q  Okay.

21  Q  And I was just going to ask if you were aware of any

22  people, any names of individuals whom you believe defendant

23  selected for the GS-512-14 position who did not have one year

24  prior experience at the 13 level or the 512 series position?

25  A  I'm not aware.

## Page 109

1 they have direction in how they are to do their job.
2     Q  Okay.  And the particular group of people, you say
3 the names of the people changed, correct?
4     A  Yeah.
5     Q  Okay.  Did the name of their position change?
6     A  They were called auditors at one point, yes.
7     Q  Okay.
8     A  They were called --
9     Q  So they had been called auditors and now they were
10 called technical analysts?
11     A  Yes.
12     Q  Okay.  And as auditors, are you saying they were
13 making calculations based on broad rules that were implemented
14 on appeal?
15     A  They were making -- when an Appeals officer makes a
16 determination on a case, a findings on a case, there's
17 normally computations that have to be made.  The people, the
18 auditors, technical analysts, they were the ones who made the
19 computations on a lot of the cases.
20     Q  Now, are you familiar with what the position
21 description of the auditors, what was, what was in that?  Do
22 you remember each of the elements?
23     A  No.
24     Q  Okay.  Do you remember what the -- each of the
25 elements are in the position description for the technical

## Page 110

1 analyst position?
2     A  No.
3     Q  Okay.  When you were doing for the four years what
4 you believe was the same position as you were applying for
5 here, what were you called?
6     A  A program analyst.
7     Q  Okay.  And what was the -- was it a  343?
8     A  Yes.
9     Q  Series, right?
10     A  Correct.
11     Q  Okay.  And what grade level were you being paid at
12 during those four years?
13     A  A 13.  I'm not sure if at any of that time the
14 positions were 343 -- 345s.  It may have been a 345 at some
15 point.
16     Q  And what was the title for that 345?
17     A  Program analyst.
18     Q  Still program analyst?  If I recall correctly, the
19 512 is a, is a revenue agent program analyst, isn't it?
20     A  Exactly, because it's not a regular agent position.
21     Q  Okay.  Was there -- when they refer to it they use
22 the four different words.  Is there a similar addition to the
23 program analyst title that applies in either the 343 or the
24 345 series to distinguish them?
25     A  No.  When they took the revenue agent position and

## Page 111

1 decided that that's what they were going to call some of the
2 program analysts, they had to put program analyst behind it
3 because it's not a revenue agent position.  It's not an
4 Appeals officer position.  They had to put that back there to
5 distinguish that position versus the real revenue agent or
6 appeals officer position.
7     Q  Okay.  It's like a hybrid, somewhere between a
8 revenue agent and a program analyst?
9     A  No, but it's the same position.  They just had to
10 change the name.  They just changed the name.  It's the exact
11 same position.
12     Q  Except that you -- I thought you said earlier that
13 they had included with the position description a requirement
14 for some more technical responsibilities?
15     A  No, you're talking about -- no, I'm talking about
16 the 512 position versus the 343 position.  There was a
17 difference in the requirement.
18     Q  Are you familiar with how the position description
19 for the 512 reads?
20     A  No, not exactly.
21     Q  So you don't know for sure if they have additional
22 technical requirements for the 512 --
23     A  Well --
24     Q  -- they didn't have for the 343, right?
25     A  The revenue agent position has always had more

## Page 112

1 strict requirements than the 343 position.
2     Q  Okay.  Like accounting or tax computation --
3     A  They had more -- there were more -- no, tax
4 computation is not an -- well, in a regular revenue agent
5 position there's nothing to do with tax computations other
6 than a revenue officer may occasionally have to do the
7 computations.  It has nothing to do with tax computations.
8     Q  But they'll sometimes have to do them?
9     A  Well, just like a tax auditor or anybody else will
10 sometimes have to do them, yes, but it --
11     Q  But as a program analyst you didn't have to do them?
12     A  As a program analyst, correct, because we don't
13 examine tax returns.
14     Q  Gotcha, okay.  Can you tell me who it was that you
15 supervised when you believe you were performing the functions
16 of the position that was advertised in vacancy announcement
17 APB-03-138MM for those four years?
18     A  Okay.  What we did and, and if you read what it says
19 that we had to do --
20     Q  What what says?
21     A  Okay, okay.  You're saying who I had to supervise?
22     Q  Right.
23     A  Okay.
24     Q  Did you supervise anybody for those four years?
25     A  Okay.  No, not directly.  We had to, though,

Page 133

1  information, suggests turned it down?
2      A  No, I don't know, but it -- matter of fact, I
3  believe I was told that Dave works it.
4      Q  And do you know who told you that?
5      A  I don't remember.
6      Q  And you don't have any personal knowledge of how
7  that got, how the 14 got turned down or ultimately created.
8  Is that correct?
9      A  Correct.
10     Q  Just one other thing.  My recollection was you
11 indicated that Mr. Cohen had said that they got you again.  Do
12 you recall that?
13     A  Yes.
14     Q  Okay.  Can you tell me the circumstances of that
15 conversation?
16     A  Well, we were discussing -- oh, it was after a
17 meeting we had.  There were the 930 positions also I'm
18 determined to not be qualified for and we were at a meeting.
19 I'm trying -- I don't want to confuse -- I'm confusing
20 something.  I was in my office and I went past his office.  I
21 may be getting things confused.
22     Q  Who is Mr. Cohen?  Let's start with that.
23     A  He's an analyst.  He's another analyst, a 14,
24 caucasian male.
25     Q  343 series?

Page 134

1      A  I think they changed him.
2      Q  Do you know what series he is now?
3      A  I believe a 930.
4      Q  And he's not a supervisor, right?
5      A  No.
6      Q  And what do you recall about this conversation?
7      A  We were talking about me not being selected for
8  another position in the office.
9      Q  Oh, but not the one that, not the one that was
10 advertised under vacancy announcement APB-03-138MM?
11     A  I don't -- I need to go back and check but I was
12 thinking was a different position.
13     Q  Okay.  And -- well how did the conversation go?
14     A  Well, I think there was an announcement as to who
15 got the positions and he said, oh, they got you again, huh?
16     Q  And do you know what position it was?
17     A  I believe it was one of the 930s that I applied for.
18     Q  Has anyone ever recommended to you that you take a
19 detail into the 930 series or a 512 series for a year?
20     A  Yeah --
21         MR. DAY:  Objection, to the extent that question may
22 involve any conversation between you and your attorneys you
23 are directed not to answer it.  With respect to any
24 conversations with anybody else, you can go ahead and answer.
25         THE WITNESS:  No.

Page 135

1          BY MR. NEBEKER:
2      Q  So excluding your attorneys, no one has ever
3  suggested to you that you take a detail into the 930 series?
4      A  No.
5      Q  And no one's ever suggested that you take a detail
6  into the 512 series?
7      A  No.
8      Q  Okay.  Do you know if -- do you recall ever having
9  any conversations -- I'm sorry, who is your current
10 supervisor?
11     A  Current supervisor is Chinsy --
12     Q  Okay.  Oh, and was Mr. Allison, Jeff Allison your
13 supervisor for a period of time?
14     A  Yes.
15     Q  Okay.  Did Mr. Allison ever recommend to you that
16 you attempt to get experience in either the 930 series or the
17 512 series through a detail?
18     A  No.
19     Q  Or through some other method to temporarily go in o
20 a 930 or a 512 position?
21     A  No.  He knows I've already done the job for years.
22     Q  Have you ever, have you ever --
23     A  -- change.
24     Q  Have you ever done the 930 position at the GS-13
25 level?

Page 136

1      A  For what our office does?  Yes.
2      Q  You have performed -- have you ever held a 930
3  position at the 14 level?
4      A  No.
5      Q  Have you ever held a 512 position at the 14 level?
6      A  No.
7      Q  Okay.  And Mr. Allison has never recommended to you
8  that you attempt to do so?
9      A  No.
10     Q  Okay.  Have you ever had any discussions with Mr.
11 Allison about how to advance your career?
12     A  Well, when I was not selected -- when I was
13 determined to not qualify for a 930 position, Mr. Allison told
14 me that I needed to rewrite my job -- my 170 -- my job
15 application and that maybe what it was was that I didn't put
16 in it as specifically as I should have my tax background is
17 what he said.
18     Q  And did you try that?
19     A  Well, I haven't applied for another position.
20     Q  I see.  Do you know if any have become available?
21     A  On the 930s?
22     Q  Yes.
23     A  Yes.  Matter of fact, yes, I -- yes it did and I did
24 apply.  I think I did put another -- put a couple lines in it
25 concerning having tax background, you know, put a -- that'

# Qualifications Record

**1. NAME**

Robinson, Pamela

**2. NATURE OF ACTION**
APN-RPN-03-138MM

| **4. POSITION TITLE, GRADE AND SERIES** | **3. LOCATION OF POSITION** |
|---|---|
| Internal Revenue Agent GS-0512-14 | DC, LA, or St. Louis |

**5. QUALIFICATION STANDARD USE**
QSH

**6. TIME REQUIRED BY STANDARD (Specify years or months)**

| **6.A. TOTAL** | **6.B. GENERAL** | **6.C. SPECIAL** | **6.D. IN NEXT LOWER GRADE** | **6.E. IN SECOND LOWER GRADE** |
|---|---|---|---|---|
| 1 | 0 | 1 | GS-13 | |

**19. ADMINISTRATIVE OR SUPERVISORY EXPERIENCE REQUIRED BY STANDARD**
☐ YES ☐ NO

**8.A. WRITTEN TEST REQUIRED:** ☐ YES ☐ NO

**IN NEXT LOWER GRADE:**

**8.B. IF "YES," GIVE TITLE, ELIGIBLE RATING, AND DATE.**

**IN SECOND LOWER GRADE:**

| 9. FROM | TO | EXPERIENCE AND TRAINING CREDITED (Including Mil. Ser.) TITLE, SERIES & GRADE. (IF NON-GOVERNMENT, GIVE TITLE & SALARY) | GEN'L YRS-MOS | SPEC. YRS-MOS |
|---|---|---|---|---|
| 10/01 | pres | Analyst - GS-343-13 | | |
| 10. 7/28 | 10/01 | " - GS-343-13 | 14 | 14 |
| 11. 4/94 | 7/28 | " - GS-343-13 | 14 | |
| 12. 6/91 | 4/94 | " GS-343-13 | 14 | |
| 13. 12/89 | 6/91 | " GS-343-13 | 14 | |
| 14. 6/87 | 12/89 | " GS-343-13 | 14 | |
| 15. 7/85 | 6/87 | AO GS-930-12 | 14 | |
| 16. | | SUBSTITUTION ALLOWED Supv. N GS-526-11 | 14 | |
| 17. | | | 14 | |

