# Merit Program Questionnaire (MPQ)

(It is the applicant's responsibility to accurately and thoroughly complete this form.) A separate MPQ should be completed for each position for which you wish to be considered.

**Purposes and Uses:** The information you furnish on this form as well as other information that is developed will be used to determine your qualifications/potential for the position for which you are applying under the Merit Promotion Program. The information will be used on a "need to know" basis by Internal Revenue Officials. The information may also be provided when appropriate, to the Office of Personnel Management under the routine uses listed on page 45239 of the Federal Register, Vol. No. 200, 2200 Thursday, October 14, 1976. The information contained on this form is a part of TR/IRS 36.003, General Personnel Record.

## Privacy Act and Public Burden Statements

Section 1104 of title 5 allows the Office of Personnel Management to authorize other Federal agencies to rate applicants for Federal jobs. We need the information you put on this form to see how well your education and work skills qualify you for a Federal job.

We must have your Social Security Number (SSN) to keep your records straight because other people may have the same name and birth date. The SSN has been used to keep records since 1943, when Executive Order 9397 asked agencies to do so. The information we collect will be used for employment purposes, including checking references, or establishing suitability for employment, may be given to Federal, State and local agencies in response to lawful requests for information or when necessary to report apparent violations of law, or other lawful purposes. Giving us your SSN or any of the other information is voluntary. Failure to provide this information may affect your ranking among applicants.

Public burden reporting for this collection of information is estimated to vary from 20 to 120 minutes with an average of 50 minutes per response, including time for reviewing instructions, searching existing data sources, gathering data needed and completing and reviewing the collection of information.

| 1. Position, series, and grade for which you are applying | | | 2. Announcement number | | 3. Closing date |
|---|---|---|---|---|---|
| Internal Revenue Agent (Sr. Program Analyst), GS-512-14 | | | APB-03-138MM | | 5/19/2003 |

| 4. Name (last) | (First) | (MI) | 5. Current position |
|---|---|---|---|
| Jones | Sheila | E. | Internal Revenue Agent (Program Analyst) |

| Mailing address | | | Series and grade | Date of last promotion |
|---|---|---|---|---|
| 117 Fairway Dr. | | | GS-512-13 | 10/21/2001 (NTE 1 yr) |

| City | State | Zip Code | Function and Office Code Symbol |
|---|---|---|---|
| Waterloo | IL | 62298 | AP:TS:TP&P:LMSB and TEGE |

| 6. Telephone numbers (including area code) | | 7. Social Security Number |
|---|---|---|
| Day: (314) 612-4885 | Evening: (618) 939-9133 | ▉▉▉▉▉▉▉ |

8a. High School or (highest grade completed)/Vocational/Trade/Other:

Cahokia High School
Cahokia, IL 62206

| b. Name of college or university, location and Zip Code | Attended month and year | | Major: Accounting | | Degree and date |
|---|---|---|---|---|---|
| | From | To | Credits completed - Semester or Quarter Hours | | |
| Fontbonne University, St. Louis, MO | 9/1992 | 6/1995 | 152 | | Bachelor of Science - 6/1995 |
| Southwestern Illinois College, Belleville, IL | 9/1972 | 6/1974 | 62 | | Associates Degree - A.S. |

| c. Chief undergraduate subjects | Credits completed | d. Chief graduate subjects | Credits completed |
|---|---|---|---|
| Accounting | 22 | | |
| Business Law | 6 | | |
| Economics | 6 | | |

**ATTACH TRANSCRIPT(S) FOR POSITION WITH POSITIVE EDUCATIONAL REQUIREMENT**

9. Other formal training or course (Do not attach copies of training certificates.)

| Type of Training/Course, eg: OPM, IRS, College, Army, etc.) | Location | Title | Date | |
|---|---|---|---|---|
| | | | From | To |
| IRS | St. Louis, MO | Rev. Agent Phase I, II, III, IV, V | 10/1979 | 5/1992 |
| IRS | San Francisco/St. Louis | Lead Functional/Lead Core | 1/1991 | 2/1992 |
| IRS | Cincinnati, OH | Special Processing | 8/1993 | 8/1993 |
| IRS | Chicago, IL | Restricted Interest | 8/1994 | 8/1994 |
| IRS | Lexington, KY | Intermediate Restricted Interest | 5/2000 | 5/2000 |
| IRS | New Carrollton, MD | SGML Training | 1/28/2002 | 2/1/2002 |

Form 9686 (Rev. 12-2001)    Catalog Number 21010Y    publish.no.irs.gov    Department of the Treasury-Internal Revenue Service

10. Experience (Start with most recent significant position held and list all relevant federal and non-federal experience.)

| Date (Mo/Day/Yr.) | | Position (Show organizational title and activity or function. Otherwise show agency or firm. Use additional sheet if necessary) | Series and Grade | Salary (Per Hour/Year) | Average No. of hours per week. |
|---|---|---|---|---|---|
| From: | To: | Sr. Program Analyst (10/21/01 to 12/14/02) Internal Revenue Agent-Program Analyst (12/15/02 to present) | GS 512-13 | $84,164 | 40 |
| 10/21/01 | Present | | | | |

Your Immediate Supervisor: David M. Geber                    Telephone Number: (202) 694-1827

DESCRIPTION OF DUTIES. (USE ADDITIONAL SHEETS IF NECESSARY; DO NOT ATTACH POSITION DESCRIPTION.)

Prior to Appeals' Refinement, my program responsibilities included coordinating LBS Travel Expenses, coordinating Friday Report articles submitted by LBS employees, Early Referral Program, Delegation Orders and Policy Statements, and IRM Part 8 Updates. Specifically my duties included monitoring travel usage, and generating and analyzing monthly travel reports using the Automated Financial System program. Friday Report articles prepared by LBS employees were sent to me to ensure all publishing guidelines were followed, and that the article was accurate and appropriate for publishing. I generated and analyzed AdHoc reports on the Early Referral Program cases to identify systemic problems with the assignment process. I suggested possible enhancements to the program. I was involved in coordinating changes made to Delegation Orders 42, 97, 236, and 247, which included ensuring the clearance process was properly followed.

In early October, responsibility for the entire TCS Program transitioned to me. This program covers a wide array of activities relating to the TCSs. My duties include coordinating the purchase and distribution of computation software, and keeping track of which programs each employee uses. I also coordinate a committee who is responsible for suggesting and reviewing changes and updates to the TCS Web Site. On a monthly basis, I plan and lead conference calls with two TCS groups - the ATCSAG (Appeals Tax Computation Specialist Advisory Group) and the RGS Area Contacts Group. These two groups are an integral tool to communicating with field employees to ensure their concerns are identified and addressed. I have been actively involved in updating TACS (Technical Automated Control System), which is used by the TCSs to generate monthly time reports and to track inventory. I also coordinate and oversee an IRM 8.17 work group responsible for updating the TCS portion of the IRM. (see item 17 a. for additional duties)

| 11. Date (Mo/Day/Yr.) | | Position (Show organizational title and activity or function. Use additional sheet, if necessary) | Series and Grade | Salary (Per Hour/Year) | Average No. of hours per week. |
|---|---|---|---|---|---|
| From: | To: | LMSB Appeals Tax Computation Specialist | GS-512-13 | $74,322 | 40 |
| 2/2/97 | 10/20/01 | | | | |

Your Immediate Supervisor: Mary K. Nystedt                    Telephone Number: (312) 886-5736 Ext. 687

DESCRIPTION OF DUTIES. (USE ADDITIONAL SHEETS IF NECESSARY; DO NOT ATTACH POSITION DESCRIPTION.)

As a team member on the Team Case Leader's cases, I worked with the most complex and complicated auditing, computational and procedural issues within LMSB: Area 3 Appeals. Each case required direct communication with the taxpayer's representative to resolve complex issues and computational differences. Many times a written position on settlement of computational issues was provided to the Team Case Leader for inclusion in the ACM. Contact with Compliance personnel was also necessary on most cases to resolve questions and differences between the 120-day pre-computation and the Revenue Agent Report.

The cases required research of old tax law and/or interpretation of court decisions and opinions. These cases also involved precedent setting determinations which required a considerable amount of judgment and knowledge in order to interpret case documents and applicable tax laws. The cases involved usually concerned large partners, and national and international operations. This position required me to analyze and review voluminous case file materials in order to clearly and persuasively present the government's position on computational issues, and to prepare accurate audit statements that were legally correct.

When preparing statutory notices of deficiency on these complex cases, particular attention was paid to details provided in the Revenue Agent Report, Team Case Leader and/or Area Associate Counsel's instructions. This was critical to the accuracy and validity of the statutory notice. It was also an important source of information provided to the taxpayer so that the unagreed issues were fully understood and the government's position was properly defended.

I worked independently and required very minimal supervision or input from the Team Case Leader or my supervisor.

Sheila E. Jones

11. Experience, continued

| Date (Mo/Day/Yr.) | | Position (Show organizational title and activity or function. Otherwise show agency or firm. Use additional sheet if necessary) | Series and Grade | Salary (Per Hour/Year) | Average No. of hours per week |
|---|---|---|---|---|---|
| From: | To: | | | | |
| 1/1/1990 | 2/2/1997 | Chief of Technical Section in St. Louis Appeals | GM - 512-13 | $59,600 | 40 hrs |

Your Immediate Supervisor
Diane S. Ryan

Telephone Number:
(314) 612-4640

DESCRIPTION OF DUTIES. (USE ADDITIONAL SHEETS IF NECESSARY; DO NOT ATTACH POSITION DESCRIPTION.)

I was a first line supervisor responsible for planning, directing, coordinating and reviewing work for the technical analysts (currently known as tax computation specialists) who determined and reviewed final tax liabilities for all appealed cases, prepared statutory notices of deficiency and Rule 155 computations, determined Jt. Committee jurisdiction, and performed other duties relating to accounting and auditing work. Staffing under my supervision ranged from 4 to 9 technical analysts.

My duties entailed monitoring the aging of the cases received in the Technical Section to ensure lapse time was kept within the guidelines set by Regional Office. When possible, I performed audit computations on the more complex cases. In addition, I provided technical and procedural guidance to managers, appeals officers, district counsel attorneys, technical analysts, and other support employees. When a problem arose on a case relating to the audit or restricted interest computations, I coordinated with ESPB to resolve the problem so processing of the case was not delayed. I not only routinely interacted with ESPB, but also with the Problem Resolution Office and the KCSC to resolve taxpayer inquiries pertaining to account or billing problems.

As the supervisor, I prepared numerous written case reviews, a mid-year evaluation and an annual performance appraisal for each technical analyst. I also provided a mid-year appraisal and an end-of-year accomplishment statement to my supervisor for each fiscal year. I acted as on-the-job instructor for new hires, and provided workshops to train my employees on new or complex areas of tax law that impacted their jobs.

Each year my PMRS objectives included a requirement that the Technical Section provide good customer service, produce quality work products, and keep the turnaround time on the cases to a minimum. Thus, it was my responsibility to analyze my subordinate's monthly reports to identify discrepancies or problems that adversely impacted my objectives. When identified, I had to determine what actions to take to remedy them. I created a spreadsheet that tracked the monthly inventory for the section. It kept track of hours spent on the case and the length of time the case was in the section. From this, I compiled a monthly report that was given to the Chief, Appeals.

I was a member of the Appeals Regional Quality Council. This council was responsible for analyzing quality suggestions submitted by employees throughout the Region to determine if they had merit. Discussions centered on whether to form a team; who would populate the team; who would be directly and indirectly impacted by the findings, etc. As a member, I was given ownership of one or more quality suggestions. This meant I was responsible for staying on top of the team's progress, offering my assistance when necessary, and providing the Council with updates at the monthly meetings.

**12. Awards** (List specific types of awards and date received with the last 3 years; list other special recognition and any pertinent information)

Special Act Award - 8/11/2002
Performance Award - 8/12/2001
Performance Award - 8/22/2000

**(DO NOT ATTACH COPIES OF AWARDS, LETTERS OF APPRECIATION, ETC.)**

**13. Organization** (Show membership, and offices, professional societies civic groups, etc.)

Secretary, Ridge Ladies Golf League - 2003
President, Ridge Ladies Golf League - 2000/2002
Council Member, Belleville Diocese Youth Ministry Council - 2001/2002/2003
Catechism Teacher, Sts. Peter and Paul Parish School of Religion - 2000/2001/2002/2003

**14. Other Assignments** (details, task forces, on-the-job- instructor etc.)

LMSB and TCS CPE Planning Committee for 2002/2003
IRM Part 8 Work Group – 2002
Coordinator for LMSB ATM Guide Work Group - 2002
TCS CPE Instructor in 2000/2001/2002
ATCL and Tax Computation Specialist Ranking Scheme Work Group - 2002
Appeals Tax Computation Specialist IRM 8.17 Task Force
Tax Computation Specialist Critical Elements and Standards Task Force
Coordinator of In-House BNA Software Training for Large Case TCSs in Midstates Region
Midwest Regional Quality Council
Midwest Appeals Automation Council
TCS on-the-job Instructor

**15. Special Qualifications and Skills** (Languages- Indicate level of proficiency (Very Good, Good, Fair) to converse, write, read, Shorthand (words per minute, Typing (words per minute), computer skills, etc.)

Proficient in the use of the following software programs:
   > Excel      > Word
   > PowerPoint   > BNA
Experience in using SGML for IRM Updates and DMI for computing Interest
Proficient typing skills - 65 wpm
Excellent communication skills - written and oral

**16. Kind of Job Related License or Certificate Held** (CPA, CIA, Lawyer, Engineer, etc.)

N/A

Form **9686** (Rev. 12-2001)

17. Statement of Accomplishment: Describe duties and accomplishments which demonstrate your potential for the position to be filled. Use additional sheets if necessary.

a. Describe your current duties and responsibilities that are relevant for this position.

(continuation of item 10 above)

After the Refinement, I continued to have responsibility for the TCS Program, coordination of Friday Report submissions, and the Early Referral Program. In addition, I was given responsibility for Statutes.

I participated and helped coordinate a work group assigned the task of writing the LSB text for the ATM Guide. In addition, another analyst and I worked with the ATMs on this work group to create the ranking criteria and standard interview questions for the ATCLs. Subsequently, we also created the ranking criteria for the Tax Computation Specialist GS 526-9, GS 512-11, 12 and 13 positions. Currently, I am coordinating the TCS CPE and assisting with the ATCL CPE planning for 2003. I also participated in planning both the ATCL and the TCS CPEs for 2002, and was an instructor for the TCS IRM 8.17 session at the CPEs in 2001 and 2002.

I have been designated as the TCS representative on the Reporting Compliance Advisory Council (RCAC), a cross-functional group who discusses and plans activities relative to the RGS software. I was also the TCS representative on the Shared Drive Initiative group, who was charged with finding ways to utilize the shared drive to increase productivity in Appeals.

b. Describe any special qualifications that are relevant for this position. (Give examples.)

Temporary Promotion and Reassignment to Program Analyst - My current position mirrors the requirements of this job announcement. The experience that I have gained since becoming a Program Analyst in October 2001 is instrumental in highly qualifying me for this position.

Appeals Tax Computation Specialist IRM Task Force Member - Participation on this task force demonstrated my ability to communicate effectively both orally and in writing. It also supported my extensive knowledge of the TCS position.

Chief, Technical Section - The experience of planning, coordinating and managing the work of subordinates while monitoring the satisfaction of customers - both internal and external - is a pertinent tool to performing the duties of a Program Analyst.

