# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

PAMULA ROBINSON,         )
                                   )
               Plaintiff,    )
                                   )
           v.                     )      Civil Action No. 05-1212 (RBW)(DAR)
                                   )
HENRY PAULSON         )
SECRETARY OF THE TREASURY,   )
                                   )
          Defendant.   )
_____)

# PLAINTIFF'S OPPOSITION TO
# DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Pamula Robinson, by and through undersigned counsel, hereby opposes Defendant's Motion for Summary Judgment ("Motion"), and in support of her Opposition files the attached Memorandum of Law, setting forth Plaintiff's arguments and reasons why Defendant's Motion should be denied and this case should be allowed to proceed to trial.

Respectfully submitted,

_____/s/_____
JOSEPH D. GEBHARDT
    (D.C. Bar No. 113894)
CHARLES W. DAY, JR.
    (D.C. Bar No. 459820)
MARK A. DANN
    (D.C. Bar No. 484523)
GEBHARDT & ASSOCIATES, LLP
1101 17th Street, N.W.
Suite 807
Washington, DC 20036-4716
(202) 496-0400

December 29, 2006            Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

PAMULA ROBINSON,            )
                            )
          Plaintiff,           )
                            )
         v.                )         Civil Action No. 05-1212 (RBW)(DAR)
                            )
HENRY PAULSON           )
SECRETARY OF THE TREASURY,   )
                            )
         Defendant.        )
_____)

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

Plaintiff Pamula Robinson filed her Complaint seeking relief from Defendant's unlawful employment discrimination in not selecting her for a position on the basis of her race (African American) in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. Ms. Robinson has been a dedicated federal employee for more than 30 years and has served with the Internal Revenue Service's Office of Appeals for the last 16 years as a GS-343-13 Program Analyst in the Technical Services, Tax Policy & Procedures Division ("TP&P"). Despite her many years of service and extensive background, the IRS discriminated against Ms. Robinson when IRS manager David M. Geber (white) manipulated the selection process for the GS-14 Senior Program Analyst position responsible for the Technical Analyst Program advertised in Vacancy Announcement APB-03-138MM ("Technical Analyst Program Coordinator" or "Coordinator") to prevent Ms. Robinson from being selected for the job. Geber manufactured a pretextual reason for not selecting Ms. Robinson by intentionally re-classifying the Technical Analyst Program Coordinator position, which was previously and subsequently occupied by 343 series employees, as a 512 series position

to prevent Ms. Robinson from being considered for the position and to assure that Sheila E. Jones, a white candidate, would be selected instead.

Defendant's Motion for Summary Judgment should be denied because: (1) Ms. Robinson has established a prima facie case of discrimination; (2) Defendant's Motion relies almost exclusively on questions of credibility, and Ms. Robinson has established a genuine issue of material fact concerning Defendant's stated reason for manipulating the selection process; and (3) a reasonable jury could decide that Defendant discriminated against Ms. Robinson.

## BACKGROUND

Plaintiff maintains, and intends to show at trial, that Geber rigged the selection process by changing the series of the Technical Analysis Program Coordinator position in order to select the white candidate. As a direct result of Geber's actions, Ms. Robinson did not ostensibly qualify for the position and was not even consider her for the vacancy despite having performed the duties of the position for four years. See Mot. at 12 ("her application was not considered for selection").

## I.    IRS Divisions and Occupational Series.

Program Analysts at IRS Headquarters maintain portions of the IRS Manual and monitor the policies and procedures used by IRS staff in the Field Offices.[1]  See Ex. 1 at 26, 28, 62.  Specifically,

---

[1] When an individual challenges a tax levied against, that appeal is processed by the IRS Appeals Division, which is further divided according to the types of taxes being reviewed (e.g., Large Case for corporations). See Depo. of David M. Geber at 24 (Oct. 11, 2006), copy attached as Exhibit 1; see also Appeals Division Organizational Chart, copy attached as Exhibit 2. Appeal employees are assigned to one of three series. The 343 series represents Program Analysts, who monitor the Agency's policies and procedures. The 930 series represents Appeals Officers, who negotiate and settle tax appeals (most positions in Appeals are in the 930 series). The 512 series represents Internal Revenue Agents, who are essentially professional accountants. See Rule 30(b)(6) Depo. of Carson C. Sprott at 23-24, 28, 29-30 (Sept. 28, 2006), copy attached as Exhibit 3; see also Depo. of Sheila E. Jones at 24 (Aug. 10, 2006), copy attached as Exhibit 4. After Appeals Officers negotiate appeals, 512 series Tax Computation Specialists (aka Technical Analysts) are responsible for re-computing the appellant's tax liability. See Ex. 4 at 27. Because Tax Computation Specialists

they set policies for individually assigned programs and communicate with field employees to resolve issues that arise in relation to their designated programs.[2] See Ex. 4 at 31. Unlike Tax Computation Specialists, who are essentially field accountants, Analysts do not work on claims, but instead monitor and assist the field staff. See Ex. 1 at 61-62. Geber, the Director of Large & Medium Sized Businesses ("Large Case"), a subset of TP&P and the office to which the position at issue was assigned, admits that he seldom used his accounting background for his work at IRS Headquarters.[3] See Ex. 1 at 19.

Employees in IRS Headquarters have traditionally occupied 343 series positions. See Ex. 1 at 63. In fact, prior to Geber's actions, all Large Case employees were assigned to the 343 series. See Ex. 1 at 28-29; see also Rule 30(b)(6) Depo. of Thomas Roley at 21 (Sept. 27, 2006), copy attached as Exhibit 5. Classifying the Technical Analyst Program Coordinator position at issue as a 512 series position was an anomaly; it was the only 512 series position announced during Geber's tenure as Director of Large Case. See Ex. 1 at 54. For nearly 20 years, no Large Case employee was ever classified as a GS-512-14 Program Analyst.[4] See Ex. 5 at 13, 20-21. The 343 series is

---

review appeals and do the actual accounting work, there are not typically assigned to the Appeals Headquarters – it is considered a field position. See Ex. 1 at 62; Ex. 4 at 31. Analysts, Tax Examiners, and Appeals Officers are the only positions assigned to the Appeals Headquarters. See Ex. 4 at 31.

[2] Appeals has several programs, including the Technical Analyst Program (aka Tax Computation Specialist Program). See Ex. 1 at 26, 30, 54; Ex. 4 at 48-49, 51-52.

[3] According to Geber, experience as a revenue agent (and more specifically accounting) was only "occasionally" relevant to the work of Analysts in Large Case. See Ex. 1 at 91-92.

[4] Human Resources Specialist Carson C. Sprott, a Rule 30(b)(6) designee, announced maybe four 512 series positions a year in Appeals, and he could not recall ever announcing one in Technical Services. See Ex. 3 at 15; see also Depo. of Carson C. Sprott at 18 (Sept. 28, 2006), copy attached as Exhibit 6.

3

considered broad, and Program Analysts "without limitation [can] do a range of things." See Depo. of Beverly Ortega Babers at 49 (Oct. 11, 2006), copy attached as Exhibit 7.  Defendant considers it "a catch-all" position because the "duties can be very varied" and 343 series employees do "a lot of different things." See Ex. 3 at 26, 44; see also Ex. 3 at 26-27 ("To know what a 343 does, you really have to ask the person what they do").

Sheila E. Jones, the selectee in this case, admitted that the GS-343-14 Program Analyst position she held (the Technical Analyst Program Coordinator) "was a totally different position" from the GS-512-13 Tax Computation Specialist position because the Analyst position "was broader than doing a tax computation specialists computations." See Ex. 4 at 63-64.  Yet, Defendant arbitrarily assigned its employees to different series and this capricious practice gave Geber an opportunity to discriminate against Ms. Robinson in the selection for the position at issue. See Ex. 3 at 30 (Defendant claims it could not describe how the 512, 930, and 343 series interact, or to what extent the duties of these Analyst, Agent, and Officer positions overlap).

## II.    Technical Analyst Program and Technical Analyst Program Coordinator Position.

Before Geber reclassified the Technical Analyst Program Coordinator's series, the employee responsible for the Technical Analyst Program (i.e., the Technical Analyst Program Coordinator) always occupied a 343 series position. See Ex. 1 at 50; Ex. 5 at 21-22.  Ms. Robinson served as the Coordinator for four years between 1994 and 1998, while in a GS-343-13 position. See Ex. 1 at 35; Ex. 5 at 27; see also Defendant's Discovery Response (Def's Resp. to Req. for Admission No. 17), copy attached as Exhibit 29.  In 1998, due to a realignment, James Skunda took over the Coordinator duties while in a GS-343-14 position. See Ex. 1 at 36; Ex. 5 at 26; Ex. 4 at 67.  After Skunda took an extended leave, Sheila Jones assumed the Coordinator duties on October 31, 2002, during a one-

year temporary assignment as a GS-343-14.[5]  See Ex. 1 at 36, 41-42; Ex. 5 at 63; Ex. 4 at 33-34, 63-64, 81; Performance Rating for Sheila E. Jones (March 24, 2003) ("Departure Rating"), copy attached as Exhibit 8; see also Performance Rating for Sheila E. Jones (June 4, 2003), copy attached as Exhibit 9.

As a result of the selection at issue, Sheila Jones was then permanently assigned to Large Case, but as a 512 Technical Analyst Program Coordinator, instead of a 343.  Subsequently, the Technical Analyst Program was assigned to Thomas Louthan another 343 series employee, and Jones assumed other program duties. See Ex. 4 at 67-68; see also Decl. of Pamula Robinson (Dec. 29, 2006), copy attached as Exhibit 30. (This information can be verified by the IRS's Discovery Directory).  Thus, Sheila Jones was the only 512 Technical Analyst Program Coordinator.

The IRS does not have documents that specify the duties of the Technical Analyst Program Coordinator. See Ex. 5 at 62.  However, it is understood that the Coordinator manages the activities of an advisory panel composed of field personnel, see Ex. 5 at 24-25, 29-33, 45; organizes training through Continuing Professional Education ("CPE") programs, see Ex. 5 at 34-39, 45; maintains the website Tax Computation Specialists use to share ideas, see Ex. 5 at 40-43, 45; and updates relevant portions of the IRS Manual, see Ex. 5 at 46.[6]  These four functions represent the "major" duties

---

[5] For more than a year, starting in October 2001, Sheila Jones performed the duties of a Program Analyst. See Ex. 29 (Def's Resp. to Req. for Admission No. 53).  However, she states she has virtually no recollection of how she was selected for the assignment. See Ex. 4 at 61, 65. Also, while the assignment was supposed to end in 2002, Sheila Jones continued working as the Technical Analyst Program Coordinator through April 2003, and it is unclear how or why this extension occurred (she claims it was through a detail assignment). See Ex. 1 at 37; Ex. 4 at 64-65.

