# EXHIBIT 1

1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

```
- - - - - - - - - - - - - - - x
                              :
PAMULA ROBINSON,              :
                              :
       Plaintiff,             :
                              :
   vs.                        : Civil Action
                              :
JOHN W. SNOW, SECRETARY OF THE : No. 05-1212
TREASURY,                     :
                              :
       Defendant.            :
                              :
- - - - - - - - - - - - - - - x
```

Washington, D.C.
Wednesday, October 11, 2006

The deposition of DAVID GEBER, called for
examination by counsel for Plaintiff in the above-
entitled matter, pursuant to Notice, in the offices
of Gerhardt & Associates, 1101 Seventeenth Street
N.W., Washington, D.C., convened at 2:05 p.m., before
Cathy Jardim, a notary public in and for the District
of Columbia, when were present on behalf of the
parties:

1          You can answer, if you have an answer.

2          THE WITNESS:  The difference was that the

3   earlier series did not handle appeals.  930 was an

4   appeals officer series, and the 930 at the 15 level

5   was a supervisory appeals officer.

6      Q.    Generally speaking, what are the criteria

7   for a 930 series position?

8      A.    You are asking me something that I really

9   don't remember.

10     Q.    Moving forward from your tenure at the

11  Washington field office, when did that conclude?

12     A.    In 1989, I became the chief of the

13  Washington appeals office, so that meant that I had

14  two associate chiefs under me who managed a similar

15  number of employees to the ones that I managed before

16  and was responsible for the operations of the entire

17  office.

18     Q.    Who was your first-line supervisor?

19     A.    The regional director of appeals.

20     Q.    Do you remember who that was?

21     A.    Probably Jim Dockerty.

22     Q.    And who was your second-level supervisor

1    during that period?

2        A.    I really don't recall.

3        Q.    What were your duty responsibilities,

4    generally speaking, during that period?

5        A.    I was the monitor of all of the work that

6    came in in terms of making sure it was properly

7    assigned, that it was properly completed, that it was

8    properly processed, and in essence that cases moved

9    through appeals expeditiously, getting us the right

10   answer for both the taxpayer and the government.

11       Q.    During that period, up to that point, how

12   much had you used your accounting background?

13       A.    I utilized it in the estate-tax role where I

14   was valuing property and closely held corporations.

15   In appeals, not so much, but there were instances

16   when a case came in to me for review when there was

17   an accounting issue, and I had to get back involved

18   in it.

19       Q.    During your time as a chief, did you retain

20   your 930 series?

21       A.    I did.

22       Q.    When did your tenure as a chief conclude?

```
1        A.   Let me back up.  I may have changed series.
2   I don't recall, but it may have been a 340 at that
3   point.  I am not 100 percent certain.
4        Q.   Okay.
5        A.   That concluded in 1996, when -- well,
6   actually -- I can't give you an exact answer.  I
7   don't really recall, but what happened, there was a
8   reorganization of appeals, reorganization within the
9   entire service and of appeals.  When appeals was
10  reorganized, it was along the lines of the district
11  offices, so if there was a district office in
12  Baltimore, the chief was in Baltimore.  Had there
13  been a district office in D.C., there would have been
14  a chief in D.C.
15            As it turned out, the district office was in
16  Baltimore.  The guy who was chief in Baltimore
17  remained chief, and I took a position as associate
18  chief, in other words, the position I had held
19  previous to that.
20            Subsequent to that, there were -- the number
21  of people in the Washington office was severely
22  diminishing, for some reason, and they decided they
```

1      Q.    Did you apply for the position at the

2    headquarters?

3      A.    What happened -- as I mentioned, my position

4    was being eliminated because they were downscaling to

5    one associate chief.  I did not apply.  I called the

6    then-national chief of appeals and said, I need a

7    job.  Can you help me out?  He said, I have a

8    position that you could fill.  You will have to take

9    a downgrade to do it.  So I did that.  I got salary

10    retention for two years and went over to

11    headquarters.

12      Q.    And who was that that you called?

13      A.    Vince Cansielo.

14      Q.    And the position he provided you with, was

15    that a competitive position?

16      A.    I believe that he did not have to fill it

17    competitively at that time because it was a team

18    leader position.  That is what I recall.  I did not

19    compete.

20      Q.    Did you consider him to be a friend?

21      A.    He was a former manager, yes, he was friend.

22      Q.    And you called him up, told him you needed a

23

1   position, and he provided you with one?

2        A.   Exactly.

3             MR. NEBEKER:  Objection.

4             BY MR. DANN:

5        Q.   The position you then obtained in

6   headquarters, what were your duties?

7        A.   I was an analyst, senior analyst.  I had

8   programs assigned to me that I monitored, evaluated,

9   assisted the field with.  I was the go-to guy for

10  some of the other analysts when they needed help with

11  various things, senior analyst.

12       Q.   What was your grade level?

13       A.   A 14.

14       Q.   And your series?

15       A.   343.

16       Q.   How long were you in that position?

17       A.   Until February of 2002 -- no, February of

18  2003, sorry.

19       Q.   At that point in time, what position did you

20  obtain?

21       A.   The director of tax policy and procedure for

22  LMSB.

1    Q.    What is LMSB?

2    A.    Let me back up.  TPP, tax policy and

3    procedure, for large cases, that is what LMSB was,

4    large case area of headquarters appeals, and that was

5    a newly created position under one of the 23

6    organizations or so.

7    Q.    And when you moved to large case --

8    A.    Well, the other position was in large case

9    as well.  When I first went over, the senior analyst

10   position was in large-scale.

11   Q.    So what precisely was the change in

12   position?

13   A.    The change in position was that I was now

14   managing the analysts.

15   Q.    What was your title?

16   A.    Director, Tax Policy and Procedure.  It was

17   actually LMSB TEGE, Tax Exempt and Government

18   Entities.

19   Q.    Who was your first-line supervisor when you

20   obtained that position?

21   A.    First-line supervisor, at that time it was

22   Earl Blanch.

1        Q.    Did you compete for the director's position?

2        A.    I did.

3        Q.    Who was your second-level supervisor at that

4    time?

5        A.    If Earl was the first level, then Dave

6    Robinson would have been the second level.

7        Q.    Did you have subordinates when you became

8    the director?

9        A.    Yes, I did.

10       Q.    How many?

11       A.    About seven.

12       Q.    Can you tell us who those seven people were?

13       A.    Sandy Cohen; Gene Perdue; Michelle Topel;

14    Jacqueline Harris; Yvonne Bellany-Arvin --

15       Q.    Can you spell that?

16       A.    B-E-L-L-A-N-Y, dash, A-R-V-I-N, and there

17    may have been one more, but right now I can't

18    recall -- one or two more.

19       Q.    And as director of large case, were you

20    responsible for personnel matters such as hiring?

21       A.    I was responsible for filling position

22    vacancies, to the extent that I could request a

26

1    vacancy announcement, and -- the actual sections were

2    generally made a step above me, but I would make the

3    recommendation based on the package that came

4    through.