**18. REMARKS**

TIG _____

SPECIALIZED _____

SPF _____

**TOTAL** 14

EXHIBIT
Robinson
2
TS4
PRO/GAO 800-831-6868
9/12/06

**20. QUALIFIED** ☑ YES ☐ NO

**20. SIGNATURE OF REVIEWER**

**21. DATE**

FORM 2005 (REV. 11-81)    U.S. GPO: 1965-0-461-505/32
DEPARTMENT OF TREASURY  INTERNAL REVENUE SERVICE

105

*the S/S*

# APPLICATION FOR PROMOTION/REASSIGNMENT

Name (Last, First, Middle)

Robinson, Pamula

| Social Security Number | B-03- | | Check Appropriate Box For Consideration (See Instructions) |
|---|---|---|---|
| 138NM | 5/19/03 | Closing Date | ☐ One-Time |
| | Number | | ☒ Continuous |
| | | | ☐ Management Careers Program |

**A–PRESENT POSITION**

**1. Title, Series and Grade**

Program Analyst GS-343-13

**3. Employing Office, Address, and Symbols**

IRS   Chief Appeals
1099 – 14th St., NW
Washington, DC 20005

| 2. Office Phone | 8. Title |
|---|---|
| 202  694-1859 | Program Analyst |

**B–POSITION FOR WHICH YOU WISH TO BE CONSIDERED**
(List only one kind of position and one grade)

| 10. Desired Location (Place "X" to indicate only one organization) | | 9. Series and Grade |
|---|---|---|
| NOX | National Office | GS-512-14 |
| | Regional Office | |
| | District Office | |
| | Service Center | |
| | Detroit Computing Center | Specify which Region, District, or Service Center— |
| | Martinsburg Computing Center | |

**4. Supervisor's Name**

Felise Izen

**5. Office Phone**

818  242-7703

| 11. Desired Post of Duty (See Instructions) | 12. Desired Division and Branch |
|---|---|
| Washington, DC | National Office |

MANAGEMENT CAREERS APPLICANTS–DO NOT COMPLETE BLOCKS 6 AND 7

6. Specify training you have had appropriate to position applied for. (Additional space on reverse side if needed.)

7. Incentive Awards Received and Date (Additional space on reverse side if needed.)

CFC Leadership – 2001         Performance 2000      Performance – 2001    Performance – 2002

Deputy Commissioner – 2001    Performance 2000

*Pamula Robinson*

Employee's Signature          (See Reverse Side for...)       *5/1/03*       Supervisor's Initials      Date

Form 4539 (Rev. 6-91)
Cat No. 41708M

106

Application Standard

☐ Meets Basic Eligibility Requirements Now
☒ Does Not Meet Eligibility Requirements

**Reason:** Sync -

**Last Promotion Date**

De ... ... ...space below - Personnel Office Use Only

| | Indicate Written Test Series, if Required | Date Test Taken | Date Notified | Personnel Specialist | Office Phone | Test Results |
|---|---|---|---|---|---|---|

Additional space for training and awards received. (*Please use corresponding number on reverse side.*)

## PRIVACY ACT STATEMENT

**GENERAL**

This form is not contained within a system of records, however, as the form is soliciting personal information, a statement is included. This statement is provided for individuals applying for reassignment or promotion under the Internal Revenue Service promotion plan.

**AUTHORITY**

The authority to collect this information, including the SSN, is derived from one or more of the following: 5 U.S.C. 3301 and 3302; Executive Orders 10577 and 9397.

## PURPOSES AND USES

The information you supply on this form as well as other information will be used to determine your qualifications for the position you are applying for. The SSN will be used to ensure proper identification. The information will be used by officials with IRS who have a "need to know." Disclosure may also be made to the Office of Personnel Management (OPM) under the requirements of the Federal Personnel Manual (FPM).

**EFFECTS OF NONDISCLOSURE**

Your providing the requested information is voluntary, however, your failure to do so may result in your application not being processed.

*U.S. Government Printing Office: 1995 — 384.082/20043

67

# MERIT PROGRAM QUESTIONNAIRE

(It is the applicants responsibility to accurately and thoroughly complete this form.) A separate MPQ should be completed for each position for which you wish to be considered.

Purposes and Uses: The information you furnish on this form as well as other information that is developed will be used to determine your qualifications/potential for the position for which you are applying under the Merit Promotion Program. The information will be used on a "need to know" basis by Internal Revenue Officials. The information may also be provided when appropriate, to the Office of Personnel Management under the routine uses listed on page 45239 of the Federal Register, Vol.No.200, 2200 Thursday, October 14,1976. The information contained on this form is part of TR/IRS 36.003, General Personnel Record.

## Privacy Act and Public Burden Statements

Section 1104 of Title 5 allows the Office of Personnel management to authorize other Federal agencies to rate applicants for Federal jobs. We need the information you put on this form to see how well your education and work skills qualify you for a Federal job.
We must have your Social Security Number (SSN) to keep your records straight because other people may have the same name and birth date. The SSN has been used to keep records since 1943, when Executive Order 9397 asked agencies to do so. The information we collect will be used for employment purposes, including checking references, or establishing suitability for employment, may be given to Federal, State and local agencies in response to lawful requests for information or when necessary to report apparent violation of law, or other lawful purposes. Giving us your SSN or any other information is voluntary. Failure to provide this information may effect your ranking among other applicants.
Public burden Reporting for collection of information is estimated to vary from 20 to 120 minutes with the average of 50 minutes per response, including time for reviewing instructions, searching existing data sources, gathering data needed and completing and reviewing the collection of information.

**1.Position,series and grade for which you are applying.**
Program Analyst GS-512-14

**2.Announcement Number**
APB-03-138MM

**3.Closing Date**
5/19/03

**4.Name (last)** Robinson  (First)  (Mi) Pamula

**5.Current Position**
Program Analyst

Mailing Address
3902 - 71st Avenue

Series and Grade
343-13

Date of Last Promotion
December 1989

| City | State | Zip Code |
|---|---|---|
| Hyattsville | MD | 20784 |

Function and Office Code Symbols

**6.Telephone Number (Including area code)**

Day: (202) 694-1859    Evening: (301) 772-1764

National Director of Appeals C:AP:SBSE
**7.Social Security Number**

**8a. High School or highest grade completed/Vocational/Trade/Other**
Degree

| Name of College or University,Location | Attended From To | Major: Accounting Credits Completed | Degree and Date |
|---|---|---|---|
| Univ. of MD, College Park | 6/70 - 6/74 | 12 Acctg. credits | |
| Prince Georges Comm. College | 1/88 - 6/89 | 27 Acctg. Credits | B.A. Business Administration |
| c.Chief Undergraduate Subjects  Credits Completed | | d. Chief Graduate Subjects  Credits Completed | |
| Business Administration | | | |

ATTACH TRANSCRIPTS FOR POSITION WITH POSITIVE EDUCATIONAL REQUIREMENT

**9. Other Formal Training or Course (Do not attach copies of training certificates)**

| Type of Training/Course,eg: OPM,IRS, College, Army, etc | Location | Title | Date From To |
|---|---|---|---|
| Tax | IRS | Tax Auditor Phases 1-3 | |
| Tax | IRS | Revenue Agent Phase III & IV | 9/74 - 9/76 |
| Appeals Officer | IRS | Appeals Officer | 3/92 - 4/92 |
| EEO | IRS | EEO Counselor's Training | 3/89 |
| Basic Instructor | IRS | Basic Instructor Training | 2/90 |
| Tax | IRS (NYU Grad) | Financial Products | 2/92 |
| Computer | USDA Grad School | Microsoft Word, Excel, Power Point, Access | 6 - 11/96 |
| Tax | IRS (NYU Grad) | Partnership Taxation 1 | 6/96 |
| | | | Current |

**10. Experience (Start with most recent significant position held and list all relevant federal and non-federal experience within the last 10 years.)**

FORM 9686 (1-95)    Catalog 21010Y    Department of the Treasury- Internal Revenue Service

68

| Date (Mo/Day/Yr) | | Position (Show organizational title and activity or function. Otherwise show agency or firm. Use additional sheet if necessary) Program Analyst | Series and Grade | Salary (Per Hour/Year) | Average No. of hours per week |
|---|---|---|---|---|---|
| From | To | | | | |
| Oct 2001 | Current | Chief, Appeals | GS-343-13 | 84,218    yr. | 40 |

Your Immediate Supervisor: Felise Izen     Telephone Number: (313) 242-8337

DESCRIPTION OF DUTIES. (USE ADDITIONAL SHEETS IF NECESSARY; DO NOT ATTACH POSITION DESCRIPTION.)

Abusive Scheme Coordinator - This year I helped Appeals start two new programs, one of which was Abusive Offshore Credit Card Schemes. Regarding the Offshore project I: 1)Attended Off Shore Credit training to assist in managing this emerging issue; and 2) Began an Off Shore Credit settlement matrix to get this high priority program off the ground quickly. I have attended several high level meetings in order to help Appeals formulate a settlement position on these project cases. My initial attempt to create a settlement matrix for off shore credit cases was quite good and imaginative. Without actually seeing any cases I was able to come up with a concept that was an excellent starting point for our discussions. I performed this task without assistance.

Training Coordinator – As the group training coordinator I help each analyst get information regarding their own training history. I also help them locate training available in their program areas. I arranged a training session for electronic research and CENTRA which was beneficial to and appreciated by the entire group. I review Form 182 – Outside Training Request forms to see if it appeared the request should be paid for from outside training funds. I keep track of the outside training funds.