I certify that to the best of my knowledge and belief, all of my statements on this form are true, correct, complete, and made in good faith.

| 18. Original signature (Sign each application in ink) | 19. Date signed (Month, day, year) |
|---|---|
| *Sheila E. Jones* | 5/14/2003 |

Form 9686 (Rev. 12-2001)    Catalog Number 21010Y    publish.no.irs.gov    Department of the Treasury-Internal Revenue Service

# Bargaining Unit Performance Appraisal and Recognition Election

(Review instructions before completing this form)

| 1. Name of employee (Last, first, middle initial) | 2. Social Security Number | 3. Reason for Appraisal |
|---|---|---|
| Jones, Sheila | | ☐ Annual Rating  ☐ Interim Rating |
| 4. Office symbols/Organization | 5. Pay plan, series and grade | ☐ 90 Day Appraisal |
| Appeals- LBS, Operations | GS-343/ 14 | ☒ Other |
| 6. Position title | 7. Period covered | Reason for other: Departure |
| Program Analyst | From: 5-30-02   To: 12-15-02 | 8. Mandatory progress review was |
| 9. Retention Standard Rating | ☐ Not Applicable  ☒ Met  ☐ Not Met | conducted on |

| 10. Critical Job Elements (CJEs) | 11. Performance Aspects | 12. Performance Aspects Rating | | | | 13. CJE Ratings |
|---|---|---|---|---|---|---|
| | | Exceeds | Meets | Fails | N/A | |
| I. Employee Satisfaction – Employee Contribution | A. Workplace Interaction | X | | | | |
| | B. Workgroup Involvement | X | | | | 5 |
| | C. Workplace Environment | X | | | | |
| II. Customer Satisfaction – Knowledge | A. Issue Identification | | X | | | |
| | B. Technical Knowledge | X | | | | 4 |
| | C. Issue Resolution | X | | | | |
| | D. | | | | | |
| | E. | | | | | |
| III. Customer Satisfaction – Application | A. Verbal Communications/ Listening | X | | | | |
| | B. Written Communications | X | | | | 5 |
| | C. Interaction | X | | | | |
| | D. | | | | | |
| | E. | | | | | |
| IV. Business Results – Quality | A. Accuracy of Work | X | | | | |
| | B. Research and Analysis | X | | | | 5 |
| | C. Security/Privacy/Disclosure | X | | | | |
| | D. | | | | | |
| | E. | | | | | |
| V. Business Results – Efficiency | A. Planning and Scheduling | X | | | | |
| | B. Workload Management | X | | | | 5 |
| | C. Time Utilization | X | | | | |
| | D. | | | | | |
| | E. | | | | | |

| 14. Overall rating | ☒ Outstanding  ☐ Fully Successful  ☐ Unacceptable | 15. Average CJE Score |
|---|---|---|
| | ☐ Exceeds Fully Successful  ☐ Minimally Successful | 4.8 |
| | ☐ Not Ratable   Reason for not ratable: | |

**A. Certification of Rating –** *By signing below, each Rater and Reviewer certifies that records of tax enforcement results (ROTERs) were not used to prepare this appraisal.*

16a. Rater name/title/signature/date
*William Kuentz*  Dir. LBS, MAP  3-7-03

16b. Reviewing Official name/title/signature/date
*Andrew S. Zander*  3-12-03

16c. Employee signature/date *(Signature only indicates copy has been received, not agreement)*
*Sheila B. Jones*  3/24/03

| 17a. Revalidation of Rating of Record *(Period covered)* | 17b. Mandatory progress review conducted on | 18a. Revalidation of Rating of Record *(Period covered)* | 18b. Mandatory progress review conducted on |
|---|---|---|---|
| From:           To: | | From:           To: | |
| 17c. Rater name/title/signature/date | | 18c. Rater name/title/signature/date | |
| 17d. Reviewing Official name/title/signature/date | | 18d. Reviewing Official name/title/signature/date | |
| 17e. Employee signature/date *(Signature only indicates copy has been received, not agreement)* | | 18e. Employee signature/date *(Signature only indicates copy has been received, not agreement)* | |

Form **6850-BU** (1-2003)   Cat. No. 35509M        publish.no.irs.gov        Department of Treasury - Internal Revenue Service

| **B.** Management Determination and Employee Election Regarding Performance Recognition *Review instructions and information for each determination or election before completing this form.* | Name of employee (Last, first, middle initial) Jones, Sheila |
|---|---|

**Management Determinations**

a. A QSI has been approved for this employee.

b. **Tenth step of the grade - 3% of salary award in lieu of a QSI** - This employee is paid at the tenth step of the grade and is not eligible for a QSI; therefore, a 3% of salary award or a performance award, whichever amount is greater, has been approved for this employee.

c. **Time-Off** - This employee may elect time-off if granted a performance award or if he or she elects a 3% of salary award in lieu of an approved QSI. (A combination of monetary payment and time-off is not authorized for this election.)

**Employee Elections**

d. **QSI** - I accept the approved QSI. I understand I am not eligible for a performance award under the National Performance Awards Agreement (NPAA) for the covered period.

e. **3% of salary award in lieu of a QSI** - I elect a 3% of salary award in lieu of an approved QSI. I understand I will receive either the 3% of salary award or a performance award for which I am eligible under the NPAA, whichever amount is greater.

f. **Tenth step of the grade - 3% of salary award in lieu of a QSI** - I understand I am paid at the tenth step of the grade and ineligible for a QSI. Therefore, I understand I will receive either a 3% of salary award, or a performance award for which I am eligible under the National Performance Awards Agreement, whichever amount is greater.

g. **Time-Off** - I elect to receive time-off in lieu of a monetary award described above. I understand if the calculated time-off hours exceed the 40 or 80 hour limitation, the value of the excess hours will be paid as a supplemental monetary award.

h. **Monetary Award** - If granted a performance award, I elect to receive a single monetary payment.

**Period covered indicated in block 7**

From: 4-30-02    To: 12-15-02

19. Supervisor checks the box(es) applicable to recognition determination.

| ☐ a ☐ b ☐ c | Supervisor name/title/signature/date |
|---|---|

20. Employee checks one box applicable to the supervisor determination indicated above.

| ☐ d ☐ e ☐ f ☐ g ☐ h | Employee signature/date |
|---|---|

**Period covered indicated in block 17A (Revalidation)**

From:    To:

21. Supervisor checks the box(es) applicable to recognition determination.

| ☐ a ☐ b ☐ c | Supervisor name/title/signature/date |
|---|---|

22. Employee checks one box applicable to the supervisor determination indicated above.

| ☐ d ☐ e ☐ f ☐ g ☐ h | Employee signature/date |
|---|---|

**Period covered indicated in block 18A (Revalidation)**

From:    To:

23. Supervisor checks the box(es) applicable to recognition determination.

| ☐ a ☐ b ☐ c | Supervisor name/title/signature/date |
|---|---|

24. Employee checks one box applicable to the supervisor determination indicated above.

| ☐ d ☐ e ☐ f ☐ g ☐ h | Employee signature/date |
|---|---|

Form **6850-BU** (1-2003)    Cat. No. 35509M    page 2    publish.no.irs.gov    Department of Treasury - Internal Revenue Service

**C.**

## Instructions to complete Form 6850-BU

All information requested on page one must be completed for processing.

Detailed information on administering the Performance Management System for Bargaining Unit employees is available at: http://shr.web.irs.gov/pers/pm/Nonmgrindex.htm and http://shr.web.irs.gov/cle/index.htm

**Blocks 1, 2, 5 and 6.** Self-explanatory.

**Block 3. Reason for Appraisal:** If "Other" is checked, provide a reason (e.g. Within-Grade Increase determination).

**Block 4. Office symbols/Organization:** State office symbols and business unit (to include section down to the immediate office (e.g. W:CAR:MP:M)).

**Block 7. Period covered:** State the actual dates of the appraisal period. The period covered is normally twelve months, however, there are situations when the period covered will be either longer or shorter than a twelve-month period (e.g. 90 Day Appraisal, Interim Rating).

**Block 8. Mandatory progress review was conducted on:** Supervisor annotates the date mandatory progress review was conducted with the employee.

**Block 9. Retention Standard Rating:** Narrative is mandatory if assigned rating is "Not Met".

**Block 10. Critical Job Elements (CJEs):** The five (5) critical job elements for all positions are listed.

**Block 11. Performance Aspects:** List performance aspects for each CJE, which are identified in the performance plan. Each critical job element consists of 3 - 5 aspects.

**Block 12. Performance Aspects Rating:** Rate each aspect as Exceeds, Meets, Fails or Not Applicable (N/A) by checking the appropriate block.

**Block 13. CJE Ratings:** Appraise the employee against the CJEs of his/her position for the rating period. In rare situations, if performance of the duties/responsibilities reflected by a CJE has not been observed for the mandatory minimum time required, rate the CJE as "Not Applicable" (N/A). Reasons for not appraising CJE(s) must be documented as part of the appraisal.

The rating for each CJE will be based upon a review and consideration of all aspects of the CJE, using the following scale:

- OUTSTANDING - "5" - Exceeds all performance aspects of the CJE.
- EXCEEDS FULLY SUCCESSFUL - "4" - Exceeds more than half of the performance aspects of the CJE and meets the remaining performance aspects.
- FULLY SUCCESSFUL - "3" - Meets all performance aspects of the CJE.
- MINIMALLY SUCCESSFUL - "2" - Fails one performance aspect of the CJE.
- UNACCEPTABLE - "1" - Fails two or more performance aspects of the CJE.

**Block 14. Overall Rating:** After rating the individual critical job elements (Column 13) and the Retention Standard (Block 9), assign an overall rating using the following scale:

- OUTSTANDING - Employee is rated "Outstanding" in more than half of the CJEs and "Exceeds Fully Successful" in the remainder of the CJEs, and receives a "Met" on the Retention Standard.
- EXCEEDS FULLY SUCCESSFUL - Employee is rated "Exceeds Fully Successful" or above in more than half of the CJEs and "Fully Successful" in the remainder of the CJEs, and receives a "Met" on the Retention Standard.
- FULLY SUCCESSFUL - Employee is rated "Fully Successful" or above in all of the CJEs, and receives a "Met" on the Retention Standard.
- MINIMALLY SUCCESSFUL - Employee is rated "Minimally Successful" in one or more CJEs but not "Unacceptable" in any CJE, and receives a "Met" on the Retention Standard.
- UNACCEPTABLE - Employee is rated "Unacceptable" in one or more CJEs or receives a "Not Met" on the Retention Standard.

**C.** **Instructions to complete Form 6850-BU continued**

**Block 15. Average CJE Score:** Is determined by dividing the sum of the ratings assigned in column 13 by the total number of CJEs. Supervisor annotates the numerical score to include two decimal places (e.g. 4.50).

**Block 16. Certification:** Required signatures.

**Blocks 17 and 18.** Revalidation of Rating of Record: If a supervisor determines that a journey level or above employee, in at least the second year of their position, would receive a Rating of Record for the current appraisal period identical to the Rating of Record for the previous period, the supervisor may certify that the most recent Rating of Record is valid for performance in the current appraisal period. When revalidating an appraisal, supervisors are also revalidating the Retention Standard Rating from the previous rating of record. Appraisals may be revalidated indefinitely.

## Instructions for Part B - Management Determination and Employee Election

Detailed information on administering the Performance Awards Program for Bargaining Unit employees is available at: http://shr.web.irs.gov/pers/pm/NPAIndex.htm and http://shr.web.irs.gov/pers/pm/AwardIndex.htm.

**Period Covered.** The period covered for this section must correspond to the periods indicated in Blocks 7 or 17A or 18A.

**Quality Step Increase (QSI) Determination.** A management level higher than the initiator of the QSI recommendation, as determined by the operating, functional, or support unit, must approve a QSI.

**Time-Off Determination.** The employee's immediate supervisor has approved a time-off option in lieu of a monetary performance award or a 3% of salary award.

**Blocks 19, 21 and 23.** Supervisor reviews options and checks the appropriate box(es), signing and dating the form.

**Blocks 20, 22 and 24.** The employee documents election by checking the appropriate box that corresponds to management's determination, signing and dating the form.

## Privacy Act Notice

The Privacy Act of 1974 requires that when we ask you to provide information about yourself, we must tell you: our legal right to ask for the information; the principal purpose(s) for which the information is intended to be used, what could happen if we do not receive any or all of the information, and whether your response is voluntary or mandatory. Our legal right to ask you to acknowledge receipt of the performance appraisal is derived from 5 USC 9508, General Workforce Performance Management System and 26 CFR Part 801, Balanced System for Measuring Organizational and Employee Performance within the Internal Revenue Service. The authority to solicit this information is also derived from 5 USC 2301, 5301, 5336, and 5338 and the Code of Federal Regulations (Title 5, Part 531, Subpart D, "Within-Grade Increases" and Subpart E, "Quality Step Increases"). Management is requesting this information in order to record the employee's election. The QSI or award will be processed in accordance with the information you furnish. Failure to furnish any or all of this information may result in your QSI or award possibly being processed other than you would have elected, or may negate the employee's opportunity to elect time-off. The legal authority to request this information is the United States Code, Title 5, Chapters 43 and 45 and the Code of Federal Regulations (Title 5, Part 451, Subpart A, "Agency Awards"). The information contained in this form may be disclosed to IRS employees who need it to conduct official duties. Disclosures may also be made when appropriate, under routine uses published in the Federal Register for Privacy Act Systems of Records, Treasury/IRS 36.03, General Personnel and Payroll Records. Under the appropriate circumstances, disclosure may be made to the Office of Personnel Management, the Equal Employment Opportunity Commission, the General Accounting Office and others.

This is a departure rating covering Sheila's performance from the end of her last appraisal period (April 30, 2002) through the end of her temporary promotion (December 15, 2002). May 1, 2002

As a Grade 14 Program Analyst, Sheila was assigned the responsibility for the LBS portion of the Friday Report, tracking and reporting on travel funds for all of LBS, the Appeals Delegation Orders, and coordination of the Area Director conference calls. As time went on, other significant assignments were added, most notably the coordination of the IRM group focusing on updating the manager's guide, creating the ranking criteria for positions within LBS, and updating the LBS portion of the IRM. On October 31, she was assigned sole responsibility for the Tax Computation Specialist (TCS) Program when the previous analyst left on extended sick leave.

She did great job of handling all of her assignments and made a significant contribution to the success of the LBS Operations group.

## 1. Employee Satisfaction – Employee Contribution

### A. Workplace Interaction

This aspect highlights one of Sheila's strongest assets – the ability to work well with others. As an analyst, she repeatedly demonstrated her ability to develop and sustain excellent interaction with others in the office. She volunteered to assist the analyst responsible for planning the LBS CPE and the analyst responsible for the Tax Computation Specialists CPE. Her hard work and positive attitude were instrumental in helping these analysts plan and carry out very successful CPEs.

She wasted no time in establishing the necessary contacts to efficiently track and report on the LBS travel funds. On her own initiative, she made contacts to acquire permission and learn how to use the Report Management System (RMS) so that she could run travel reports. Responsibility in this program area required Sheila to interact often with the budget employees as well as the Area Directors. She developed excellent rapport with both.

Sheila was required to interact with a wide range of employees within and outside of Appeals. These interactions were always professional, courteous and productive. She has done an excellent job of creating effective working relationships with everyone she has dealt with during her time as a program analyst.