[6] Coordinating the advisory panel consists of organizing periodic conference calls so participants could discuss "what was going on in the field, the kinds of problems they might be experiencing, possible solutions, any ideas they might want to share." See Ex. 5 at 32. Organizing CPEs consists of coordinating logistics because the advisory panel designed the CPE by outlining its content, constructing the agenda, and selecting instructors. See Ex. 5 at 34-36.  The Technical

performed by the Technical Analyst Program Coordinator.[7] See Ex. 5 at 45.  In sum, the chief

mission for the Technical Analyst Program Coordinator is to facilitate communication among the

Tax Computation Specialists in the field.[8] See Ex. 5 at 30; see also Ex. 5 at 64 (the tasks have

remained unchanged).

At any given time, any employee assigned to Large Case manages up to eight different

programs, only one of which might require accounting experience. See Jones Depo at 48-52.  In fact,

after her selection for the position at issue, Sheila Jones was assigned to the Statute of Limitations

---

Analyst Program Coordinator merely assists with logistical matters by securing a location, lining
up instructors, printing and delivering training materials, preparing a budget estimate, and serving
as the master of ceremony. See Ex. 5 at 36-39.  She is not expected to teach any sessions during the
CPE. See Ex. 5 at 39.  Maintaining the website is also a function that is performed by someone other
than the Coordinator.  An information technology person designs and runs the website and the
advisory panel reviews and screens the software posted on the site. See Ex. 5 at 41-43.  Finally,
updating the IRS Manual is a "fairly mundane" exercise consisting of "cosmetic" or "superficial"
revision (e.g., changing an employee's title). See Ex. 5 at 50-53.  The Coordinator simply draws on
volunteers from the field, and the IRS has automated the revision process so the employees most
familiar with needed revisions may initiate the changes. See Ex. 5 at 40, 46-48.  Moreover, because
there are so few legislative/regulatory changes to the tax computations parts of the Manual,
employees in the field, not the Coordinator, suggest and draft most of the changes. See Ex. 5 at 48-
49.  When significant changes are made, the Coordinator convenes a group of volunteers and has
them resolve the matter. See Ex. 5 at 50-51.  The Coordinator does not have to personally make
changes to the Manual. See Ex. 5 at 52.  She simply submits changes proposed by other employee
to the Director for approval. See Ex. 5 at 52, 55.

[7] While the Technical Analyst Program Coordinator occasionally performs other miscel-
laneous functions, like procuring software, much of this work is also performed by individuals in
the field, not by the Coordinator. See e.g., Ex. 5 at 59 (verifying the tax computation was done by
volunteers in Miami and New York").  The Coordinator's actual duties are logistical in nature. See
e.g., Ex. 5 at 61 ("work out a price, make sure we had the money to buy it, coordinate with the field
to find out how many people needed that software").

[8] The Technical Analyst Program Coordinators: "had oversight responsibility for the
program.  So it was their job to stay in touch with the people and the program in the field, to under-
stand what kinds of problems they were having, what their needs might be, to try to assist them,
essentially, make their job easier, whether it was training or to clarify practice or procedural matters
or anything along that line." See Ex. 5 at 24.

Program in addition to the Technical Analyst Program, and she was later assumed other programs, such as the Early Referral Program, Delegation Orders and Policy Statement Program, IRM Coordinator Program, Travel Budget Program, AQMS Liaison Program, the ACDS Program, the Morning News Flash Program.[9] See Ex. 4 at 48-52. Also, Geber admitted that at the time the vacancy was announced, it was not clear that the selectee would necessarily be assigned to the Technical Analyst Program (as opposed to any one of the many other programs). See Ex. 1 at 50, 54; see similarly Ex. 29 (Def's Resp. to Req. for Admission No. 20). In light of the fluid nature of program assignments and the fact that the vast majority of Large Case programs do not require specialized accounting skills, it is clear that during Sheila Jones's self-serving Rule 30(b)(6) deposition, she (and the Defendant) exaggerated the amount of accounting knowledge necessary to perform the duties of the position at issue in order to justify a 512 classification.

**III.    Geber, Robinson, Jones, and Sprott.**

Ms. Robinson is African American, and Geber knew this when he took the actions at issue in this case. See Ex. 1 at 32, 89. Geber also knew Ms. Robinson had previously coordinated the Technical Analyst Program, because he served as her first-level supervisor during that period. See Ex. 1 at 35. When he announced the vacancy at issue, Geber also knew Ms. Robinson wanted a promotion and had been applying for GS-14 positions. See Ex. 1 at 43, 80-81; Ex. 29 (Def's Resp. to Req. for Admission Nos. 28, 29) . He also knew she had never held a 512 series position.[10] See

---

[9]  Some other programs for which Large Case was responsible include: Fast-Track Mediation, Fast-Track Settlement, Straight Mediation and Arbitration, Tax-Exempt Organizations, Ex-Parte Communication, Early Referral, and Quality Measurement System. See Ex. 1 at 26, 30, 54.

[10]  Geber was on the selection panel that first hired Ms. Robinson to work in the Washington, D.C. Field Office, and he supervised her on several occasions thereafter. See Ex. 1 at 18, 32, 49. He also had a practice of being familiar with his subordinates' backgrounds. See Ex. 1 at 89. In fact, he would look into their personnel files. See Ex. 1 at 90. According to Geber, it is "[v]ery

Ex. 1 at 43-44; Ex. 29 (Def's Interrog. Resp. No. 8; Def's Resp. to Req. for Admission No. 31).

Finally, Geber knew employees with experience in the 343 series would not be considered for a 512

series position.[11]

Ms. Robinson has been a GS-343-13 Program Analyst for 16 years, and she has consistently

received positive performance ratings for her service. See e.g., Performance Ratings for Pamula

Robinson (June 13, 1996) and (July 10, 1999), copies attached as Exhibit 10. Moreover, she has

received many performance awards and letters of commendation, including a Deputy Commis-

_____

important" for a supervisor to be aware of a subordinates' experience before he issues assignments, and he gave Ms. Robinson assignments when he served as her supervisor. See Ex. 1 at 91. Thus, he was familiar with Ms. Robinson's professional background and experience (i.e., her service in positions outside the 512 series).

During his deposition, Geber tried suggesting that his interactions with Ms. Robinson were only minimal, at best. See e.g., Ex. 1 at 86-87 (doubling the number of employees in the Washington, D.C. Field Office from "probably 20" to "as high as 40's" to diminish the implication of their work together). However, his claim is simply not credible. First, in addition to working with Ms. Robinson in the Field Office, Geber also supervised her for at least four months while they worked at IRS Headquarters. See Ex. 1 at 89. In his own words, "if I had an assignment to give her, obviously we had interaction. If she was bringing the assignment in to me completed, we had interaction. If I needed her to follow up on something, we had interaction." See Ex. 1 at 89. Second, Ms. Robinson served as the internal management document coordinator, so she regularly relayed proposed changes to the IRS Manual to and from Geber and the others. See Ex. 1 at 87. As Geber noted, updating the IRS Manual was "absolutely" an integral and routine part of the office's function, so it is reasonable to assume that they interacted on a fairly regular basis. See Ex. 1 at 62. Third, they worked on the same floor at IRS Headquarters with only 25-30 other employees. See Ex. 1 at 87. Fourth, they attended the same quasi-social events, such as retirements parties, and interacted in the hallways at work. See Ex. 1 at 88, 91.

[11] He "inquired ... as to the eligibility of the employees to be converted from the GS-343 series to the GS-512 series and ... was told it had not happened." See Ex. 29 (Def's Resp. to Req. for Admission No. 32). Also, the Positions Qualifications Standards Handbook, which dictates the qualification determination process, is used by virtually all government employees and is readily available on the internet. See Ex. 3 at 42-43.

sioner's Award.  Ms. Robinson has also been deemed qualified to perform GS-14 level work.[12]  See e.g., Letter to Pamula Robinson from Lajuana F. Wilson (Jan. 7, 2004) and Letter to Pamula Robinson from Michele McDonald (June 9, 2004), copies attached as Exhibit 11.

In addition to her experience as a Program Analyst,  Ms. Robinson also served as the Technical Analyst Program Coordinator between 1994 and 1998.  See Ex. 1 at 35; Ex. 5 at 27.  Her Performance Appraisals for this period were rated as either "outstanding" or "exceeds fully successful" for each of her critical performance elements. See e.g., Ex. 10.  In fact, Ms. Robinson demonstrated a wide range of knowledge concerning Technical Analyst Program and the corresponding sections of the IRS Manual; she coordinated national training (Continuing Professional Education ("CPE")) programs for over 200 Technical Analysts that were very well received and obtained outstanding ratings from the participants; she regularly answered questions from field staff; she participated in several business and program reviews of the Technical Section; and she updated the Technical Analyst Handbook and Technical Advise Request Forms.  See Ex. 10.  She provided assistance to the Technical Section Chiefs in the field, pointed out areas that they could improve in, and shared procedures that were used in other offices; and her supervisors noted that her suggestions were beneficial to all of the offices she visited.  See Ex. 10.  Ms. Robinson also participated in studies, served as project leader, headed up Technical Analysts task forces, and prepared advisory memos concerning the impact of legislative and regulatory initiatives.  See Ex. 10.

Thus, Ms. Robinson had performed the tasks expected of the Technical Analyst Program Coordinator.  She had experience with training, coordinating CPEs, reviewing web pages, matrixing new programs, and procurement work, as well as experience overseeing various administrative pro-

---

[12]  It should be noted, however, that Defendant inexplicably revoked at least some of these vacancies after Ms. Robinson applied and was considered qualified. See Ex. 11.

grams, conducting electronic research, and working with congressional correspondence. <u>See</u> Ex. 6 at 68, 70-71; <u>see also</u> Merit Program Questionnaire for Pamula Robinson (May 15, 2003), copy attached as Exhibit 12.  Ms. Robinson had strong interpersonal skills and a background in program advisement, including work researching databases and resolving disputes between different IRS Divisions. <u>See</u> Ex. 6 at 68, 71.  In fact, by Geber's own admission, Ms. Robinson received an impressive and "laudatory note" about her "very good" work from "another satisfied customer" who lavished complements on her for being "the driving force behind planning and conducting the national CPE for Technical Analysts for at least the last two years."[13] <u>See</u> Ex. 1 at 33-35, 88; <u>see also</u> Memorandum to David Geber from Diane Sullivan (July 1, 1998), copy attached as Exhibit 13.