5        Q.   And what was the purpose of large case?

6        A.   To examine the largest corporations -- well,

7    large case in examinations exams the largest

8    corporations in the country -- actually in the world,

9    and if they are unable to obtain agreement to an

10   adjustment, that case comes to appeals, appeals in

11   the field.  We wrote the manual.  We developed

12   programs for use in the field.  We monitored the

13   activities in the field in the various areas

14   affecting large case.

15       Q.   Can you give us examples of programs that

16   you operated in large case?

17       A.   There was a fast track -- there were two

18   fast-track programs; one was a fast-track mediation,

19   and I believe the other was called fast-track

20   settlement.  The fast-track mediation case involved

21   the largest cases around.  The fast-track settlement

22   cases were smaller cases, but the idea was let's get

1    assigned to large case, what was the structural

2    design of the appeals division?

3        A.   I don't really recall.  I know it was large

4    and mid-sized business operations, LBS operations.

5    There was a small business and wage and investment

6    group, operations that set policies and procedures

7    and did the same type of work that we did for large

8    case, they did for the small business organization.

9            There was a review area that was involved in

10   reviewing appeals determinations on a random basis

11   or, I think, there may have been some that were

12   mandatory reviews.  There was a human resources area.

13   There was a finance area.

14       Q.   During that preceding period, prior to you

15   becoming director and the restructuring, the staff

16   members within large case, what were their series

17   positions?

18       A.   They were all 343's with the possible

19   exception -- well, Jacqueline Harris came to me in

20   the reorganization and so did Yvonee Bellany.  The

21   people I had prior to that would have been 343's.

22   There may have been a 512 in there, I couldn't swear

1   to it, and when Yvonne came in she was a 592.  She

2   was only a grade 12.  She handled reprocessing.

3        Q.   And after the reorganization, what were

4   their series?

5        A.   They were 343's until the word came down

6   from on high, Commissioner Risotti, that we were to

7   freeze the 343 series, there were too many of them

8   throughout the service, and that the 343's should be

9   converted into something that was more appropriate

10  and specific for the position, for the job that was

11  being done.  At that point --

12       Q.   So they were all 343's prior to that?

13            MR. NEBEKER:  Objection, vague.

14            BY MR. DANN:

15       Q.   I am trying to summarize.  After the

16  transition, the employees within large case were what

17  series?

18       A.   I believe that the majority of them were

19  343's.  The person who was handling the tax comp

20  specialist position -- the tax comp specialist may

21  have already been a 512 because she was a 512 in her

22  prior position and they may not have converted her

1    when she came over.

2        Q.    Tax comp, is that also known as technical

3    services?

4        A.    No, it is known as tax computation

5    specialist.  It is known as technical analyst.

6        Q.    The person you are referring to is Sheila

7    Jones?

8        A.    Yes, that is correct.  You didn't let me

9    finish the last question.

10       Q.    I actually think you have, but if you have

11   more to share, you can.

12       A.    You stopped me before I said Yvonne Bellany

13   was a 592, and she was a 12.

14       Q.    Who is Beverly Babers?

15       A.    Beverly for a period was the director of

16   technical services and my immediate supervisor for a

17   period of time.

18       Q.    And when did she become your first-line

19   supervisor?

20       A.    Actually when I got the job as the director

21   of TPP/TEGE.  If she wasn't there, I believe she came

22   shortly thereafter.

31

```
 1      Q.   What type of interactions did you and
 2 Ms. Babers have regarding large case matters and
 3 personnel matters?
 4      A.   Whenever I wanted to announce a position or
 5 fill a position, I would discuss it with her or we
 6 would send messages back and forth.  When we had a
 7 program issue, for example, I believe the person who
 8 was handling the fast-track mediation, we had
 9 discussed possibly moving him back as an appeals
10 officer and pulling someone in as an analyst to do
11 that kind of work.  We would have discussions about
12 personnel matters, about -- we would have meetings
13 that went over what was going on in the group and
14 each area within the group.  Not extensive.  I was on
15 my own a lot, but if I needed help, she was there.
16      Q.   Did she give you a good deal of discretion
17 to run large cases as you saw fit?
18      A.   Yes.
19      Q.   Who is Dave Robeson?
20      A.   National director of appeals at the time.
21      Q.   And was he your second-level supervisor?
22      A.   Yes.
```

32

```
 1        Q.    Did you and Mr. Robeson communicate on a

 2   fairly regular basis?

 3        A.    We communicated on an occasional basis, I

 4   would say.

 5        Q.    Who is Pamula Robinson?

 6        A.    Pam Robinson is an analyst in the tax policy

 7   and procedures for small business and wage and

 8   investment.

 9        Q.    And how do you know Ms. Robinson?

10        A.    Ms. Robinson was an appeals officer -- she

11   was hired as an appeals officer in the old Washington

12   field office while I was still there, and I knew her

13   from that point on.

14        Q.    Do you remember when that was?

15        A.    No, I am sorry, I don't.

16        Q.    What race is Ms. Robinson?

17        A.    She is black, African American.

18        Q.    Did you ever serve as Ms. Robinson's

19   supervisor?

20        A.    For a very short period after I came to

21   headquarters appeals.  I was detailed into the

22   position that her manager served while he was off for
```

1   a couple of months.

2       Q.   And do you remember what program she was

3   working on at that time?

4       A.   No, I really don't.

5       Q.   Do you remember when that was?

6       A.   That would have been in late 1996.

7       Q.   What was your impression of Ms. Robinson?

8       A.   She was an average analyst.  She got her

9   work done.  There was nothing that made her stand out

10  at that point.  There was nothing that was

11  objectionable about her at that point.  I did not

12  evaluate her.

13                  (Geber Exhibit No. 2

14                   was marked for identification.)

15          BY MR. DANN:

16      Q.   You have been given what has been marked as

17  Exhibit 2.  Can you take a moment to review that.

18          (Pause.)

19          BY MR. DANN:

20      Q.   Do you recognize this document?

21      A.   I don't remember it, but obviously it is my

22  note on top.

34

1       Q.    What is the document entitled?

2       A.    "Assistance of Program Analyst, Pamula

3    Robinson."

4       Q.    Who is it addressed to?

5       A.    It is addressed to me.

6       Q.    And what is the date?

7       A.    July 1, 1998.

8       Q.    And who is the author of the document?

9       A.    Diane Sullivan, an appeals officer.

10      Q.    You indicated there is a note at the top.

11   Can you read that?

12      A.    "Pam, another satisfied customer.  I retain

13   the original for your file.  Vince got his own copy."

14      Q.    Is that your initials or signature?

15      A.    Those are my initials, yes.

16      Q.    What is the date?

17      A.    7/13/98.  There may have been a period after

18   the '96 that I was also over there when someone was

19   out for a short period.

20      Q.    Turning to the first paragraph, and I quote,

21   "I would like to take a few moments to express my

22   appreciation for the outstanding assistance I

1   recently received from Pamula Robinson, a program

2   analyst in your office.  Pamula was the driving force

3   behind planning and conducting the national CPE for

4   technical analysts for at least the last two years."