Web Reviewer - I periodically review the web pages to look for information that may be helpful to management or fellow employees to project new types of casework coming to Appeals. I am involved with on-going research of the Operating Divisions Web pages. The information that I learn will help Appeals project future workload.

KITA Coordinator – This year I helped us start two new programs, one of which are the claims involving "Killed in Terrorist Actions" (KITA) cases. I am assigned the analyst coordinating these cases. These cases though few are quite sensitive. I had to: 1) Research issues. 2) Provide field personnel with procedures for handling these cases; and 3) Establish contacts in Compliance for updates as necessary.

Member of the SPOC Team – General Appeals contact person for the Notice Clarity replacement team. I worked with the group to establish Appeals procedures for notices submitted for changes to language. I provide assistance for the review questions in my area.

Member of Service Center Team – As a member of the Service Center team I scanned the SBSE web sites and summarized my findings and provided them to the managers. I coordinated a meeting with Appeals management and the SBSE transition team before they disbanded to make sure Appeals had the latest information on SBSE's campus transactions.

Headquarters Appeals Combined Federal Campaign (CFC) 2001 Coordinator - As the CFC Coordinator I designed a program that would encourage my fellow employees to give their money to the eligible organizations under the CFC program. I sent preparatory information then had a 'kick-off'. I then designed a plan to keep employees interested in the program so that we would meet our campaign goal. Events and strategies were implemented throughout the campaign to encourage employees to give. The campaign was successful. Headquarters Appeals employees contributed over 200% of our goal. We were again a recipient of the President's Award based on our contributions to the CFC Program.

Employment Tax Coordinator - I advise and assist field personnel with questions and procedures that may arise in performing their duties. I wrote an Appeals Employment Tax section for the IRM. I am the liaison between the

FORM 9686   (Rev. 9-95)     Catalog 21010Y     Department of the Treasury- Internal Revenue Service

169

employment tax deposits resulting from unemployment compensation payments. I review IRM and other procedural mate al from Chief Counsel and TE/GE. I prepare Friday Report articles to alert the field of changes that may affect t rm until the changes can be incorporated in the IRM and/or official instructions are issued. mpleted the i M on Employment Tax issues. This is the first time this information has ever been in the ppeals manual.

Interest Abatem nt Coordinator - I advise and assist field personnel with questions and procedures that may arise in performing ther lutres. I updated the Appeals IRM to reflect changes in the law and procedures. I review IRM and other procedura material from Chief Counsel and Compliance. I prepare Friday Report articles to alert the fiel d of changes that ma affect them until the changes can be incorporated in the IRM and/or official instructions are issued.

Administrative osts Coordinator - Appeals is the function responsible for evaluating and processing Administrative ost claims for the IRS. I am responsible for advising and assisting field with questions and procedures that may arise in performing their duties. I updated the Appeals IRM and reorganized it to make the procedures easi to understand. I review the files sent in from the field to see if the taxpayer meets the procedu al and technical q lifications for payment of their administrative costs. If the qualifications are met I complete the forms necessar to request payment from the Treasury Judgment Fund. Upon receipt of the check I prepare certified mail f sending the payment to the taxpayer, notify the field employee that payment has been received, send a copy of e check to the Appeals Officer, and close the file.

Electronic Res rch Coordinator - As the Appeals Electronic Research Coordinator I serve as a member on the Electronic Res rch Oversite Council. In addition, I am responsible for ensuring that field personnel have the electronic rese ch material needed to do their job. I make sure the Appeals personnel are assigned ID numbers and p sswords for t e current research packages. I undate and validate the databases. I had to research the data needed use the da base to be aligned with the new organizational structure. I respond to field inquiries.

Commissioner ongressional Correspondence - I review complaint correspondence sent to IRS Management and Public official . I do whatever is necessary to resolve the situation tha caused the complaint, if possible. I draft a reply to the co plaintee or review the draft reply from the AO/SO, Management or Appeals CSO/CSR.

| 10. Experience (Sta with most recent significant position held and list all relevant federal and non-federal experience within the last 10 years.) | | | | |
|---|---|---|---|---|
| Date (Mo/Day/Yr.) From | To | Position (show organizational title and activity or function. Otherwise show agency or firm. Use additional sheet if necessary) | Series and Grade | Salary (Per Hour/Year) | Average No. of hours per week |
| 7/98 | Oct. 2 01 | Program Analyst NDA Office of Collection, Service Center and Appraisal Services | GS 43-13 | 75,857 yr. | 40 |

Your Immediate Su ervisor: Robert Wihl     Telephone Number: (202) 461-4203

DESCRIPTION F DUTIES. (USE ADDITIONAL SHEETS IF NECESSARY; DO NOT ATTACH POSITION DESCRIPTION

Employment x Coordinator - I advise and assist field personnel with questions and procedures that may arise in erforming th duties. I wrote an Appeals Employment Tax section for the IRM. I am the liason between the Dept. of Labo nd OETAC/TEGE for resolution of the States proposed deficiency for underpayment of employment t deposits resulting from unemployment compensation payments. I review IRM and other rocedural ma rial from Chief Counsel and TE/GE. I prepare Friday Report articles to alert the field of changes hat affec them until the changes can be incorporated in the IRM and/or official instructions are issued.

st Abate ent Coordinator - I advise and assist field personnel with questions and procedures that may arise in ming th r duties. I updated the Appeals IRM to reflect changes in the law and procedures. I review IRM and

10

Administrative Expenses Coordinator - Appeals is the function responsible for evaluating and processing administrative cost claims for the IRS. I am responsible for advising and assisting field with questions and procedures that may arise in performing their duties. I updated the Appeals IRM and reorganized it to make the procedures easier to understand. I review the files sent in from the field to see if the taxpayer meets the procedural and technical qualifications for payment of their administrative costs. If the qualifications are met I complete the forms necessary to request payment from the Treasury Judgment Fund. Upon receipt of the check I prepare certified mail for sending the payment to the taxpayer, notify the field employee that payment has been received, send a copy of the check to the Appeals Officer, and close the file.

Electronic Research Coordinator - As the Appeals Electronic Research Coordinator I serve as a member on the Electronic Research Oversite Council. In addition, I am responsible for ensuring that field personnel have the electronic research material needed to do their job. I make sure the Appeals personnel are assigned ID numbers and passwords for the current research packages. I update and validate the databases. I had to research the data needed to cause the database to be aligned with the new organizational structure. I respond to field inquiries.

Commissioner/Congressional Correspondence - I review complaint correspondence sent to IRS Management and Public officials. I do whatever is necessary to resolve the situation that caused the complaint, if possible. I draft a reply to the complaintee or review the draft reply from the AO/SO, Management or Appeals CSO/CSR.

Other Assignment

Headquarters Appeals Combined Federal Campaign (CFC) 2000 Coordinator - As the CFC Coordinator I designed a program that would encourage my fellow employees to give their money to the eligible organizations under the CFC program. I sent preparatory information then had a 'kick-off'. I then designed a plan to keep employees interested in the program so that we would meet our campaign goal. Events and strategies were implemented throughout the campaign to encourage employees to give. The campaign was successful. Headquarters Appeals employees contributed 232% of our goal. We were the only function within the Capital Area IRS that was a recipient of the President's Award based on our contributions to the CFC Program.

10a. Experience (Start with most recent significant position held and list all relevant federal and non-federal experience within the last 10 years.)

| Date (Mo/Day/Yr.) | | Position (show organizational title and activity or function. Otherwise show agency or firm. Use additional sheet if necessary) | Series and Grade | Salary (Per Hour/Year) | Average No. of hours per week |
|---|---|---|---|---|---|
| From | To | | | | |
| 4/94 | 7/98 | **Program Analyst** | 343-13 | $67,000 yr. | 40 |

Your Immediate Supervisor: Michael J. Coyne

Telephone Number: (202) 401-4203

DESCRIPTION OF DUTIES. (USE ADDITIONAL SHEETS IF NECESSARY; DO NOT ATTACH POSITION DESCRIPTION.)

I plan, implement, coordinate, monitor, analyze and administer assigned programs. I assist field personnel in technical and procedural matters. I revise and update Internal Revenue Manual sections as they apply to my assigned programs. I interact with employees at all levels in the Service. Some of the specific programs I was assigned were:

Technical Advice Program - This program includes the Appeals Technical Advice cases, technical information cases (including Contrary to Service Position, Denial of Technical Advice, and Field Service Advice cases). I controlled the inventory by co-designing a data base using Microsoft Access. Assist the Mgmt. Assistant in resolving problems in producing the quarterly reports. Prepare the quarterly report, if necessary. Research, in the CENTAUR and/or uniSTAR databases to retrieve data necessary for the completion of the quarterly report. Resolve disputes between Chief Counsel (CC) attorneys and field personnel, function as liaison between CC Attorneys and field personnel, follow up on status of request. Advise field personnel concerning technical advice procedures and whether a case is appropriate to submit for technical advice, etc.

Barred Statute Report - I receive and analyze reports from the regional offices of cases that had statutes expired which were reported that quarter. Use CENTAUR and uniSTAR to insert missing data from the reports to limit and contact when the information is available from those sources. Contact field personnel for additional information if I cannot get the missing information from available sources. Analyze the reports looking for trends. Prepare a summary report containing dollar amounts, source of the return, tax years, reason for the barred statute, etc.

Technical Analyst Program - Advise and assist Technical Analyst and Regional Analyst in questions and procedures that may arise in performing their duties. Determination of software available in each office and analysis of software needs for standardization of computational software.

Technical Analyst CPEs - Planned the CPEs from the start to finish including determining field needs, preparing the agenda, obtaining instructors, preparing individual student schedules, determining space and audio visual needs, estimating costs, etc.