### B. Workgroup Involvement

Sheila again exceeds expectations in this aspect of the job element. While in LBS Operations, she had occasion to work closely with several members of the workgroup to improve operations. She shared responsibility for leading the IRM group with another analyst and she worked effectively in conjunction with several

members of the group to produce Friday Report articles. She and another analyst volunteered to develop ranking criteria for the ATCL and TCS positions, which resulted in an excellent product that will be used to assist in ranking promotion packages for these positions in the future.

During employee meetings, she readily participated in discussion of topics important to the group. She willingly shared her experiences and suggestions but always in a tactful, courteous way. When she obtained information that she felt would be helpful or important to the group, she did not hesitate to voluntarily share it. Several times she offered her assistance to others.

## C. Workplace Environment

Sheila always works well with others and is genuinely interested in offering her help no matter what the situation. During this rating period, she demonstrated her willingness to do whatever was necessary to make the office a better, more productive place to work. She approached each task with a positive, upbeat attitude. Whenever interacting with co-workers, she was always receptive to their opinions and suggestions, and sensitive to their feelings. This helped create a cooperative atmosphere within the group, and resulted in others becoming very receptive to her.

It is very valuable to have someone like Sheila in the group. Her contributions towards the good of the group and not just her programs, demonstrates her ability to be a team player.

## I have rated Sheila as exceed in all aspects of this job element.

## 2. Customer Satisfaction – Knowledge

## A. Issue Identification

Sheila's program responsibilities presented her with numerous opportunities to interact with all levels of employees within Appeals. Whether she was contacting the Directors or Technical Advisors about the travel budget, soliciting input for the update of the IRM, or planning and coordinating conference calls with the Appeals Tax Computation Specialists Advisory Group, she was able to effectively open the lines of communication and keep them open.

During her time as a Program Analyst she was able to identify problems and/or solutions. As roadblocks were thrown up, she analyzed the cause and sought a solution by researching the avenues for resolution. Before seeking the help of her supervisor or co-worker, she always formed an opinion and organized her thoughts before presenting the problem to them.

B. Technical Knowledge

Sheila has considerable expertise in certain areas, especially that related to the Tax Computation Specialists. Although she was new to the position of a program analyst, she quickly learned what roles she would be playing and took necessary steps to learn what needed to be done to successfully manage her programs.

Her expertise as a Tax Computation Specialist was a big asset in the smooth transition of the TCS Program to her starting in August. She was able to immediately pick up and go forward with the various duties performed by the previous analyst, including participation on a cross-functional RGS group, coordination and planning of conference calls with two different TCS groups, distribution of technical and procedural information pertinent to the TCSs, and coordination of the purchase and installation of the tax computation software.

Her analysis and recommendations for changes to the TACS program were critical to the final enhancements forwarded to ITS. Recently, the new Directors of the TCSs have consulted with her in an attempt to learn what needs to be done to the TACS program to revise it for the new realignment. Additionally, they have sought her input on technical and procedural matters pertaining to TCSs.

C. Issue Resolution

There is no doubt that Sheila has an adept ability to get things done and bring projects to conclusion timely. She never hesitates to make contacts and seek information when there is a need to work through issues that prevent tasks from being completed. One particular project stands out - the recent purchase of the BNA software for the TCSs. The method of purchase changed significantly from last year. Problems developed with what items were being purchased for Appeals. There was much confusion along the way, but Sheila stayed on it and in the end it was satisfactorily resolved.

Another example was her handling of outdated software on some TCS's computers. She identified the problem during a conference call with the TCS Advisory Council. She immediately sent an email to all TCSs detailing the version of software they should have, and asking that she be notified if their software was not up-to-date. Once she accumulated the list, she made the necessary contacts to ITS. Her ability to identify an issue and take the necessary steps towards resolution was critical to getting the TCSs quickly updated.

**I have rated Sheila as exceed in aspects B and C of this job element, and as met in aspect A.**

## 3. Customer Satisfaction – Application

### A. Verbal Communications/Listening

Sheila communicates extremely well. As the newest member of the group, it did not take her long to establish excellent working relationships with everyone. This is due in part to her ability to convey a positive, upbeat attitude and willingness to pitch in and help when needed. It is also due to her listening and speaking skills.

Her ability to establish rapport with her peers and the field employees is evident in her success at managing her programs. She was a catalyst in leading the IRM group charged with updating the manager's guide. This group included field management and a NTEU representative. Because of Sheila's excellent communication skills, everyone was kept updated, involved and on track through regular conference calls.

She always clearly conveys her thoughts to listeners. Her ability to verbally communicate well was supported by her teaching assignment at the TCS CPE in June. Sheila conducted three sessions on the IRM 8.17 updates. Feedback from her presentations was very positive. Several attendees commented on the effectiveness of her presentation.

### B. Written Communications

Sheila demonstrated her ability to write effective communications several times within the rating period. She not only wrote articles for the Friday Report but also edited articles submitted by other LBS employees. She received a very complimentary email from one Specialty ATM, who commended her on the great job she did on editing an article he submitted.

It was routine for Sheila to send written communications to Directors, Technical Advisors and Managers concerning issues related to her programs. All of her communications were tactful, effective and well thought out. The written communication she provided me in October on the IRM workgroup meeting provided me with a clear picture of what this group intends to accomplish. As the new temporary Director of Operations, it provided me just the right depth of information to bring me up-to-date. Her email was very well organized, well written and informative.

Feedback from the Human Resources Specialist who worked with Sheila and another analyst on creating the ranking criteria for the TCS and ATCL positions fully supports Sheila's competence in the area of effective written communication. She commented that through hard work and commitment, they developed "excellent" products.

## C. Interaction

As a Headquarters analyst, Sheila was required to interact with field employees and other Headquarters analysts on numerous occasions. In each case she was able to build effective working relationships with courteous, professional interaction. She has a friendly, outgoing personality which makes others feel very comfortable and open to communicating with her.

Sheila was able to handle uncomfortable situations very easily by approaching them with sensitivity to the opinions and feelings of others. One particular instance comes to mind. One of the ATMs on the IRM workgroup had an assignment on the ATM Reference guide that was several days past due. She contacted him, tactfully explained the problem his delay was causing and offered her assistance. Soon thereafter, he completed and submitted his assignment and work on the guide was completed.

**I have rated Sheila as exceed in all aspects of this job element.**

## 4. Business Results – Quality

## A. Accuracy of Work

Sheila is very conscientious and always strives to produce the highest quality of work that she can. Whether she is writing or editing an article for the Friday Report, writing emails to the Areas on the travel budget, or preparing text for the IRM, she makes sure that the information she produces is accurate.

She is cognizant of the importance of providing information that is factually correct. Many times the information she produces is used by the Directors, Technical Advisors or Managers to inform field employees. This requires her to be very careful when analyzing information and making decisions about what needs to be shared with other Appeals employees.

## B. Research and Analysis

Because of her background as a Tax Computation Specialist, Sheila has the necessary expertise to research and analyze information, and use it when making decisions. As a relatively new analyst, she was required to research procedures many times when handling issues that were new to her, e.g. document clearances on Delegation Orders, use of RMS to generate travel reports, and the use of AdHoc reports to analyze Early Referral cases in Appeals.

When given an assignment that she was unfamiliar with, she quickly took steps to make the necessary contacts to gather information needed to complete the job successfully.

C. Security/Privacy/Disclosure

Sheila is well aware of the need for confidentiality in her work. The travel reports she generates from RMS are "Official Use Only" and she properly follows the procedures required for information of this type.

She always protects her computer and work area in accordance with local guidelines. Taxpayer information is appropriately destroyed. When she works with information that should be kept private, e.g. travel allocations, ranking criteria for TCS and ATCL positions, she takes necessary steps to ensure that the information does not fall into the hands of someone who does not have need for it.

**I have rated Sheila as exceed in all aspects of this job element.**

## 5. Business Results – Efficiency

A. Planning and Scheduling

There is no doubt Sheila effectively manages her time when planning her work. She easily recognizes what is a priority and what is not and takes quick actions to ensure that she meets all deadlines given to her. Although some of her projects were open-ended with no specific deadline attached, Sheila easily managed to keep these projects moving while handling other work.

Sheila was instrumental in planning conference calls for the IRM workgroup charged with updating the ATM Reference Guide. Every month she scheduled the call, notified the participants, and provided a written overview of accomplishments after each call. Her diligence in coordinating this effort was one of the reasons for the efficient update of the guide.

Once she became responsible for the TCS Program, she was required to identify agenda items and schedule conference calls with two different TCS groups. She wasted no time in taking over this responsibility when the prior analyst left on sick leave. Her ability to take control and determine what needs to be done was instrumental in keeping the TCS program operating efficiently.

B. Workload Management

Sheila's assignments range from weekly updates to long-term projects. She was successful in managing the wide variety of work assignments given to her. When she got into a situation where she felt a little overwhelmed, she did not hesitate to ask her manager for help in setting priorities. She has demonstrated her ability to deal with varying challenges successfully while keeping her programs/assignments up-to-date.

When she first came to Operations, (before this rating period) she had to start from scratch learning her programs. Well before her temporary assignment ended, she had gained the expertise necessary to consistently manage her programs well. Her experience at managing an inventory as a TCS contributed to her success. In addition, her ability to track assignments, monitor due dates, and plan her workday were also contributing factors to her success.

## C. Time Utilization

During this evaluation period, Sheila managed to handle a number of competing priorities and still meet the objectives established for her other programs. This could only have been accomplished by effective utilization of time. Balancing the demands of short-term and long-term projects requires a person to be organized, and focused on the task at hand. Sheila easily demonstrated her capabilities in this area.

She was able to handle extra assignments while concurrently managing her programs. Two examples of her extra assignments were her teaching assignment at the TCS CPE in June, and the help she gave the AOs, ATCLs and other TCSs in the St. Louis office. These employees continued to rely on her TCS expertise by seeking her advice and help on their cases. Sheila was able to provide this assistance while keeping all of her program analyst's work on track and progressing. Whenever Sheila was given something requiring a response, she always made sure that it was completed timely.

**I have rated Sheila as exceed in all aspects of this job element.**

# Qualifications Record

| 1. | NAME |
|---|---|

Robinson, Pamela

| 2. NATURE OF ACTION | 3. LOCATION OF POSITION |
|---|---|
| APN-RPN-03-138MM | DC, LA, or St. Louis |

**4. POSITION TITLE, GRADE AND SERIES**
**Internal Revenue Agent GS-0512-14**

**5. QUALIFICATION STANDARD USE**
**QSH**

**6. TIME REQUIRED BY STANDARD (Specify years or months)**

| 6.A. TOTAL | 6.B. GENERAL | 6.C. SPECIAL | 6.D. IN NEXT LOWER GRADE | 6.E. IN SECOND LOWER GRADE |
|---|---|---|---|---|
| 1 | 0 | 1 | GS-13 | |

**19. ADMINISTRATIVE OR SUPERVISORY EXPERIENCE REQUIRED BY STANDARD**

☐ YES ☐ NO    IN NEXT LOWER GRADE:    IN SECOND LOWER GRADE:

| 8.A. WRITTEN TEST REQUIRED: | 8.B. IF "YES," GIVE TITLE, ELIGIBLE RATING, AND DATE. | | |
|---|---|---|---|
| ☐ YES ☐ NO | | | |

| FROM | TO | EXPERIENCE AND TRAINING CREDITED (Including Mil. Scr.) TITLE, SERIES & GRADE. (IF NON-GOVERNMENT, GIVE TITLE & SALARY | GEN'L YRS-MOS | SPEC. YRS-MOS |
|---|---|---|---|---|
| 9. 10/01 | pres | Analyst - GS-343-13 | 14 | |
| 10. 7/28 | 10/01 | '' - GS-343-13 | 14 | |
| 11. 4/94 | 7/28 | '' GS-343-13 | 14 | |
| 12. 6/91 | 4/94 | '' GS-343-13 | 14 | |
| 13. 12/89 | 6/91 | '' GS-343-13 | 14 | |
| 14. 6/87 | 12/89 | AO GS-930-12 | 14 | |
| 15. 7/85 | 6/87 | SUBSTITUTION ALLOWED Sup. '' GS-826-11 | 14 | |
| 16. | | | | |
| 17. | | TOTAL | 14 | |

**18. REMARKS**

TIG_____
SPECIALIZED_____
SPF_____

Sprott
EXHIBIT NO. 14
9.28.06
C. Jardim

| 20. QUALIFIED | 20. SIGNATURE OF REVIEWER | 21. DATE |
|---|---|---|
| ☐ YES ☑ NO | | 6/7/17 |

FORM 2065 (REV. 11-81)    U.S. GPO: 1983-0-461-505/32
DEPARTMENT OF TREASURY  INTERNAL REVENUE SERVICE

**ARTICLE 12**

USC Section 7101 et seq. The Union recognizes that the electronic mail system is the property of the Employer; and therefore, all NTEU users will comply with the system usage rules which the Employer establishes. Moreover, NTEU will comply with the provisions of subsection 4E when communicating with employees who are not representatives.

## Section 15

**A.**

The Employer will provide each chapter whose bargaining unit employees occupy the building:

1. a copy of building specifications before they are submitted to GSA;

2. a copy of building specifications approved by GSA;

3. a copy of building leases upon request;

4. a copy of all action plans the Employer uses in the process of modifying or occupying space; and

5. a copy of build out requests before they are submitted to GSA.

**B.**

The parties recognize that building specifications, build out specifications, floor plans, and action plans used in the process of modifying or occupying such space are proper subjects to be negotiated between the parties prior to implementation.

## Section 16

Each Union steward in a Campus will have access to the nearest telephone. If the steward does not have access to a private telephone, the Employer will respect the steward's privacy. Employees and Union representatives who have access to Government telephones (including FTS or Government-leased lines, where available), VMS, e-mail, or Government-owned computers, for performing his or her regular duties, may utilize those devices for labor-management matters in accordance with Article 9.

## Section 17

The Employer will provide the chapter president of each Center Campus with a reserved parking space.

## Section 18

The Employer will provide each Campus chapter copies of all center director issuances which pertain to personnel policies, practices and matters affecting working conditions.

## Section 19

The Employer will permit access to the National NTEU web site via the Intranet.

## Section 20

Upon a request from the NTEU National President, and subject to IVT network availability, the Employer will provide NTEU with quarterly access to the Employer's IVT network.

# Article 12
# Performance Appraisal System

## Section 1
## Applicability

**A.**

The Employer has determined that the evaluation of employee work performance for purposes of both competitive and non-competitive personnel actions shall be made by means of critical job elements and performance standards-based performance appraisals. The Employer and the Union agree that the purpose of a performance appraisal system is to ensure that the Service provides the appropriate level of service to the customer as part of accomplishing the mission and to continually improve the performance of the organization and to reward employees. To this end, the performance appraisal system is designed to accurately reflect the desired level of performance and to facilitate the assistance, coaching, and development that will allow employees to improve and enhance performance.

**B.**

For purposes of this Agreement, competitive and non-competitive personnel actions include annual ratings, all promotions, within-grade increases, reductions in force, and acceptable level of competence determinations.

**C.**

This article is intended to be interpreted and applied in a manner consistent with 5 U.S.C. Chapter 43 and 5 CFR 430.