Sheila Jones is white and Geber knew this because they worked together and he later supervised her when he became Director of Large Case.[14] <u>See</u> Ex. 1 at 23, 36-37; Ex. 4 at 9, 57.  As noted above, she became the Technical Analyst Program Coordinator on October 31, 2002, during what was supposed to be a one-year temporary assignment. <u>See</u> Ex. 1 at 36, 41-42; Ex. 5 at 63; Ex. 4 at 33-34, 63-64, 81; Ex. 9; Ex. 10.  Prior to her temporary assignment, Sheila Jones served as a Tax Computation Specialist. <u>See</u> Ex. 4 at 22.  In fact, she worked in the field when Ms. Robinson was at the IRS Headquarters serving as the Technical Analyst Program Coordinator. <u>See</u> Ex. 4 at 26.  Prior to her selection for the vacancy at issue, Sheila Jones had only about six months of experience as the Technical Analyst Program Coordinator. <u>See</u> Ex. 8.  Nevertheless, when Geber

---

[13]  Geber deposition testimony paints a picture of Ms. Robinson's performance that is starkly inconsistent with his own written statements on this note. <u>See</u> Ex. 1 at 33-35.  When asked his impression of Ms. Robinson, he said "[t]here was nothing that made her stand out ... nothing that was objectionable about her."  But, when presented with the note, he conceded that he was (and is still today) impressed with Ms. Robinson's "very good" work. <u>See</u> Ex. 1 at 33-35, 88.

[14] Geber claims that Thomas Roley was Sheila Jones' supervisor when she applied for the position. <u>See</u> Ex. 1 at 37-38. <u>But see</u> Ex. 5 at 13 (Roley left Large Case in September 2002).

announced the vacancy, he "figured Ms. Jones was going to apply." See Ex. 1 at 94.  Unlike Geber, Beverly Ortega Babers (African-American Hispanic), is the Director of Technical Services, Geber's first-level supervisor, and the person who signed the selection certificate making Sheila Jones the Technical Analyst Program Coordinator, She did not know Sheila Jones prior to or after her selection. See Ex. 7 at 25-26.  In fact, Babers learned for the first time that Sheila Jones was selected as the Technical Analyst Program Coordinator as a result of the instant case. See Ex. 7 at 19, 26, 30.

Carson C. Sprott, a Human Resources Specialist, worked in the IRS's Human Capital Office, where he was responsible for up to 12 merit promotion files each week. See Ex. 3 at 13-14.  Sprott's performance ratings were based on two criteria: cycle time (i.e., "how fast [promotions] come out") and quality (i.e., "correct qualification determination"). See Ex. 3 at 16-17.  As a result, he was under pressure to process applications in a quick and uniform manner.  Conversely, he had no incentive to inquire about the actual duty responsibilities of a given position or the qualifications of the individual applicants.  In fact, Sprott's assistant, Michelle McDonald, performed a third of all of his qualification determinations on his behalf. See Ex. 3 at 21-22; see also Ex. 6 at 85, 88 (describing McDonald's duties as secretarial and her performance as "sloppy").

## IV.    The Freeze and Conversions.

On February 27, 2002, the IRS claims it imposed a freeze on all vacant Analyst and related positions in the 343 series because the series "was deemed to be too general."[15]  See Mot. at 2; see also Ex. 1 at 50-51, 63-64; see also Memorandum to Chief Information Officer from Bob Wenzel, copy attached as Exhibit 14.  However, the IRS completed its review of the 343 series prior to 2003.

---

[15] While generally accepted as the basis for the freeze, Geber did not accept this rationale because he "was ambivalent as to what series [his subordinates] were, as long as they got their jobs done," and Large Case employees accomplished their assigned duties irrespective of their series designation. See Ex. 1 at 65.

See Ex. 7 at 40-41.  In fact, Sheila Jones was assigned to her 343 series position and assumed responsibility for the Technical Analyst Program in October 2002, after the freeze was already in place. See Ex. 1 at 42-43; Ex. 9.

There were also exceptions to the freeze, Geber knew it was possible to obtain an exceptions, and there was nothing preventing him from requesting an exception so that the Technical Analyst Program Coordinator position could remain in the 343 series. See Ex. 1 at 68, 74-75; Ex. 7 at 56. See e.g. Memorandum to Acting Commissioner from David B. Robison (Apr. 7, 2003), copy attached as Exhibit 15.  Geber knew that all he needed to do to obtain an exemption was to file a memo. See Ex. 1 at 68, 71; Ex. 7 at 57. See e.g., Ex. 15.  In fact, Appeals was granted three exemptions on April 8, 2003, just before the vacancy at issue was announced on May 5, 2003. See Ex. 1 at 78-79; Ex. 15.  Moreover, David B. Robison, Chief of the Office of Appeals, requested that Appeals be excluded from the freeze completely on May 23, 2003, and this request was granted on June 9, 2003, before the selection at issue was made.[16] See Ex. 1 at 79-80; See also Memorandum to Acting Commissioner from David B. Robison (May 23, 2003), copy attached as Exhibit 16.

Geber claims Robison directed him to convert all eligible Large Case employees from the 343 to 512 series in response to the freeze.[17] See Ex. 1 at 55-56, 63-64.  He also claims he complied

---

[16] Technical Services was small and the staff met regularly, so information relating to human resources, personnel needs, and staff projections were regularly relayed to Geber. See Ex. 7 at 23. Babers either forwarded documents concerning such matters to Geber or discussed them during the staff meetings. See Ex. 7 at 23-24. Also, Babers knew that Felicia Izen, Director of Small Business & Wage, requested exceptions to the freeze and that Appeals requested a complete exemption. See Ex. 7 at 23-24, 65. The only inference to be drawn from these facts is that Geber was informed of and knew about these requests and responses.

[17] According to Babers, a conversion is "a paperwork exercise" by which an employee is reassigned from one series to another series at the behest of her first-level supervisor. See Ex. 7 at 63. This suggests that the different series are interchangeable and fungible, which contradicts assertions made by Defendant. For example, there was nothing preventing Geber from announcing

by converting Gene Perdue (white), Sandy Cohen (white), Michelle Topel (white), and "possibly" Jacqueline Harris (African American) to the 512 series. See Ex. 1 at 44, 51, 63-64. However, Geber could not state when (or whether) these alleged conversions actually took place. See Ex. 1 at 51 (he hedged his assertions regarding the alleged conversions he with: "possibly, I am not positive"). Moreover, documents produced by Defendant in response to discovery requests do not support Defendant's assertions that any such conversions took place (the absence of this information is compelling in light of Plaintiff's discovery request for information on the "name, race, position title, and pay grade of all Office of Appeals employees" during this time frame (See Ex. 29 (Def's Interrog. Resp. No. 2)). Perdue and Harris are currently assigned to the 930 series and Cohen occupies a 343 series position.[18]  See Ex. 30 (This information can be verified by the IRS's Discovery Directory). Also, Babers did not discuss any conversions with Geber despite being his first-level supervisor, and she was not involved in any conversions. See Ex. 7 at 52, 62-63.

Despite the freeze and any conversions that may have taken place, Appeals' Authorized Staffing Pattern ("ASP")[19] indicates that Geber was not prohibited from filling any 343 series positions. The proposed ASP for 343 series positions in Appeals was submitted for approval on or

---

the position within the 903 series. See Ex. 1 at 70. He claims he just "didn't consider it." See Ex. 1 at 70-71.

[18]  Due to their retirement from federal service and the holiday season, Plaintiff has been unable to reach these individuals. However, early communications with them suggest that Defendant's assertions are either not true or a pretext. For example, Cohen occupied a 512 series position for only two weeks before being assigned to the 930 series on May 4, 2003.

[19] The Authorizing Staffing Pattern set the parameter for positions a division is permitted to fill. See Ex. 7 at 49. As the Director of Large Case, Geber was responsible for developing the ASP for Large Case, and he was aware of the ASP for 343 series positions. See Ex. 7 at 50; Ex. 1 at 66. Also, when a manager wants to hire someone, one of the first things he routinely does is review the ASP, and Geber did so before he announced the vacancy at issue. See Ex. 7 at 44-45.

before October 15, 2002, and appears to have been approved on or about October 30, 2002. See Ex. 7 at 53, 55; Ex. 14. Once it was approved, Geber had full discretion to fill any Analysts and related positions he wished as provided therein. See Ex. 7 at 54. This was true irrespective of the freeze. See Ex. 7 at 54. The applicable ASP set the number of 343 series positions in Appeals at 75. See Ex. 1 at 76; Ex. 7 at 55; Ex. 16. By April 7, 2003, Appeals already had plans in place to meet the objective of the freeze in compliance with its ASP. See Ex. 1 at 78; Ex. 7 at 60-61; Ex. 15. Also, by May 23, 2003, before the selection at issue was made, Appeals met its ASP objective. See Ex. 1 at 80; Ex. 7 at 65-66; Ex. 16.

## V.    The Vacancy Announcement and Change in Series.

As Director of Technical Services, Babers "relied on [subordinates such as Geber] really to run the operations of the place." See Ex. 7 at 18-19. This discretion extended to personnel matters, including the selection and hiring of employees. See Ex. 7 at 18-19. Babers gave Geber a great deal of discretion to run Large Case as he saw fit, he was "on his own a lot," and any conversations they had concerning personnel matters were limited.[20] See Ex. 1 at 31. Babers also gave him a lot of latitude to run his own shop within the parameters of the ASP. See Ex. 7 at 49. Thus, Geber was the person primarily responsible for filling position vacancies in Large Case. See Ex. 1 at 25-26. It was Mr. Geber's responsibility to assess whether or not a vacancy needed to be filled and, if so, how and when to fill it. See Ex. 7 at 20. Babers also relied on Gebers' recommendations in making personnel decisions. See Ex. 7 at 20. Thus, it was Geber, alone, who requested that the vacancy at issue be announced. See Ex. 1 at 49, 53; Ex. 7 at 35; see also Mot. at 3. He simply copied Babers

---

[20]    For example, Babers routinely signed Performance Appraisals that her subordinates gave to her for approval and she never disapproved the proposed rating of a first-level supervisor, such as Geber. See Ex. 7 at 28, 30.

on an email when he decided to announce the position, and Sprott, in turn, prepared the Vacancy Announcement in accordance with the Standard Form 52 and Geber's request. See Ex. 7 at 46; Ex. 6 at 13; see also Email to and from David M. Geber and Beverly O. Babers (April 18 - 22, 2003), copy attached as Exhibit 17. It was also Geber, alone, who made the decision to reclassify the Technical Analyst Program Coordinator's series from 343 to 512, thereby excluding Ms. Robinson from consideration.[21] See Ex. 1 at 57-58.