5   Did I read that correctly?

6       A.   Yes, you did.

7       Q.   What was your impression of this memo?

8       A.   Well, obviously at the time I was impressed

9   with it.  And I am impressed with it today.  It was

10  very good, back in 1998.

11      Q.   You can place the document to the side?

12           Does this refresh your recollection as to

13  the program Ms. Robinson was working on during the

14  period you supervised her?

15      A.   That is probably one of the programs she was

16  working on.

17      Q.   And what was one of the programs?

18      A.   This would have been the technical analyst

19  program.

20      Q.   Do you know who took over the

21  responsibilities of that program following

22  Ms. Robinson?

36

```
 1      A.   The first person that I was aware of who had

 2   that program was James Schoonda.  I don't know if

 3   there was any intervening person or not.

 4      Q.   And what series is Mr. Schoonda?

 5      A.   He was -- he has since retired -- 343-14.

 6      Q.   And who took over the position after

 7   Mr. Schoonda retired?

 8      A.   That would be Ms. Jones.

 9      Q.   Sheila Jones?

10      A.   Yes.

11      Q.   Was there a period where she controlled the

12   program on a temporary basis?

13      A.   Yes.

14      Q.   Do you recall what series she was in at that

15   time?

16      A.   I believe it was 512.  I wouldn't swear to

17   it.

18      Q.   How do you know Ms. Jones?

19      A.   Ms. Jones was a co-worker while I was an

20   analyst in the large case group, and subsequently she

21   worked for me when I took over the position.

22      Q.   And what is Ms. Jones' race?
```

37

1     A.    She is Caucasian, white.

2     Q.    What precise dates did you supervise

3   Ms. Jones?

4     A.    It would have been from late -- it would

5   have been from sometime in February of 2003 until I

6   retired in January 2004.  There may have been a break

7   somewhere in between when she was back working as a

8   tax comp specialist, but she still helped me out.

9     Q.    Was there ever a period prior to February

10  2003 in which you supervised her?

11    A.    I am sorry.

12    Q.    Was there ever a period prior to February of

13  2003 in which you supervised her?

14    A.    If there was, it was on an acting basis.

15                    (Geber Exhibit No. 3

16                    was marked for identification.)

17            BY MR. DANN:

18    Q.    Mr. Geber, you have been given what has been

19  marked as Exhibit 3.  Do you recognize this document?

20    A.    I am sure I had seen it before, yes.

21    Q.    What is it?

22    A.    It is Merit Program Questionnaire of Sheila

38

1   Jones.

2       Q.   For what position?

3       A.   APB 03-138MM.

4       Q.   And that is the position at issue in this

5   case, correct?

6       A.   Correct.

7       Q.   Turning to the second page, box number 10,

8   the date period indicated in this section of

9   Ms. Jones' MPQ is October 21, 2001, to the present;

10  is that correct?

11      A.   That is what the document says, yes.

12      Q.   And who is identified as her immediate

13  supervisor?

14      A.   I am.

15      Q.   But you were not her supervisor during that

16  entire period, were you?

17      A.   I was not.  Tom Roley was her supervisor

18  during the early part of that period.

19      Q.   You can put that document to the side.

20           Did you ever issue Ms. Jones a performance

21  appraisal?

22      A.   I believe that when she applied for this

39

1    position, the performance appraisal that was in

2    effect was a recertified appraisal which human

3    resources determined was not sufficient and that we

4    needed to do an updated, a fresh appraisal; so the

5    answer is yes.

6        Q.    What is a recertified appraisal?

7        A.    The contract with NTEU indicated that if the

8    performance of an employee had not changed from

9    period to period, it was permissible to just

10   recertify the prior appraisal.  But I believe it said

11   that if a person applied for a position, then a fresh

12   appraisal was required.

13       Q.    And you said, we produced a new appraisal.

14   Who is we?

15       A.    I am sorry, I produced a new appraisal.

16       Q.    And at whose behest or request did you

17   produce this new appraisal?

18       A.    It would have been somebody in the human

19   resources office.

20       Q.    Do you know which office?

21       A.    No, I do not.  May have been Carson Sprott

22   or someone in his immediate area.

```
 1                    (Geber Exhibit No. 4

 2                    was marked for identification.)

 3          BY MR. DANN:

 4     Q.    You have been given what has been marked as

 5   Exhibit 4.  Is this the performance rating you are

 6   referring to?

 7     A.    Yes, it is.

 8     Q.    Is that your signature in box 16A?

 9     A.    Yes, it is.

10     Q.    And what is the date of this performance

11   appraisal?

12     A.    June 2, 2003.

13     Q.    When was the date on which Ms. Jones' annual

14   performance rating was due to be produced?

15     A.    It would have been during the month of her

16   birthday, as I recall.  There was a schedule where

17   the birthday month determined which month you

18   prepared the appraisal, but I don't think it was the

19   same month because there were a couple of months that

20   were eliminated in there.  This doesn't have her

21   birth date on there, so I have no idea.

22     Q.    What period does this performance appraisal
```

1  cover?

2      A.   May 1, '02, to April 30, '03.

3      Q.   But you were not her supervisor during this

4  entire period, were you?

5      A.   No, but I got input from her prior

6  supervisor and used whatever notations happened to be

7  in the file.

8      Q.   At the time you completed this performance

9  appraisal, you were aware that Ms. Jones had applied

10  for the position at issue in this case?

11      A.   That is correct.

12      Q.   You can put that aside.  Actually, sorry.

13  Can you take a look at the second page of this

14  document?  I asked you earlier what series Ms. Jones

15  was in when she was performing the temporary duties

16  of the position at issue in this case.  You indicated

17  that you weren't certain.  Does this refresh your

18  recollection?

19      A.   She was a temporary 14 because she had been

20  temporarily promoted to a 14-343 and then was

21  returned to the 512 position, and I thought she had

22  stuck around.

42

1    Q.   During the period in which she performed the

2  position, she was in a 343 series?

3    A.   That is correct.

4    Q.   When did she obtain that 343 promotion?

5    A.   I don't have those dates available to me.

6    Q.   It would have been during the rating period

7  which this document memorializes, correct?

8    A.   Well, I am just looking.  Since the previous

9  program analyst was leaving at the end of October,

10  transition began in August to move responsibilities,

11  so she couldn't have gotten the temporary until

12  Mr. Schoonda left, and my recollection is that

13  Mr. Schoonda left sometime in November of '02.

14    Q.   Is it possible she got the promotion in

15  October of '02?

16    A.   It is possible.

17    Q.   You mentioned earlier that there was a

18  directive that came from the commissioner's office.

19  Do you know when that directive was instituted?

20    A.   No, I really don't recall.

21    Q.   Is it possible that that was done in

22  February of 2002?

43

1     A.    It is possible.

2     Q.    So Ms. Jones would have obtained a 343

3  position during this freeze period?

4     A.    Not to my knowledge.  That temporary

5  promotion may have been later.  If you have access to

6  human resources, you can get the exact dates.  I

7  cannot certify to the exact dates one way or another.