FORM 9686 (3-95)    Catalog 21010Y    Department of the Treasury- Internal Revenue Service

| 10b. Experience (Start with most recent significant position held and list all relevant federal and non-federal experience within the last 10 years.) | | | | | |
|---|---|---|---|---|---|
| Date (Mo/Day/Yr.) | | Position (show organizational title and activity or function. Otherwise show agency or firm. Use additional sheet if necessary) | Series and Grade | Salary (Per Hour/Year) | Average No. of hours per week |
| From | To | | | | |
| 90 | 199? | EEO Counselor (collateral duty) | N/A | N/A | |

our Immediate Supervisor : Maria Diago     Telephone Number: (202) 401-4064

**DESCRIPTION OF DUTIES. (USE ADDITIONAL SHEETS IF NECESSARY; DO NOT ATTACH POSITION DESCRIPTION.)**

I was charged with resolving EEO-related problems that have surfaced by individuals who perceive that they have ben discriminated against. I ascertain whether the pre-complaint falls within the purview of the EEO law (Title VII of the Civil Rights Act of 1964, as amended), and if it is processable under the Code of Federal Regulations 29 Part 1614. The attempted resolution involves meeting with the individual and management officials involved in the dispute; collecting facts with the intent of reaching a mutually agreeable resolution to the pre-complaint and if the resolution cannot be reached, advise the aggrieved in writing of his/her right to further pursue the complaint at the formal stage.

73

| 1. Uc. Experience (St... with most recent signi..., position held and lis all relevant federal tax... eral experience within the last 10 years.) | | | | | |
|---|---|---|---|---|---|
| Date (Mo/Day/Yr) | | Position (show organizational title and activity or function. Otherwise show agency or firm. Use additional sheet if necessary) **Program Analyst** **NDA Office of Large Case Programs** | Series and Grade | Salary (Per Hour/Year) | Average No. of hours per week |
| From | To | | | | |
| 6/01 | 4/5... | | 343-13 | $45,826 | 40 |

...r Immediate Sup...visor: Thomas Roley          Telephone Number: (202) 401-4164

**DESCRIPTION OF DUTIES. (USE ADDITIONAL SHEETS IF NECESSARY; DO NOT ATTACH POSITION DESCRIPTION.)**

I planned, implemented, coordinated, monitored, analyzed and administered assigned programs. I assist field personnel in technical and procedural matters. I revised and updated Internal Revenue Manual sections as they apply to my assigned programs. I interacted with employees at all levels in the Service. Some specific programs were as follows:

<u>Joint Committee Coordinator</u> - Answered questions from field personnel to resolve issues when they arose. Worked with Exam JC Coordinator to do an extensive updated to the IRM, including detailed examples, to address problems in the field. Produced and maintained an inventory control system of the cases in our inventory. Processed the cases and followed up on the status while open in our inventory, and prepared the cases for closing. Produced quarterly reports.

<u>Technical Advice Coordinator -</u> This program included the Appeals Technical Advice requests and technical information requests (including Contrary to Service Position, Denial of Technical Advice, and Field Service Advice requests). I controlled the inventory - at first using dBase, then the FoxPro database systems. I processed the cases to be transmitted to Chief Counsel (CC), acted as liaison between the CC and Field personnel, managed and assisted in the resolution of disputes between CC and Field personnel when there was a difference of opinion on an issue. I produces a quarterly report of the cases (received, opened and closed) during the quarter.

<u>Coordinate Meetings With ARDA(LC)s and Director of Large Case -</u> Coordinated the ARDA(LC) meetings, arranging the logistical requirements for the meeting.

<u>Coordinate Conference Calls With ARDA(LC)s and Director of Large Case -</u> Set up conference calls for the Office Director and the ARDA(LC). Resolved problems associated with the conference calls while they were in process.

<u>ISP</u> - I was responsible for keeping abreast of the changes in ISP coordinators and updating the Appeals ISP IRM. Coordinated the ISP Coordinator's Meeting, including creating the agenda, meeting with the steering committee, and arranging the logistical requirements for the meeting.

<u>New Issues Raised on Docketed Cases</u> - I was responsible for researching this area and updating the Appeals IRM.

<u>Data Verification and Analysis for Cases on CENTAUR</u> - Verified data entered on CENTAUR, particularly on closed cases. Generated statistics used as a measure of Appeals performance. I reviewed information from CENTAUR to identify important trends or other useful information about the large case program.

<u>Assisted in Preparation for the Chief Counsel Briefings</u> - Assisted in the analysis of information from the CENTAUR database and other sources for the preparation of information. Also assisted in the preparation of the binder used as a basis for the Chief Counsel briefings. Also assisted in the preparation of the binder used as a basis for the Chief Counsel briefings.

74

| 10d. Experience (Start with most recent significant position held and list all relevant federal and non-federal experience within the last 10 years.) | | | | |
|---|---|---|---|---|
| Date (Mo/Day/Yr) | | Position (show organizational title and activity or function. Otherwise show agency or firm. Use additional sheet if necessary) **Program Analyst: NDA Office of Field Services** | Series and Grade | Salary (Per Hour/Year) | Average No. of hours per week |
| From | To | | | | |
| 12/89 | 6/91 | | 343-13 | | 40 |
| Immediate Supervisor: Joseph DeStefanis | | Telephone Number: (202) 401-4203 | | | |

DESCRIPTION OF DUTIES. (USE ADDITIONAL SHEETS IF NECESSARY; DO NOT ATTACH POSITION DESCRIPTION.)

I planned, implemented, coordinated, monitored, analyzed and administered assigned programs. I assist field personnel in technical and procedural matters. I revised and updated Internal Revenue Manual sections as they apply to my assigned programs. I interacted with employees at all levels in the Service.

ORM **9686** (1-91)        Catalog 21010Y        Department of the Treasury- Internal Revenue Service

16

| 10c. Experience (Start with present or most recent position held and list all relevant federal and non-federal experience within the last 10 years.) | | | | | |
|---|---|---|---|---|---|
| Date (Mo/Day/Yr.) From | To | Position (show organizational title and activity or function. Otherwise show agency or firm. Use additional sheet if necessary) | Series and Grade | Salary (Per Hour/Year) | Average No of hours per week |
| ]7 | 12/[ ]8 | Appeals Officer | 930-12 | $30,486 | 40 |

Your Immediate Supervisor : Gary Knott     Telephone Number: (202) 376-0234

DESCRIPTION OF DUTIES. (USE ADDITIONAL SHEETS IF NECESSARY; DO NOT ATTACH POSITION DESCRIPTION.)

I analyzed information received from taxpayers, examination files, the tax law and court decisions with the purpose of negotiating settlement of tax and penalty cases. These cases generally come from the Examination or Collection Divisions and could not be settled at that level. I was detailed to the Appeals Auditor position an regularly perform duties such as preparing documents to close District Counsel cases, making NMF assessments, reversing premature assessments, etc.

ORM 9686 (1-5)     Catalog 21010Y     Department of the Treasury- Internal Revenue Service

10f. Experience (Start with most recent significant position held and list all relevant federal and non-federal experience within the last 10 years.)

| Date (Mo/Day/Yr.) | | Position (show organizational title and activity or function. Otherwise show agency or firm. Use additional sheet if necessary) | Series and Grade | Salary (Per Hour/Year) | Average No. of hours per week |
|---|---|---|---|---|---|
| From | To | | | | |
| 35 | 6/ | Supervisory Tax Technician | GS 526-11 | $29,890 | 40 |

Your Immediate Supervisor: Alvin Howard     Telephone Number: (202) 376-0861

DESCRIPTION OF DUTIES. (USE ADDITIONAL SHEETS IF NECESSARY; DO NOT ATTACH POSITION DESCRIPTION.

I performed managerial duties such as: Monitoring performance of employees and evaluating their performance; setting up work plans; updating/revising procedural documents; settling disputes between taxpayers/taxpayer's representatives and the auditors; conducting training; assisting tax auditors with problem cases; conducting counseling sessions; details to Service Center to review the work selected for District offices. I interacted with IRS employees at all levels and functions.

12. Are you delinquent on any Federal debt? (Includes delinquencies arising from Federal taxes, loans, overpayment of benefits, and other debts to the United States Government; plus defaults of Federally guaranteed or insured loans such as student and home mortgage loans.)

__ Yes   X  No   If "Yes" use space below to provide the type, length and amount of the delinquency or default, and the steps that you are taking to correct the error or repay the debt.

13. Awards (List specific types of awards and date received within the last 3 years; list other special recognition and any pertinent information)
CFC Leadership Award - Feb. 2001
Deputy Commissioner's Award - Feb. 2001
Performance Award – 2002
Performance Award - 2001
Performance Award - 2000

14. Organizations (Show membership and office, professional societies civic groups, etc.)
Child Evangelism Fellowship - Teacher
Child Evangelism Fellowship - Transportation Coordinator for 5-Day Clubs

FORM 9686 (1-95)     Catalog 21010Y     Department of the Treasury- Internal Revenue Service

77

15. Other assignments (details, task forces, etc. - Job-instructor, etc.)

<u>Automation Task force</u> - Headed a taskforce which looked at the feasibility of standardizing the computational software in Appeals. We analyzed Appeals needs, what software was currently being used by Appeals, available software (in house and commercial), software costs, the strengths and the weaknesses of the available software. Even though the report was ignored and no action taken when it was turned in, the recommendations are being implemented now (three years later).

<u>Certified Mail Taskforce</u> - I was a member of a taskforce which looked at the Service's current use of certified mail. The purpose of the taskforce was to determine how we could reduce the cost of sending mail to the taxpayer without increasing taxpayer burden or reducing taxpayer rights. We analyzed the effectiveness of certified and registered mail. We analyzed and reconciled congressional requirements with functional policies. We made recommendations to functions, which were beyond the scope of congressional requirements, on how they could more efficiently and effectively provide taxpayers with mail. We issued a report of the results of the study.

16. Special Qualifications and skills (Languages-Indicate level of proficiency (Very Good, Good, Fair) to converse, write, read, Shorthand (words per minute, Typing (words per minute) computer skills, etc.)

17. Kinds of Job Related License or Certification Held (CPA, CIA, Lawyer, Engineer, etc.)

FORM 9686 (1-51)     Catalog 21010Y     Department of the Treasury- Internal Revenue Service

18. Statement of Accomplishments: Describe duties and accomplishments which demonstrate your potential for the position to be filed. Use additional sheets if necessary.