## Section 2
## Definitions

**A.**

Annual Rating/Annual Rating of Record -a written record of the appraisal of each critical job element and the overall performance rating. Annual ratings are prescheduled ratings of record and are generally issued once a year. Ratings of record are the official documentation for personnel actions such as within-

Scott
EXHIBIT NO. 15
9-28-06
C. Jardim

grade increases, career ladder promotions, successful completion of probationary period, reductions in force, and adverse performance based actions, absent acceptable substitutes in accordance with Government-wide regulations. These are based upon summary level ratings, i.e., an overall rating of performance.

**B.**

Appraisal - the act or process of reviewing and evaluating the performance of an employee against the described performance standard(s).

**C.**

Critical Job Element - a component of an employee's job that is of sufficient importance that performance below the minimum standard established by the Employer would result in unacceptable performance in the employee's position.

**D.**

Evaluative Recordation - a supervisor's record of indications of performance which forms the foundation for employee development, performance improvement, and/or a summary rating of record, which may have an adverse impact on personnel actions affecting the employee, including the written results of workload or progress reviews. However, in no case will the Employer use measures of program effectiveness to evaluate or appraise an individual employee.

**E.**

Performance Appraisal - the Employer's written assessment of an employee's work performance for purposes of all personnel actions, including, for example, ratings of record (including annual appraisals), summary departure ratings, departure appraisals, promotion appraisals, and revalidated appraisals.

**F.**

Performance Aspect - a portion of the performance standard.

**G.**

Performance Indicator - anything that directs a manager's attention to some aspect of an employee's performance.

**H.**

Performance Standards - the expressed measure of the level of achievement established by the Employer for the duties and responsibilities of a position or group of positions.

**I.**

Revalidated Appraisal - an appraisal for a journey level or above employee in at least the second year of his or her position who receives a rating of record for the current appraisal period that is identical to the rating of record received for the previous period. Appraisals may be revalidated indefinitely.

**J.**

Tax Enforcement Results - tangible products resulting from the substantive efforts of professional and technical employees to enforce the laws relating to the filing of tax returns and the payment of taxes due.

**K.**

Tax Enforcement Duties - any duties of any employees that are intended to create tax enforcement results.

**L.**

Progress Review - a review of an employee's work based on the manager's observation of measurable behaviors related to the critical job elements and performance standards of a position. All employees will receive at least one (1) progress review, if not more, as part of an annual evaluation process, usually about six (6) months before the end of the rating cycle. However, in no case will the Employer use measures of program effectiveness to evaluate or appraise an individual employee.

## Section 3
## Critical Job Elements and Performance Standards

**A.**

The Employer has determined that, pursuant to 5 U.S.C. § 9508 and 5 U.S.C. § 4302, performance standards must, to the maximum extent feasible, permit the accurate evaluation of job performance on the basis of objective criteria related to the positions in question. The Employer has determined that it will not use critical job elements and standards that impose absolute or unreasonable standards unless authorized by law.

**B.**

In accordance with 5 CFR 430.204(b)(1), after initial issuance of critical job elements and standards, the critical job elements and standards will be reissued annually, normally within thirty (30) days of the beginning of the appraisal period. The Employer has determined that critical job elements and standards will be based on the requirements of the employee's position. Employees will be evaluated based on a comparison of performance with the standards established for the appraisal period. In addition, for employees covered by the Employer's general performance plans, each time an employee is assigned to a new position, the Employer will communicate the specific critical job elements and performance standards of the position that will apply to the employee.

**C.**

All aspects of all standards, including numerical standards, procedures, or requirements, referenced

**ARTICLE 12**

in the critical job elements and standards will be communicated to affected employees at the time the employees receive their critical job elements and standards. When an employee is expected to meet a numerical standard that is different from that referenced above, that difference will be communicated in writing.

**D.**

Each critical job element and each aspect of the element will be numbered and/or lettered for identification purposes. The Employer will inform the employee, at the time the critical job elements and standards are communicated, whether aspects of any critical job elements are to be accorded different weights.

**E.**

The Employer has determined that first line supervisors will meet with their employees once every twelve (12) months to discuss new or revised critical job elements and standards; however, if the critical job elements have not changed, the supervisor need not meet with journey level and above employees but will communicate that the critical job elements will remain the same for that rating period. These meetings can occur as a group meeting (that is, more than one, or all of the employees, and the supervisor), or as a one-on-one session between an employee and the supervisor. The type of meeting will be decided on a case-by-case basis by the supervisor. Each Union chapter whose bargaining unit members are attending the meeting will be provided reasonable notification and an opportunity to attend the meeting. The purpose of these meetings or sessions will be to clarify any questions that the employees have concerning their critical job elements and standards (for example, explanations or examples of what employees must do to perform at the levels above fully successful).

**F.**

The Employer has determined that, to the maximum extent feasible, performance standards must be specific, observable and measurable. The performance standard, through its description of the goal in terms of quality, quantity or timeliness, must provide a clear means of assessing whether objectives have been met.

**G.**

**Forced Distribution:** the Employer will not prescribe a distribution of levels of ratings for employees covered by this Agreement, unless otherwise mutually agreed; however, the Parties acknowledge that, absent their voluntary agreement, such negotiations are not subject to impasse procedures.

**H.**

For the duration of this Agreement, the definitions for the overall ratings of Outstanding and Exceeds Fully

Successful shall be as outlined in subsection 5B below; however, for the FY 2002 appraisal period, the Employer has determined and established the following interim definitions:

1.  Outstanding - The employee is rated Outstanding in at least two of the critical job elements (not including the Employee Satisfaction/Employee Contribution critical job element) and Exceeds Fully Successful in two critical job elements (not including the Employee Satisfaction/Employee Contribution critical job element) and receives at least a Fully Successful rating in the Employee Satisfaction/Employee Contribution critical job element.

2.  Exceeds Fully Successful - The employee is rated Exceeds Fully Successful in at least two of the critical job elements (not including the Employee Satisfaction/Employee Contribution critical job element) and Fully Successful in the remainder of the critical job elements that includes the Employee Satisfaction/Employee Contribution critical job element.

As of July 1, 2002, the Employer will provide the Union with a study showing the average ratings given in this critical job element for each major occupation in each awards pool. Data will also be presented showing the average occupational/pool rating in each of the other four critical job elements.

## Section 4
## Performance Appraisals

**A.**

Employees will receive performance appraisals annually. Annual rating will be issued on a quarterly basis by January 31, April 30, July 31, and October 31 for those employees who were due evaluations during the prior calendar quarter based on Social Security Number (e.g., appraisals for October 1 through December 31 are due January 31). The ending date for an employee's annual rating period shall be based on a month determined by the last digit of the employee's Social Security Number (SSN) (Exhibit 12-1). However, if there is a change from one (1) permanent position to another during the last sixty (60) days of the appraisal year, the departure rating(s) becomes the rating(s) of record for the appraisal period. Additionally, when the supervisor cannot prepare a rating of record at the time specified in the plan, the appraisal period shall be extended for the amount of time necessary to meet a reasonable minimum appraisal period at which time a rating of record shall be prepared. The employee's existing rating will be used as the next annual rating until the new appraisal is prepared. The annual rating period date will remain as established regardless of within-grade increases, promotions, and any other actions whether temporary or permanent.

**B.**

1. The Employer has determined that annual ratings/annual ratings of record will be prepared and recommended by employees' immediate supervisors (those who are immediately responsible for the employees' work and who assign, review and evaluate the employees' work).

2. Ratings of record will be prepared within thirty (30) days of the end of the quarter in which the appraisal is due. Upon request, the Employer will provide the local affected chapter a list showing the names and locations of the employees whose annual ratings are overdue by more than sixty (60) days.

3. The Employer has determined that all other performance appraisals will be made by the employees' immediate supervisors (those who are immediately responsible for the employees' work and who assign, review and evaluate the employees' work). However, in a competitive action, if the immediate supervisor is to be considered for a vacant position for which the employee is also being considered, the appraisal will be made by the next higher level manager. In the event that the immediate supervisor is an acting manager, that is, a bargaining unit employee who has been designated to act as a supervisor, but who has not been in a managerial capacity sixty (60) days or more, the appraisal will be made by the next higher level manager.

4. Annual ratings/annual ratings of record when used will reflect the employee's performance for the full annual appraisal period unless the information necessary to make such an appraisal is not available. The employee's annual appraisal will not reflect performance between the end of the month in which the employee's appraisal cycle ended and when the appraisal was given to the employee. Ratings for periods of time which are less than the full annual appraisal period will be so noted. However, annual ratings/annual ratings of record must be postponed or delayed as required in 5 CFR 430 and 531.

5. During the final thirty (30) days of an employee's annual appraisal period (or as otherwise agreed upon), the employee may prepare a written self-assessment (on a form to be provided by the employer) to submit for their supervisor's consideration.

   An employee who chooses to prepare such assessment shall be granted a reasonable amount of official time, not to exceed four (4) hours to do so, and shall submit that self-assessment to his or her immediate supervisor by no later than the last workday of his or her annual appraisal cycle. This self-assessment will be limited to two(2) pages in length. Employees who wish to do self-assessments will be given appropriate guidance on how to write self-assessments.

   (a) By no later than October 1, 2002, the Employer will develop a Web-based tutorial (as well as a comparable paper-based version for employees who do not have access to the Employer's Intranet) to help employees prepare self-assessments of their performance.

   (b) Employees will be afforded a one-time opportunity to complete the tutorial on official time, at an appropriate time to be determined by their immediate manager. However, employees may take the tutorial any number of times on their own time.

6. If the supervisor rejects an employee's self-assessment, the supervisor will meet with the employee and explain his or her reason.

7. In addition to the appraisals that are due based on the above requirements, an employee may request another appraisal be prepared if it has been more than 90 days since his or her last annual appraisal. If the supervisor determines that the current appraisal is no longer valid and indicative of the employee's current performance, the supervisor may, at his or her discretion, prepare a new appraisal; however, the supervisor's determination not to prepare a new appraisal is not grievable.

**C.**

Performance appraisals will be made in a fair and objective manner. They will measure actual work performance in relation to the performance requirements of the positions to which employees are assigned and will be based on a reasonable and representative sample of the employee's work.

**D.**

An employee will be advised each time an appraisal is used in a personnel action, and the employee will be provided a copy upon request.

**E.**

Performance appraisals will provide for the uniform treatment of all employees in a Division with identical elements and standards and with similar working conditions, with particular attention to employees performing the same job in the same work unit. Emphasis on the work unit does not lessen the Employer's obligation to provide uniformity at the Divisional level.

**ARTICLE 12**

**F.**

Supervisors will discuss employees' annual or revalidated appraisals at the time such appraisals are issued to employees.

**G.**

Employees may make written comments concerning any disagreement with an annual or revalidated appraisal within fifteen (15) workdays of issuance. In the case of any appraisal which will be used in a pending competitive action, written comments concerning disagreements must be submitted within three (3) workdays of issuance. Such comments will be attached to and become part of the appraisal.

**H.**

Employees will be provided with a reasonable amount of official time, not to exceed four (4) hours, to prepare written comments concerning any performance appraisal unless the Employee requests a review as outlined in subsection 4S. Such comments will be attached to and become part of the appraisal. Failure to rebut does not indicate employee agreement with the appraisal. Similarly, failure by the supervisor to comment on the employee's rebuttal does not indicate agreement with the employee's comments. It is not necessary or appropriate for a supervisor to prepare additional remarks regarding the employee's comments in that the appraisal constitutes management's stated position.

**I.**

An employee's initials on a performance appraisal, where the signature is provided for, indicates only that the performance appraisal has been received, not an employee's agreement with the performance appraisal.

**J.**

1.  The Employer has determined that only time spent performing work related to an employee's critical job elements and standards will be considered in performance appraisals. Authorized time spent performing collateral duties and Union representational functions will not be considered as a negative factor when evaluating any critical job elements. For example, if a Union representative has spent 30% of a work period on official time, annual leave, LWOP or performing Union duties, this fact will be considered in the application of expected performance standards. Additionally, if an employee is performing collateral duties or Union representational functions that result in frequent interruptions of normal work, such factors will be taken into account when evaluating the employee.

2.  The Employer has determined that a Union representative working virtually full time on Union duties, will receive an annual or a revalidated appraisal, provided the Union representative has worked enough time to be rated, i.e., performed at least 120 hours of work in an evaluation year. If the minimum period cannot be met, the Union representative will receive a "Not Ratable" (NR) rating. While the Parties anticipate that some Union representatives may perform representational duties on a full time or virtually full time basis, they also want to maximize the opportunity for those representatives to perform IRS work. Consequently, each year, these representatives and their supervisors will meet to attempt to identify ways to assign them at least 120 hours of work, which can be performed in a manner consistent with their representational duties. For example, the appraisal could be based upon:

    (a)  working an amount of time equal to that which would meet the center learning curve for the position held by the Union representative;

    (b)  agreements which were in existence at the time NORD/NC V were signed and which are in accord with existing regulations; or

    (c)  the performance of tasks, projects, cases, or other work products/activities which are included in the employee's position description and ratable under one (1) or more critical job elements.

**K.**

In the application of standards to individual employees, the Employer will take into account mitigating factors such as availability of resources, lack of training, or frequent authorized interruptions of normal work duties.

**L.**

All changes in working procedures must be communicated to employees before they can be charged with errors. If instructions were previously in writing, the Employer will issue new written instructions as soon as possible.

**M.**

The process of monitoring performance is on-going. Therefore, the Employer will counsel employees in relation to their overall performance rating on an as needed basis. Such counseling will normally take place when a supervisor notices a decrease in performance and include advice or recommendations on better communicating job requirements, identifying and providing supplemental training (classroom and on-the-job), and providing additional coaching, monitoring, mentoring, and other developmental activities, as appropriate, to help improve employee performance until the employee shows improvement. Special emphasis should be given to those cases

when an employee's performance indicates a decrease in the overall rating. Employees at the journey [...] and above who receive a three (3) in a critical element for more than three (3) years in a row will be entitled to receive, upon request, a development plan. This plan will be jointly established and will identify work assignments and developmental activities which are designed to improve the employee's performance.

**N.**

An employee may request review and reconsideration of the appraisal in accordance with the Performance Appraisal dispute resolution procedure outlined in subsection 4S. Employees may request review and reconsideration (that is, grieve) their appraisal only upon the issuance of that appraisal; however, if the matter remains unresolved at the conclusion of that process, the Union may invoke arbitration at that time, or alternatively, within thirty (30) calendar days after the employee's appraisal is used in an action, but in no case may an employee's appraisal be grieved or arbitrated more than once after its issuance.

**O.**

In disciplinary actions, performance appraisals, if used to support the actions, may be challenged only in the grievance procedure provided for by this [...] -eement. In adverse actions or actions taken for [...] .cceptable performance, performance appraisals, if used to support the actions, may be challenged in the grievance procedure or statutory appeals procedure.

**P.**

All scored performance appraisals must contain a written narrative justification for each score given beyond simply stating that the standards have been met. Normally, this narrative need not exceed two single-spaced typed pages. If no justification is available due to a lack of opportunity to perform in that element or to be observed performing in that element, a "Not Applicable" (NA) will be awarded in lieu of any score. However, if the supervisor decides to award a "4" or "5" in an element and that same score or a lower score was awarded the prior year, no narrative will be required. In these instances the employee may prepare a narrative summary for that element in the same manner as provided in subsection 4B5 above.

1. If the Employer determines that a journey level or above employee in at least the second year of his or her position would receive a Rating of Record for the current appraisal period identical to the Rating of Record received for the previous period, he/she may revalidate that the most recent Rating of Record is valid for performance in the current appraisal period. At least

five (5) workdays prior to this revalidation, the employee will be advised by the Employer of the decision. While there is no narrative summary required for revalidation, the supervisor will still conduct a performance discussion with the employee.