Unfortunately, it is clear that Geber engaged in personnel practices that are illegal, antithetical to merit promotion principles, and lend themselves to capricious and discriminatory hiring practices. As an initial matter, the Appeals selection processes tends to be haphazard, and according to Geber, he and other staff were often "pulled off the street" to review promotion packages. See Ex. 1 at 46-47. Also, Geber utilized the "old buddy system" to obtain an Analyst position at IRS Headquarters by calling a friend, asking for a job, and getting one without having to compete with anyone else based on merit promotion principles. See Ex. 1 at 22-23; see similarly Ex. 17 ("I'm going to check with an old friend in the Philly office..."). Geber also admits that he and Robison manipulated and targeted at least one vacancy announcement with the objective of selecting individuals from a limited group, although he feebly tries to distinguish this practice from "restricting the pool of applicants." See Ex. 1 at 73-74.

In fact, it appears Geber may have taken illegal actions in order to prevent Ms. Robinson from being considered for the Technical Analyst Program Coordinator position by preselecting

---

[21] In fact, Babers had no understanding of the Technical Analyst Program Coordinator's programmatic responsibilities or duties, so she relied "[q]uite heavily" on Geber's understanding and recommendation regarding the skill set required to perform the position at issue. See Ex. 7 at 37, 39. As a result, neither Babers nor Sprott know why the position was announced as a 512 series position. See Ex. 7 at 35-36; Ex. 6 at 17.

15

Sheila Jones.[22]  The vacancy was announced on May 5, 2003, and closed on May 19, 2003. See Ex.

1 at 50; Ex. 6 at 13; see also Vacancy Announcement APB-03-138MM, copy attached as Exhibit

18.  However, Geber knew as early as April 2003, before he had Sprott announce the vacancy at

issue, that Sheila Jones was going to be selected for the position instead of Ms. Robinson.[23] See Ex.

1 at 58-60.  On April 18, 2003, he wrote in an email stating that "Sheila Jones would just be moving

from 13-14..."  See Ex. 1 at 58-60; Ex. 17 ("The bottom line is that I think we're OK.  I'm going to

check with an old friend in the Philly office...").[24]  Defendant claims Geber reclassified the

Technical Analyst Program Coordinator's series from 343 to 512 because of the freeze and to align

the position with the other positions he claims he converted to 512. See Ex. 1 at 50-51, 63-64, 70.

## VI.    The Selection Process.

By May 19, 2003, each candidate for the Technical Analyst Program Coordinator position

was expected to submit an application packet consisting of three documents: a card identifying the

vacancy; the Merit Program Questionnaire; and her most recent performance appraisal. See Ex. 3

---

[22]    Preselection is "when somebody is already slotted for a position even before you announce it." See Ex. 1 at 60.  Specifically, it occurs when management "already have a candidate in mind for the position and th[e] merit promotion [process] is just a paper exercise to meet the legal requirements of merit promotion and the regulations of the IRS and the Internal Revenue manual, [because] the whole time [management] knows who they want and they pick that person without considering other applicants." See Ex. 3 at 58-59.  Geber knew the IRS considers preselection illegal. See Ex. 1 at 60; Ex. 3 at 58-59.

[23]    Inexplicably, Sheila Jones has almost no recollection of how she learned about the vacancy or any of the steps that led to her selection. See e.g., Ex. 4 at 71-72, 91-93.  She also applies circular logic to explain her selection. See Ex. 4 at 94 (I was selected because I was the "best qualified"; I was the best qualified because I "got the job").  However, Sheila Jones does admit that she may have spoken to Geber about the position in April 2003, before the vacancy was announced on May 5, 2003. See Ex. 4 at 72; Ex. 18.

[24]    Among others, this email was sent to Izen, Geber's counterpart in Small Business & Wage (a similarly situated manager), after they discussed obtaining exceptions to freeze and only 10 days after she obtained such an exception. See Ex. 1 at 68, 74-75; Ex. 15.

16

at 31-32; Ex. 6 at 14; See e.g., Ex. 12 and Application for Promotion for Pamula Robinson (May 15, 2003) ("application packet"), copy attached as Exhibit 19. The packets were supposed to be stored in the Merit Promotion File ("MPF") along with other items, such as fax cover sheets, to establish a "paper trail."[25] See Ex. 3 at 41; Ex. 6 at 25-26. However, the MPF for the Coordinator position is not complete, some of the information contained therein is false and unreliable, and Sprott's assertion that the MPF Checklist accurately reflects the processing of the applications for this position is not true. [26] See e.g., Ex. 6 at 29.

─────────────

[25] An MPF typically contains all documents concerning a vacancy, such as the Announcement, a Position Description, the Qualification Determination Sheet, any ranking materials, the Selection Certificate, and an MPF Checklist. See Ex. 3 at 31-34; see also Merit Promotion Folder Checklist 315708 (July 2, 2003), copy attached as Exhibit 20. The MPF Checklist documents the steps taken to process and review the file, the person who completed the steps, and when the steps were supposedly done. See Ex. 3 at 31-34; Ex. 6 at 27-28. The MPF also contains a call sheet for recording communications made in relation to the selection. See e.g., Call Sheet for Vacancy Announcement APB-03-138MM, copy attached as Exhibit 21.

[26] For example, the performance appraisal Defendant claims Sheila Jones submitted on May 14, 2003 (a Departure Rating), is not contained in the MPF. See Ex. 6 at 33-34, 77. Also, the MPF Checklist incorrectly sates that Sheila Jones' performance appraisal was received on May 14, 2003, yet, the Performance Appraisal Defendant claims to have used to assess her qualification was not completed until June 4, 2003, two days after Sprott allegedly completed his qualification determination. See Ex. 6 at 28, 34, 38, 78-79. Compare Ex. 9 with Ex. 20 and Qualification Record for Sheila Jones (June 2, 2003), copy attached as Exhibit 22. (MPF Checklist indicates the qualification determination was completed by "CS"on June 2, 2003). The MPF Checklist states "Non-Select" Letters were not applicable ("N/A") to this position, yet Ms. Robinson was issued one. Compare Ex. 20 with Letter to Pamula Robinson from Carson C. Sprott (undated), copy attached as Exhibit 23. see also Ex. 6 at 51. Discovery revealed two versions of Ms. Robinson's Qualification Records – one with Sprott's signature dated June 7, 2003, and one with no signature or date. See Ex. 6 at 81; see also Qualification Records for Pamula Robinson (June 2, 2003) and (undated), copies attached as Exhibit 24. Defendant has no explanation for the duplication. See Ex. 6 at 81-82. While Sprott claims he maintained the MPF by collating materials as they were submitted, performing the qualification determinations and attaching the appropriate sheet, forwarding the materials to the selecting official, and entering the selection on the SF-50, see Ex. 6 at 25, 40; Ex. 3 at 40, he had no explanation for these irregularities.

The MPF Defendant originally produced in response to Plaintiff's Discovery Request did not contain original source material, but rather a mix of files contained in the original MPF and other

17

Sprott claims he completed the qualification determination for the Technical Analyst Program Coordinator position in two steps.  See Ex. 6 at 47. First, he "checked for timeliness to make sure [the application packets] were received within the vacancy announcement period."  See Ex. 6 at 47.  Then, he compared the information contained in the candidates' Merit Program Questionnaires with the Qualification Standards handbook.  See Ex. 6 at 47.  These are the only two steps he claims to have taken in completing the qualification determinations.  See Ex. 6 at 48.

### A.    Untimely Performance Appraisal.

If any one of these three documents that make up a candidate's application packet is not submitted, the candidate is supposed to be deemed not qualified.[27]  See Ex. 3 at 37; see also Ex. 29 (Def's Resp. to Req. for Admission No. 41).    Ms. Robinson submitted a complete application packet on May 15, 2003. See Ex. 6 at 35; Ex. 19.  Her application packet was complete and timely, see Ex. 6 at 44, yet she was determined to be unqualified, see Ex. 24.  By contrast, Sheila Jones' application packet, which was originally submitted on May 14, 2003, but it was incomplete and untimely, yet she was deemed qualified. See Ex. 22.  Defendant claims Sheila Jones submitted a Departure Rating with her original application packet in lieu of a proper performance appraisal. See Ex. 29 (Def's Resp. to Req. for Admission Nos. 40, 42); Ex. 4 at 109-10; see also Ex. 6 at 47 (Departure Ratings are not proper).  Defendant further claims this error was corrected in a timely fashion when some unknown person belatedly placed Sheila Jones' June 4, 2003 Performance

---

documents from the administrative Report of Investigation. See Ex. 3 at 34.  Defendant provided what purports to be the original MPF only after Mr. Sprott's depositions were concluded.

[27]    If an applicant does not submit a performance appraisal as part of her packet, her supervisor is given 10 days to submit one on her behalf.  See Ex. 3 at 35-36.  However, even assuming this liberal policy was applied in this case, Defendant could not, as it claims, have considered Ms. Jones' June 4, 2003 Performance Appraisal as part of her application because it was submitted 21 days after she submitted her application packet. Compare Ex. 18 with Ex. 9; see also Ex. 3 at 35-36.

Appraisal into the MPF. However, Sheila Jones herself does not recall whether she submitted a performance appraisal as part of her application packet. <u>See</u> Ex. 4 at 83-84, 88.[28]  Also, the Departure Rating Defendant claims Sheila Jones submitted is not contained in the MPF. <u>See</u> Ex. 6 at 26, 33-34, 77. Moreover, the June 4, 2003 Performance Appraisal was issued after Sprott had already completed his qualification determination on June 2, 2003. <u>Compare</u> Ex. 9 <u>with</u> Exs. 20 and 22; <u>see</u> Ex. 6 at 78-79; <u>see also</u> Ex. 1 at 84; Ex. 6 at 28 (Sprott sent the ranking materials to Geber on June 4, 2003). Furthermore, Sprott conceded that it is possible Sheila Jones did not submit a performance appraisal (or Departure Rating) when she sent her application.[29] <u>See</u> Ex. 6 at 31. Finally, the mark contained on the List of Applicants indicating that Sheila Jones' Performance Appraisal was submitted was clearly inserted after the packets were originally reviewed, but it is unclear when. <u>See</u> Ex. 6 at 31; <u>see also</u> List of Applicants for Vacancy Announcement APB-03-138MM, copy attached as Exhibit 25.