8     Q.    You can put it aside.

9     A.    If she was a temporary until December of

10 2002, then to me that would indicate that possibly --

11 but when she got it, I don't know.  I have no idea

12 and I was not involved in that action.

13    Q.    During this period, the period in which this

14 position was being announced, you were generally

15 aware that Ms. Robinson was interested in positions

16 at the GS-14 level, weren't you?

17    A.    When I think back, yes -- any GS-13 would be

18 interested in a GS-14 position for promotion.

19    Q.    And you knew that she had applied for GS-14

20 positions?

21    A.    I believe I was aware of that fact, yes.

22    Q.    You also knew Ms. Robinson had not held a GS

44

1   series 512 position prior to joining the office of

2   appeals; is that correct?

3       A.   That is correct.

4       Q.   During your tenure as a manager in appeals,

5   you inquired on behalf of your own subordinates as to

6   eligibility of employees for conversions from series

7   343 to 512 positions; isn't that correct?

8       A.   I checked with human resources to see what

9   the requirements were for the 512 series, and then

10  when I had that information, I spoke to each of my

11  343's and said, are you qualified, do you qualify?

12  If so, do you have any objection to being converted

13  since the commissioner wants to reduce the number of

14  343's?

15      Q.   And when did you do this?

16      A.   It would have been prior to -- either prior

17  to the announcement of this position or concurrent

18  with -- probably prior to -- in fact, I would be

19  almost positive it was prior to.  That is why I would

20  have announced this as a 512.

21      Q.   Who is Teresa D'Angelis?

22      A.   A human resource specialist in Philadelphia.

46

1    an e-mail.

2        Q.    Who is Carson Sprott?

3        A.    He is also in human resources -- human

4    resource specialist.

5        Q.    So you know Mr. Sprott?

6        A.    I know of Mr. Sprott.  I have seen his name.

7    I don't recall ever communicating with him, or if I

8    did, it was like a one-time deal.

9        Q.    How are you aware of Mr. Sprott?

10        A.    His name appeared -- how am I aware of

11    Mr. Sprott?  He may have been -- his name may have

12    been in another package I worked on.

13        Q.    By package, what do you mean?

14        A.    Vacancy announcements, promotion packages.

15        Q.    How many such packages have you had occasion

16    to work on?

17        A.    In what time period?

18        Q.    During your tenure as director of large

19    cases?

20        A.    It was only two, actually, for my group.

21    There were many times that I was pulled into a

22    promotion package either to be a ranking official or

47

```
 1   a member of a panel.  Sometimes I felt like I was
 2   being pulled off the street when she needed somebody,
 3   but it would probably be in one of those
 4   circumstances where I saw Mr. Sprott.
 5       Q.   What about prior to your tenure as director,
 6   how often did you work on vacancy packages?
 7            MR. NEBEKER:  Objection, vague as to the
 8   term worked on.
 9            You can answer if you understand the
10   question and have an answer.
11            THE WITNESS:  Whenever asked.  When I was
12   asked, I did it.  It was normally when I was in an
13   acting capacity.  There were a couple of occasions
14   where I was asked if I would do it in my capacity as
15   a senior analyst.
16            BY MR. DANN:
17       Q.   Do you know who Richard Bell is?
18       A.   No.
19       Q.   Do you know who Angelica Stevens is?
20       A.   Yes.
21       Q.   Who is she?
22       A.   The staff assistant to Beverly Babers.
```

49

```
 1        Q.   Other than the position at issue in this

 2   case, did you ever have occasion to be involved in a

 3   position in which Ms. Robinson applied?

 4        A.   If I did, I do not recall it.

 5        Q.   Other than this --

 6        A.   I may have been on the panel that originally

 7   selected her to come into the field office of

 8   appeals.

 9        Q.   Are you aware if you were ever involved in

10   an application or a vacancy that Ms. Jones applied

11   for other than the one at issue?

12        A.   No, I don't believe I was.

13                      (Geber Exhibit No. 5

14                      was marked for identification.)

15             BY MR. DANN:

16        Q.   Mr. Geber, you have been handed what has

17   been marked as Exhibit 5.  Do you recognize this

18   document?

19        A.   This is the announcement for this position.

20        Q.   Who requested that this position be posted?

21        A.   I did.

22        Q.   And why did you -- strike that.
```

1               What was the opening date for this vacancy?

2       A.    May 4.

3       Q.    What was the closing date?

4       A.    May 19, my birthday.

5       Q.    Why did you announce this position?

6       A.    We had a vacancy in the group.  We needed

7    somebody to fill it who could do the work.

8       Q.    And the vacancy, was that as a result of Mr.

9    Schoonda's departure?

10      A.    It may have been, or there may have been

11   another vacancy in the group.  I don't recall.  In

12   fact, I think there were a couple at that time.

13      Q.    The vacancies that occurred, what series

14   were those vacancies?

15      A.    One was announced as a 512 --

16      Q.    I want to know what the occupant prior to

17   the departure was.

18      A.    343.

19      Q.    Why did you announce this position as a 512?

20      A.    I announced it as a 512 because under the

21   commissioner's mandate and directives from

22   Mr. Robeson, we were not to announce 343's, there was

51

1    a freeze on 343's, and as I mentioned, I believe,

2    prior to this, I had converted my other 343's into

3    512 positions, and this was to be consistent with

4    that and to satisfy the mandate of Commissioner

5    Risotti and the directive from a national director.

6        Q.    Who had you converted from a 343 to a 512?

7        A.    Gene Perdue, Sandy Cohen, Michelle Topel,

8    possibly, I am not positive, Jacqueline Harris.

9        Q.    What race are those individuals?

10       A.    Three are white, Jacqueline Harris is black

11   female.

12       Q.    When did these conversations occur?

13       A.    I do not have the dates available.

14       Q.    How can a person be converted from a 343 to

15   a 512 position?

16       A.    512 requires a certain level of accounting

17   education and it also requires some specialized

18   experience at the 512, normally at least one year at

19   the 512-13 level.

20       Q.    If these individuals had had 343's, how were

21   they eligible?

22       A.    They were revenue agents prior to becoming

53

1     Q.   Mr. Geber, you have been given what has been

2   marked as Exhibit 6.  Do you recognize this document?

3     A.   This would have been the form 52 which

4   requested a personnel action.

5     Q.   And this is the request for the promotion at

6   issue in this case, correct?

7     A.   That is correct.

8     Q.   And who is identified as the requesting

9   official?

10    A.   I am.

11    Q.   You can set this aside.

12    A.   But may I say something about this

13  announcement?

14    Q.   Yes.

15    A.   Or about this document?

16    Q.   Actually, no, there is no question on the

17  table.  Mr. Nebeker will give you an opportunity if

18  you need to address it.

19         MR. NEBEKER:  Remember what it was you were

20  going to say.

21         THE WITNESS:  I will try to.

22         BY MR. DANN:

54

1      Q.    Generally speaking, what were the

2  responsibilities of the person -- strike that.