I have almost 30 years of experience in the Service with experience in many areas. I have been working with Appeals for the last 15 years and have a sensitivity to taxpayer needs.

a. Describe your current duties and responsibilities that are relevant for this position.

As a analyst with the responsibility for congressional/commissioner correspondence, I have had to look into a variety of taxpayer complaints. I have had to make sure we took steps to assist the taxpayer in resolving those complaints if it were possible.

I currently plan, implement, coordinate, monitor, analyze and administer assigned programs. The position applied for require the same skills and duties that I currently perform.

b. Describe any special qualifications that are relevant for this position. (Give examples)

I certify that to the best of my knowledge and belief all of my statements on this form are true, correct, complete and made in good faith.

| 19. Original Signature (Sign each application in ink) | 20. Date signed (Month, day, year) |
|---|---|
| Pamela Robinson | 5/15/03 |

FORM 9686 (1-5-0)    Catalog 21010Y    Department of the Treasury- Internal Revenue Service

# Performance Appraisal and Retention Standard Rating

(Review instructions on the reverse before completing form)

| 1. Name of employee (Last, first, middle) | 2. POI | 3. Period covered | 4. Reason for Appraisal |
|---|---|---|---|
| Pamula Robinson | | From: 11/1/01  To: 10/31/02 | ☒ Annual Rating |
| 5. SSN | | 6. Organization code | ☐ Departure Rating |
| ~~████████~~ | | C:AP: Program Ops | ☐ Merit Promotion |
| 7. Position title | | 8. SPD or PD # | ☐ Other |
| Program Artist | | 50717 | 9. Pay plan, series/ grade |
| | | | GS-0343-13 |

| 10. Critical Job Elements | | Job Element Rating | | | | | | 11. Retention Standard Rating |
|---|---|---|---|---|---|---|---|---|
| | | N/A | 1 | 2 | 3 | 4 | 5 | |
| I. Employee Satisfaction – Employee Contribution | | | | | | ☒ | | ☐ Not applicable |
| II. Customer Satisfaction – Knowledge | | | | | | | ☒ | ☒ Met |
| III. Customer Satisfaction – Application | | | | | | ☒ | | ☐ Not Met |
| IV. Business Results – Quality | ☐ Measured  ☒ Unmeasured | | | | | | ☒ | 12. Average of Critical Elements |
| V. Business Results – Efficiency | ☐ Measured  ☒ Unmeasured | | | | | ☒ | | 4.4 |

**13. Summary Level:**

☐ Outstanding  ☒ Exceeds Fully Successful  ☐ Fully Successful  ☐ Minimally Successful  ☐ Unacceptable

**14. Annual Rating**

Rater

Name/title/signature/date (I certify that records of tax enforcement results were not used to prepare this appraisal.)
*Jeffrey Allison*
DIRECTOR PROGRAM Operations

Reviewing Official

Name/title/signature/date (I certify that records of tax enforcement results were not used to prepare this appraisal.)
*Lee Ewing*

This appraisal has been discussed with me and I have been given a copy.
*Pamula Robinson, 1-28-03*
Employee signature/date

| 15. Revalidation of Rating of Record ☐ (See instructions for revalidation). | Period covered |
|---|---|
| Rater | From:  To: |

Name/title/signature/date (I certify that records of tax enforcement results were not used to prepare this appraisal.)

Reviewing Official

Name/title/signature/date (I certify that records of tax enforcement results were not used to prepare this appraisal.)

This appraisal has been discussed with me and I have been given a copy.

Employee signature/date

16. Merit Promotion Revalidation  ☐ (See instructions for Merit Promotion revalidation).

Name/title/signature/date of revalidation

Form 6850 (Rev. 7-2001)    Cat. No. 61525M    publish.no.irs.gov    Department of Treasury – Internal Revenue Service

90

## Instructions

Appraise the employees against the critical job elements of his/her position for the rating period. Information is available online at http://shr.web.i s.gov/ide

Blocks 1 and 3 t  9 - Self-explanatory

Block 2. POI  ERSONNEL OFFICE IDENTIFIER) - Contact your Transactional Processing Branch for the correct number.

Block 10. CRI  CAL JOB ELEMENTS
The five (5) cri  al job elements for all employees are listed. If performance of the duties/responsibilities reflected by a critical job element has not been observed, iden t  the critical job element as NOT APPLICABLE (NA). Reasons for not appraising critical job element must be documented as part of the appraisal. I  icate as applicable, if performance is measured by TEPS or unmeasured (critical job elements IV and V).

The rating for  ach critical job element will be based upon a review and consideration of all aspects of the critical job element, using the following scale:
- OI  STANDING - Exceeds all performance aspects of the critical job element: (5)
- E  CEEDS FULLY SUCCESSFUL - Exceeds more than half of the performance aspects of the critical job element and meets the remaining pe  rmance aspects: (4)
- FU LY SUCCESSFUL - Meets all performance aspects of the critical job element: (3)
- MI IMALLY SUCCESSFUL - Fails one performance aspect of the critical job element: (2)
- U  ACCEPTABLE - Fails two or more performance aspects of the critical job element: (1)

Block 11. RET NTION STANDARD RATING - Narrative is mandatory if rating is Not Met.

Block 12. AVE  AGE OF CRITICAL JOB ELEMENTS - Used to determine performance awards.

Block 13. SUM ARY LEVEL - On the basis of the rating on the individual critical job elements and the Retention Standard, assign an overall Rating using the follow  g scale:
- OI  STANDING - Employee is rated Outstanding in more than half of the critical job elements and exceeds Fully Successful in the remainder of  e critical job elements.
- E  CEEDS FULLY SUCCESSFUL - Employee is rated Exceeds Fully Successful or above in more than half of the critical job elements and Fu  Successful in the remainder of the critical job elements.
- FU LY SUCCESSFUL - Employee is rated Fully Successful or above in all of the critical job elements.
- MI IMALLY SUCCESSFUL - Employee is rated Minimally Successful in one or more critical job element but not Unacceptable in any cri  al job element.
- U  ACCEPTABLE - Employee is rated Unacceptable in one or more critical job elements or receives a "Not Met" on the Retention Standard.

Block 14. ANN  AL RATING - Signatures as indicated. The rater and reviewing official must certify that records of tax enforcement results were not used to prepar  e appraisal.

Block 15. REV  IDATION OF RATING OF RECORD - If a manager determines that a journey level or above employee, in at least the second year of their position, v  uld receive a Rating of Record for the current appraisal period identical to the Rating of Record for the most previous period, the manager may  e  ify that the most recent Rating of Record is valid for performance in the current appraisal period. A manager may revalidate a Rating of Record only  ce.

Block 16. MER  PROMOTION REVALIDATION - Place a check in the box if you are revalidating a Rating of Record that is more than six (6) months old but less th  12 months old on or before the opening date of the vacancy announcement. This applies to bargaining unit employees only. Narratives are required wi  all Merit Promotion evaluations.

---

### PRIVACY ACT STATEMENT

The Privacy Ac   f 1974 requires that when we ask you to provide information about yourself, we must tell you: our legal right to ask for the information; the principal pu  ose(s) for which the information is intended to be used, what could happen if we do not receive any or all of the information and whether your r  ponse is voluntary or mandatory.

Our legal right   ask you to acknowledge receipt of performance appraisal is derived from 5 USC 9508, General Workforce Performance Management System and 26  FR Part 801, Balanced System for Measuring Organizational and Employee Performance within the Internal Revenue Service. Your signature will a  nowledge that you received the performance appraisal and it was discussed with you. Your supervisory officials will consider the information you  rnish in preparing an assessment of your performance or conducting periodic progress reviews.

The information  ontained in your performance assessment may be disclosed to IRS employees who have a need for the record in their official duties. Disclosures ma  also be made when appropriate, under routine uses published in the Federal Register for Privacy Act system of records, Treasury/IRS 36.003, Gener  Personnel and Payroll Records. Under the appropriate circumstances, disclosure may be made to the Office of Personnel Management, t  Equal Employment Opportunity Commission, the General Accounting Office and others. Failure to furnish any or all of this information nay result in y  supervisors preparing your appraisal or conducting a progress review withou  considering information you may feel is relevant or significant.

Form 6850 ( v. 7-2001)    Cat. No. 61525M        publish.no.irs.gov        Department of Treasury - Internal Revenue Service

## Pamula Robinson
### Summary of Accomplishments
### Rating Period—November 1, 2001 – October 31, 2002

### Employee Satisfaction—Employee Contribution
### Overall Rating—4 or Exceeds Fully Successful

Of the three aspects in this critical element Pam is rated as "exceeds" in aspects 1A and 1B and "meets" in aspect 1C for an overall rating of 4 or exceeds fully successful.

Pamula has volunteered for several assignments that have benefited and improved the work environment for our workgroup. As a result of our employee satisfaction workgroup meetings we decided we needed a group training coordinator. Pam volunteered for this assignment. She now helps each analyst get information regarding their own training history. She also helps them locate training available in their program areas. Pam arranged a training session for electronic research and CENTRA for our entire group which was very beneficial and appreciated by the group.

As training coordinator Pam has secured instructors and helped planned a segment for our group meeting. This session will involve automation issues, electronic research, and the IRM—all subjects of importance to Program Operations analysts.

Pam served as the Appeals coordinator for the annual Combined Federal Campaign drive. Our headquarters office received the President's award last year with 100% participation and meeting 200% of our monetary goal.

Some examples of Pam's efforts to improve the work environment for field employees includes the following:

- When Pam was scanning the SBSE web sites she summarized her findings and provided them to her manager and to the employees who she thought had programs impacted by her findings.
- Pam worked with the Service Center Transition Group to plan and host a conference call with that group the analysts from Program Operations before it disbanded. As a result Appeals was able to gain important knowledge and perspective about the major changes facing our campus operations. She provided information to the senior managers responsible for the roll out of campus operations.

82

- Pam volunteered to be the training coordinator for the group. She is assisting in getting each employee to update and complete a training profile.