   (a)  In these instances, the employee may prepare a narrative summary or self-assessment as provided in subsection 4B5 above, and it will be attached to the revalidated evaluation for all purposes. If the supervisor objects to its accuracy, the supervisor may prepare his or her own full evaluation with narrative. The lack of a full evaluation in response does not indicate the supervisor agrees with the employee's self-assessment.

2. The Employer has determined that an employee's annual appraisal can be revalidated as many times as the manager determines that the appraisal is still accurate and reflects the employee's current performance.

**Q.**

The Employer has determined that when the monitoring of an employee's performance while communicating with a taxpayer takes place without written notice to the employee at least eight (8) work hours in advance, the results will be made known to the employee within three (3) workdays. However, if the employee has provided incorrect information to a taxpayer, the manager will inform the employee as soon as possible but no later than eight (8) work hours. Upon request, an employee will be allowed to listen to any tape recording. Ratings of exceeds, meets or fails will not be used when an employee is issued feedback from monitoring. Such feedback may be either in narrative or check sheet format.

**R.**

The fact that an employee assumes new tasks, receives new critical job elements, changes positions, is a trainee, and/or gets promoted to a new position does not create a presumption that his or her performance is only "fully successful." Rather, an employee's performance rating will be based strictly on his or her performance against those critical job elements that apply during the appropriate performance rating cycle.

**S.**

The annual performance appraisal provides invaluable information to supervisors regarding an employee's need for additional training or coaching, and provides the employee with realistic feedback on how well he or she has performed during the rating cycle, as compared to the critical job elements for his or her position. Because of the importance of the annual appraisal, any disagreement between the supervisor and the employee over its content should

**ARTICLE 12**

be resolved in an expedited manner that encourages open and constructive dialogue regarding the supervisor's performance expectations, the employee's performance, and the appraisal itself. Therefore, as an exception to the negotiated grievance procedure set forth in Article 41, the following process will be used exclusively to grieve disputes regarding performance appraisals.

1. Within fifteen (15) workdays of receipt of his or her annual performance appraisal, an employee may submit a Request for Review of that appraisal with the immediate supervisor (or the rating official, if it is different than the immediate supervisor). Such Request for Review shall be in writing and shall set forth the employee's reason(s) for the request (e.g., the articles and sections violated, the remedy requested); official time shall be afforded the employee and his or her Union representative to prepare for the meeting, in accordance with Article 9. The Review meeting will be scheduled as soon as possible, but not later than five (5) workdays from the supervisor's receipt of the employee's request.

   (a) The Review Meeting shall include the supervisor, the employee, and the employee's Union representative. The Review Meeting is intended to provide the opportunity for the employee to present and discuss aspects of his or her performance during the rating period that he or she believes should be brought to the supervisor's attention.

   (b) Within five (5) workdays of the Review Meeting, the supervisor will provide a written decision to the employee affirming or modifying, as appropriate, the employee's original performance evaluation, with a copy provided to the designated Union representative. Such decision shall normally be no more than two (2) pages in length.

2. If the Review Meeting does not resolve the employee's concern, he or she may thereafter submit a written Request for Reconsideration to either his or her second-level supervisor, or in the alternative, the employee's first level Executive. Such Request for Reconsideration shall be submitted to the appropriate management official within ten (10) workdays of receipt of the Review Decision. The employee and his or her designated Union representative shall be provided a reasonable amount of official time, in accordance with Article 9, to prepare the Request for Reconsideration.

   (a) If the employee submits the Request for Reconsideration to his or her second-level supervisor, that second-level supervisor shall schedule and hold a Reconsideration Meeting within five (5) workdays of receipt of the employee's request (note that if the employee's second-level manager is an Executive, then a Reconsideration Meeting is optional, as provided in paragraph (2)(b) below). The employee and his or her designated Union representative shall attend the meeting. Within ten (10) workdays of the meeting, the second-level manager shall issue a written decision to the employee, with a copy provided to the designated Union representative.

   (b) If the employee submits the Request for Reconsideration to his or her first level Executive, a Reconsideration Meeting is optional. In this regard, the Executive will normally review the requesting employee's annual appraisal and any supporting documentation provided by the employee and/or his or her rating and reviewing officials and render a final decision, as set forth below; however, if the record is not sufficient for the Executive to make an informed decision in the matter, the Executive may request a meeting, in person and/or by telephone, with: (1) the employee involved, along with his or her designated Union representative, to discuss the employee's Request for Reconsideration; or (2) the appropriate Chapter president to discuss one or more employee Requests for Reconsideration simultaneously. Employee(s) and/or Union officials attending such meetings shall be afforded official time in accordance with Article 9. The Executive shall issue a written decision to the employee, with a copy provided to the appropriate Union representative, within ten (10) workdays of receipt of the Request for Reconsideration, or if a meeting is held in the matter, within ten (10) workdays of that meeting.

   (c) The Employer's decision on an employee's Request for Reconsideration, whether rendered by the employee's second-level manager or his or her Executive, shall be considered final, and the Union may thereafter appeal that decision to arbitration, in accordance with the expedited arbitration procedures set forth in Article 43 (that, is, the Union must invoke arbitration within thirty (30) calendar days).

## Section 5
## Rating Scale

Annual appraisals will be made on Form 6850 and will consist of ratings of "5", "4", "3", "2" or "1", on each critical job element. The ratings and definitions, which were established and determined by the Employer, are defined as follows:

1. Outstanding: "5" exceeds all performance aspects of the critical job element;

2. Exceeds Fully Successful: "4" exceeds more than half (1/2) of the performance aspects of the critical job element and meets the other performance aspects;

3. Fully Successful: "3" meets all of the performance aspects;

4. Minimally Successful: "2" fails one (1) performance aspect;

5. Unacceptable: "1" fails two (2) or more performance aspects; and

6. NA (Not Applicable): performance of the duties/responsibilities reflected by the critical job elements and standards has not been observed.

No later than September 30, 2002, the Employer will conduct a study, which will be provided to the union, comparing the average critical job element scores for the major occupations based on appraisals issued during calendar year 2002 to the average critical job element scores for this same group based on appraisals issued during calendar year 2001.

### B.
Each performance appraisal will include an overall rating, established and determined by the Employer, as follows:

1. Outstanding:  employee is rated Outstanding in more than half (½) of the critical job elements and Exceeds Fully Successful in the other critical job elements;

2. Exceeds Fully Successful: employee is rated Exceeds Fully Successful or above in more than half (½) of the critical job elements and Fully Successful in the other critical job elements;

3. Fully Successful:  employee is rated Fully Successful or above in all of the critical job elements;

4. Minimally Successful:  employee is rated Minimally Successful in one (1) or more critical job elements but not Unacceptable in any critical job elements; and

5. Unacceptable: employee is rated Unacceptable in one (1) or more critical job elements.

## Section 6
## Receipt and Notice of Elements and Standards

### A.
In no event will employees be held accountable or responsible for their critical job elements and standards until they are received by the employees. The Employer has the responsibility of proving that the critical job elements and standards were received by the employees.

### B.
Employees will initial and date a receipt for the critical job elements and standards to show when they were received and discussed with the employee. Initialing does not mean the employee agrees with the Employer established critical job elements and standards. This receipt will be maintained by the Employer and will be available to the employees upon request.

### C.
A receipt will be obtained for substantive changes to critical job elements and standards, for example, changes in numbers for organization, function, and program (OFP) codes, changes in written time deadlines, or substantive changes in other written standards. This receipt will identify the changes as well as the effective date of those changes.

### D.
Employees permanently assigned to a new position description, new positions or work units with different critical job elements and standards, will be given a copy of those and an opportunity to discuss them with the Employer. The Union will be invited to attend these meetings. Union representatives will receive copies at least two (2) workdays in advance of the employees. Employees will be provided time at the beginning of the meetings to read their critical job elements and standards.

### E.
Questions left unanswered during the meetings referenced above will normally be responded to within one (1) week of the end of the meeting. Answers to questions raised by or of interest to the entire group will be communicated to the group.

## Section 7
## New and Revised Elements and Standards

### A.
The Union National Office will be provided copies of critical job elements and standards that are new or revised and will be afforded an opportunity to bargain impact and implementation before the critical job

elements and standards are put into effect. Subsequent to implementation, employees will be responsible for the elements and standards when received.

### B.

If deletions are made for any reason in critical job elements, performance standards, or the aspects that make up the critical job elements, the Union will be notified, as well as the affected employee(s), but the change will take effect immediately.

## Section 8
## Use of Statistics

### A.

The Employer has determined that for purposes of rating critical job elements with performance standards that do not contain a numerical measure of performance, statistics, however generated, may be used as performance indicators provided, however, that tax enforcement results will not be accumulated and maintained as a regular statistic in such a way as to identify the product of any individual employee nor may the Employer use any comparative statistics to assess or evaluate an employee's work. However, the Employer may raise any question with an individual employee about the number of cases the employee has turned in during a specific period, the amount of time the employee has been spending on individual cases, or the kind of results the employee has been achieving. Per IRM 1.5, Managing Statistics in a Balanced Measurement System Handbook, in evaluating the performance of an employee, the supervisor will not use the numeric results achieved with any of the balanced measures to equate directly to a particular rating. Rather, the appraisal should focus on the actions that were taken against the objectives and the results achieved to improve performance. It is a violation of this Agreement to evaluate an employee's performance based on the performance of other employees or on numerical goals or objectives which encouraged the employee to take a specific enforcement action, as opposed to the appropriate action, on any case.

### B.

The Employer has determined that statistics on tax enforcement results concerning an employee's performance maintained by the Employer for the purpose of forecasting and monitoring aspects of work planning and control programs will not be used as quotas, allocations, or as specific amounts of work that must be completed by any individual employee.

### C.

The Employer has determined that enforcement production records will not be used to establish individual quantity performance standards. None of the foregoing will be used to compare one (1) employee with another. For example, no enforcement

employee will be adversely evaluated because he or she failed to meet a certain numerical average, rate, dollar amount, or percentage.

### D.

The Employer and the Union recognize that the Employer has embarked upon a program of automation that will have an as yet undetermined impact on the evaluation of individual employee performance. In recognition of this fact, the Employer will bargain the impact and implementation of any new automated system affecting employee performance appraisals during the life of this Agreement.

## Section 9
## Evaluative Recordation

### A.

The Employer has determined that an evaluative recordation will be furnished to an employee within fifteen(15) workdays of the time the supervisor becomes aware, or should have been aware, of the event which it addresses. If furnished after that time, it may not be used by the supervisor, a ranking panel, or ranking official. Any material which may have an adverse effect on an employee's appraisal or rating by a ranking panel or ranking official, the maintenance of which is not required by the IRM system and which is not shared with the employee, shall be removed and destroyed. Telephone monitoring evaluative recordation will be conducted in accordance with subsection 4Q.

### B.

The Employer will grant the employee a reasonable amount of official time to make written comments concerning any disagreement with an evaluative recordation or other review document at any time prior to its use in a performance appraisal or personnel action. Such comments will be attached to and become a part of the appraisal. The supervisor will determine the appropriate time for the employee to prepare the written response based on workload demands. This time will be scheduled no later than three (3) workdays after the receipt of the request for official time.

### C.

Evaluative recordations respecting telephone monitoring (for example, Forms 6067 and 8094-A) will generally be completed by the Employer within two (2) workdays of the monitored calls and shared with the affected employees within that time. However, failure to meet this goal shall not operate to preclude the Employer from using such information pursuant to subsection 9A above.

### D.

In selecting cases for review, the Employer will select a reasonable and representative sample of the

employee's work. The supervisor will consider any particular case(s) the employee asks him or her to r̶ ̶̶ew.

**E.**

When a review of a particular employee's work performance is specifically made by a manager above the employee's immediate (or first line) supervisor, and that review produces any negative feedback with respect to that particular employee's performance, the procedural requirements set forth in subsections 9A and 9B apply. Wherever possible, the employee will be given the opportunity to meet and/or discuss the matter with the higher-level manager who provided the evaluative comments.

## Section 10
## Details

Pursuant to 5 CFR 430, when employees are detailed or temporarily promoted and the assignment is expected to last ninety (90) days or more, the Employer will provide the employees with critical job elements and standards as soon as possible (no later than thirty (30) days from the beginning of the assignment). The employees will be rated on the critical job elements for the assignment. These ratings will be considered in deriving the employee's next rating of record.

## ̵ction 11
## New System

The Employer will not implement any new system of critical job elements and standards during the life of this Agreement (that is, generic standards) without affording the Union the opportunity to reopen this article.

## Section 12
## New Rating Levels

The Employer has determined to write critical job elements and performance standards at the fully successful level and at a level above and at a level below the fully successful level. The Union will be afforded the opportunity to bargain impact and implementation before these critical job elements and standards go into effect.

## Section 13
## Computer Tracking

At the outset of this Agreement and quarterly thereafter, managers will inform their employees in writing of all computer programs they intend to use to track their employees' performance.

## Section 14
## Numerical Performance Standards for Measured Employees

The parties recognize that the work performed within the Submission Processing function requires specific understanding and procedures as identified below:

**A.**

The Total Evaluation Performance System (TEPS) is the employee performance evaluation system used to evaluate all center employees, GS-08 and below, on a measured performance plan.

**B.**

For purposes of this Agreement, a "measured employee" is an employee who may or may not receive a "measured appraisal", depending on whether or not certain criteria (described below) are met; and a "measured appraisal" is an appraisal derived, in part, from systemically computed "Quality and Quantity" ratings by TEPS.

**C.**

Performance standards for measured employees are set by the Employer pursuant to 5 USC 4302 and Section 3 of this article. Numerical performance standards for each organization, function, and program (OFP) code, by grade level, are set by the Employer in the manner described in IRM 3(43)(401)0.

**D.**

The local chapter will be provided with proposed changes to numerical standards at least two (2) weeks in advance of their proposed implementation date and will be afforded an opportunity to discuss them with the Employer before the employee group meetings described below.

**E.**

Meetings between the Union and the Employer relating to changes in numerical standards will be held at the Operations/Department level. The Union may bring up to three (3) representatives to these meetings. Official time for the meetings will be granted in accordance with Article 9, and bank time may be used for preparation, in accordance with Article 9.

**F.**

In addition to the revised numerical standards, the Employer will provide the local chapter with the reasons for the proposed changes in numerical standards, together with relevant and necessary data supporting the changes.

**G.**

For purposes of Section 7 of this article, the right of the Union to bargain over any adverse impact in the

**ARTICLE 12**

implementation of new or revised numerical standards shall be as follows:

1. when the procedures of IRM 3(43)(401)0 are not followed; and

2. when the Center Director Ranges are revised.

**H.**

In cases where the impact bargaining relating to changes in numerical standards is not completed by the time the proposed numerical standards are scheduled to take effect, the proposed numerical standards will not be implemented as scheduled.

**I.**

Employees will, in advance of the effective date of changes in numerical standards, be provided notification of the new numerical standards, be invited to group meetings to discuss the changes, and be afforded an opportunity to comment on them. These meetings are deemed to be "formal meetings" for purposes of Union attendance. The Employer will explain to employees the reasons for the proposed changes to numerical standards during these group meetings.

## Section 15
## Quarterly Performance Summaries for Measured Employees

**A.**

On a quarterly basis, TEPS will calculate performance summaries for measured Quality and measured Quantity. These summaries will be given to employees in January, April, July, and October of each year, and will cover the employees performance for the preceding four (4) full quarters.