   Geber claims someone in the IRS Human Resources Office asked him to issue Sheila Jones a new Performance Appraisal, but he cannot remember who and he does not recall ever communica-

_____

   [28]  In a bizarre turn about, Sheila Jones tried during her deposition (after  a one-hour lunch break) to assert that her May 14, 2003 application packet was complete. <u>See</u> Ex. 4 at 109-10. However, her assertions contradict prior deposition testimony in which she claimed she could not recall whether she submitted a performance appraisal. <u>See</u> Ex. 4 at 83-84, 88. Also, she could not recall who drafted the alleged Departure Rating, what period it supposedly covered, or why it was considered a Departure Rating and not a Performance Appraisal. <u>See</u> Ex. 4 at 111-12. While Sheila Jones admitted that she faxed her application packet, she claims to have miraculously obtained another version of the packet containing a notation indicating that her Departure Rating was being rejected (it is still not clear how she placed a document into a fax machine and pulled it out the other end with a notation on it). <u>See</u> Ex. 4 at 113-16. However, she could not recall who wrote the note or to whom it was directed, and claims she did nothing in response to the note. <u>See</u> Ex. 4 at 115-16. Defendant subsequently produced a copy of the application packet Sheila Jones referenced during her deposition, but it does not contain any notation concerning her Departure Rating being rejected.

   [29]  Sprott could only speculate about what "probably" happened with Sheila Jones' Performance Appraisal. <u>See</u> Ex. 6 at 31-32 ("could be" "probably").

ting with Sprott. See Ex. 1 at 39, 46. Also, according to Sprott, the only communication he had with Geber concerning the vacancy was the Routing Slip he prepared and mailed to Geber, along with the ranking package. See Ex. 6 at 32; see also Routing Slip to David Geber from Carson Sprott (June 4, 2003), copy attached as Exhibit 26. There is also no indication on the MPF call sheet that either Sprott or his assistant contacted Geber. See Ex. 21. Geber was not Sheila Jones' supervisor during this period; it is unclear why anyone from the IRS Human Resources Office would have asked him to complete her appraisal. See Ex. 1 at 37, 40-41; see also Ex. 4 at 65. Regardless, Geber prepared Sheila Jones' Performance Appraisal after he knew she had applied for the position and for the express purpose of incorporating it into the MPF.[30] See Ex. 1 at 38-39, 41, 79-80; Ex. 29 (Def's Resp. to Req. for Admission Nos. 29, 43). Also, since the Performance Appraisal was not completed until June 4, 2003, Sprott lied when he claimed he verified that Sheila Jones' application was complete as part of his qualification determination, which he completed on June 2, 2003. Compare Ex. 9 with Exs. 20 and 22; see Ex. 6 at 28, 34, 38, 78-79.

## B.    Qualification Determination.

Sprott, who was responsible for assessing the candidates qualifications for the selection at issue, has never heard of the Technical Analyst Program and does not know what the Technical Analyst Program Coordinator does. See Ex. 3 at 27, Ex. 6 at 71-72. In fact, "[o]ther than general appeals work," he has no understanding of what Technical Services employees do. See Ex. 6 at 17. So, when he assessed Ms. Robinson's qualifications, Sprott wrongly believed "the job is mostly to compute taxes and be a professional accountant." See Ex. 6 at 68. His sole basis for believing the

---

[30]  The Performance Appraisal was prepared exclusively by Geber with no input from Babers. See Ex. 7 at 31. Indeed, Babers does not recall ever being involved in rating Sheila Jones' performance. See Ex. 7 at 27-28.

Technical Analyst Program Coordinator was responsible for accounting was Geber's decision to reclassify it. See Ex. 6 at 68-69. According to Sprott, it "would stink a little bit" if a person within the 343 series had previously performed the duties of the position and it were later advertised within the 512 series. See Ex. 6 at 75. Oblivious to the fact that every Coordinator prior to the selection at issue was a 343 series employee, he also thought "it would be very weird if a 343" had been performing the duties of the position. See Ex. 6 at 75.

A Human Resource Specialist is expected to compare candidates' Merit Program Question-naires with the Qualifications Standards Handbook. See Ex. 3 at 43, 45; see also Ex. 6 at 45. The most crucial information is a candidate's description of her prior experience "[b]ecause qualifica-tions are [supposed to be] based on duties and not titles." See Ex. 6 at 45. Sprott claims he com-pared the candidates' Merit Program Questionnaires with the Qualifications Standards Handbook, yet he determined that Ms. Robinson was not qualified for the Technical Analyst Program Coordi-nator position.[31] See Ex. 6 at 37; 43. By contrast, he determined that Sheila Jones was qualified for the position. See Ex. 6 at 38. Sprott claims that the sole reason he considered Ms. Robinson to be unqualified and Sheila Jones to be qualified was his assessment of their experience.[32] See Ex. 6 at 49. Thus, Defendant did not consider Ms. Robinson for the position because she lacked one year of prior experience in the 512 series. See Ex. 29 (Def's Interrog. Resp. No 7).

---

[31]  Sprott used a Qualification Record to memorialize his qualification determinations for this position. See Ex. 6 at 33, 36; see e.g., Ex. 24. However, he initially noted on Ms. Robinson's Record that she had sufficient "specialized training" for the position, but then crossed that notation out. See Ex. 6 at 39; Ex. 24. He could not explain why he initially indicated that she was qualified, and attributed to a "[s]imple error." See Ex. 6 at 39.   He also said that processing the vacancy was "easy" and his assessment was not independently verified. See Ex. 6 at 46, 51-52.

[32]  Ms. Robinson's application packet was timely and complete, and she met the educational requirements for the position. See Ex. 6 at 44, 49, 66.

If the Technical Analyst Program Coordinator position had remained classified as a 343 series position, Ms. Robinson would have been deemed qualified. See Ex. 6 at 75. Ms. Robinson would also have been considered qualified if the assessment had been based on the actual duties of the position as opposed to its series designation because she previously performed the Coordinator's duties. Her Merit Program Questionnaire described many of the tasks she has experience in performing, such as training, coordinating CPEs, reviewing web pages, matrixing new programs, and procurement work, as well as experience overseeing various administrative programs, conducting electronic research, and working with Congressional correspondence. See Ex. 6 at 68, 70-71. Sprott also conceded that her experience evidenced her interpersonal skills and background in program advisement. See Ex. 6 at 68, 71. After the Coordinator's series was reclassified, only one person was deemed qualified for the vacancy, which is unusual. See Ex. 1 at 61.

### C.    Ranking and Selection.

After Sprott conducted his qualification determination, he then "forwarded the application to the selecting official" – Geber. [33] See Ex. 6 at 52; Ex. 26. Geber has tried to minimize his role in the selection by noting that Babers was the selecting official. See Ex. 1 at 81. However, Defendant admits that "Jones was selected by Dave Geber and Beverly Ortega Babers for the position." See Ex. 29 (Def's Interrog. Resp. No 7). Geber's backpedaling also contradicts his

---

[33] The impact of the ranking process is unclear at this time, but records suggests the ranking questions were not specifically tailored for the Technical Analyst Program Coordinator's position. See Ex. 6 at 55. Also, according to the Best Qualified List (Vacancies Register), "Pertinent Experience [was] Not Used" to assess the applicants. See Vacancy Register for Vacancy Announcement APB-03-138MM, copy attached as Exhibit 27. By contrast, "Current Performance Appraisals" were used to assess/rank the applicants. See id. If true, this would have assured Ms. Robinson's selection over Sheila Jones because the latter would not have benefitted as a result of her prior experience in the 512 series and her untimely Performance Appraisal would have been detrimental.

22

admission that Babers gave him a great deal of discretion and the conversations they had regarding

personnel matters were "not extensive." See Ex. 1 at 31.  Regardless, Geber recommended Sheila

Jones for the position, and on June 20, 2003, Babers signed the selection certificate based on his

recommendation. See Ex. 1 at 25-26, 57, 81; Ex. 7 at 66-67; Promotion Certificate for Vacancy

Announcement APB-03-138MM, copy attached as Exhibit 28; see also Ex. 7 at 21, 28-30 (Babers

never disapproved a selection recommendation).

## STANDARD OF REVIEW

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is only appro-

priate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together

with the affidavits, if any, show that there is no genuine issue as to any material fact and that the

moving party is entitled to a judgment as a matter of law." See Fed. R. Civ. P. 56(c); Celotex Corp.

v. Catrett, 477 U.S. 317, 318 (1986);  Diamond v. Atwood, 43 F.3d 1538, 1540 (D.C. Cir. 1995).

Summary judgment is not proper where, as in this case, the evidence is such that a reasonable fact-

finder could rule in favor of the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

243 (1986).  In deciding a summary judgment motion, "the court must draw all inferences in the

nonmoving party's favor and accept the nonmoving party's evidence as true." Carter v. George

Wash. Univ., 180 F. Supp. 2d 97, 102 (D.D.C. 2001) (quoting Anderson, 477 U.S. at 248), aff'd, 387

F.3d 872 (D.C. Cir. 2004)); see also Stewart v. Ashcroft, 211 F. Supp. 166, 169 (D.C. Cir. 2003).

"[T]he D.C. Circuit has directed that because it is difficult for a plaintiff to establish proof

of discrimination, the court should view summary judgment motions in such cases with special

caution." Carter, 180 F. Supp. 2d at 103; see also Aka v. Wash. Hosp. Ctr., 156 F.3d 1284 (D.C. Cir.

1998) (en banc).  It also observed that "Title VII [does not] authorize federal judges to become

super-jurors, weighing evidence and drawing independent conclusions regarding the ultimate

question of discrimination." <u>Barbour v. Browner</u>, 181 F.3d 1342, 1354 (D.C. Cir. 1999) (Tatel, J.,

concurring and dissenting).

## ARGUMENT

Summary judgment is not appropriate in this case because material facts are in dispute and

there is a genuine issue as to Defendant's true reason for not selecting Ms. Robinson for the

Technical Analyst Program Coordinator position. Indeed, the evidence in this case is subject to

significant disagreement, and there are sufficient disputed issues to warrant a trial and an ultimate

finding in Plaintiff's favor.

**I.      The Issue Is Whether Ms. Robinson Was Discriminated against When She Was Not
Selected for the GS-14 Senior Program Analyst Based on her Race.**

Ms. Robinson was discriminated against when Geber changed the Technical Analyst

Program Coordinator's occupational series from 512 to 343 in order to prevent her from being

considered for the position. Geber's act of intentionally mis-classifying the position's series lead

directly to Ms. Robinson not being considered for the vacancy and assured that Sheila Jones, the

white applicant and indeed the only remaining candidate, would be selected instead. Ms. Robinson

previously served as the Technical Analyst Program Coordinator for four years and but for Geber's

actions, she would have been considered and selected for the vacancy now at issue; it was Geber's

jury-rigging of the position's series that prevented this from occurring.

Contrary to Defendant's characterization, this case is not solely about Sprott's review of Ms.