3          This was the only 512 level 14 position

4  announced during your tenure as director of large

5  cases; isn't that true?

6      A.    I believe that is correct.

7      Q.    And this position, the person who was

8  selected for this position was going to take over the

9  tax computation program or technical analyst program?

10     A.    That is what was anticipated at the time,

11 but it was not carved in stone.  We can shift

12 programs at any time.

13     Q.    What other programs could that person have

14 been responsible for?

15     A.    At that point I had ex parte communications

16 which arose out of revenue, the RR 98.  We had

17 fast-track mediation.  We had fast-track settlement.

18 We had straight mediation and arbitration that we

19 were dealing with.  We had various people working on

20 sections of the Internal Revenue manual.  That is

21 just a small number.  There were lots of programs in

22 the group.  We had a tax-exempt organizations

55

1    program.  I am trying to remember what else we had.

2    That is all I can recall.

3         Q.   So it is possible that the selectee for this

4    position would not have been exclusively responsible

5    for tax computation programs?

6         A.   I don't think any of my analysts were

7    exclusively responsible for one program.

8         Q.   These other programs you mentioned, did they

9    involve accounting duties?

10        A.   What they involved was coordination with the

11   field and often with revenue agents in the field

12   concerning issues that may have involved accounting

13   issues.

14        Q.   Backing up for a moment, when you converted

15   some of your employees to the 512 series, why did you

16   not convert them to 930 positions?

17        A.   The direction I got at that time was that

18   the analysts in similar situations in the examination

19   division were being converted to 512 and that if my

20   people were eligible, that I should convert them to

21   512 as well.

22        Q.   Who directed you to do so?

56

1      A.    It would have been Mr. Robeson.

2      Q.    So you had direct communications with

3  Mr. Robeson regarding personnel matters such as this?

4      A.    I did on occasion.

5      Q.    And who classified the positions for the

6  conversions?

7      A.    Someone up in human resources.

8      Q.    What is the difference between a 343 series

9  and a 512 series position?

10         MR. NEBEKER:  Objection, vague.

11         THE WITNESS:  Primarily the accounting

12  requirement, but having been out of the game since

13  2003, I would have to take a look at PDs to be able

14  to answer that question with any degree of accuracy.

15         BY MR. DANN:

16     Q.    So a person who had served as a 343 and had

17  that accounting experience would have been eligible

18  for a 512?

19     A.    A person who had served as a 343 and had at

20  least a year of specialized experience at the 13

21  level, at least at the 13 level, would have qualified

22  for the 512-14.

57

1      Q.   Who was involved other than yourself in

2  announcing this vacancy?

3      A.   Teresa D'Angelis did the announcement.

4  Based on something you showed me before, I guess,

5  Michelle McDonald was the receiver of the

6  applications.

7           Someone in human resources was responsible

8  for reviewing the applications to make certain that

9  they were -- that the people who applied met the

10  qualifications.  Then the package was sent down to

11  me.  Since Sheila was the only one on the list, and I

12  was not able to do the ranking myself because the

13  union contract said that if you are the manager of

14  the position and you are the manager of an employee

15  who applies for the position, you cannot be the

16  ranking official, I asked Tom Roley to rank the

17  package.  He ranked the package, got it back to me,

18  and then I went to Beverly and recommended that

19  Sheila be selected, and then it was sent back to

20  human resources to process.

21      Q.   Teresa D'Angelis was not involved in the

22  decision as to what series the position would be?

58

```
 1      A.   No.

 2      Q.   That decision was made by you?

 3      A.   No -- well, it was made by me -- yes, the

 4   512 was made by me, yes.

 5                   (Geber Exhibit No. 7

 6                    was marked for identification.)

 7           BY MR. DANN:

 8      Q.   Mr. Geber, you have been given a document

 9   marked as Exhibit 7.  Do you recognize this document?

10      A.   Only because it has my name at the top.

11      Q.   What is this document?

12      A.   This is a message to Teresa D'Angelis asking

13   her to process vacancy announcements for two

14   positions in my group.

15      Q.   And this is from who?

16      A.   This is from me.

17      Q.   And what is the date of this e-mail?

18      A.   April 22, 2003.

19      Q.   Now, there are three preceding e-mails

20   attached to this, correct?

21      A.   I think there were only two.

22      Q.   Looking at  the second e-mail dated April
```

59

1   18, 2003 at 1:03 p.m., who sent that e-mail?

2        A.   I did.

3        Q.   And who is it addressed to?

4        A.   Beverly Babers, Falice Eisen, Diane Ryan and

5   Annette Streeter.

6        Q.   What is the title?

7        A.   "Vacancies in Technical Services."

8        Q.   Turning to the bottom paragraph, third

9   sentence, Sheila Jones would just be moving from a 13

10  to 14, so that is not a new position and I could

11  replace myself.  Did I read that correctly?

12       A.   That is what it says.

13       Q.   Bottom line is that I think we are okay.

14  Did I read that correctly?

15       A.   Yes, you did.

16       Q.   And then the next sentence reads:  I am

17  going to check with an old friend in the Philly

18  office about the likelihood that he could get one of

19  his good 14's to apply for the analyst slot?

20       A.   That is correct.

21       Q.   Why was this position considered not a new

22  position?

1    A.    In one case I was replacing myself since I

2    had become the manager, and the other position was

3    the one that had been occupied by Jim Schoonda.

4    Q.    Who was the friend in the Philly office you

5    were referring to?

6    A.    He was a manager, associate chief, whose

7    name I cannot recall.  If you have a list of the

8    personnel, I could pick it out, or maybe I will think

9    about it.

10    Q.    Are you familiar with the term preselection?

11    A.    I am.

12    Q.    What does it mean?

13    A.    It means that somebody is already slotted

14    for a position even before you announce it.

15    Q.    Are you aware that the IRS considered such

16    an action illegal?

17    A.    I do.

18    Q.    The position for which you are referring to

19    for Sheila Jones, that is the position at issue in

20    this case, correct?

21    A.    I am not certain that it is.  It may be.

22    Q.    You can put that document aside.  In your

1  experience working on vacancies, is it unusual, or

2  was it unusual in your experience for there to be

3  only one candidate for a position?

4      A.   It was unusual but certainly not unheard of.

5      Q.   I would like to take a five-minute break.

6           (Discussion off the record.)

7            (Brief recess.)

8           BY MR. DANN:

9      Q.   Mr. Geber, you were just reviewing some

10  documents.  What were those documents?

11     A.   The documents just now, I was given

12  documents he had to see if I could read a signature,

13  which I couldn't.

14     Q.   The duties of the employees at the

15  headquarters, if I understand correctly, and in

16  particular, large case, were responsible for

17  supporting front-line revenue agents; is that

18  correct?

19     A.   They were responsible for supporting

20  front-line appeals officer and, in the case of large

21  case, team chiefs, which is a term we have not used

22  before.

1     Q.   And those appeals agents, they were the

2   front-line people that would interact and do the

3   actual accounting, for example, and reviews of tax

4   issues?