- As Training Coordinator she searched available training courses to see if classes were available for needs of my fellow employees.

- She reviewed Form 182 – Outside Training Request forms to see if it appeared the request should be paid for from outside training funds. Kept track of outside training funds.

- Pam works well with others in the group. She contributes to our work group meetings with ideas and suggestions for making the group more productive.

Of the three aspects in this critical element Pam is rated as "exceeds" in all three aspects of this critical element for an overall rating of 5 or outstanding.

## Customer Satisfaction--Knowledge
## Overall Rating—5 or Outstanding

- Pam is very knowledgeable about her program areas. She is very conscientious in making sure that she thoroughly understands the issues in her program areas. Pam has provided very good technical information and guidance to the field on employment taxes issues. Her newly completed employment tax manual will be a very valuable tool for the field. It will help ensure that we are resolving these cases correctly.

- This year Pam helped us start two new programs—claims involving "Killed in Terrorist Actions" and Abusive Offshore Credit Card Schemes. Pam was assigned as analyst for the "Killed in Terrorist Action" cases. These cases though few are quite sensitive. Pam had to: 1) Research issues, 2) Provide field personnel with procedures for handling these cases; and 3) Establish contacts in Compliance for updates as necessary. Regarding the Offshore project Pam: 1) Attended Off Shore Credit training to assist in managing this emerging issue; and 2) She began an Off Shore Credit settlement matrix to get this high priority program off the ground quickly. She has attended several high level meetings in order to help Appeals formulate a settlement position on these project cases. Pam's initial attempt to create a settlement matrix for off shore credit cases was quite good and imaginative. Without actually seeing any cases she was able to come up with a concept that was an excellent starting point for our discussions.

83

Pam researched the proper procedures for payment of administrative costs—this is a procedure that isn't often used—Pam determined that the costs were appropriate and filed all forms to ensure that the government paid the appropriate costs to the taxpayer. On one particular case Pam had to inform an ATM that he had inappropriately resolved the case. The agreement had to be pulled back. Pam did an excellent job of listening to the ATM's position and responding to each issue he raised.

Some examples of Pam's efforts to provide excellent technical guidance or response to taxpayers are as follows:

- Pam prepares controlled correspondence for taxpayer inquiries to the Commissioner, Members of Congress, or Chief of Appeals—she thoroughly researches the issues and prepares letters well.
- Pam researched the proper procedures for payment of administrative costs—this is a procedure that isn't often used. Pam determined that the costs were appropriate and filed all forms to ensure that the government paid the appropriate costs to the taxpayer.
- Web Scan Project: Periodically review the web pages to look for information that may be helpful to management or sites she summarized her findings and provided them to her manager and to the employees who she thought had fellow employees to project new types of casework coming to Appeals. When Pam was scanning the SBSE web programs impacted by her findings.
- Pam prepares controlled correspondence for taxpayer inquiries to the Commissioner, Members of Congress, or Chief of Appeals—she thoroughly researches the issues and prepares letters well.
- Pam has completed the Employment Tax handbook
- Pam coordinated a review of Appeals IRM sections at the request of TIGTA to ensure we do not make reference to the prohibited label of "Illegal Tax Protestor" in our IRM. She wrote the brief response required.
- Pam has revised the IRM on administrative costs to simplify and enhance instructions to the field.

### Customer Satisfaction--Application
### Overall Rating—4 or Exceeds Fully Successful

Of the three aspects in this critical element Pam is rated as "exceeds" in aspects 3A and 3B and is rated as "meets" in aspect 3C for an overall rating of 4 or "exceeds fully successful."

84

Pam is part of the team of analysts that prepares the controlled correspondence letters responding to taxpayer inquiries, comments, or concerns. She works with the Customer Service Outreach representatives to ensure that the letters are well written and accurate. She has also written our first Appeals IRM section on Employment taxes. Pam prepared a memorandum for national distribution on employment tax changes that she was highlighting in her new handbook for the IRM—the memo was well written and reviewed by Counsel and will be published shortly. Pam prepared a memorandum for national distribution on employment taxes. It was been informative—she also put this information into the Friday report under recent developments in the Employment Tax area

Pam worked with the Service Center Transition Group to plan and host a conference call with that group the analysts from Program Operations before it disbanded. As a result Appeals was able to gain important knowledge and perspective about the major changes facing our campus operations. She provided information to the senior managers responsible for the roll out of campus operations.

All of Pam's interactions are polite and professional. Here are some examples:

- Notice Clarity Worked with group to establish Appeals coordinator to review Gen Appeals notices submitted for changes to language.

- Pam has completed the IRM on Employment Tax issues. This is the first time this information has ever been in the Appeals manual.

- Pam prepared a memorandum for national distribution on employment tax changes that she was highlighting in her new handbook for the IRM—the memo was well written and informative—she also put this information into the Friday report under recent developments in the Employment Tax area

- Pam researched the proper procedures for payment of administrative costs—this is a procedure that isn't often used—Pam determined that the costs were appropriate and filed all forms to ensure that the government paid the appropriate costs to the taxpayer. On one particular case Pam had to inform an ATM that he had inappropriately resolved the case. The agreement had to be pulled back. Pam did an excellent job of listening to the ATM s position and responding to each issue he raised.

- In coordinating the KITA cases, Appeal's considered proposing a reversal of the position Compliance took. These are sensitive cases and Compliance has jurisdiction over the issue (the case has to be closed through the Compliance coordinator). Pam handled the situation with caution and involved all of the necessary interim steps [illegible] keeping everyone in a favorable light. She drafted a response of her findings and sent it to the Compliance

@004

85

- coordinator to make sure that she was correctly framing Compliance's position. This sensitive approach to resolving the conflict ensured that unnecessary complications would not arise later.

- In working the controlled correspondence cases a representative was so confident in Pam that he began referring others to her when they had problems. Among those who called, a couple of them had questions concerning why they did not receive the tax rebate issued to the general public. Instead of Pam referring them to someone else, she asked them questions to capture what happened and explained to them why they did not qualify for the rebate. This action benefited both the taxpayer and the Service.

## Business Results--Quality
## Overall Rating

Of the three aspects in this critical element Pam is rated as "exceeds" in all three aspects of this critical element for an overall rating of 5 or "outstanding".

Pamula prides herself in completing all assignments carefully and thoroughly. She is always able to answer questions about her program areas and considered all factors before making a final decision on recommendations to manage her program assignments. Here are a few examples:

- Pam researched the proper procedures for payment of administrative costs—this is a procedure that isn't often used—Pam determined that the costs were appropriate and filed all forms to ensure that the government paid the appropriate costs to the taxpayer. On one particular case Pam had to inform an ATM that he had inappropriately resolved the case. The agreement had to be pulled back. Pam did an excellent job of listening to the ATM's position and responding to each issue he raised.

- Pam is involved with on-going research of the Operating Divisions Web pages. The information that she learns will help Appeals project future workload. She summarizes the findings and distributes the information to her manager and other interested employees.

- All controlled correspondence is completed via e-mail and Pam ensures that taxpayer identities are not disclosed since e-mail is not secure.

Pam is very aware of security and disclosure requirements. She makes sure that all controlled correspondence is properly transmitted and is not sent via e-mail with taxpayer names or identifiers in the letter. She is getting security ID cards for all employees using electronic research.

Of the three aspects in this critical element Pam is rated as "exceeds" in aspects 5A and 5B and is rated as "meets" in aspect 5C for an overall rating of 4 or "exceeds fully successful".

Pam is able to work all of her assignments by their assigned due date. She keeps current on her controlled correspondence making every effort to get the cases answered by the original due date set by ECMS.

## Business Results--Efficiency
## Overall Rating

• Pam provided costing information for the purchase of BNA software in role as electronic research coordinator. She also provided area directors with information regarding employees who were not using LEXIS software and advised them not to order as many copies of the software in current year thus saving Appeals funds.

• When General Appeals needed to come up with a strawman proposal to resolve Offshore Credit Project cases Pam was able to accomplish this without assistance. She reviewed the project summary and came up with a proposal that is imaginative and viable. She accomplished this in a relatively short time period and within the timeframes required by the project.

• Pam timely reviews the commissioner/congressional correspondence cases she is assigned. She timely determines whether the case is appropriate for her to handle or whether the case should be sent to the field CSR for response.

47

Pamula Robinson.
CHART OF CRITICAL ELEMENTS

| CRITICAL ELEMENT | | CRITICAL ELEMENT ACCOMPLISHMENTS |
|---|---|---|
| EMPLOYEE SATISFACTION—EMPLOYEE CONTRIBUTION. This individual performance critical job element describes how the employee's actions contribute to the overall office working conditions. The employee supports the workplace climate where everyone is treated with honesty, dignity and respect, free from harassment and discrimination | | Overall Rating<br><br>4 or Exceeds Fully Successful |
| Workplace Interaction | 1A<br>Exceeds | • When Pam was scanning the SBSE web sites site summarized her findings and provided them to her manager and to the employees who she thought had programs impacted by her findings.<br>• Pam worked with the Service Center Transition Group to plan and host a conference call with that group life analysts from Program Operations before it disbanded. As a result Appeals was able to gain important knowledge and perspective about the major changes facing our campus operations. She provided information to the senior managers responsible for the roll out of campus operations. |
| Workgroup Involvement | 1B<br>Exceeds | • Pam volunteered to be the training coordinator for the group. She is assisting in getting each employee to update and complete a training profile.<br>• Training Coordinator: Searched available training courses to see if classes were available for needs of my fellow employees.<br>• Reviewed Form 182 – Outside Training Request forms to see if it appeared the request should be paid for from outside training funds. Kept track of outside training funds. |
| Workplace Environment | 1C<br>Meets | • Pam arranged a training session on Lexis and Electronic Research so that other employees can do their jobs better<br>• Pam works well with others in the group. She contributes to our work group meetings with ideas and suggestions for making the group more productive. |