**B.**

Performance summaries are not, in and of themselves, performance appraisals within the meaning of subsection 2E of this article. They are evaluative recordations.

## Section 16
## Annual Ratings for Measured Employees

A seasonal employee who has worked a minimum of sixty (60) days shall receive a "Calendar Year Appraisal" using all available performance data for the current year, provided that such data is valid and indicative of the employee's performance.

## Section 17
## Criteria for Quality Ratings for Measured Employees

**A.**

Employees will receive measured ratings in Quality based on their performance against numerical

standards established by the Employer as described in subsection 14C.

**B.**

Measured Quality performance summaries will be derived from a random sampling of an employee's work. To select a random sample of an employee's work, samples must be taken on a continuous basis (generally weekly) throughout the rating period. Random sampling is the process of choosing a sample in such a way that all completed work has the same chance of being included in the sample. The local TEPS Committee will be responsible for assuring that this section is implemented in accordance with the intent of the National parties.

**C.**

The goal of the Employer's sampling system is to achieve a confidence level of 90% in an employee's overall effectiveness score.

**D.**

Lists of critical defects as now established (or as may be established in the future) by the Employer will be applied in a uniform manner within each center in the quality review of the employees' work.

**E.**

The employee's performance scores for Quality, stated as "percent accurate", will be increased by using a calculation which adjusts the sample accuracy by adding the standard error of proportion at a 90% confidence level.

**F.**

Each OFP worked by an employee will be time weighted, and the results combined to derive the employee's performance index in Quality. These are commonly referred to as "Employee Index" or "Employee Index Score".

**G.**

Measured ratings for Quality will be calculated only in those cases where the affected employees have spent at least 40% of their direct time on measured work, and at least 25% of their total time on measured work.

## Section 18
## Criteria for Quantity Ratings for Measured Employees

**A.**

Employees will receive measured ratings in Quantity based on their performance against numerical standards established by the Employer as described in subsection 14C.

**B.**

Employees will receive an effectiveness score for ~ach OFP worked. These effectiveness scores will be .nultiplied by the appropriate time/weight factors. The sum of these time weighted effectiveness scores will be used to derive the employee's performance summary in Quantity.

**C.**

Measured ratings for Quantity will be calculated only in those cases where the affected employees have spent at least 40% of their direct time on measured work and at least 25% of their total time on measured work.

## Section 19
## Reports Relating to Ratings for Measured Employees

**A.**

The following reports will be provided to affected employees:

1. Weekly Individual Performance Report;
2. Quarterly Individual Performance Summary Report - Quality/Quantity;
3. Annual Individual Performance Summary Report; and
4. Unit Distribution of Measured Ratings (posted in unit).

**B.**

The Employer will establish a menu of available reports generated by TEPS and circulate it to all Union center chapters representing measured employees. Each chapter may select which reports it wants to receive. All generated reports shall be available to the local TEPS Committee in each center. The following reports will be provided to the Union as a minimum:

1. Monthly Branch Performance Report;
2. 2-Month Cumulative Branch Performance Report;
3. 3-Month Cumulative Branch Performance Report;
4. Unit and Branch Distribution of Ratings - Quality/Quantity; and
5. Calculated Base Point/Fixed Standards and Branch Base Points.

**C.**

Nothing in this section serves as a waiver of the Union's statutory right to additional information that is reasonable and necessary for it to perform its representional duties.

**D.**

The Employer and the Union shall, upon request of the Union, conduct quarterly meetings at the branch level to discuss the contents of the foregoing reports to the Union. Rights relating to attendance and time are set forth in subsection 14E above.

**E.**

The Employer will provide each center chapter with a PC, a printer and as much software as is necessary to read and print from the data referenced above. The PC, printer, and software will be owned and maintained by the Employer, but shall be for the exclusive use of the local center chapter to perform its representational duties. All reports in subsection 19B above, shall be provided in a mutually agreed upon format to the local Union chapter. Each Union center chapter shall be provided with the necessary computer hardware and software to allow it to read, print, and manipulate the data that is provided.

## Section 20
## Total Evaluation Performance System (TEPS) Committees

**A.**

The Employer and the Union shall establish a National TEPS Committee consisting of four (4) Union representatives appointed by the Union and four (4) representatives appointed by the Employer.

**B.**

IRS employees who are appointed by the Union to serve on this committee shall be on official time during the time that they are performing the functions of the Committee and carrying out their duties as members of the Committee. The Employer shall pay the travel and per diem expenses of members of the Committee for attendance at Committee meetings and for performing any activities of the Committee that require travel outside the member's commuting area.

**C.**

The National TEPS Committee shall meet quarterly unless the parties agree to meet less frequently. These meetings will be held in Washington, D.C. or in a location to be agreed upon between the parties. If no agreement can be reached regarding a site, the meetings will be held in Washington, D.C.

**D.**

The National TEPS Committee shall be responsible for the monitoring and oversight of the TEPS program in all centers to promote consistent implementation and administration of TEPS nationwide. In order to carry out this charge, the Committee shall be responsible, at a minimum, for the following:

1. nominating members to participate in the creation and revision of all TEPS IRM's and training materials to determine their accuracy, consistency, and whether such materials are consistent with the terms of this Agreement;

2. collecting and reviewing any local TEPS agreements or understandings for consistency with this Agreement;

3. overseeing the creation of the training package using the "train the trainer" concept; the Committee will provide assistance, research, and consistent solutions to problems identified during the initial development process, as well as during presentation to the field;

4. tracking the percentage of employees on measured performance plans who are measured under TEPS; this data shall be gathered and forwarded to the Committee in advance of its quarterly meetings; as determined appropriate by the Committee, additional data from any local center may be requested if problems or potential problems are suspected or identified;

5. reviewing recommendations for resolution of local problems referred by the local TEPS committees; and

6. reviewing proposed changes to the Director's Ranges and recommending a course of action to the center (if the recommendation is not acceptable to the Employer, the Union retains the right to bargain consistent with law).

**E.**
Each center campus will establish a local TEPS committee to be staffed by one (1) representative appointed by the Union and one (1) by the Employer. These representatives shall be the local TEPS coordinators for their respective centers and shall be charged with monitoring the implementation of the system in their centers. They shall be on official time when performing duties necessary for monitoring and administering the TEPS system within their local center and carrying out other duties and responsibilities as necessary to achieve the goals established by the National TEPS Committee and the parties at the national level.

**F.**
The local TEPS Committee will address local implementation and administration problems and propose solutions to the center director or the National TEPS Committee.

**G.**
The local TEPS Committee will be advised of any adjustments made to the base points pursuant to IRM 3(43)(401)0.

**H.**
The local TEPS Committee will validate and review for statistical significance the data supporting any proposed changes to Center Director Ranges and concur with such changes.

## Section 21
## Miscellaneous Provisions

**A.**
Time spent by employees at the health unit, preparing Forms 3081 and at group meetings will be charged in a uniform manner throughout a center. Direct time is considered to be only that time spent specifically performing work rather than administrative functions.

**B.**
If an employee is held accountable for work under a particular skill code, that employee will be assigned that skill code.

**C.**
Any grievance, by or on behalf of a measured employee, over an annual rating that is made in advance of a related personnel action, (for example, within-grade increase, career ladder promotion) will be joined automatically to any grievance, by or on behalf of such measured employee, over the subsequent related personnel action if the original grievance has not been resolved at the time the subsequent grievance is filed.

**D.**
For purposes of this Agreement, the determination that a rating is valid and indicative involves a decision that the data is correct (valid) and that numeric results reflect the employee's actual performance.

**E.**
If it is determined that a measured rating is not valid and indicative of an employee's performance, the employee will be evaluated on an unmeasured basis as provided for in that employee's performance plan and other applicable provisions of this article.

## Section 22

The parties agree to convene a joint team following term negotiations to update the TEPS agreement to include recently negotiated changes in the TEPS program and to make other improvements upon which they agree.

## Section 23

The following provision applies to the Submission Processing function.

The parties agree to the following terms which change the way TEPS operates as of the effective

date of the Agreement. The goal is to increase the number of employees receiving measured evaluations. The question of whether those employees performing compliance work in centers are to receive unmeasured evaluations pursuant to IRS Policy Statement P-1-20 is a separate issue and not addressed by this Agreement.

1.  The IRS will provide NTEU at the national and local levels a chart showing the number of employees on measured evaluations per center for each of the four (4) quarters preceding this Agreement and for the eight (8) quarters following its implementation. This data will be further broken down by branch in each center. The historical data will be given to the Union within thirty (30) days of signing this Agreement and the future data will be sent the Union each quarter thereafter.

2.  Management has determined to label the work in all organization, function, and program groups (OFPGs) that has a 97% accuracy rate or higher in a quarter to be High Quality Work (HQW). Once the work achieves this level, Individual Quality Review (IQR) will cease in that OFPG until the level of accuracy for the OFPG drops below 97%. IQR will be replaced with product review (PR). All those employees who are working on an OFPG during the time it is considered HQW will be granted the minimum employee efficiency score needed to achieve a five (5) rating in that OFPG.

3.  The accuracy of a HQW/OFPG will be assessed at the end of the eighth week of a quarter. If the work is below the 97% level at that time, management will notify employees working that OFPG, through a medium agreed upon locally, that the work will return to IQR at the beginning of the next quarter. Prior to this announcement, there must be a meeting between the Union and the Employer representatives to examine the accuracy of the calculation. Care should be taken by the local parties to follow the IRM rules on PR for HQW, and they should involve their TEPS Coordinators in this effort. A decision to drop IQR and return to PR may be announced at anytime and the determination to make the change will also be made on data from the eighth week unless agreed otherwise in local discussions.

4.  All OFPGs that are not HQW will be clustered by branch in order to increase the efficiency of the quality review process. They will be clustered by accuracy rate as follows:

| | |
|---|---|
| 96.9 - 95% | 83.9 - 80% |
| 94.9 - 93% | 79.9 - 76% |
| 92.9 - 90% | 75.9 - 72% |
| 89.9 - 87% | 71.9 - 68% |
| 86.9 - 84% | 67.9 - 0% |

A sample will be drawn that ensures the final error rate has a confidence level of 90% and the standard error proportion will be added to the employee's "percent accurate" calculation. The Employer has determined that the local parties will address any situations where employees with the appropriate skills who would normally be considered for assignment to the HQW in their unit are unreasonably denied an appropriate share of that work.

5.  Employees must be working on measured work for more than sixty (60) days before they can be given a measured evaluation. Thereafter, the employee will be evaluated using the learning curves agreed upon by the local parties for the work in each OFPG and none of the work performed during an employee's learning curve will be included in the measured data base or in the employee's evaluation.

6.  The "valid and indicative" requirement is retained, but the parties will exclude "low hour data" (as defined in the revised IRM) for Quantity. They will also exclude data from those OFPGs with less than six (6) employees working them in a quarter. The Employer has determined that these will be excluded from the measured data base as well as the employee's evaluation.

7.  The Director's Quality and Quantity Ranges will be set center-wide rather than branch-wide. Moreover, the Employer recognizes that a change in the Director's Ranges can be a change in working conditions that is negotiable. It will, therefore, give the Union advance notice of a change no less than the fourth week prior to the change and bargain, if requested and required. If the Director's Ranges are changed (initially or subsequently) and the parties reach an impasse over the impact and implementation issues related to the change, the ranges will remain the same.

8.  The Employer has determined that base points will be set reasonably. They will be reviewed mid-quarter by the parties and adjusted pursuant to the IRM. The calculated base point for Quality will be the average accuracy rate for the previous four (4) quarters.

9. The parties agree to delete any prior agreement that lower graded employees always have lower standards than higher graded employees.

10. The Employer will provide all NTEU chapters representing employees on a measured performance plan the data it normally receives on TEPS in as streamlined and uniform manner before the implementation of these changes.

11. A TEPS training program will be developed for employees, stewards, TEPS Coordinators and managers. Stewards will receive the same training as provided managers.

12. The recommendation of the Joint TEPS Redesign Committee dated 4/18/96 will guide the development of TEPS, absent the agreements described above.

# Article 13
# Promotions/Other
# Competitive Actions

## Section 1
## Purpose

**A.**

The parties recognize the importance of a systematic and equitable process that affords long-term employees opportunities to work in the location of their choice and provides bargaining unit employees the maximum opportunity to develop and advance to their full potential, consistent with the recognized need of the Employer to maintain staffing and skill levels sufficient to meet mission requirements.

**B.**

Except as provided in subsection 1C2 below, the Employer has determined that it will provide first consideration to IRS employees for its bargaining unit vacancies by considering the "best qualified" (BQ) candidates at all grades for which a position is announced.

1. In this regard, the Employer may simultaneously post vacancy announcements for, and separately rate, rank, and assess, as applicable, both internal and external candidates for such vacancies. However, the certificate(s) listing internal Best Qualified (BQ) candidates, as determined according to the procedures set forth in this article, will be referred first to the selecting official for final consideration.

2. Under no circumstances will the selecting official be permitted to review and/or consider external candidates prior to making a final determination regarding the selection or non-selection of internal BQ candidates. Once the selecting official has made final select/non-select determinations regarding internal candidates, the certificate(s) listing external BQ candidates may be referred for consideration.

**C.**

In those circumstances where the Employer determines that, for business reasons, it has a requirement to concurrently consider external candidates in certain entry/developmental professional and administrative (that is, two-grade interval) positions below the journey grade level, it will provide written notice, with appropriate explanation of those business reasons, to the NTEU National President. Such notice/explanation shall be provided at least thirty (30) days in advance of the external announcement posting date.

1. When concurrently considering internal and external candidates for bargaining unit positions, the Employer has determined that selections will be made from within the IRS whenever the employees who are eligible for consideration are as well qualified as those available from outside the IRS.

2. When the Employer concurrently considers external candidates, it will, in all cases, provide a written narrative explanation (normally one to two pages in length) to each non-selected internal BQ candidate providing reasons for his or her non-selection, as well as feedback concerning what the employee can do to improve his or her chances for selection when applying for similar vacancies in the future.

**D.**

The Employer will provide the National Office of the Union, as well as the appropriate local chapter/joint council with a yearly accounting of the number of bargaining unit vacancies by grade and series filled with bargaining unit employees and those filled with non-bargaining unit employees. The information will also include the retention rate for external selectees for the prior year. The parties will review these statistics in the context of IRS Policy Statement P-0-1 to discuss the extent to which selections have been made from within the IRS. This discussion will not focus on individual selection actions.

**E.**

The Employer agrees that where OPM establishes a positive education requirement in accordance with 5 CFR 300, the Employer will provide NTEU with copies of the validation study or studies that support that requirement, as well as other pertinent information. Such information shall be furnished at least sixty (60) days prior to the use of the positive education

9. The parties agree to delete any prior agreement that lower graded employees always have lower standards than higher graded employees.

10. The Employer will provide all NTEU chapters representing employees on a measured performance plan the data it normally receives on TEPS in as streamlined and uniform manner before the implementation of these changes.

11. A TEPS training program will be developed for employees, stewards, TEPS Coordinators and managers. Stewards will receive the same training as provided managers.

12. The recommendation of the Joint TEPS Redesign Committee dated 4/18/96 will guide the development of TEPS, absent the agreements described above.