Robinson's application, which took place only after Geber had already surreptitiously changed the

position's series. Given Sprott's mismanagement of the MPF and acceptance of Sheila Jones'

untimely Performance Appraisal, a reasonable jury could certainly question his credibility, which

leaves open the question of whether he conspired with Geber. However, the key decision in this

case was Geber's choice to alter the position's series, which Sprott relied on to reject Ms. Robinson's application.  Geber knew that changing the Technical Analyst Program Coordinator's series to 512 would cause Defendant's Human Resources Office to summarily reject Ms. Robinson's application from consideration  (not based on her ability to perform the job, but because her resume did not contain the number "512").  See Ex. 29 (Def's Interrog. Resp. No 7).

By focusing elusively on the actions of Sprott, rather than the preceding and controlling actions of Geber, Defendant obfuscates key facts and encourages the Court to ask the wrong questions in this case, particularly with respect to the prima facie phase.  The burden of establishing a prima facie case is not meant to be an onerous one. Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981).  Moreover, the elements are flexible, and must be tailored on a case-by-case basis to avoid becoming a "rigid, mechanized, and ritualistic" framework.  Furnco Constr. Corp. v. Waters, 438 U.S. 567, 577 (1978). See also McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 n.13 (1973) ("The facts necessarily will vary in Title VII cases, and the specification above of the prima facie proof required from respondent is not necessarily applicable in every respect to differing factual situations"); Burdine, 450 U.S. at 253-54 n.6; McGill v. Muñoz, 203 F.3d 843, 846 n. 3 (D.C. Cir. 2000).

Properly considered, the facts of this case highlight the discriminatory actions of Geber, not the resulting actions of Sprott or even Babers, whose decisions merely flowed from Geber's discriminatory conduct.  See e.g., Stacks v. Southwestern Bell Yellow Pages, Inc., 27 F.3d 1316, 1323 (8th Cir. 1994) ("an employer cannot escape responsibility for discrimination when the facts on which the reviewers rely have been filtered by a manager determined to purge the labor force of [a protected class]"); see also EEOC v. BCI Coca-Cola Bottling Co., et al., 450 F.3d 476, 484 (10th Cir. June 7, 2006) ("In the employment discrimination context, 'cat's paw' refers to a situation in

which a biased subordinate, who lacks decisionmaking power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action."  "The 'Rubber Stamp' doctrine ... refers to a situation in which a decisionmaker gives perfunctory approval for an adverse employment action explicitly recommended by a biased subordinate.") (citing <u>Griffin v. Wash. Convention Ctr.</u>, 142 F.3d 1308, 1311–12 (D.C. Cir. 1998)).

The central inquiry of any discrimination case is whether the evidence, circumstantial or otherwise, is sufficient to create an inference that a basis for a decision was an illegal criterion such as race discrimination.  Since Geber's decision to change the Technical Analyst Program Coordinator's series from 343 to 512 is the discriminatory act in this case, the relevant questions are why Geber changed the series and whether his reason for doing so is actually a pretext for discrimination.  The employment-related decision at issue was Geber's decision to alter the position's series, and the question to be decided is whether he did so to discriminate against Ms. Robinson.

## II. Defendant's Motion Should Be Denied Because Ms. Robinson Has Established a <u>Prima Facie</u> Case of Discrimination.

To prevail in a non-selection case, a plaintiff must demonstrate that "she applied for an available position for which she was qualified, but was rejected under circumstances which give rise to an inference of unlawful discrimination." <u>Burdine</u>, 450 U.S. at 253-54.  However, the typical approach for evaluating such cases must be modified slightly in this case because Geber's act of mis-classifying the position's series prevented Ms. Robinson from being considered for the position. <u>See</u> Mot. at 12.  Thus, the Court must consider whether Ms. Robinson would have qualified for the position but for Geber's discriminatory conduct.  To wit, was she qualified to perform the Technical Analyst Program Coordinator's duties under its proper 343 series designation.

26

To meet her prima facie burden of discrimination, Ms. Robinson need only show that she: (1) is a member of a protected class;[34] (2) applied and was qualified for a job for which the employer was seeking applicants (the Technical Analyst Program Coordinator or Senior Program Analyst position with a 343 series designation); and (3) was rejected under circumstances which give rise to an inference of unlawful discrimination.[35]  Under this formulation, Ms. Robinson is capable of meeting her prima facie burden.

## A.    Ms. Robinson Was Qualified to Perform the Duties of the GS-14 Senior Program Analyst Position.

Ms. Robinson applied and was qualified for the GS-14 Senior Program Analyst position, which was advertised by Defendant to serve as the Technical Analyst Program Coordinator.

### 1.    Ms. Robinson had experience as a Program Analyst, successful performance appraisals, and a number of performance awards.

Ms. Robinson was qualified for the position by virtue of her long and stellar service as a Program Analyst.  She served as a GS-13 Program Analyst for 16 years and consistently received positive performance ratings for her service.  In fact, her performance as a Program Analyst has met or exceeded Defendant's expectations, and she has received many performance awards and letters of commendation, including a Deputy Commissioner's Award.  See Ex. 29 (Def's Resp. to Req. for Admission No. 10).  Ms. Robinson has also been deemed qualified to perform GS-14 level work.

---

[34] "[A]s an African-American, Plaintiff is a member of a protected class." See Mot. at 10.

[35] Ms. Robinson can also meet her prima facie burden by showing that: (1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination. See Barnette v. Chertoff, 453 F.3d 513, 515 (2006) (quoting Brown v. Brody, 199 F.3d 446, 452 (D.C. Cir. 1999)).  The change in the position's series was an adverse employment action because it had "objective, tangible, and 'materially adverse consequences [for] the terms, conditions, or privileges'" of Ms. Robinson's employment by denying her "the opportunity to advance within the hierarchy of the [IRS]." See Stewart v. Ashcroft, 352 F.3d 422, 426-27 (D.C. Cir. 2003) (quoting Brown, 199 F.3d at 457).

See Ex. 11.

### 2.     Ms. Robinson served as the Technical Analyst Program Coordinator for four years.

Ms. Robinson was qualified for the position because she previously served as the Technical Analyst Program Coordinator for four years. See Ex. 29 (Def's Resp. to Req. for Admission No. 17); see also Ex. 1 at 35; Ex. 5 at 27.  In fact, she served as the Coordinator while Sheila Jones was still working as a Tax Computation Specialist in the field, and her four years of service dwarf Sheila Jones' six months of work as the Technical Analyst Program Coordinator.  Moreover, Ms. Robinson's Performance Appraisals during this period uniformly show that she exceeded Defendant's expectations.  Her supervisors rated her as either "outstanding" or "exceeds fully successful" and noted her professionalism. See e.g., Ex. 10. She also received "laudatory" complements from "satisfied customers" for her "very good" work on the Technical Analyst Program.  See Ex. 1 at 33-35, 88; Ex. 13.  Even Geber admitted that Ms. Robinson's prior work as a the Technical Analyst Program Coordinator was impressive. See Ex. 1 at 33-35, 88; Ex. 13.

Ms. Robinson also had experience performing the Technical Analyst Program Coordinator's "major" duties, which include coordinating with field employees on the advisory panel, see Ex. 5 at 24-25, 29-33, 45; organizing CPE programs, see Ex. 5 at 34-39, 45; maintaining a website, see Ex. 5 at 40-43, 45; and updating the Internal Revenue Manual, see Ex. 5 at 46.  During her tenure as the Coordinator, Ms. Robinson demonstrated a wide range of knowledge concerning the Technical Analyst Program and the relevant sections of the IRS Manual; she coordinated successful national CPE programs; she regularly answered questions from field staff; she participated in program reviews and studies; and she updated documents for use by Technical Analysts. See Ex. 10. Ms. Robinson also has experience with websites and procurement matters. See Ex. 6 at 68, 70-

71; Ex. 12.  Finally, she has strong interpersonal skills and a broad background in program advise-

ment.  See Ex. 6 at 68, 71; see also Ex. 5 at 30 (the Coordinator's chief mission is to facilitate

communication among the Tax Computation Specialists in the field).

At one point, Defendant claimed the duties of the current position are not "similar in nature

or function to the program" Ms. Robinson coordinated because it "was later elevated by manage-

ment and new expectations were added to the program. See e.g., Ex. 29 (Def's Resp. to Req. for

Admission Nos. 18, 19).  However, Defendant has apparently rejected this assertion (it has not

claimed this as a legitimate nondiscriminatory reason for changing the position's series).  Also,

Plaintiff claims the Technical Analyst Program Coordinator's duties have remained the same, and

her contention is supported by witness statements.[36]  See e.g., Ex. 5 at 64.  Thus, there would be a

dispute of fact as to whether the position has changed, which must be resolved at trial or through the

forthcoming expert discovery.

### 3.   Defendant's Cannot Defeat Ms. Robinson's Prima Facie Case By Attacking her Qualifications.

As illustrated above, Ms. Robinson met the minimum qualifications for the position and in

fact exceeded them.  Based on several facts, such as her longer tenure as the Technical Analyst

Program Coordinator (four years vs. six months for Jones), Ms. Robinson was also significantly

---

[36]  As an initial matter, Geber has never personally asserted this as a reason for changing the position's series.  Moreover, Skunda and Louthan each performed the duties of the position during the period after it allegedly changed, and they did so within the 343 series.  See Ex. 1 at 36; Ex. 5 at 26; Ex. 4 at 67-68.  Also, to the extent some of the position's duties differ from tasks Ms. Robinson performed as the Technical Analyst Program Coordinator, it is due solely to the fact that the advisory panel and website were not in place at that time. See Ex. 5 at 62.  Furthermore, the advent of the advisory panel and website, and even the automation of revisions to the IRS Manual, serve to disperse the actual duties of the position to other employees, making the job easier.  Based on these facts, it is clear that Defendant's initial excuse was false, and it is now relying on two new reasons to justify its actions.

more qualified than Sheila Jones. If there is any controversy over their comparative qualifications, this would be a dispute of fact and question of pretext. Moreover, it is an issue Defendant never addressed during the selection process because Ms. Robinson's application was not considered for selection. See Mot. at 12. According to Defendant, Sheila Jones was selected over Ms. Robinson solely "by virtue of her prior experience at the GS-512-13 level," not based on a comparative review of their qualifications. Since Defendant never conducted this analysis during the selection process, Defendant's request that the Court now do so is inappropriate, particularly is assessing Plaintiff's prima facie case. Also, "[w]here the defendant's proffered evidence for showing that a plaintiff was not meeting the employer's expectations mirrors the nondiscriminatory reason produced by the employer, courts have assumed a prima facie case and proceeded to the pretext inquiry in the interests of fairness and efficiency." Jones v. Giant Foods, Inc., et al., 2000 WL 1835393 *2 (D.Md. Nov. 27, 2000) (citing Lovelace v. Sherwin-Williams Co., 681 F.2d 230, 245 (4th Cir. 1982)).[37]

    **B.    Geber Manipulated Defendant's Personnel System and Mis-Classified the Position to Prevent Ms. Robinson from Being Considered for the Vacancy, and His Actions Give Rise to an Inference of Unlawful Discrimination.**

Throughout this selection process, Defendant was confronted with a choice between two candidates – one white and one African American. Both candidates were experienced and apparently well qualified for the position. Yet, Geber was willing to go to any lengths to ensure that the African American candidate, Ms. Robinson, was forced out of the selection process – lengths

---

[37] See also Siegel v. Alpha Wire Corp., 894 F.2d 50, 54 (3d Cir. 1990) ("This argument ... goes to the issue of whether [plaintiff] can demonstrate [defendant's] reason is pretextual, not to the initial question of whether [plaintiff] made out a prima facie case"), cert. denied, 496 U.S. 906 (1990); Bienkowski v. American Airlines, Inc., 851 F.2d 1503, 1505 (5th Cir. 1988) (analyzing plaintiff's qualifications "at both the prima facie case and pretext stages of a termination case is an unnecessary redundancy"); Yarbrough v. Tower Oldsmobile, Inc., 789 F.2d 508, 512 (7th Cir. 1986); MacDonald v. Eastern Wyo. Mental Health Ctr., 941 F.2d 1115, 1119-21 (10th Cir.1991).

that can only be explained by his bias against an African American because of her race.