5     A.   That is correct.

6     Q.   So your employees, those employees within

7   the headquarters and in large case in particular were

8   not responsible for directly working on claims?

9     A.   No, they were not.

10     Q.   They were responsible, for example, for

11   updating and maintaining relevant manuals?

12     A.   Absolutely.

13     Q.   Thank you.  I just wanted to clarify the

14   general position responsibilities.

15     A.   Also, they had contact with managers in the

16   field as well as the appeals officers and team

17   chiefs.

18     Q.   And that contact was for what purpose?

19     A.   That could have been for any purpose at all,

20   whether it was to discuss -- say we got a complaint

21   about a case and it involved something that that

22   particular analyst was familiar with.  It could have

63

1  been to discuss that case with the manager, it could

2  have been to discuss why a case wasn't moving as well

3  as it should have been moving, could have been for

4  any reason whatsoever.

5      Q.   Turning back to the conversions very

6  briefly, if the conversions were appropriate, and

7  that it was appropriate to convert them to 512 series

8  positions, why were those people not previously

9  designated as such?

10     A.   The analyst positions have traditionally

11 been 343, long before I got involved and long before

12 the commissioner said we don't like the 343 anymore.

13 So, I have no insight into the answer to your

14 question.

15     Q.   So it was a matter of practice that analysts

16 in the headquarters were 343's?

17     A.   They were.

18     Q.   And your decision to convert them to a 512

19 was motivated by what factors?

20     A.   It was motivated by the fact that the

21 commissioner put a freeze on 343's and said that the

22 areas should reduce the 343's.  That wasn't just

1    appeals; that was service wide, reduce the 343's, and

2    in appeals, the directive was if you can convert

3    these people to 512.

4        Q.    Who made that directive?

5        A.    The director of appeals, Dave Robeson.

6        Q.    And why did he direct you to convert them to

7    512 in particular?

8        A.    I believe because the analysts in the

9    examination division had already been converted to

10   512s, and he was keeping parity with them.

11       Q.    Were there any other reasons for the

12   conversions to 512?

13       A.    Not that I am aware of.  It fit especially

14   when you are dealing with large case.  You were

15   dealing with the most complicated and complex cases

16   in the country.

17       Q.    What was the goal of the freeze?

18       A.    It is my understanding that the 343 series

19   was deemed to be too general, and let's get these

20   people into a series that is more specific and better

21   reflects the work that they are expected to do.  To

22   some extent, it could have been to get more out of

65

1    them, hey, you are 512's, you need to do more

2    accounting work, and this is an overall thing that I

3    am talking about, not in my area.

4        Q.    What about in your area?

5        A.    In my area, I was ambivalent as to what

6    series they were, as long as they got their jobs

7    done.

8        Q.    And what jobs were they responsible for

9    doing?

10       A.    We have been over that many times.  They

11   were responsible for administering, devising,

12   monitoring various cases that involved large case.

13       Q.    And were your employees doing so to your

14   satisfaction?

15       A.    They were.

16       Q.    Irrespective of their series identification?

17       A.    Yes, irrespective of their series

18   identification.

19       Q.    Who was responsible during the freeze for

20   preparing the authorized staffing patterns within

21   large case?

22       A.    Within large case appeals?

66

1     Q.   Yes.

2     A.   There was something called a Philadelphia

3   group, and I don't remember how exactly this worked.

4   A bunch of the bigwigs got together in Philadelphia

5   and they came back and said this is what you are

6   authorized, and that is all I remember.

7     Q.   Please don't look at the documents unless we

8   need to.  If you need to, Mr. Nebeker will allow you

9   to.

10                    (Geber Exhibit No. 8

11                    was marked for identification.)

12          BY MR. DANN:

13     Q.   You have been given what has been marked as

14   Exhibit 8.  Can you take a moment to review it?

15     A.   I don't think I ever saw this one.

16          (Pause.)

17          BY MR. DANN:

18     Q.   Do you recognize this document?

19     A.   No.  This is the first time I have ever seen

20   it.

21     Q.   Are you familiar with the information in the

22   document?

68

1     A.    I am not aware.

2                     (Geber Exhibit No. 9

3                     was marked for identification.)

4           BY MR. DANN:

5     Q.    Before you look at that document, when were

6     you expected to propose the number of ASPs within

7     large case?

8     A.    I don't recall that either.

9     Q.    You have been handed what has been marked as

10    Exhibit 9.  Do you recognize this document?

11    A.    No.  Never saw it.

12    Q.    Were you aware that there was a process for

13    obtaining exceptions to the freeze?

14    A.    I remember hearing that.

15    Q.    And from whom did you hear that?

16    A.    Probably in a meeting with the lady whose

17    names is on this, Falice Eisen, who was the director

18    in the small business and wage.

19    Q.    What did you understand the process to be?

20    A.    You had to file a request for an exception,

21    and lots of luck.

22    Q.    Did you ever have occasion to file a request

1    you take to decide how to announce the position?

2        A.    All right, let's go back a minute.  The 512

3    was what -- the decision I made, originally

4    consistent with everybody else I had converted to

5    512.  The 930 came about because based on a staffing

6    analysis, there was excess staffing in the

7    Philadelphia appeals office at the 14 level.

8            I had a vacancy.  Mr. Robeson said you can

9    fill that vacancy if you can pull one of the 14's

10   that is in Philadelphia -- if you can select one of

11   the 14's that is in Philadelphia.  So that position

12   was announced as a 930 in the hopes there would be

13   a --

14       Q.    But there was nothing preventing you from

15   announcing this as a 930?

16       A.    I never considered it.

17       Q.    But there was nothing preventing you --

18       A.    I can't say.  I don't know.

19       Q.    Can you state anything that would have

20   prevented you --

21       A.    I didn't consider it.

22       Q.    Is there anything that prevented you, or

1   would have prevented you, from announcing this as a

2   930?

3        A.   Again, I don't know.

4        Q.   What did you understand the process to be

5   for requesting exceptions?

6        A.   You have to file a memo.  I don't know

7   where.  Is it in this memo?  I will read it and

8   learn.  This involved bargaining unit and

9   non-bargaining unit.  Our positions were all

10  bargaining unit.  I am not sure this applied.

11       Q.   If you had wanted to announce a position as

12  a 343, if you had wanted to obtain an exception, what

13  would you have done?

14       A.   I would have spoken to my immediate

15  supervisor, and if my immediate supervisor concurred,

16  I would have prepared the documents needed for an

17  exception.

18       Q.   You mentioned earlier that you had announced

19  the position as a 930 in hopes of drawing someone

20  from the Philadelphia office.  Did I understand you

21  correctly?

22       A.   That was the second position.

1    prior to this 930 one we are speaking about, in which

2    you targeted employees in a particular office?

3        A.    I have not, but I know there have been other

4    vacancy announcements where the POD was set at a

5    particular location, whether for this purpose or some

6    other purpose.

7        Q.    And the POD is the --

8        A.    Post of duty where the position will be

9    located, where the selectee will work.