Pamula Robinson

| CRITICAL JOB ELEMENTS | | COMMENTS |
|---|---|---|
| **CUSTOMER SATISFACTION—KNOWLEDGE:** This individual performance critical job element describes how the employee promotes the satisfaction of taxpayers and customers by providing the technical expertise to serve the customers with professional and helpful service. Accurate identification and resolution of issues and the correct interpretation of laws, rules, regulations and other information sources are key components of this critical job element: Issue Identification | **2** | Overall Rating— 5 or Outstanding |
| | **2A** Exceeds | • Pam was assigned as analyst for the "Killed in Terrorist Action" cases. These cases though few are quite sensitive. Pam had to: 1) Research issues, 2) Provide field personnel with procedures for handling these cases; and 3) Establish contacts in Compliance for updates as necessary. <br>• Web Scan Project: Periodically review the web pages to look for information that may be helpful to management or fellow employees to project new types of casework coming to Appeals. When Pam was scanning the SBSE web sites she summarized her findings and provided them to her manager and to the employees who she thought had programs impacted by her findings. <br>• Attended Off Shore Credit training to assist in managing this emerging issue. <br>She began an Off Shore Credit settlement matrix to get this high priority program off the ground quickly. She has attended several high level meetings in order to help Appeals formulate a settlement position on these project cases. |
| Technical Knowledge | **2B** Exceeds | • Pam prepares controlled correspondence for taxpayer inquiries to the Commissioner, Members of Congress, or Chief of Appeals—she thoroughly researches the issues and prepares letters well. <br>• Pam's initial attempt to create a settlement matrix for offshore credit cases was quite good and imaginative. Without actually seeing any cases she was able to come up with a concept that was an excellent starting point for our discussions. <br>• ......... ...... ........ .......... ............ ......... ...... personnel regarding abatement of interest claims—particularly those |

89

| Issue Resolution. | 2C Exceeds |
|---|---|
| | • that relate to how Appeals personnel conducted review of the case<br>• Pam is completing the Employment Tax handbook<br>• Drafted an IRM for Appeals, Participated in the settlement of the State FICA Penalty issue. |
| | • Pam coordinated a review of Appeals IRM sections at the request of TIGTA to ensure we do not make reference to the prohibited label of "Illegal Tax Protestor" in our IRM. She wrote the brief response required.<br>• Pam researched the proper procedures for payment of administrative costs—this is a procedure that isn't often used—Pam determined that the costs were appropriate and filed all forms to ensure that the government policies to inform an ATM that he had inappropriately resolved the case. Pam had to inform an ATM that he had inappropriately resolved the case. The appropriate costs to the taxpayer. On one particular case, Pam had to agreement had to be pulled back. Pam did an excellent job of listening to the ATM's position and responding to each issue he raised.<br>• Pam has revised the IRM on administrative costs to simplify and enhance instructions to the field. |

90

**Pamula Robinson**

| | | | Overall Rating—<br>4 or Exceeds Fully Successful |
|---|---|---|---|
| **CUSTOMER SATISFACTION—APPLICATION**<br>This individual performance critical job element describes how the employee promotes the satisfaction of taxpayers and customers through professionally and courteously identifying customers' needs and/or concerns and providing quality products and services. Communication to the customer is appropriate for the issue and encourages voluntary compliance. | **3** | | |
| Verbal Communications/ Listening | **3A**<br>Exceeds | | • Pam worked with the Service Center Transition Group to plan and host a conference call with that group the analysts from Program Operations before it disbanded. As a result Appeals was able to gain important knowledge and perspective about in the major changes facing our campus operations. She provided information to the senior managers responsible for the roll out of campus operations.<br>• Pam works with the Customer Service Outreach representatives to properly answer all controlled correspondence. She works with the Customer Service Outreach representatives to ensure that the letters are well written and accurate. |
| Written Communications | **3B**<br>Exceeds | | • Notice Clarity Worked with group to establish Appeals coordinator to review Gen Appeals notices submitted for changes to. language.<br>• Pam has completed the IRM on Employment Tax issues. This is the first time this information has ever been in the Appeals manual.<br>• Pam prepared a memorandum for national distribution on employment tax changes that she was highlighting in her new handbook for the IRM—the memo was well written and informative—she also put this information into the Friday report under recent developments in the Employment Tax area |
| Interactions | **3C**<br>Meets | | • Pam worked with the Service Center Transition Group to plan and host a conference call with that group the analysts from Program Operations before it disbanded. As a result Appeals was able to gain important knowledge and perspective about the major changes facing our campus operations. She provided information to the senior managers responsible for the roll out of campus operations.<br>• Pam's interactions are always polite and professional. She has discussions with taxpayers regarding the controlled correspondence that they have sent to the IRS. This is to ensure that she understands their issue or concern and properly responds to it in the<br>• Pam researched the proper procedures for payment of administrative |

costs—this is a procedure that isn't often used—Pam determined that the costs were appropriate and filed all forms to ensure that the government paid the appropriate costs to the taxpayer. On one particular case Pam had to inform an ATM that he had inappropriately resolved the case. The agreement had to be pulled back. Pam did an excellent job of listening to the ATM's position and responding to each issue he raised.

05/15/03 THU 16:15 FAX 2026941845    IRS    @011

## Pamula Robinson

| ACTUAL [CRITICAL JOB ELEMENT] | RECOMMENDED RATING | COMMENTS |
|---|---|---|
| **BUSINESS RESULTS—QUALITY:** This individual performance critical job element describes how the employee promotes the achievement of business results by completing assignments thoroughly and accurately within established guidelines. The use of proper research and analytical tools and the protection of taxpayer privacy are key components of this critical job element. | **4** | Overall Rating— 5 or Outstanding |
| Accuracy of Work | **4A** Exceeds | • Pam researched the proper procedures for payment of administrative costs—this is a procedure that isn't often used—Pam determined that the costs were appropriate and filed all forms to ensure that the government paid the appropriate costs to the taxpayer. |
| Research and Analysis | **4B** Exceeds | • Pam researched the proper procedures for payment of administrative costs—this is a procedure that isn't often used—Pam determined that the costs were appropriate and filed all forms to ensure that the government paid the appropriate costs to the taxpayer. On one particular case Pam had to inform an ATM that she had inappropriately resolved the case. The agreement had to be pulled back. Pam did an excellent job of listening to the ATM's position and responding to each issue she raised.<br>• Pam is involved with on-going research of the Operating Divisions Web pages. The information that she learns will help Appeals project future workload. She summarizes the findings and distributes the information to her manager and other interested employees. |
| Security/ Privacy/ Disclosure | **4C** Exceeds | • All controlled correspondence is completed via e-mail and Pam ensures that taxpayer identifiers are not disclosed since e-mail is not secure. |

# Pamula Robinson

| CRITICAL JOB ELEMENTS | | Overall Rating— 4 or Exceeds Fully Successful | COMMENTS |
|---|---|---|---|
| **BUSINESS RESULTS—EFFICIENCY:** This individual performance critical job element describes how the employee promotes achievement of business results by completing assignments timely within established guidelines. The use of proper workload management and time utilization techniques is a key component of this critical job element. | 5 | | |
| Planning and Scheduling | 5A Exceeds | | • Pam provided costing information for the purchase of BNA software in role as electronic research coordinator. She also provided area directors with information regarding employees who were not using LEXIS software and advised them not to order as many copies of the software in current year thus saving Appeals funds. |
| Workload Management | 5B Exceeds | | • When General Appeals needed to come up with a strawman proposal to resolve Offshore Credit Project cases Pam was able to accomplish this without assistance. She reviewed the project summary and came up with a proposal that is imaginative and viable. She accomplished this in a relatively short time period and within the timeframes required by the project. |
| Time Utilization | 5C Meets | | • Pam timely reviews the commissioner/congressional/correspondence cases she is assigned. She timely determines whether the case is appropriate for her to handle or whether the case should be sent to the field CSR for response. |
| | | | • Pam promptly inputs request for Lexis ids when requested by the field. Pam timely transmits requests for ChoicePoint ids and passwords for our employees. Pam promptly notifies the Lexis coordinator/employees of their ids and passwords when she receives them. |



# DEPARTMENT OF THE TREASURY
## INTERNAL REVENUE SERVICE
### WASHINGTON, D.C. 20224

**AGENCY-WIDE
SHARED SERVICES**

PAMULA  ROBINSON
TAX POLICY/PROC (SB/WI)
89-83-16740
3902 71ST AVE
LANDOVER HILLS, MD 20784

TO BE OPENED BY
ADDRESSEE ONLY

SSN: ▓▓▓▓▓▓▓
YOU ARE NOT ELIGIBLE FOR ANNOUNCEMENT   89-83-03-138MM
INTERNAL REVENUE AGENT      GS-0512-14
PERMANENT-FULLTIME      PD Number:
TOUR OF DUTY:

TAX POLICY/PROC (LM/TE)
REMARKS: LACKS SPECIALIZED EXPERIENCE.
If you have any questions, please contact CARSON C SPROTT
on (510)637-4568 [TTY#           ].

REGIONALSUPPORT Office
Stop # 600S



EXHIBIT
Robinson
3
9/13/06   TSA

**Subject:**    Discrimination Complaint of Pamula Robinson V. John W. Snow, Secretary of the Department of the Treasury, TD Case Number 04-2002.

### UNSWORN DECLARATION UNDER PENALTY OF PERJURY

In accordance with the provisions of 28 U.S.C. 1746, I, the undersigned, Carson C. Sprott do hereby make the following Unsworn Declaration, under penalty of perjury, pertinent to the above stated subject:

**1. Please identify yourself for the record (name, title, organization and race).**

I, Carson C. Sprott, am a Human Resources Specialist, GS-201-11 assigned to National Headquarters, Office 86, Division 8477, Branch 03 of the Internal Revenue Service at Oakland, California. I am a Caucasian.

**2. Please provide a short description of your current professional role with the Agency to include an explanation as to whether you were serving in the same capacity as of July 10, 2003?**

I am Human Resources Specialist (GS-0201-11) and was serving in that capacity on 7/10/03. My duties are to:

- PROVIDE A FULL RANGE OF TECHNICAL GUIDANCE & CONSULTATION SERVICES TO MANAGEMENT ASSOCIATED WITH STAFFING/RECUITMENT (I.E., COMPLEX INTERNAL/EXTERNAL HIRING, PROMOTIONS, CONTRACTUAL/REGULATORY REQUIREMENTS, SOURCES & STRATEGIES, AREAS OF CONSIDERATION, ETC).