# Article 13
# Promotions/Other
# Competitive Actions

## Section 1
## Purpose

**A.**

The parties recognize the importance of a systematic and equitable process that affords long-term employees opportunities to work in the location of their choice and provides bargaining unit employees the maximum opportunity to develop and advance to their full potential, consistent with the recognized need of the Employer to maintain staffing and skill levels sufficient to meet mission requirements.

**B.**

Except as provided in subsection 1C2 below, the Employer has determined that it will provide first consideration to IRS employees for its bargaining unit vacancies by considering the "best qualified" (BQ) candidates at all grades for which a position is announced.

1. In this regard, the Employer may simultaneously post vacancy announcements for, and separately rate, rank, and assess, as applicable, both internal and external candidates for such vacancies. However, the certificate(s) listing internal Best Qualified (BQ) candidates, as determined according to the procedures set forth in this article, will be referred first to the selecting official for final consideration.

2. Under no circumstances will the selecting official be permitted to review and/or consider external candidates prior to making a final determination regarding the selection or non-selection of internal BQ candidates. Once the selecting official has made final select/non-select determinations regarding internal candidates, the certificate(s) listing external BQ candidates may be referred for consideration.

**C.**

In those circumstances where the Employer determines that, for business reasons, it has a requirement to concurrently consider external candidates in certain entry/developmental professional and administrative (that is, two-grade interval) positions below the journey grade level, it will provide written notice, with appropriate explanation of those business reasons, to the NTEU National President. Such notice/explanation shall be provided at least thirty (30) days in advance of the external announcement posting date.

1. When concurrently considering internal and external candidates for bargaining unit positions, the Employer has determined that selections will be made from within the IRS whenever the employees who are eligible for consideration are as well qualified as those available from outside the IRS.

2. When the Employer concurrently considers external candidates, it will, in all cases, provide a written narrative explanation (normally one to two pages in length) to each non-selected internal BQ candidate providing reasons for his or her non-selection, as well as feedback concerning what the employee can do to improve his or her chances for selection when applying for similar vacancies in the future.

**D.**

The Employer will provide the National Office of the Union, as well as the appropriate local chapter/joint council with a yearly accounting of the number of bargaining unit vacancies by grade and series filled with bargaining unit employees and those filled with non-bargaining unit employees. The information will also include the retention rate for external selectees for the prior year. The parties will review these statistics in the context of IRS Policy Statement P-0-4 to discuss the extent to which selections have been made from within the IRS. This discussion will not focus on individual selection actions.

**E.**

The Employer agrees that where OPM establishes a positive education requirement in accordance with 5 CFR 300, the Employer will provide NTEU with copies of the validation study or studies that support that requirement, as well as other pertinent information. Such information shall be furnished at least sixty (60) days prior to the use of the positive education

requirement in a vacancy announcement. In this regard, the Union agrees to comply with any security and/or confidentiality requirements established by the Employer with regard to release of the validation study or studies to the Union in accordance with this section.

**F.**

If the Employer elects to announce a vacancy externally, it will provide information to employees on how to apply as an external candidate.

## Section 2
## Applicability

**A.**

The provisions of this section apply to all placement actions within the bargaining unit except those specifically excluded by subsection 2B. Examples of such actions are:

1. filling a position by promotion;

2. filling by reassignment, transfer, reinstatement, or demotion to a position with a higher graded full performance level than the applicant's last position;

3. filling a position by temporary promotion for more than one hundred and twenty (120) days;

4. permanent or temporary conversion for more than one hundred and twenty (120) days, from one work schedule to another, for example, a seasonal or career/career-conditional intermittent employee to regular full time or part-time, or a career/career-conditional intermittent employee to a seasonal tour of duty;

5. filling a position by reassignment if a vacancy announcement has been posted, unless:

   (a) unforeseen circumstances of an extraordinary nature become known subsequent to the posting of a vacancy announcement;

   (b) a roster has been established; or

   (c) the Employer uses the reassignment procedure described in Article 15; and

6. filling bargaining unit positions with non-bargaining unit applicants, except in the case of Additionally Established (AE) bargaining unit positions as provided in subsection 2B13 below.

**B.**

The following are examples of placement actions within the bargaining unit which are not covered by the competitive procedures of this article:

1. reassignments or change to lower grade except as set forth in subsections 2A2 and 2A5;

2. promotions to positions which have been upgraded without significant change in duties

and responsibilities on the basis of either the issuance of a new classification standard or the correction of a classification error;

3. repromotion to grades or positions from which an employee was demoted within the Service without personal cause, i.e., without misconduct or inefficiency on the part of the employee and not at the employee's request;

4. promotion to higher grade position, a requirement of which is specific training, provided selection for such training was made in accordance with this Agreement;

5. promotion of occupants of career ladder positions to the full performance level;

6. Government-wide special emphasis programs (such as VRA, Handicapped, Worker Trainee, and Cooperative Education Programs) up to and including conversion into the competitive service;

7. any other mandatory exceptions provided for by a higher authority;

8. promotion due to accretion of duties where all employees performing the same work will be promoted;

9. filling positions by reinstatement or transfer except as set forth in subsection 2A2;

10. filling a position by temporary promotion of one hundred and twenty (120) days or less;

11. increases in work schedule of one hundred twenty (120) days or less;

12. returning an employee to a full time tour of duty who has previously received a change to a part-time tour of duty (similarly situated employees will be treated equally);

13. the placement of a manager or mangement official in an Additionally Established (AE) bargaining unit position; and

14. the return of managers or management officials to bargaining unit positions at the grade they left the bargaining unit.

**C.**

The following procedures apply when considering external applicants for journey level and below vacancies in accordance with subsection 1B:

1. the Employer may recruit and commit external applicants from any appropriate source to fill those positions which have not been reserved for first consideration;

2. in any given POD, all vacancies will be announced and internal selections will be made before any external selectees enter on duty;

3. POD assignments for external selectees may not be made until post-of-duty assignments for

**ARTICLE 13**

internal, including "crossover", selectees have been made; and

4. all vacancies remaining at the time that the internal certificate is issued will for a particular POD be listed on the certificate (for example, if 100 vacancies were announced and only ten (10) external commitments were made, the internal certificate would be for ninety (90) vacancies).

**D.**

In accordance with governing law and regulation, the following actions, in the order set forth below, will be taken prior to the initiation of the competitive procedures established by this article:

1. Employees with statutory placement rights (such as an IRS employee who is returning to duty from Worker's Compensation or military service);

2. Employees with placement rights established pursuant to a decision or settlement agreement directed or approved by a third-party adjudicatory agency, such as the Merit Systems Protection Board or Equal Employment Opportunity Commission;

3. IRS employees with placement rights as established by the Career Transition Assistance Program (CTAP);

4. Employees with placement rights established by the IRS Priority Placement Program (IRSPPP);

5. Designated "Transition Employees" with placement rights established by the Transition Employee Memorandum, as amended;

6. Employees granted Priority Consideration by the Employer, or the Parties, in accordance with 5 CFR 335;

7. Employees who are eligible for a hardship assignment, pursuant to Article 15.

## Section 3
## Vacancy Announcements

**A.**

Vacancy announcements will be published prior to taking any of the placement actions described in subsection 2A for which bargaining unit employees may compete. In this regard, vacancies within a particular commuting area listed on the Service's Career Opportunity Listing (COL) will be posted on appropriate bulletin boards within that commuting area. The vacancy announcement will be posted for ten (10) workdays and at a minimum will contain the following:

1. announcement number;

2. opening and closing date;

3. the estimated number, title, series, grade, and organizational location(s), and Posts of Duty (PODs) of the vacant position(s) to be filled. In no case may a position be filled unless the Employer has announced via the vacancy announcement and/or COL, the POD and estimated number of positions in each POD. Nothing in this section requires the Employer to fill a particular position in a particular POD; however, when the Employer announces multiple positions in multiple PODs, whether by roster or individual vacancy announcement, the Employer will, to the extent possible, indicate on the announcement the likelihood (e.g. high, medium, or low probability) of filling position(s) in a particular POD.

4. shift information, for example, hours of work;

5. minimum qualifications required;

6. a brief summary of the duties of the position along with an indication of where additional information may be obtained;

7. selective placement factors, if any;

8. evaluative methods to be used by the ranking panel or official, including any specific forms to be considered, interview and/or test requirements, etc. (none of which may be used unless listed on the announcement);

9. roster designation, when applicable;

10. statement of Service's commitment to equal employment opportunity in conformance with the Department of Treasury Interim Handbook of Employee Conduct and Ethical Behavior;

11. where to submit applications;

12. position's career ladder, when appropriate;

13. statement of availability of moving expenses; and

14. in the case of seasonal employment, the expected length of season, as well as the expected eligibility for health insurance.

**B.**

The Employer has determined that selective placement factors will only be used in determining eligibility when they are essential to successful performance in the position to be filled. In such cases, they will constitute a part of the minimum requirements of the position in question.

**C.**

Changes to vacancy announcements of a non-substantive nature (that is announcement number and the number of vacancies, where the increase is less than four) will not require extension of the posting time.

**D.**

Two (2) copies of all bargaining unit vacancy announcements will be sent to the president of each chapter that has representational jurisdiction over the position(s), concurrent with the posting. Where electronic media is available, vacancy announcements will be transmitted via electronic media only. Where electronic media is not available, vacancy announcements will be posted on all official bulletin boards throughout the commuting area.

**E.**

Vacancy announcements will be posted in all locations within the same commuting area.

**F.**

If a vacancy announcement is canceled, the reason for the cancellation shall be noted on the promotion certificate and/or made part of the promotion file. A copy of the document showing the reason will be simultaneously sent to the chapter/joint council.

**G.**

In October of each year, the Employer will assign awards points to all employees who qualify for an award under the Parties' National Awards Agreement.

# Section 4
# Application Procedures and Rosters - General

**A.**

1. Employees must submit applications for each vacancy or roster for which they wish to be considered. An individual application may be submitted for each available vacancy at the time of the vacancy announcement or employees may submit applications for continuous consideration (Form 4536, Exhibit 13-1) which shall expire at close of business on December 31 of each year. Employees may indicate on the applications for continuous consideration the posts-of-duty for which they desire to be considered. Employees may withdraw applications for a position at any time. The fact that employees do not accept an offer of promotion will not be cause for their removal from a roster.

2. Applicants will not be considered if they do not meet all time-in-grade and qualification requirements by the closing date of the announcement.

3. Upon request, applicants who have been determined not to be qualified will be provided a copy of the qualification standards for the position for which they applied.

4. For positions at or below the journey level, applicants must complete a Merit Program Questionnaire (MPQ). The ranking official or panel will use this form in conjunction with the applicants' appraisals to determine each applicant's potential. In order to complete this form, each applicant will receive a reasonable amount of official time and will be provided access to his or her OPF.

   (a) When an employee's application is found to be lacking information within the employee's control (such as a signature), the Employer will notify the employee and give him or her five (5) workdays to submit the missing information. For information beyond the employee's control (such as a college transcript), the employee will have a reasonable period of time, up to ten (10) workdays, to submit the information. In the event that the missing information is not received within the time period(s) specified above, the application will be returned to the employee and the employee will not considered as an applicant for the vacancy.

   (b) If the Employer has failed to issue a timely and current performance appraisal, the employee may submit his or her self assessment, in accordance with Article 12, provided that such self-assessment proposes a summary rating no higher than the employee's current rating of record.

   (c) The Parties agree that the MPQ will be phased out as part of the automation of the internal staffing process, scheduled for implementation by December 31, 2002. In this regard, the Parties agree to establish a joint team to implement this automated process, consistent with the terms of this article. The team will be chartered to configure software selected by the Employer to meet contractual requirements, and oversee the development of a communications and training plan. Upon mutual agreement, the team may also make recommendations on modifications to this article, which, if approved by the Parties, would amend those provisions.

5. An employee who applies for a position and is not found eligible will be notified prior to the establishment of a roster or a BQ list.

6. The Employer has determined that employees rated below Fully Successful in a particular Performance Aspect are not eligible to apply for competitive promotion to a vacant position that requires the same or similar Performance Aspect.

ARTICLE 13

**B.**

**Establishment of a Roster**

1.  If the Employer projects more than one (1) vacancy will occur in any one (1) classification series and grade level in a twelve (12) month period, the Employer may establish and maintain a roster of candidates for as long as twelve (12) months.

2.  When rosters are used, they will be updated quarterly to include new applicants.

3.  An application for a position on a roster must be received by the closing date of the announcement establishing the roster, or at least fifteen (15) workdays prior to any quarterly updating of the roster. Employees who are not eligible for consideration will have their applications returned showing the reason for their disqualification or ineligibility. Applicants accepted for a roster will be so notified.

4.  Eligible applicants will remain on the roster for one (1) year. At the end of the year, applicants will be notified that they must submit new applications if they wish to be considered for future vacancies.

5.  Vacancies for all positions that are to be filled by competitive action will be announced separately.

6.  Each employee who has applied for and meets the eligibility requirements and any selective placement factors previously announced for a vacancy shall be ranked as described below, using Form 6850, Job Element Appraisal, as prepared in accordance with Article 12 of this Agreement.

7.  When a roster is used, applicants meeting basic qualifications will be ranked and placed in numerical order from the highest to the lowest score.

8.  In promotion actions, the rating on the Form 6850 may be used for a period of twelve (12) months. When the appraisal is more than twelve (12) months old on or before the date of a vacancy announcement, it may be revalidated in accordance with Article 12, and be used for an additional twelve (12) months. In this regard, a revalidated appraisal is one that is more than twelve (12) months old and that has been determined by the Employer to reflect accurately an employee's performance at the time it was revalidated.

9.  The employee's Form 6850 will be forwarded to the ranking panel or ranking official considering the vacancy or vacancies applied for by the employee and will not be altered or changed in any manner by the panel or ranking official.

10.  NTEU will be provided with copies of rosters when they are established.

## Section 5
## Ranking Applicants

**A.**
**General**

With the exception of bargaining unit employees covered under subsection 5F, employees (including Wage Grade employees) who applied for and met the eligibility requirements for a vacancy (including any selective placement factors previously established and announced by the Employer) shall be ranked as described below. No other procedures will be used to rate and rank bargaining unit employees for bargaining unit positions unless the Employer has made the details, criteria, and other characteristics of the process fully known to the Union in advance, in accordance with Article 47. Moreover, once the ranking process has been fully automated, MPQ's will not be required for any competitive promotion actions. When ranking candidates for vacancies at multiple grades (e.g., for career ladder positions that may be filled at any grade), each candidate may be ranked separately by grade, with the ranking procedure for such positions based on the journey level of the position to be filled.

**B.**

The Employer will appoint a ranking panel of three (3) voting persons, or will appoint a ranking official, to evaluate the applicants. The Employer has determined that the selecting official may not serve on a ranking panel or as a ranking official.

**C.**

In processing competitive actions covered by Section 2 of this article, the following provisions will be used to evaluate and rank applicants for any position unless otherwise specified in subsection 5E.

1.  Employees will be ranked as described below, using Form 6850, Critical Job Element (CJE) Appraisal, as prepared in accordance with the provisions of Article 12 of this Agreement.

2.  In promotion actions, a Form 6850 may be used for a period of twelve (12) months. When the appraisal is more than twelve (12) months old on or before the date of a vacancy announcement, it may be revalidated in accordance with Article 12 and be used for an additional twelve (12) months. In this regard, a revalidated appraisal is one that is more than twelve (12) months old and has been determined by the Employer to reflect accurately an employee's performance at the time it was revalidated.