Geber knew Ms. Robinson and knew that she is African American. <u>See</u> Ex. 1 at 32, 89.  He also knew Ms. Robinson had experience coordinating the Technical Analyst Program; that she wanted a promotion to GS-14 and was applying for GS-14 positions; and that she had never held a 512 series position. <u>See</u> Ex. 1 at 35, 43-44, 80-81.  Geber also knew Sheila Jones, and he knew she is white. <u>See</u> Ex. 1 at 23, 36-37; Ex. 4 at 9, 57.  Likewise, he knew that Sheila Jones had served for a short time as the Technical Analyst Program Coordinator; that she too would apply for the position when it was announced; and that she had previously worked in a 512 series position (unlike Robinson). <u>See</u> Ex. 1 at 36, 41-42, 94; Ex. 5 at 63; Ex. 4 at 33-34, 63-64, 81.  Finally, Geber knew that employees with experience in the 343 series would not be considered for the newly minted 512 series position that he orchestrated. <u>See</u> Ex. 29 (Def's Resp. to Req. for Admission No. 32).

Given these facts, a reasonable jury could infer that Geber mis-classified the Technical Analyst Program Coordinator's series to prevent Ms. Robinson from being considered for the position (despite her qualifications) and to assure that Sheila Jones would be selected instead.  It could also find that he was motivated to do so by racial animus.  His bias and determination is evident, in part, by the fact that he was willing to engage in a practice he knew that the IRS considers illegal by preselecting Sheila Jones for the position. <u>See</u> Ex. 1 at 50, 58-60; Ex. 3 at 58-59; Ex. 17.  It is also apparent by the blatant mis-classification of the position.[38]

When properly classified, the Technical Analyst Program Coordinator is a Program Analyst (343) position, not a Tax Computation Specialist (512).  First, the Coordinator is assigned to IRS

---

[38] Whether the position was mis-classified is a dispute of fact that Plaintiff intends to show at trial based on information she anticipates will be unveiled through the forthcoming expert discovery.  However, based on the available presently available, a reasonable jury could infer that Geber intentionally mis-classified the position.

Headquarters where broad strategic policies are designed. <u>See</u> Ex. 3 at 29.  By contrast, Tax Computation Specialists are considered field positions. <u>See</u> Ex. 4 at 31; <u>see also</u> Ex. 1 at 62.  Second, the Coordinator is responsible for updating and maintaining relevant portions of the IRS Manual and monitoring program policies and procedures for use in the field; the Coordinator is not responsible for working on claims. <u>See</u> Ex. 1 at 26, 28, 61-62; Ex. 4 at 31.  By contrast, Tax Computation Specialists are professional accountants who compute taxes.  <u>See</u> Ex. 3 at 23-24; Ex. 6 at 68. According to Geber, he seldom used his accounting background during his tenure in Large Case. <u>See</u> Ex. 1 at 19, 91-92.  Also, Sheila Jones explained that the 343 Program Analyst (Coordinator) position is "totally different" from the 512 Tax Computation Specialist position. <u>See</u> Ex. 4 at 63-64.

Third, prior to the selection at issue, the Technical Analyst Program Coordinator's duties were always performed by 343 series employees (Ms. Robinson, Skunda, and even Sheila Jones (during her one-year temporary assignment)). <u>See</u> Ex. 29 (Def's Resp. to Req. for Admission No. 17); <u>see also</u> Ex. 1 at 35-36, 41-42, 50; Ex. 5 at 21-22, 26-27, 63; Ex. 4 at 33-34, 63-64, 67, 81.  In fact, the vacancy at issue was the only 512 series position announced during Geber's tenure as the Director of Large Case. <u>See</u> Ex. 1 at 54; Ex. 5 at 13, 20-21.  Fourth, after Sheila Jones relinquished responsibility for the Technical Analyst Program, the duties were taken over by another 343 series employee (Louthan).  <u>See</u> Ex. 4 at 67-68.  Based on these facts, it is clear that Geber mis-classified the Coordinator position when he changed its series from 343 to 512.

If Geber had not mis-classified the Technical Analyst Program Coordinator position, Defendant's Human Resources Office would have considered Ms. Robinson qualified. <u>See</u> Ex. 6 at 75.  Using Sprott's words, Geber's decision to mis-classify the position "stink[s]," <u>see</u> Ex. 6 at 75, and the only reasonable explanation for his actions is discrimination (he excluded the African American candidate in favor of the white candidate despite Ms. Robinson's qualifications).

32

Unfortunately, Geber's actions are consistent with his prior use of the "old buddy system" and his admitted manipulation and targeting of vacancy announcement to select individuals from limited groups. See Ex. 1 at 22-23, 73-74; see also Ex. 1 at 58-60; Ex. 17 ("I'm going to check with an old friend in the Philly office..."). Geber's conduct was also enabled by Appeals' overly discretionary personnel practices and haphazard selection processes, which allows illegal conduct, is antithetical to merit promotion principles, and lends itself to capricious and discriminatory hiring practices. See e.g., Ex. 1 at 46-47 (employees were "pulled off the street" to review promotion packages). Babers relied "[q]uite heavily" on Geber to run Technical Services, she gave him a great deal of latitude to run TP&P on his own, and their discussions regarding personnel matters were limited. See Ex. 1 at 20, 31; Ex. 7 at 18-19, 25-26, 37, 39, 49, 52, 62-63 (Babers and Geber did not discuss the alleged conversions). As a result, he alone decided to change the Coordinator's series, thereby excluding Ms. Robinson from consideration. See Ex. 1 at 57-58; see also Ex. 7 at 35-36; Ex. 6 at 17.

A reasonable jury could also find that Sprott's actions and/or inactions aided Geber in achieving his discriminatory objective. Certainly, his inexplicable mismanagement of the selection process suggests that something other than traditional merit promotion principles was at play in this case. The MPF for the Technical Analyst Program Coordinator position is incomplete, some of the information contained therein is false and unreliable, and Sprott's assertion that the MPF Checklist accurately reflects the processing of applications for this position is not true. See e.g., Ex. 6 at 25, 29, 33-34, 51, 77, 81-82. Sprott also lied or mispoke when he claimed he verified that Sheila Jones' application was complete as part of his qualification determination because her Performance Appraisal was issued two days after he allegedly completed his qualification determination. Compare Ex. 9 with Exs. 20 and 22; see Ex. 6 at 34, 38, 78-79. While Plaintiff has offered a reasonable explanation for these troubling facts – discrimination against Ms. Robinson based on her

race and in favor of Sheila Jones – Defendant has no such explanation. See e.g., Ex. 6 at 81-82 (Sprott was not able to explain why Defendant possesses two versions of Ms. Robinson's Qualification Record – one with his signature dated June 7, 2003, and one with no signature or date).

## III.   Defendant's Motion Should Be Denied Because Its Stated Reason for Changing the Position's Series Are Not Credible or Legitimate and Are a Pretext for Discrimination.

Defendant has vainly tried to obfuscate the issue of culpability in this case by arguing that Sprott did not discriminate against Ms. Robinson when he determined she was not qualified for the Technical Analyst Program Coordinator position (as a non-512) and that Babers did not discriminate against her when she signed the selection certificate giving Sheila Jones the position.  While these assertions may be true,[39] they are  not relevant to Defendant's liability if Plaintiff demonstrates at trial that Geber changed the position's series to exclude Ms. Robinson from consideration for the position based on her race.   At this stage, the facts strongly support Plaintiff's claim of discrimination under two separate doctrines.

This case fits squarely within the "cat's paw" doctrine.  First, Geber lacked the authority to assess Ms. Robinson's qualifications for the position.  Second, a reasonable jury could find that Geber used Sprott and the qualification determination process (which is dictated by the Qualifications Standards Handbook) as a dupe in a deliberate scheme to exclude Ms. Robinson from consideration for the position based on her race.  Sprott never heard of the Technical Analyst Program or the Technical Analyst Program Coordinator, and he lacked any understanding of what duties the selectee would be expected to perform. See Ex. 6 at 17, 71-72; Ex. 3 at 27.  He also wrongly believed that "the job is mostly to compute taxes and be a professional accountant," and

---

[39]   As noted above, a reasonable jury could find that Sprott aided Geber in achieving his discriminatory objective, and Sprott's credibility is an issue that will need to be resolved a trial.

his only basis for this belief was Geber's decision to change the position's series from 343 to 512. See Ex. 6 at 68-69. If Geber had not mis-classified the Coordinator position, Sprott would not have excluded Ms. Robinson from consideration for the position. See Ex. 6 at 75.

This case fits also implicates the "rubber stamp" doctrine because Babers gave perfunctory approval for the selection of Sheila Jones based explicitly on Geber's recommendation. As a general matter, Babers relied "[q]uite heavily" on Geber to run Technical Services, she gave him a great deal of latitude to run TP&P "on his own," and their discussions regarding personnel matters were "not extensive." See Ex. 7 at 18-19, 25-26, 37, 39, 49; Ex. 1 at 20, 31. She also relied on his recommendation in this case to select Sheila Jones for the position. See Ex. 1 at 25-26, 57, 81; Ex. 7 at 66-67. In fact, Babers admitted that except for signing the selection certificate, she was not involved in any way in the selection. See Ex. 7 at 66.