10       Q.    I understand that in many cases you will

11   assign a person to a particular place.  My question

12   goes to drawing people from a particular office, not

13   directing them to a particular office.  Is that

14   something that you had had occasion to do in the

15   past?

16       A.    No, it is not.  This is the first time I had

17   occasion to do that.

18       Q.    And is that, is doing that consistent with

19   merit promotion principles, restricting the pool of

20   applicants, in effect --

21       A.    We didn't restrict the pool of applicants.

22   We stated the post of duty would be Philadelphia.

1  That did not restrict someone else from applying,

2  although admittedly the thought was, based on

3  Mr. Robeson's -- the staffing analysis, that we would

4  try to select it from Philadelphia.

5      Q.   So you were targeting with an objective of

6  hiring from a limited group?

7      A.   That is correct, in that particular

8  situation.

9      Q.   And you also restricted that position to

10  avoid having promotions; isn't that correct?

11     A.   I believe that that one did say they wanted

12  a grade 14 because that is where -- where there was

13  overstaffing in the Philadelphia office.

14     Q.   And the POD for this position would have

15  been what office?

16     A.   For what position?

17     Q.   For the 930 we are talking about?

18     A.   Philadelphia.

19     Q.   Are you aware of any requests filed by

20  anyone in appeals for exceptions or exemptions to the

21  freeze?

22     A.   I believe that someone, Falice Eisen or her

75

1    successor, may have requested exceptions.

2         Q.    So you knew it was possible to obtain

3    exceptions?

4         A.    Yes, I did.

5                        (Geber Exhibit No. 10

6                        was marked for identification.)

7              BY MR. DANN:

8         Q.    Before you look at the document you have

9    just been handed, you indicated you are not certain

10    of the particular ASP or appeals of the 343

11    positions; is that correct?

12         A.    That is correct.

13         Q.    Do you know when the ASP was met, when the

14    objectives of the freeze were accomplished?

15         A.    I don't.

16         Q.    Can you look at what has been marked as

17    Exhibit 10?

18         A.    This is not a very good copy.

19              (Pause.)

20              BY MR. DANN:

21         Q.    You testified that the objective of the

22    freeze was to reduce the number of 343 positions in

1  appeals; is that correct?

2      A.   That is correct, that is --

3      Q.   And the appeals section set a particular

4  SSP --

5           MR. NEBEKER:  Sorry.  Are you going to allow

6  the witness to finish the answer?

7           BY MR. DANN:

8      Q.   I was moving forward and I thought he was

9  finished.

10           MR. NEBEKER:  Was the purpose of the freeze

11  to reduce --

12           THE WITNESS:  It was to reduce the number of

13  343's throughout the service.

14           BY MR. DANN:

15      Q.   Including appeals?

16      A.   Including appeals.

17           Thank you.

18      Q.   And to reduce that number to a particular

19  ASP?

20      A.   Well, according to this, it said 75.  I did

21  not know that.

22      Q.   Do you recognize this document?

78

1     A.   I think you left out the word transition.

2     Q.   Thank you.  Other than that, did I read it

3  correctly?

4     A.   I believe so.

5     Q.   What can we understand from this document?

6     A.   That we will work and reduce it to the

7  number that we were authorized.

8     Q.   And they had already had plans to meet that

9  objective, correct?

10     A.   It sounds like it.

11     Q.   And in fact, surpass that objective,

12  correct?

13     A.   I don't know.

14     Q.   What is the date of this memo?

15     A.   April 7, 2003.

16     Q.   And was this exception granted?

17     A.   It appears that it was.

18     Q.   What date?

19     A.   April 8, 2003.

20     Q.   And the vacancy period for the position at

21  issue in this case was May 5 through the 19th,

22  correct?

79

1    A.   Correct.

2    Q.   This memo indicates that 27 employees were

3  to be moved out of the series.  Would that have

4  included the conversions we spoke about before?

5    A.   I expect so.

6    Q.   So that was part of the plan and would have

7  led to appeals obtaining the ASP of 75, correct?

8    A.   Correct.

9    Q.   Do you know when the freeze was listed?

10    A.   No, I don't.

11                     (Geber Exhibit No. 11

12                      was marked for identification.)

13            BY MR. DANN:

14    Q.   This is Exhibit 11.  What is this?

15    A.   Request for exclusion from hiring freeze

16  restrictions for analysts and related positions.

17    Q.   Who authored this?

18    A.   Dave Robeson.

19    Q.   Does this refresh your recollection as to

20  the date the freeze was lifted?

21    A.   It gives me the answer.  I didn't know it.

22    Q.   What is the date?

80

1       A.    May 23, 2003.

2       Q.    So this request would have been made prior

3   to the selection for the position at issue in this

4   case; isn't that true?

5       A.    Correct.

6       Q.    What was the date on which the exclusion or

7   release from the freeze was granted?

8       A.    The memo would indicate June 9 of '03.

9       Q.    And that too was prior to the selection in

10  this case; isn't that a fact?

11      A.    That is correct.

12      Q.    Does this document indicate whether appeals

13  met its ASP?

14      A.    It appears that appeals did meet its target.

15      Q.    You can place that to the aside.

16            Mr. Geber, I know we discussed this before,

17  but you knew Ms. Robinson was looking for a promotion

18  to a GS-14?

19      A.    I was aware that any grade 13 was looking

20  for a grade 14, and Ms. Robinson, being a GS-13,

21  would have been looking for a 14.

22      Q.    And she had applied for GS-14 positions; you

1  are aware of that?

2      A.   I am aware she had applied in the past.

3      Q.   And you knew she would not qualify for a 512

4  series position, correct?

5      A.   At the point I announced this, no, I did not

6  know what she would qualify for.

7      Q.   Now, you and Beverly Ortega Babers made the

8  selection in this case, correct?

9      A.   I recommended the selection, she approved my

10  recommendation.

11      Q.   So you did not make the selection in this

12  case?

13      A.   No.

14      Q.   You testified earlier that you were involved

15  in preparing the agency's discovery responses; is

16  that correct?

17      A.   That is correct.

18                     (Geber Exhibit No. 12

19                     was marked for identification.)

20             BY MR. DANN:

21      Q.   You have just been handed what has been

22  marked as Exhibit 12.  Do you recognize this

84

1    submitted the package to me.

2         Q.   This is the routing slip to you from

3    Mr. Carson?

4         A.   That would be correct.

5         Q.   Want is the date?

6         A.   June 4.

7         Q.   Isn't that the date on which you issued

8    Ms. Jones her performance rating?

9         A.   I would have to go back and look at the

10   performance appraisal.  May I look in here and find

11   it?

12        Q.   I think so.  I believe it was Exhibit 4.

13        A.   No.  I actually issued it on 6/2.

14        Q.   On what date did Ms. Babers sign it?

15        A.   June 4.

16        Q.   And what date did Ms. Jones sign it?

17        A.   June 4.

18        Q.   Turning back to Exhibit 14, this routing

19   slip was sent to you, and in effect it contained the

20   merit promotion file for the position at issue in

21   this case?