-PERFORM THE FULL RANGE OF PAY ADMINISTRATION DUTIES, INCLUDING CONVERSION FROM GS, GM, SM, SES, WG, & PAY-BANDING.

*page 1 of 5 pages*



30

MANAGEMENT ISSUES HAVING PLACEMENT/PAY-SETTING APPLICATIONS; OR HAVING TO DO WITH FEDERAL PERSONNEL REGULATIONS, AGENCY POLICIES, OPM GUIDANCE, & CONTRACTUAL PROVISIONS

-INTERPRET AND APPLY LAWS, REGULATIONS, POLICIES, AND PRACTICES FOR MANAGERS, EMPLOYEES, AND OFFICIALS.

-INSTRUCT ASSISTANTS ON ASSIGNMENTS/TASKS AND DESIGN SECTION TRAINING AND REFERENCE MATERIALS

-CONSULT WITH MANAGEMENT ON QUALIFICATIONS, CAREER DEVELOPMENT, AND PERSONNEL ACTIONS.

**3. Please describe your professional relationship to the Complainant and the duration of that relationship.**

I do not have a relationship, personal or professional, with the Complainant.

**4. Please address the circumstances surrounding your generation of the letter citing the Complainant's lack of specialized experience for the position advertised under Vacancy Announcement 89-83-03-138MM. This should include an explanation as to what role you played in developing the letter; your knowledge of the events leading up the PD having been changed from the 343 series to the 592 series (if appropriate); and the identification of any other management and/or HR employees who were involved in the matter. Please elaborate.**

The letter is a standard letter generated from TAPS/AMPS for candidates who are not qualified for positions. The language is canned. I performed the qualification determination on the complainant personally. The complainant indicated on her Form

31

9686 that all her time at the GS-13 level was in the GS-0343 series. That series is generally not creditable as qualifying for the GS-0512 series. So while the complainant met time-in-grade requirements, and the accounting requirement, the complainant did not meet the specialized experience requirement. The complaint also indicated she had been an EEO Counselor, which is not creditable to the GS-0512 series.

I have no knowledge of any events leading to the PD being changed. I have no knowledge of the PD being changed. I filled to job exactly as it was requested on the recruit 52, received from Appeals SHR member Theresa DeAngelis. The Recruit 52 also has David Geber's name on it as an authorizing management official. Nothing about it seemed out of the ordinary as Appeals does fill positions in the GS-0512 series.

**5. If you have not done so already, please describe the procedures that were followed in making the determination as to eligibility for the position to include the identification of any other applicants who were identified as being ineligible.**

The procedure for qualification determination is to follow the standard put forth in the Qualifications Standards Handbook (QSH) and compare the duties of the applicant as listed on their Form 9686 to the standard in the QSH and the PD for the position being applied for.

There were only 2 applicants; the selectee who was determined minimally qualified based on 10+ years in the GS-0512-13 position, and complainant, who was determined non-qualified based on the reasons given above.

**6. Were you aware that the Complainant had previously performed duties in the position for over four (4) years? If not, would that have made a difference in the decision to consider her ineligible for the new position? If not, why not?**

I was aware of the duties that were described on the Form 9686. They did not appear creditable to the PD for the job that was announced, especially since the GS-343 is generally not qualifying for the GS-512.

changed from a 343 to a 512 for a grade 14 in order for a pre-selection to be made? If you have not done so already, please address your knowledge of the accuracy of this allegation to include an explanation (if true) as to why this should not be considered evidence of discrimination against the Complainant based on her race. Please elaborate.

I don't have any information supporting or denying that there was pre-selection and that the alleged changing of the PD was pre-text for any pre-selection. However, Commissioner Rossotti had put a freeze on all new GS-343 positions, which I believe is still in effect. This may account for why the position was not announced as such, if it indeed should have been.

8. If you have not done so already, please identify and provide any documentation you may have relative to the decision to declare the Complainant ineligible for the position cited in the vacancy announcement.

I understand the promotion package has already been provided. I do not believe there is anything further that I could provide that would be relevant.

9. The Complainant has stated that to the best of her knowledge no black employee has ever been able to advance in-house above the GS-13 level in Appeals. Please address whether the records support this assertion to include (if true) an explanation as to why this should not be considered as evidence of discrimination against the Complainant based on her race.

I don't know the answer to that question specifically, but Annie Brown, former Director of Appeals SHR, and Dan Black, former Chief Appeals are both African American. Both were GS-15 or higher.

10. Please provide any additional information which you believe may assist decision-makers in making a determination as to the merits of the Complainant's claim that she was discriminated against based on her race when she was ruled

page 4 of 5 pages

I have no more information.  I would contact Appeals management.

Executed on _____2/9/04_____ at

Oakland, California

(Date)

(City/State)

Carson C. Sprott
1301 Clay Street
Oakland, CA 94612

page 5 of_5_pages

DEPARTMENT OF THE TREASURY
INTERNAL REVENUE SERVICE
WASHINGTON, DC 20224

**DEPUTY COMMISSIONER**

February 27, 2002

MEMORANDUM FOR DIVISION COMMISSIONERS
                             CHIEFS
                             NATIONAL TAXPAYER ADVOCATE

FROM:            Bob Wenzel /s/Bob Wenzel
                     Deputy Commissioner of Internal Revenue

SUBJECT:       Oversight and Management of Analyst, High-Grade and Non-Bargaining Unit (NBU) Positions

It has come to my attention that since the October 1, 2000 "stand up" of our new organization structure, we have experienced significant growth in the number of high-grade (that is, GS-14 and 15), and Senior Management positions above the baselines established by our Modernization Blueprint. We have also seen growth in the number of analysts and other similar overhead positions in the GS-343 and related occupational series, with a disproportionate number of these analyst positions designated as Non-Bargaining Unit (NBU). In light of Office of Management and Budget (OMB) Bulletin No. 01-07, Workforce Planning and Restructuring, dated May 8, 2001, and pending litigation before the Federal Labor Relations Authority, we need to take affirmative action to address these issues. Accordingly, effective immediately, I have directed the following:

a. **High-Grade and Senior Manager Positions**. Addressees are authorized to fill high-grade (that is, GS-14 and 15) and Senior Manager (SM) positions that were established in your initial Commissioner's Stand-up Package, plus any additions to that baseline to date that have been approved by the Commissioner or myself. Prospective requests for additional high-grade/SM positions over and above that adjusted baseline will be subject to my approval and should be presented as part of your periodic business performance review and/or our annual Strategic Planning and Budgeting process. The Office of Strategic Human Resources (SHR) will work with your staffs to validate your initial and adjusted high-grade/SM baselines; requests for additional high-grade/SM positions will be deferred until those baselines have been established.

b. **Analyst and Related Positions**. Until further notice, I am initiating a temporary "freeze" on the establishment of any new position or backfilling of any vacant position in the GS-343 and/or related occupational series, at all grade levels. In this regard, I have directed SHR to conduct a validation study of positions in these occupational series (both current and proposed) across the Service to determine whether their utilization and numbers are consistent with the above-referenced OMB Bulletin and our new organization structure. This study should be completed in 90 days, at which time its results and recommendations will be briefed to the Executive Resources Board (ERB). Pending the ERB's review, exceptions to the above freeze are subject to my approval.

EXHIBIT
Rebirca
10
9/1/06    TSA

2

c. **Bargaining Unit Status**. Any proposed change to the bargaining unit status of a position and/or employee must be approved in advance by SHR. This requirement does not apply to existing supervisory positions, non-clerical personnel positions in the GS-200 occupational series (except Employee Development Specialists), and positions within the Criminal Investigation Division. SHR must also approve the announcement of any NBU position, subject to these same exceptions. Additionally, I have asked SHR to review any change in a position's bargaining unit status effected on or after October 1, 2000 to date. This review will insure that such changes occurred in accordance with governing law and regulation. In those instances where a change in unit status occurred inappropriately, SHR will require the appropriate Division to initiate immediate corrective action.

SHR will issue detailed implementing instructions under separate cover. Please communicate these requirements to your subordinate components and managers immediately. If you have any questions, please contact Ron Sanders, Chief Human Resource Officer at (202) 283-9200, or your staff may contact Ron Ginnetti, Acting Director, Personnel Policy Division at (202) 283-9000.

cc: HR Policy Council Members

DEPARTMENT OF THE TREASURY
INTERNAL REVENUE SERVICE
WASHINGTON, D.G. 20224

May, 23, 2003

MEMORANDUM FOR DEPUTY COMMISSIONER

FROM:                    /s/
                         David B. Robison
                         Chief, Appeals

SUBJECT:                 Request for Exclusion from Hiring Freeze Restrictions for
                         Analyst and Related Positions

The Appeals design reduced both senior level positions and non supervisory, non-technical GS-13/14/15 positions in headquarters by shifting these resources to the field. The new structure reduced the number of senior manager positions by one and the number of headquarters analysts' positions by seven. Eleven (11) technical staff positions were redirected from headquarters to the field structure, along with two GS-15 non-technical positions. Additionally, seven GS-15 positions have been identified for movement from non-technical to technical field positions.

At the implementation of the Commissioner's hiring freeze for all analyst positions in the GS-343 and/or related occupations (i.e., 301), Appeals had an onboard count of 112 incumbents. Appeals has met its targeted occupancy rate of 75 or below by reducing the *number of employees in these series* positions.

As a result, we are requesting that Appeals be granted an exclusion from the Commissioner's hiring freeze for analyst and related positions in order to have maximum flexibility to manage the organization, including announcing key vacancies that may occur while remaining within our authorization of 75 positions.

Your signature below authorizes Appeals to be removed from the provisions of the Servicewide hiring freeze. I am available to discuss this request at your convenience or your staff may contact Annie D. Brown at (202) 694-1810.

Approved:


/s/
Bob Wenzel
Deputy Commissioner

                                        6/9/03
                                        Date