3.  The Employer will appoint a ranking panel of three (3) voting persons, or will appoint a

ranking official, to evaluate the applicants. The Employer has determined that the selecting official may not serve on a ranking panel or as a ranking official. The ranking panel or ranking official will then determine the score ("5" to "1") to be assigned to an applicant for each critical job element of the position to be filled. A score will be assigned for each critical job element as follows:

(a)  Excellent Potential          "5"

(b)  Substantial Potential       "4"

(c)  Good Potential              "3"

(d)  Moderate Potential          "2"

(e)  Limited Potential           "1"

4.  The Employer has determined that the standards for the foregoing ratings will be as follows:

(a)  Rating Level "5": Excellent Potential: The applicant is now able to perform at a level which is above fully successful on this critical job element.

(b)  Rating Level "4": Substantial Potential: The applicant is now able to perform at a level which is fully successful on this critical job element.

(c)  Rating Level "3": Good Potential: The applicant can be expected to perform at a level which is fully successful on this critical element after minimal developmental training and/or experience.

(d)  Rating Level "2": Moderate Potential: The applicant can be expected to perform at a level which is fully successful on this critical element only after considerable developmental training and/or experience.

(e)  Rating Level "1": Limited Potential: The applicant can be expected to perform at a level which is fully successful on this critical element only after extensive additional developmental training and/or experience.

**D.**

1.  The following procedure shall be used for ranking applicants for a position that is not covered by subsection 5F.

(a)  Add the numerical rating for each critical job element on Form 6850, divide the total by the number of CJEs, and multiply the results by six (6);

(b)  Add the average ratings for each critical job element of the position to be filled together, divide the total by the number of critical job elements, and multiply the results by four (4);

(c)  Add the total scores obtained in (a) and (b) above; and

(d)  Round-off scores to two (2) decimal places only;

(e)  Add one (1) point (up to a maximum of three (3) points) for a performance award in accordance with the Joint Performance Award Agreement, and for each Quality Step Increase (QSI), or performance-related monetary Special Act Award (except Manager's Awards) approved in the last three (3) years;

(f)  In accordance with applicable laws, rules and regulations, the four applicants who rank at the top will be designated as Best Qualified (BQ).

2.  The Employer has determined that individual members of the ranking panel or the ranking official will individually rate each critical job element for each applicant. Each member's rating shall become a part of the promotion file. The scores given for each applicant by each member of the ranking panel will then be added and divided by the number of members on the ranking panel to obtain the final numerical score for each critical element.

(a)  The Employer has determined that the ranking panel or the ranking official will prepare one (1) written narrative or statement concerning each applicant considered for each critical job element of the position to be filled. This narrative statement will reflect the applicant's ability to perform in the position for which the applicant is being considered. If the immediate supervisor of any applicant is a member of the ranking panel, then each panel member will prepare separate narratives. Any conclusion relative to the rating of potential will be reflected in the narrative and include information upon which the rating was based, citing the factor(s) relevant to the rating.

(b)  The evaluation will be fair and objective. Any conclusion relative to the rating of potential will be reflected in the narrative and include information upon which the rating was based, citing the factor(s) relevant to the rating. In no case will a rating be justified solely by a mathematical tabulation of scores on any document(s), for example, an annual appraisal.

**E.**

As an alternative to the provisions above, when filling vacancies above the journey level, if all eligible candidates are currently in the same series as the position to be filled, the Employer will multiply the average critical job element rating from the

**ARTICLE 13**

employee's appraisal by ten (10). This score plus the performance related award points will be used to establish the BQ list in rank order. If any eligible candidate has a different set of performance aspects or additional performance aspects, the Employer will use the ranking process outlined above.

**F.**

**Ranking of Applicants for Positions GS-8 and Below Located in the Submission Processing, Accounts Management, and Compliance Services Centers, including geographically aligned Call Sites.**

The Employer has determined that the ranking of applicants for GS-8 and below positions will be accomplished in the following manner:

1. Performance Appraisal: The employee's performance appraisal based on the critical job elements of the employee's position (Form 6850) will be used as follows:

   (a) add the numerical ratings for each critical job element;

   (b) divide the total in (a) above by the number of critical job elements;

   (c) multiply the result in (b) above by twenty eight (28); and

   (d) the results in (c) above is the number of points that are assigned the performance appraisal for ranking purposes.

2. Pertinent Experience and Training: The applicant's experience and training will be reviewed by a ranking official who will assign up to a maximum of twenty-five (25) points at the rate of five (5) points for each full six (6) months experience and training pertinent to the job to be filled which usually will have been gained in work of same type as that to be performed in the vacant position. In order to be included in the six (6) month period, the experience and training must have been gained within two (2) grades below the vacancy and must have been acquired within three (3) years of the date of application. The Employer will ensure that pertinency points are defined and applied consistently across the Campuses, through the issuance of Service-wide guidance.

3. Incentive Awards: Incentive awards, including Quality Step Increases approved for the employee within three (3) years prior to the closing date of the announcement will be evaluated by the ranking official who will award ranking points (up to a maximum of five (5)) as detailed below:

   (a) Two (2) points for each Quality Step Increase;

   (b) Two (2) points for each PMS Performance Award;

   (c) Two (2) points for each Suggestion Award of $150 or more;

   (d) One (1) point for each other Suggestion Award;

   (e) One (1) point for each monetary Special Act Award (except Manager's Awards) that is performance related and non-mandatory (total points awarded not to exceed three (3) points); and

   (f) One (1) point for each accepted system change.

4. The total scores obtained in 1, 2 and 3 above will be added together to determine the Best Qualified list of candidates. For vacancies at grade GS-8 and below covered by this subsection, applicants meeting basic qualifications will be ranked and placed in numerical order from the highest to the lowest score.

## Section 6
## Referral of Candidates

**A.**

All applicants will be treated uniformly to the greatest extent possible. Applicants who are candidates for reassignment will be rated and ranked along with other applicants.

**B.**

Any selection technique utilized by the selecting official will be uniformly applied to all BQ applicants referred to the selecting official.

**C.**

An employee's accumulation or balance of annual or sick leave may not be considered by the ranking panel or ranking official, a selecting official, or manager as a basis for selection or promotion.

**D.**

If the Employer determines to interview any employees in a selection process, all similarly situated employees will be interviewed.

1. Any general questions used in the interview process and the Employer's notes will be recorded and kept in the file. This shall not be construed to require the panel to ask identical questions of each applicant.

2. The Parties agree that during the life of this agreement, the Service will not use "Behavioral Event Interviewing" with respect to the staffing of any bargaining unit position, without an express agreement from the Union.

3. When interviewing applicants for placement, the Employer will comply with OPM regulations.

### E.

The selecting official will receive a list of Best Qualified (BQ) applicants in rank order along with evaluation material.

### F.

The BQ applicants will be the top four (4) applicants plus one (1) additional name for each additional vacancy. Up to ten (10) applicants may be certified if certifying a lesser number results in the exclusion of any equally qualified applicant. If more than ten (10) applicants are equally qualified candidates, IRS EOD will control. An employee will not be removed from the BQ list of a pending package because he or she has accepted another position unless he/she withdraws from consideration from that pending package.

## Section 7
## Selection and Documentation

### A.

Upon conclusion of the ranking process, a promotion certificate shall be prepared by the Employer. It will contain the following information:

1. names of all applicants found BQ (and scores if applicable);

2. identification of applicants as permanent or seasonal;

3. names and scores of all applicants found BQ;

4. names of applicants submitted to the selecting official;

5. name(s) of the management official or ranking panel members who evaluated the applicants;

6. evaluation criteria and methods used to determine BQ applicants;

7. the name of selecting official; and

8. the names of selected applicants.

### B.

Upon selection and notification of applicants for promotion, a designated Union official in each of the chapters that has representational jurisdiction over the positions being filled will be concurrently sent a copy of the promotion certificate previously given to the selecting official. The promotion certificate will identify the selected applicant(s).

### C.

The Employer will maintain a copy of all promotion certificates for a period of at least one (1) year. The Employer will maintain promotion or competitive selection files in accordance with regulatory requirements.

### D.

In the case of roster announcements:

1. the promotion certificate with names of all the BQ will be furnished to the Union at the time the roster is established and also after each quarterly updating;

2. after selections from a roster, the Union will be furnished the list of BQ applicants referred to the selecting official, with the selected applicant(s) identified; and

3. all BQ applicants will be notified of their standing on a roster at the time the roster is established.

### E.

Additional positions of the same kind (that is, those with the same title, series and grade, at the same POD, and same group or unit) may be filled within forty-five (45) days of the initial selection in cases where vacancies remain or occur within the forty-five (45) day period. In such cases, the originally selected employee will be replaced on the new BQ list if appropriate.

### F.

Notification of non-selected applicants on the BQ list will be made (either via telephone, email or other means, whenever possible) within 8 hours of their receipt of the selection certificate. Non-selected applicants on the BQ list for vacancies in Submission Processing, Accounts Management, and Compliance Services Centers, to include geographically aligned call sites will be notified through either the Automated Vacancy Announcement System or other automated personnel systems within one (1) pay period, whenever possible.

## Section 8
## Career Ladder Promotions

### A.

Employees in career ladder positions will be promoted in the first pay period after:

1. they become minimally eligible to be promoted (after one (1) year in their positions or whatever lesser period satisfies the basic eligibility requirements); and

2. they are capable of satisfactorily performing at the next higher level.

### B.

For employees whose elements and standards are no different than those of the next higher grade level in the career ladder, an overall annual rating of Fully Successful at the current grade will satisfy the performance requirements.

**ARTICLE 13**

## Section 9
## Miscellaneous

**A.**

The fact that an employee is the subject of a conduct investigation will not prevent or delay the employee's promotion, which would otherwise be made, unless the Employer judges that such delay is necessary to protect the integrity of the Service.

**B.**

Subject to its right to assign employees, the Employer will make a reasonable effort to return employees to their former or like positions, who, within the last year, were promoted and subsequently demoted for inability to perform at the higher level. Employees hired through an external source will be required to serve a probationary period in accordance with Articles 30 and 37. However, if the employee has already served a probationary period with IRS and does not successfully complete the probationary period and/or the formal training agreement required for the new position, as applicable, the Employer will make every effort to reassign the employee to their previous grade and same or similar position.

**C.**

Except in the case where an employee selected for a position must complete training before assuming duties of the new position, an employee who is selected for promotion will have the promotion become effective no later than one (1) complete pay period following selection. For employees who must first complete training, the promotion will become effective at the beginning of such training.

**D.**

Any applicant designated BQ who is not selected will, upon request, be entitled to counseling by the immediate supervisor. In those instances where the immediate supervisor is not the selecting official, the applicant may, upon request, obtain additional counseling from the selecting official.

**E.**

In accordance with applicable laws, rules and regulations, any applicant on the BQ list who declines a selection offer will be replaced by the next higher ranking qualified applicant.

**F.**

Grievances over positions in other Employer bargaining units must be filed with the grievant's immediate supervisor under the procedures of this Agreement.

## Section 10
## Release Of Information

**A.**

Upon request, the Employer will make available to any applicant involved in a competitive action gov-erned by the terms of this article the ranking panel's or ranking official's written narrative statement and score assigned to the applicant. Such request should be made through the applicant's supervisor.

**B.**

In the processing of grievances related to actions taken under the terms of this article, a steward representing an employee will, upon request, be furnished the "evaluative material" generated or utilized by the ranking panel or ranking official in assessing the qualifications of the eligible applicants (bargaining unit and non-bargaining unit) in regard to a grieved promotion action subject to the following criteria:

1. the aforementioned material, consisting of the panel's evaluation, managerial appraisals, and records related to experience, training and awards, will be provided to the grieving employee's steward subject to the Employer's legal responsibility and obligation to protect the privacy of the eligible applicant(s) involved in the promotion in question;

2. if the grievance is confined to BQ applicants, only the evaluative material of such applicants will be provided;

3. If the grievance involves questions of basic eligibles, evaluative material of all applicants will be provided.

**C.**

Challenges to the Employer's action in the implementation of subsection 10B above, if any, may be grieved and finally resolved by an arbitrator making an "in camera" inspection of the entire promotion file, subject to the "privacy" protection cited above.

## Section 11
## Priority Consideration

**A.**

If it is determined, through the grievance procedure, that violations of the provisions of this article resulted in denying the grievant(s) proper consideration, corrective action will be taken as follows:

1. employees erroneously omitted from a BQ list shall receive priority consideration in accordance with regulatory requirements;

2. employees who were erroneously omitted from, or improperly ranked on a roster announcement, but who do not otherwise qualify for relief under subsection 11A1 above, will be ranked in proper order on such a roster; and

3. other violations will be remedied as appropriate.

**B.**

Priority consideration consists of a promotion certifi-

cate which contains an employee's name alone being sent to a selecting official before the official considers other applicants for a position.

**C.**

An employee will be entitled to a separate priority consideration for each vacancy announcement for which the employee was improperly considered.

**D.**

If more than one (1) employee is entitled to consideration, the names of only those employees will be submitted on a single certificate to the selecting official for the next appropriate vacancy.

**E.**

If the appropriate vacancy has already been announced, the employees due the priority consideration will be considered by the selecting official before other applicants are ranked or referred for selection.

**F.**

When the Employer considers employees who have priority consideration pursuant to this Agreement and does not select those employees, the Employer will put the reasons for non-selection in writing and serve a copy simultaneously on the employees.

**G.**

Once the deadline for filing a grievance or other complaint has passed, employees who have not filed a grievance or other complaint or had one filed on their behalf may only be given priority consideration pursuant to an order issued by a higher level authority.

**H.**

In accordance with 5 CFR 335, employees normally receive priority consideration for an appropriate vacancy (defined as a vacancy at the same grade and in the same occupational series and area of consideration as the original position for which they were improperly denied appropriate consideration). In those circumstances where no appropriate vacancy is anticipated in the original area of consideration within two (2) years from the date priority consideration is granted, the employee's priority consideration will be extended to apply to similar vacancies within the original area of consideration, provided the employee meets basic eligibility requirements.

## Section 12
### Modifications to Qualifications

**A.**

In any competitive action where the qualification requirements are being modified, the Employer shall state on the vacancy announcement what the modified minimum qualification requirements are. In addition, a statement that qualification requirements have been modified shall be included on the vacancy announcement.

**B.**

The Employer shall reduce to writing the reasons for electing to modify qualification requirements in connection with a competitive action. This determination must state the reason(s) for modifying the qualification requirements. Prior to posting the vacancy announcement, all chapters that have representational jurisdiction over the position being filled shall be provided a copy of this determination and afforded five (5) workdays within which to comment and/or discuss the determination with the Employer. The Employer shall consider any input provided by the local chapter(s).

# Article 14
# Release/Recall Procedures

## Section 1
### General Provisions

**A.**

The provisions of this article apply to all employees of the Internal Revenue Service subject to periodic release and recall.

**B.**

Unless the local parties agree otherwise, the basis for release and recall at Center Campuses will be Departments in the Accounts Management Centers and Operations in the Submission Processing and Compliance Services Centers.

**C.**

For all other employees subject to release and recall, unless agreed to otherwise by the local parties, the basis for release and recall will be the highest organizational level at the post-of-duty (POD).

## Section 2

**A.**
**Basis For Release/Recall**

1.  The release and recall of career/career-conditional intermittent employees will be by IRS Enter On Duty (EOD) date of those employees possessing the skills needed.

2.  The release and recall of seasonal employees and employees on term appointments will be accomplished by a combination of performance and seniority of those employees possessing the skills needed.