Defendant now claims Geber changed the Technical Analyst Program Coordinator position's series from 343 to 512 because of the freeze and to align the position with the other positions he claims he converted to series 512.[40] See Ex. 1 at 50-51, 63-64, 70. In addition to the arguments

---

[40]    As noted previously, Defendant initially claimed the Technical Analyst Program Coordinator position changed significantly after Ms. Robinson's tenure ended, which necessitated Geber's actions. However, facts revealed during discovery made this excuse inoperable. Defendant has also implied that mastery of accounting principles or auditing techniques may have been a basis for the change in series. See e.g., Ex. 29 (Def's Interrog. Resp. No 18). However, this too is not a reason given by Geber for changing the position's series. In fact, Geber did not use his accounting background during his tenure in Appeals. See Ex. 1 at 19. Moreover, Ms. Robinson has a mastery of accounting principles or auditing techniques by virtue of her education (the "stringent" educational requirement needed to qualify for 512 positions is the only reason Defendant considers 512 positions to be "the most complex position[s]"). See Ex. 3 at 24; see also Ex. 6 at 49, 66 (she met the educational requirements). By Defendant's own admission, Ms. Robinson was not considered for the simply position because she lacked the requisite tenure in a 512 series position, not because she lacks knowledge about accounting. Also, Defendant, through its own Rule 30(b)(6) witness, could only muster a "probably" when asked whether mastery of accounting principles or auditing techniques would be helpful to performing the duties of the position. See Ex. 5 at 68. In light of these facts, it is no wonder Defendant is no longer asserting this feeble and false explanation.

previously set forth as part of Plaintiff's <u>prima facie</u> case, several more facts are in dispute regarding Defendant's stated reasons, and a reasonable jury could infer from the record that Defendant's reasons are not true and a pretext for discrimination.

### A. Defendant's Claim That Geber Changed the Position's Series Because of an Agency-Wide Freeze Is a Pretext.

Defendant claims Geber changed the Technical Analyst Program Coordinator position's series in order to comply with the February 27, 2002 freeze the IRS implemented on 343 series positions. However, there are several reasons why this explanation is not credible. First, Appeals requested to be excluded from the freeze on May 23, 2003, within days of the vacancy period for the selection at issue, and the request was granted on June 9, 2003, prior to the selection at issue. <u>See</u> Ex. 1 at 79-80; Ex. 16. Also, given Babers' practice of communicating information to Geber concerning personnel matter, a reasonable jury could infer that Geber knew Appeals was requesting an exclusion from the freeze. <u>See</u> Ex. 7 at 23. Second, Geber knew there were exceptions to the freeze and that Technical Services had obtained exception, and there was nothing preventing him from requesting an exception for this position in order to maintain its proper series designation. <u>See</u> Ex. 1 at 68, 74-75; Ex. 7 at 56. All he needed to do to obtain an exception was to file a one-page memo. <u>See</u> Ex. 1 at 68, 71; Ex. 7 at 57. <u>See e.g.</u>, Ex.15. In fact, Appeals was granted three exemptions on April 8, 2003, before the vacancy at issue opened on May 5, 2003. <u>See</u> Ex. 1 at 78-79; Ex.15.

Third, Sheila Jones was assigned to a 343 series position and assumed responsibility for the Technical Analyst Program in October 2002, after the freeze was already in place. <u>See</u> Ex. 1 at 42-43. Fourth, the IRS completed its review of the 343 series prior to 2003, and by October 2002, the ASP for Appeals set the number of allowable 343 series positions at 75. <u>See</u> Ex. 1 at 76; Ex. 7 at 40-41; 55; Ex. 16. Also, by April 7, 2003, Appeals had already implemented plans to meet the

objective of the freeze, which was accomplished by May 23, 2003. See Ex. 1 at 78, 80; Ex. 7 at 60-61, 65-66; Ex. 16; Ex. 17.  After the ASP was approved in October 2002, Geber had full discretion to fill any Analyst positions as provided therein. See Ex. 7 at 54.  This was true irrespective of the freeze. See Ex. 7 at 54.  Based on these facts, a reasonable jury could infer that the freeze did not influence Geber's decision, and that he had another motivation for changing the Technical Analyst Program Coordinator position's series, such as racial discrimination.[41]

### B.    Defendant's Claim That Geber Changed the Position's Series to Maintain Consistency in his Division Is a Pretext.

Defendant claims Geber changed the Technical Analyst Program Coordinator position's series to align it with the other positions he claims he converted to 512. See Ex. 1 at 55-56, 63-64. However, there are several reasons why this explanation is not credible.  First, the record does not verify Defendant's assertions.  Geber could not state when these alleged conversions actually took place, the documentary evidence contains no reference to the alleged conversion, and Geber's claims that he "possibly" converted these employees raises a question of credibility that must be resolved at trial.  See Ex. 1 at 51.  Second, there is evidence that contradicts Defendant's claim that the employees were converted.  Perdue and Harris are currently assigned to the 930 series, and Cohen occupies a 343 series position.  See Ex. 30.  Also, it appears that Cohen was converted to a 930 series position, not to a 512 position as Geber claims, so if Defendant had actually sought to an align the series within Large Case then the position at issue would have been announced within the 930 series.  Third, a reasonable jury could find it highly suspicious that Babers (African American

---

[41] It should also be noted that the freeze did not prevent Geber from having the position announced as a 930 series position.  See Ex. 1 at 70. Cathy Horn, the current Technical Analyst Program Coordinator who succeeded Louthan, occupies a 930 series position, and Ms. Robinson had prior experience in the 930 series.  Geber claims he just "didn't consider it." See Ex. 1 at 70-71.

Hispanic) was inexplicably excluded from any discussions regarding the alleged conversions. See Ex. 7 at 52, 62-63. Fourth, the Coordinator duties were subsequently performed by an employee assigned to a 343 series position, so designating it as a 512 series with no regard for whether this was the proper classification would have been random and capricious.

> **C.** **Defendant's Real Reason for Changing the Position's Series Can Only Be Determined Based on a Credibility Determination at Trial.**

The facts in this case are subject to significant disagreement, and there are sufficient disputed issues to warrant a trial. Moreover, properly assessing most of the facts at issue in this case will require the trier of fact to make extensive credibility determinations, which preclude summary judgment at this stage. For example, Geber knew Ms. Robinson previously served as the Technical Analyst Program Coordinator; he knew that she wanted a promotion to GS-14; and he knew that she was applying for GS-14 positions; see Ex. 1 at 35, 43-44, 80-81, yet Defendant claims he did not know Ms. Robinson would apply for the position at issue – the GS-14 Senior Program Analyst responsible for the Technical Analyst Program. Plaintiff contends this is simply not credible on its face, particularly given Geber's claim that he "figured Ms. Jones was going to apply." See Ex. 1 at 94. However, the only way this and many other issues raised in this case can be resolved is through a credibility assessment.

## CONCLUSION

Ms. Robinson has demonstrated a prima facie case of discrimination. In addition, there are genuine disputes of material fact over Defendant's reasons for mis-classifying or re-classifying the GS-14 Senior Program Analyst position at issue, which can only be resolved by a fact-finder based on the cross-examination of Geber under oath at a trial. Accordingly, Defendant's Motion for Summary Judgment should be denied. Oral argument is requested.

Respectfully submitted,


_____/s/_____

JOSEPH D. GEBHARDT
    (D.C. Bar No. 113894)
CHARLES W. DAY, JR.
    (D.C. Bar No. 459820)
MARK A. DANN
    (D.C. Bar No. 484523)
GEBHARDT & ASSOCIATES, LLP
1101 17th Street, N.W.
Suite 807
Washington, DC 20036-4716
(202) 496-0400

December 29, 2006                    Attorneys for Plaintiff

**Exhibit List**

1.      Deposition of David M. Geber (Oct. 11, 2006)

2.      Appeals Division Organizational Chart

3.      Rule 30(b)(6) Deposition of Carson C. Sprott (Sept. 28, 2006)

4.      Deposition of Sheila E. Jones (Aug. 10, 2006)

5.      Rule 30(b)(6) Deposition of Thomas Roley at 21 (Sept. 27, 2006)

6.      Deposition of Carson C. Sprott at 18 (Sept. 28, 2006)

7.      Deposition of Beverly Ortega Babers at 49 (Oct. 11, 2006)

8.      Performance Rating for Sheila E. Jones (March 24, 2003) ("Departure Rating")

9.      Performance Rating for Sheila E. Jones (June 4, 2003)

10.     Performance Rating for Pamula Robinson (June 13, 1996) and (July 10, 1999)

11.     Letter to Pamula Robinson from Lajuana F. Wilson (Jan. 7, 2004) and Letter to Pamula
        Robinson from Michele McDonald (June 9, 2004)

12.     Merit Program Questionnaire for Pamula Robinson (May 15, 2003)

13.     Memorandum to David Geber from Diane Sullivan (July 1, 1998)

14.     Memorandum to Chief Information Officer from Bob Wenzel

15.     Memorandum from David B. Robison to Acting Commissioner (Apr. 7, 2003)

16.     Memorandum to Acting Commissioner from David B. Robison (May 23, 2003)

17.     Email to and from David M. Geber and Beverly O. Babers (April 18 - 22, 2003)

18.     Vacancy Announcement APB-03-138MM

19.     Application for Promotion for Pamula Robinson (May 15, 2003) ("application packet")

20.     Merit Promotion Folder Checklist 315708 (July 2, 2003)

21.     Call Sheet for Vacancy Announcement APB-03-138MM

22.     Qualification Record for Sheila Jones (June 2, 2003)

23.     Letter to Pamula Robinson from Carson C. Sprott (undated)

24.     Qualification Records for Pamula Robinson (June 2, 2003) and (undated)

25.     List of Applicants for Vacancy Announcement APB-03-138MM

26.     Routing Slip to David Geber from Carson Sprott (June 4, 2003)

27.     Vacancy Register for Vacancy Announcement APB-03-138MM

28.     Promotion Certificate for Vacancy Announcement APB-03-138MM

29.     Defendant's Responses to First Set of Discovery Requests (June 27, 2006)

30.     Decl. of Pamula Robinson (Dec. 29, 2006)

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing Plaintiff's Opposition to Summary Judgment, Memorandum in Support of Plaintiff's Opposition, Exhibits 1-30, Statement of Material Facts in Dispute, and proposed Order was served this 29th day of December 2006, via electronic case filing through the Court, upon counsel for Defendant:

> William Mark Nebeker, Esq.
> U.S. Attorney's Office
> 501 3rd Street, N.W.
> Washington, DC 20530

_____/s/_____
MARK A. DANN