22        A.   Correct.

86

```
 1          (Brief recess.)

 2          MR. DANN:  Thank you for the break.

 3          We only have a few more questions.

 4          BY MR. DANN:

 5     Q.   You testified earlier that you first met

 6  Ms. Robinson at the Washington field office; is that

 7  correct?

 8     A.   That is correct.

 9     Q.   Can you tell me a little bit more about your

10  interaction with her?

11     A.   She was never in my group.  She was an

12  appeals officer.  My interactions with her were

13  minimal, actually.  If I had a case in my group that

14  she had a related case, we might have some

15  discussion, or I would have a discussion with her

16  manager who would then call her in, but we really did

17  not have a whole lot of interaction.

18     Q.   How many people were assigned to the

19  Washington field office during that period?

20     A.   There were probably 20 -- actually, there

21  were three groups around that time.  There may have

22  been as many as 25 to 30 appeals officers, plus
```

87

1   support staff.

2        Q.   And how many people would that include?

3        A.   Maybe eight, seven, eight.

4        Q.   So it might count mid-30's?

5        A.   Maybe as high as 40's.

6        Q.   And you didn't have occasion to interact

7   with her very often?

8        A.   Matter of fact, we were on different floors.

9        Q.   What about when you worked at headquarters?

10       A.   Occasionally.  She was -- one of her duties,

11  as I recall, was internal management document

12  coordinator, so if another function sent over a

13  manual revision that impacted on my people, she would

14  pass it through to me.  I would have it reviewed and

15  pass it back to her.  If there was something in it

16  that I wanted changed, I made sure that I would let

17  her know why we were suggesting it.  That was

18  probably the extent of our interaction.

19       Q.   And the two of you worked on the same floor

20  at the headquarters, correct?

21       A.   We were on the same floor.  We were on

22  opposite sides of the floor.

88

1      Q.   And how many people worked on that floor

2   during that period?

3      A.   I don't really recall.  Probably around 25

4   to 30.

5      Q.   And you still didn't have many interactions

6   with her?

7      A.   She was not in my group.  She wasn't doing

8   the large casework.  You know, "hi" in the hallway or

9   on the elevator.

10      Q.   And you did have occasion to supervise her

11   during the periods from the Washington field office

12   through to the --

13      A.   Never in the Washington field office.  For a

14   short period when I first got to the headquarters

15   office, and then based on one of the documents that

16   you gave me, the one with the laudatory note, I

17   recall that I was detailed into that group again as

18   acting manager for a brief period.

19      Q.   Can you expand on what you mean by a brief

20   period?

21      A.   A month or two.

22      Q.   And the previous period --

89

1       A.    About the same, about a month or two.

2       Q.    So you had about two to four months as her

3    supervisor?

4       A.    Right.

5       Q.    And you didn't have many interactions with

6    her?

7       A.    This was back in 1996 or 1998.  I really

8    don't recall.  You know, if I had an assignment to

9    give her, obviously we had interaction.  If she was

10   bringing the assignment in to me completed, we had

11   interaction.  If I needed her to follow up on

12   something, we had interaction.

13      Q.    As a manager and a supervisor in the federal

14   government, did you have a practice of being aware

15   and familiar with your subordinates' skill sets and

16   background?

17      A.    Yes.

18      Q.    Would that have been true of Ms. Robinson?

19      A.    Probably not as much as somebody who was in

20   my group on a permanent basis or that I was managing

21   on a permanent basis.

22      Q.    But even for a temporary period?

1       A.   For a temporary period, I would look into

2    the personnel files and see -- usually that did not

3    have a history.   It just had maybe the last year's

4    information and notes and maybe the appraisal from --

5    the last appraisal.

6       Q.   Would you be able to garnish that

7    information from interactions with the person?

8       A.   Garnish what information?

9       Q.   Their background, their skill set, their

10   experience?

11      A.   Yes, you could.

12      Q.   Would you make it a practice of doing so for

13   people you are supervising?

14      A.   For those people that I was supervising on a

15   permanent basis, it would be one-on-one in the

16   beginning.   Well, the group that I took over, I knew

17   most of the people and I knew what their skill sets

18   were.   When I am in a group on a temporary basis, it

19   would vary, it depended.

20      Q.   Did you ever have occasion to meet or spoke

21   with Ms. Robinson in a more social setting outside of

22   work?

91

1     A.    I am sure that we both attended retirement

2   parties and the like, but that would be about it.

3     Q.    In terms of making assignments or giving

4   assignments to subordinates, how relevant is a

5   person's background and experience and skill set?

6     A.    Very important, unless what you are trying

7   to do is bring them along and prepare them and help

8   them acquire a new skill set.

9     Q.    And you did assign Ms. Robinson duties and

10  projects and tasks while you served as her

11  supervisor?

12    A.    During that brief period, yes.

13    Q.    How relevant is experience as a revenue

14  officer to making the types of assignments you did --

15    A.    Revenue officer?

16          MR. NEBEKER:  Objection, vague as to time.

17          BY MR. DANN:

18    Q.    I was in the middle of saying -- I will

19  rephrase it.  While at the headquarters during your

20  tenure as director of large case, how relevant would

21  experience as a revenue officer have been to the

22  types of assignments you gave to your analysts?

92

1      A.   I did not have analysts who had revenue

2   officer type experience.  Revenue officer is a

3   collection agent.

4      Q.   What about revenue agents?

5      A.   If the assignment that I had involved

6   accounting, yes, I would want somebody that was

7   familiar with it.  If I -- if it was work on a

8   particular case, to support the field, and depending

9   on the case, the revenue agent experience would be

10   relevant.

11      Q.   How often would those circumstances arise?

12      A.   I really could not recall, occasionally.

13      Q.   Occasionally, but not often?

14      A.   Not every day.

15           MR. DANN:  I think that is all we have.  I

16   will yield to Mr. Nebeker.

17           MR. NEBEKER:  I have a few follow-up

18   questions.

19           EXAMINATION BY COUNSEL FOR DEFENDANT

20           BY MR. NEBEKER:

21      Q.   Would you pull out Exhibit 7.  I believe

22   that is the exhibit you were looking at when I was

94

1    A.    Yes.

2    Q.    And why was it that you chose to have it

3    advertised in the 512 series?

4    A.    We talked before about the freeze on 343.

5    It was my understanding that the examination division

6    had converted its 343 analysts to 512.  Mr. Robeson

7    said that was a good fit for us and told me to

8    convert ours too, to the extent that they were

9    qualified.

10    Q.    Did the race of any applicant or potential

11    applicant for the position play any role in your

12    decision to advertise that position as a 512 series

13    position?

14    A.    No.  When you announce a position, you don't

15    know who is going to apply, and you really -- I

16    figured Ms. Jones was going to apply because

17    Ms. Jones was in my group and I had some daily

18    contact with her.  Beyond that, I had no idea who

19    would apply, and race certainly did not enter into my

20    decision to advertise it as a 512.

21        MR. NEBEKER:  I have nothing further.

22    FURTHER EXAMINATION BY COUNSEL FOR PLAINTIFF