# EXHIBIT 6

1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA


- - - - - - - - - - - - - - - x
                              :
PAMULA ROBINSON,              :
                              :
        Plaintiff,            :
                              :
  vs.                         : Civil Action
                              :
JOHN W. SNOW, SECRETARY OF THE : No. 05-1212
TREASURY,                     :
                              :
        Defendant.            :
                              :
- - - - - - - - - - - - - - - x


                    Washington, D.C.
                    Thursday, September 28, 2006


        The deposition of CARSON SPROTT, called for

examination by counsel for Plaintiff in the

above-entitled matter, pursuant to Notice, in the

offices of Gebhard & Associates, 1101 17th Street,

N.W., Washington, D.C., convened at 12:35 p.m.,

before Cathy Jardim, a notary public in and for the

District of Columbia, when were present on behalf of

the parties:

13

1       A.    Yes.  The requesting official would be on

2   there, the management official.

3       Q.    Would it identify the selecting official?

4       A.    Not necessarily, although the requesting

5   official and the selecting official can be the same

6   person.

7       Q.    When the deposition concludes, can you

8   review your files and see if you have retained a copy

9   of the Recruit 52 and if so, turn it over to

10  Mr. Nebeker or Ms. Vergne?

11      A.    Will do.

12      Q.    Can you please tell me what the announcement

13  period, opening date and closing dates were?

14      A.    May 5, 2003, opens; closes May 19, 2003.

15      Q.    Are you identified anywhere on this vacancy

16  announcement?

17      A.    No.  My assistant is identified on this.

18      Q.    And who is your assistant?

19      A.    Michelle McDonald.

20      Q.    Want is the purpose of her identification on

21  this document?

22      A.    So they have a contact for which to send

14

1    their applications.

2        Q.    And what forms, according to this exhibit,

3    were applicants required to submit?

4        A.    It says required forms:  4536, 9686 and

5    current appraisal with narrative.  The 4536 is the

6    card I told you about.  The 9686 is the application

7    slash resume and the current appraisal is the current

8    performance appraisal of record.  Good to have

9    numbers to put with this.

10       Q.    To your knowledge do you know who was

11   involved in developing the Recruit 52 other than the

12   embedded HR person with whom you communicated?

13       A.    I would assume it would be the requesting

14   official on the Recruit 52, but I couldn't say who

15   that was without looking at it.

16       Q.    There is a, on the third line of this

17   document, halfway through the line, it says SPO 2844.

18   What does that refer to?

19       A.    I am sorry, where are you looking?

20   Servicing personnel office.  That is Oakland, 2844.

21       Q.    What is 2844?

22       A.    Oakland's number.

1    computation --

2        Q.    And by earlier you are referring to in this

3    deposition--

4        A.    Tax computation, professional accounting --

5    to answer an earlier question, tax policy, PROC, that

6    stands for procedure, tax policy and procedures, I

7    believe that is what that was truncated from.

8        Q.    Are you aware of what employees from the tax

9    policy and procedures division do?

10       A.    Other than the 512, not specifically, no.

11       Q.    Are you aware of what the technical services

12    division employees do?

13       A.    Other than general appeals work, no.

14       Q.    Do you have any knowledge as to why this

15    position was selected as a 512 series position?

16       A.    I don't.

17       Q.    Other than Teresa D'Angelis, did you have

18    any communications with anyone relative to or in

19    reference to the posting or development of the

20    vacancy announcement?

21       A.    No.

22                    (Sprott Exhibit No. 4 was.

1                    marked for identification.)

2           BY MR. DANN:

3      Q.   During your tenure at the IRS, how often did

4  you work on series -- the selections of series 512

5  positions?

6      A.   Every year that I was there, probably.  I

7  would probably see at least one a quarter.  As I

8  mentioned earlier, the bread and butter of appeals

9  was the 930, the appeals officer, but 512, Internal

10  Revenue agents were not unusual, we would see them.

11      Q.   Can you contrast your experience with

12  respect to the quantity of 512s you reviewed as

13  opposed to the series 343 positions?

14      A.   I would guess, but I would say four to one.

15      Q.   To your knowledge, are you aware of any 512

16  series positions previously announced for technical

17  services?

18      A.   I couldn't say either way.

19      Q.   Are you aware of any 512 series that were

20  announced in tax policy and procedures?

21      A.   I can't say there were.

22      Q.   Can you look at the next document marked

1    case it turned from Recruit 52 to promotion

2    competitive for the selectee.

3        Q.    Would that be memorialized in a standard

4    form 50?

5        A.    Yes.

6        Q.    And would that typically be maintained in

7    the merit promotion file?

8        A.    Yes, and I believe I saw it in this case.

9        Q.    You indicated this was the majority, I think

10   you said, merit promotion file.  Are there any

11   documents not contained in this other than the front

12   side of the Recruit 52?

13       A.    You know, often there would be -- any extra

14   material would be maintained, like fax cover sheets,

15   I think I described earlier, material not submitted.

16   I couldn't say whether or not those things were --

17   they weren't used to make determinations, but they

18   usually were maintained.

19       Q.    Who maintained this particular merit

20   promotion file?

21       A.    Myself.

22       Q.    You say they would typically be maintained,

1  if they fax cover sheets, but you do not see them in

2  this file?

3       A.   Yes.

4       Q.   Do you have an explanation for why they are

5  not in this file?

6       A.   No.

7       Q.   We will ask you, with respect to the Recruit

8  52, please review your personal files in reference to

9  this case and any documents you have retained

10  relative to this promotion, and if you do identify

11  any documents you believe should have been in the

12  merit promotion file, please turn those over and we

13  will ask that those be a continuing request?

14          MR. NEBEKER:  Understood.

15          BY MR. DANN:

16       Q.   You can place that to the side.  There are a

17  few documents I will ask you to review that are

18  isolated documents, some of which were pulled out of

19  the merit promotion file and I am doing this for ease

20  as much as anything else.

21                    (Sprott Exhibit No. 6 was

22                     marked for identification.)

1          MR. NEBEKER:  These are already contained in

2     Exhibit 5, but you are make marking them separately.

3          MR. DANN:  Yes, for ease and for us handling

4     the documents.

5          BY MR. DANN:

6     Q.   Mr. Sprott, you have just been given what

7     has been marked as Exhibit 6.  Do you recognize this

8     document?

9     A.   I do.

10     Q.   What is it?

11     A.   It is a checklist, human resource

12     specialists and assistants will use to make sure all

13     steps are completed.

14     Q.   What is the title of this?

15     A.   Merit promotion file checklist.

16     Q.   And what is the -- is there a reference to

17     the vacancy announcement itself?

18     A.   There is through the SF 52 number.  That SF

19     52 would correspond with the announced vacancy.

20     Q.   And what is generally contained on this

21     document, information wise?

22     A.   All the steps necessary to appropriately and

28

1    legally -- and regulatory-wise, complete a merit

2    promotion file and the dates we did them and who did

3    them.  So the initials are mine and my assistant.

4        Q.   Which are yours?

5        A.   CS.

6        Q.   And which initials memorialize your

7    assistant?

8        A.   MM.

9        Q.   And who would have entered those into the

10   actual form?

11       A.   My assistant looks like probably entered --

12   the ones other than myself.  It looks like my

13   assistant entered everything that is typed.  She

14   hand-wrote in four at the bottom and then I did

15   reviewed the package.

16       Q.   When you say reviewed, is that your

17   signature?

18       A.   Yes.

19       Q.   What is the date?

20       A.   4/2/03 -- excuse me, 7/2/03.

21       Q.   That is July 2, 2003?

22       A.   Yes.

29

1     Q.   And the information contained here, is it an

2   accurate reflection of the processing of this

3   particular application?

4     A.   It is.

5                    (Sprott Exhibit No. 7 was

6                     marked for identification.)

7          BY MR. DANN:

8     Q.   You have been given what has been marked as

9   Exhibit 7.  Do you recognize this?

10    A.   I do.

11    Q.   What is it?

12    A.   It is a list of everybody who applies for a

13  position within an agency, whether qualified or not.

14  It is a tool to keep the package straight.  Some

15  vacancy announcements will get hundreds of

16  applications.  This is to make sure you handle all of

17  them appropriately.

18    Q.   What is the title?

19    A.   List of applicants.

20    Q.   Want is the vacancy announcement?

21    A.   APB-RPB-03-138MM.

22    Q.   And can you, other than a list of the names,

1        A.    To make sure.

2        Q.    And who maintained this document?

3        A.    I did.   That is my writing.

4        Q.    Under Ms. Jones, the fourth column, there is

5    a check mark?

6        A.    Yes.

7        Q.    Does that strike you as a different form of

8    a check mark than the other check marks on this page?

9        A.    It does.

10       Q.    Why?

11       A.    It could be that her evaluation came in at a

12    different time.  Say the vacancy announcement closed

13    on Friday.  Monday I am sitting down, I have stacks

14    of applications, applicant A, has everything; C, we

15    are missing this.  So you leave a blank on this.

16    Then you would go back and say, these are the

17    materials I have to chase up.  What could be is that

18    Jones did not initially submit an evaluation and it

19    came in late.

20       Q.    You said could be.  I would ask you for the

21    duration of this deposition to please state what you

22    believe has happened as opposed to what could have

1    been.  In this case do you know why the check mark is

2    different from the remaining check marks?

3        A.    Having reviewed the case I can say that

4    Sheila Jones' application initially had a departure

5    rating submitted as we discussed earlier and those

6    are not accepted unless they are the rating of record

7    so I probably contacted her manager or herself and

8    said I need a rating of record.

9        Q.    You said probably?

10       A.    I can't say who I contacted.

11       Q.    Did you maintain your notes?

12       A.    There is a note of requesting a performance

13   appraisal for that applicant, yes.

14       Q.    Do you have a copy of that note?

15       A.    I do.

16           MR. DANN:  Off the record.

17           (Discussion off the record.)

18           BY MR. DANN:

19       Q.    Are there any notations on this document

20   with respect to the dates on which these check marks

21   were entered?

22       A.    No, there are not.

33

```
 1                    (Sprott Exhibit No. 8 was

 2                       marked for identification.)

 3           BY MR. DANN:

 4      Q.   Mr. Sprott, you have been given what has

 5   been marked as Exhibit 5.  Can you please review

 6   that?  For the record, this is pages 48 through 64 of

 7   the report of investigation.

 8           I apologize, that is Exhibit 8.

 9           Do you recognize this document?

10      A.   I do.

11      Q.   What is it?

12      A.   It is a page from personnel and myself,

13   personally, that is my writing all over it.  It is a

14   2065 qualifications record.  This is what human

15   resources specialists use to memorialize their

16   qualification determination on an individual

17   application.

18           Beyond that is Sheila Jones' application,

19   including her 4536, her 9686 and her performance

20   appraisal and I can answer the question that there

21   does appear to be missing material from this packet

22   because we have a current performance appraisal and I
```

1  noted that her departure rating was submitted and I

2  would have maintained that in the back of the case.

3  And that is not included here because what we have is

4  a performance appraisal.

5      Q.  Can you turn back to Exhibit No. 5, and can

6  you review briefly, flip through the pages in the

7  bottom right corners.  Are there numerical notations

8  on some of the pages of that file, on the bottom

9  right corner?

10     A.  Yes.

11     Q.  Are there pages without a similar numerical

12  notation?

13     A.  Yes.

14     Q.  Can you explain why some of the files have

15  numerical notations and others do not?

16     A.  That is not my writing.  I don't know what

17  that is.

18     Q.  Is this the application packet, turning back

19  to Exhibit 8, is this the application packet you

20  reviewed in assessing Ms. Sheila Jones' application

21  for the position in this case?

22     A.  It is.

35

1     Q.    In reference to the packet submitted, how

2  many applicants were there for this position?

3     A.    Just two.

4     Q.    And who were they?

5     A.    Sheila Jones and Pamula Robinson.

6     Q.    Can you please tell me what information

7  Ms. Robinson submitted for this position?

8     A.    The same things, form 4536; the 9686, the

9  resume slash application; and the current performance

10 appraisal.

11    Q.    And to your knowledge was her performance

12 appraisal a current appraisal?

13    A.    I believe it was.

14    Q.    And was it submitted with her original

15 application?

16    A.    I think so.

17    Q.    And what documents did Ms. Jones submit?

18    A.    A 4536, 9686, and a departure rating.

19    Q.    And do you know the method by which these

20 applicants submitted their packets?

21    A.    Fax.

22    Q.    Both?

36

```
 1       A.   I think you can see the fax date stamps on
 2   both of them.  You can.
 3       Q.   If you would, would you please turn to the
 4   next document.
 5                    (Sprott Exhibit No. 9 was
 6                     marked for identification.)
 7            BY MR. DANN:
 8       Q.   You have been hand what has been marked as
 9   Exhibit 9.  Can you please review it briefly?
10       A.   Okay.
11       Q.   Do you recognize this document?
12       A.   I do.
13       Q.   What is it?
14       A.   This is a form 2065, HR's memorialization of
15   the qualifications determination for Pamula Robinson
16   as well as her 4536, 9686 and her current performance
17   appraisal at the time.
18       Q.   I believe you indicated before that the top
19   sheet, what is entitled qualifications records for
20   Sheila Jones, that you maintained that top sheet of
21   Exhibit 8; is that correct?
22       A.   That is correct.
```

37

 1      Q.   Turning to the top sheet of Exhibit 9, is

 2   that also true with respect to this?

 3      A.   That is my writing all over that.

 4      Q.   There is a notation at the top right?

 5      A.   Yes.

 6      Q.   What is that?

 7      A.   NQ.

 8      Q.   What does that stand for?

 9      A.   Not qualified.

10      Q.   Is that your handwriting?

11      A.   It is.

12      Q.   There are notations in the columns to the

13   right.  Can you tell us what those notations

14   reference?

15      A.   The two columns are, G E N'L, short for

16   general; S P E C, short for specialized.  What those

17   mean are generalized and specialized experience.  At

18   the lower grades, the grades four and five, you can

19   become qualified for generalized experience, but for

20   higher grade positions, you have to have experience

21   at the next lower grade and that experience has to be

22   specialized experience.  So what I am noting is that

38

1   while Pamula Robinson has -- I am noting that I went

2   through every one of those jobs she has listed, and

3   the periods, so I evaluated the material she

4   submitted for each of the jobs but did not find it to

5   be specialized experience for this position.  It was

6   all general experience.  This position requires one

7   year of specialized experience so she wasn't

8   qualified.

9        Q.   What notations are you actually making?

10        A.   In the general column, it says one plus, one

11   plus experience in each of those jobs.

12        Q.   And turning back to Exhibit 8 , is that your

13   signature on the bottom of Exhibit 8 ?

14        A.   It is.

15        Q.   And what is the date?

16        A.   6/2/03.

17        Q.   What does that reference?

18        A.   The date I've performed the qualifications

19   evaluation.

20        Q.   What does that mean?

21        A.   The date I determined that Sheila Jones was

22   qualified for this position.

39

1    Q.    Can you turn back to Exhibit 9?

2    A.    Yes.

3    Q.    Is your signature on this document?

4    A.    No, it is not.

5    Q.    There is a notation on Exhibit 9, in the top

6    row, row number nine, under specialized.  What is

7    that notation?

8    A.    It looks like -- I started to mark there and

9    then I crossed it out and annotated with my signature

10   that I didn't mean to do that, that was an error.

11   Q.    Why is that an error?

12   A.    Because she didn't have specialized

13   experience at that time.

14   Q.    Why were -- why did you begin to and in fact

15   note specialized experience on the column?

16   A.    I couldn't explain why.  Simple error.

17   Q.    These two documents, Exhibits 8 and 9,

18   portions of them are maintained -- who maintains

19   these documents?

20   A.    I did at the time.

21   Q.    And where do you maintain them?

22   A.    In the merit promotion file.

40

1     Q.    Did you do that in this case?

2     A.    I did.

3           MR. DANN:  Can we take a five-minute break?

4           (Discussion off the record.)

5           (Brief recess.)

6           BY MR. DANN:

7     Q.    Mr. Sprott, you testified you maintained the

8     merit promotion file in this case.  What do you mean

9     by maintained the file?

10    A.    I collated materials as they came in.  I

11    performed the qualification determinations and

12    attached the appropriate sheet.  I forwarded the

13    materials to the selecting official and entered the

14    selection on the SF 50.

15    Q.    Where did you physically maintain these

16    records?

17    A.    Oakland, in a locked file cabinet at night

18    and on my desk during the day.

19    Q.    And who had access to these documents other

20    than yourself?

21    A.    All specialists in the office.  We could all

22    get into them.

43

1   floor.

2        Q.   To your knowledge was this file still in the

3   IRS's possession when you left your tenure and

4   employment at the IRS?

5        A.   To my knowledge, yes.  It was less than two

6   years.

7        Q.   Do you recall giving this file or making a

8   copy of this file at any time?

9        A.   No.

10       Q.   Did you make a determination about

11   Ms. Robinson's qualifications for the position at

12   issue in this case?

13       A.   I did.

14       Q.   What was that determination?

15       A.   Not qualified.

16       Q.   When you -- you can set aside that document.

17   When did you make that determination?

18       A.   Probably soon after.  Looking at the

19   document I didn't sign it or date it but after

20   receipt.  I was pretty timely.

21       Q.   Can you estimate how long that would be?

22       A.   A few days.

44

```
 1        Q.    To your knowledge when did you receive her

 2   application?

 3        A.    Within the vacancy announcement period.  I

 4   couldn't say, but it is time stamped at the top of

 5   the application.  Pamula Robinson's application was

 6   timely.  But it just wasn't qualified.

 7        Q.    In assessing application packets, can you

 8   describe for me your decision-making process?

 9        A.    Absolutely.  You have a series of

10   applications in front of you, and the qualification

11   standard for that individual occupation.  So at that

12   point you probably -- since you see a variety of

13   occupations dealing with the customer base, you would

14   refresh yourself with the standards, you would look

15   over the 512 occupational requirement, maybe glance

16   over a position description as well, see if there is

17   anything unique in this case, and then compare that

18   standard with -- it wouldn't be as much information

19   on the 4536, that is just a data card, but you would

20   check, but you would really look to see if that

21   qualified under form 9586 and you would stop at the

22   start of the resume.  First you check to see did they
```

45

1    have time in grade.  They did.  What did they do for

2    that year, and then you would see if they qualified

3    based on what they described their position as doing.

4        Q.    When you looked to what they did for the

5    year, do you refer to the series in which they were

6    working?

7        A.    You would look at the series, but you would

8    also look at the description of their duties.

9        Q.    And why would you look at the description in

10   addition to the series?

11       A.    The series would give you a clue, but you

12   really need to look at what people said they were

13   doing.

14       Q.    Why do you need to do that?

15       A.    Because qualifications are based on duties

16   and not titles.

17       Q.    In terms of first principles, when you

18   reviewed, generally speaking, applications, did you

19   do so with an eye toward including and weeding in

20   applicants, or excluding and weeding out applicants?

21       A.    Neither.  You apply the standard.  I don't

22   think you are trying to do either one.  You qualify

46

1    those that are qualified and you don't qualify those

2    that aren't.

3        Q.    You responded by referring to "you."  I am

4    asking you?

5        A.    Me, I would.

6        Q.    How did you operate principally, what was

7    your philosophy in reviewing and assessing the

8    documents?

9        A.    My philosophy was to apply the standards as

10   they existed.  I did not try to include or exclude.

11   Either way.  I wasn't trying to maximize the pool or

12   minimize it.  I applied the standard to the

13   applications I received.

14       Q.    In the applications you have worked on, can

15   you give me an estimate of how many applicants

16   typically apply for a position?

17       A.    I couldn't.  It hugely varies.  It is as few

18   as none and as many as 200.

19       Q.    What is typical?

20       A.    A dozen I would say.  This was a small

21   package.  This was an easy one.

22       Q.    We have spoken about your general principle

47

1  and approach.  Can you please tell us what you did in

2  assessing and reviewing these applications for this

3  position?

4      A.    Absolutely.  I received the applications.  I

5  checked for timeliness first to make sure they were

6  received within the vacancy announcement period.

7  Both were timely.  Then you checked for missing

8  material.  One had missing materials.  One had an

9  inappropriate performance appraisal and that was

10  requested.  Then I took the standard qualifications

11  handbook for the 512-14 and reviewed the narrative

12  portions of the form 9686 to see if both applicants

13  qualified for the position announced.  one did, one

14  did not, based on the duties they described.

15      Q.    Is the review an exact science?

16      A.    An exact science, no.  It is based on a

17  professional determination by myself.

18      Q.    And have you had occasion to resolve close

19  calls where an applicant appeared to be qualified or

20  not but that was a close call?

21      A.    I would agree there are close calls, and

22  that is why you look at the duties and not just the

48

1  qualifications.

2      Q.   And how would you resolve the close calls?

3      A.   I probably would refer those to the senior

4  specialist in the office whom I described earlier,

5  Larry Floratega.

6      Q.   Did you review any of these two applications

7  to him?

8      A.   No.  I did not.  She.  It wasn't a close

9  call.

10      Q.   Other than reviewing the card and the

11  application itself, I believe you referred to that as

12  the form --

13      A.   The card is the 4546 and the application is

14  9686.

15      Q.   Did you take any steps in addition to

16  reviewing those documents in making your assessment

17  other than referring back to the standards handbook?

18      A.   No.

19      Q.   Other than pertinent experience or prior

20  experience of the candidates, what criteria did you

21  use?

22      A.   What is the education requirement for that

49

1   position.  So I made sure they both also met the

2   education requirement.  They did, but only one met

3   the experience standard.

4       Q.   I am sorry, what did you say?

5       A.   The 512 has the positive education

6   requirement we discussed earlier, the accounting 24,

7   so I had to make sure both candidates had that, they

8   both did, but only one met the experience

9   qualifications.

10      Q.   Was that your sole reason for making the

11  determination you made in this case?

12      A.   Yes.

13      Q.   And that -- is that true with respect to

14  both candidates?

15      A.   Yes.

16      Q.   After you made the determination, what did

17  you do?

18      A.   After you make the determination, the 4536

19  has a cutoff tab that allows you to send back whether

20  or not the application was received.  So after you

21  get two letters, first you get your own stub of this

22  form, saying application received or not.  You send

51

```
 1      A.   Standard boiler-plate non-select letter.  So
 2   you would put official letterhead into the printer
 3   and hit print and it would print out the letters as
 4   you entered them in the database.
 5      Q.   And to whom was this addressed?
 6      A.   Pamula Robinson.
 7      Q.   And did you prepare this?
 8      A.   I did.
 9      Q.   Is there any reference to the date on which
10   this document was sent?
11      A.   There is a fax number at the bottom, but
12   that doesn't make sense because we mailed these.  It
13   apparently has been faxed before it was photocopied,
14   and I don't see a date on it, no.
15      Q.   Do you recall when you mailed this?
16      A.   I don't, but if we went to the checklist,
17   that date should be indicated there probably.
18      Q.   In terms of reviewing and making a
19   determination with respect to this merit promotion
20   file, was there any verification process in place?
21      A.   Meaning did anybody check my work?
22      Q.   Yes.
```

52

 1    A.    No.

 2    Q.    What happened after you made the

 3    determination with respect to initial qualifications

 4    for this application?

 5    A.    Well, I thought nothing, but apparently I

 6    had a statement earlier about it a year later.

 7    Q.    I am sorry --

 8    A.    You produced something that was an

 9    off-the-record statement that I don't recall at all.

10    Q.    Were you personally involved in any steps

11    that continued after issuing Exhibit No. 10?

12    A.    Absolutely, yes, because issuing this letter

13    doesn't mean the process didn't go forward for the

14    candidate that is qualified.  Even if there is one,

15    there is still a formal process.  So the certificate

16    of eligibles, in this case with one person and their

17    application to the receiving official.  So I

18    forwarded the application to the selecting official.

19    They reviewed the application.  They can decide to

20    select or not select that person.  They decided to.

21    Annotated the certificate appropriately.  Sent it

22    back to me.  At that point I then changed the Recruit

55

1    I don't know, but I would imagine policy in D.C. but

2    it wasn't me.

3        Q.    Would it have been specialized in this case

4    or unique to this position?

5        A.    Yes.  Unique to the series, not necessarily

6    to the grade, as I recall.

7        Q.    Would it would be unique to the -- or

8    designed specifically for the program in which the

9    applicant was expected to work?

10       A.    I don't think so.

11       Q.    Were you involved in the rating system at

12   all?

13       A.    No.

14       Q.    The job elements and performance standards,

15   how do those differ from KSAs?

16       A.    KSAs are specifically developed questions

17   that are even more in-depth.  Summary job elements

18   and performance standard apply to this job throughout

19   the IRS.  These are general things that are

20   appropriate for 512s wherever they would sit.  KSAs

21   you can develop more specifically for a particular

22   job.  For example, you can develop them for tax

1      Q.    Would that be standard A or standard B under

2   basic requirements?

3      A.    I would have to look.  I couldn't say off

4   the top of my head.  Would you like me to review her

5   application?

6      Q.    Yes.

7      A.    She meets standard A, 24 plus hours in

8   accounting.

9      Q.    And in addition to the basic requirements,

10  you would have reviewed the requirements on page two

11  under -- listed under "For positions at GS 12 and

12  above"?

13     A.    That is correct, yes.

14     Q.    When you look at your qualifications record,

15  your qualifications record lists the positions that

16  you reviewed; is that right?

17     A.    It is, and these correspond with the

18  positions submitted by the applicant on her form

19  9686.

20     Q.    And for each of those positions, you

21  determined that she had one plus year of generalized

22  experience, but no years of specialized experience;

68

1   professional accounting.  She does describe what is

2   typical of a 343, a variety of administrative duties,

3   she does training, matrixed new programs, CFC,

4   Combined Federal Campaign, collecting donations for

5   folks, she did some procurement work, she reviewed

6   web pages.  All these are very typical administrative

7   duties of someone in a management 343 series.

8       Q.   So tell me again of the five criteria listed

9   on page two of the qualification standards, which

10  ones she does not meet?

11      A.   She does not meet one, two, three, four.

12  You could make the argument that she worked with

13  five, but the interpersonal part is the least

14  important of doing a technical qualification.

15      Q.   And why is that?

16      A.   Because the job is mostly to compute taxes

17  and be a professional accountant, and not just to

18  interact with people.

19      Q.   What is the basis for your understanding of

20  what the principal purpose of the job is?

21      A.   The principal purpose of the 512 job?

22      Q.   Yes.

69

1      A.    Tax computation, assessing liabilities.

2      Q.    And that is based on --

3      A.    The standard.

4      Q.    The 512 qualifications standard?

5      A.    Yes.

6      Q.    Do you bring to bear any other understanding

7    of what that position entails other than the

8    qualifications standard?

9      A.    No.

10     Q.    Does the fact that one coordinates various

11   programs have any relation to any of these criteria?

12     A.    Well, it would depend on what the programs

13   were, but in her application, it doesn't.

14     Q.    Moving on to page 70, block 10, does this

15   list the position that you reviewed in line 10 of

16   your qualifications record?

17     A.    It does.

18     Q.    And what position is this?

19     A.    She is a program analyst there for the

20   office of collection.

21     Q.    And you rated this position as one year of

22   generalized experience but zero years of specialized

1    experience?

2        A.    I did.

3        Q.    And why was that your determination?

4        A.    Much like her most current position at the

5    time, the duties she describes here are very typical

6    of a 343 management analyst, they are administrative

7    in nature, overseeing various administrative

8    programs, she did electronic research, she worked

9    with congressional correspondence.  At the top, she

10   worked with collection of employment tax.  There is

11   not any information in here about conducting

12   financial analysis.  There is nothing in here about

13   professional accounting, there is not anything about

14   computation.  There is not anything about using tax

15   laws to assess liabilities.

16       Q.    Moving to page 72, this position listed as

17   appears to be 10 A.  Is this the position you listed

18   in block 11 of your qualifications record?

19       A.    It is.

20       Q.    And what position is that?

21       A.    Program analyst, series 343 grade 13.

22       Q.    And you listed this program as qualifying

71

1    for a year of generalized experience but not

2    specialized?

3        A.    That is correct.

4        Q.    And once again, why did you make that

5    determination?

6        A.    While some of the description of what she

7    does is different, like the other two positions they

8    are non-technical in nature.  Program advisement and

9    smaller programs that don't have tax computation

10   statute usage in them, and if you look at the

11   technical advisor, she was researching databases, and

12   resolving disputes between chief counsel and

13   personnel.  That is not tax computation.

14       Q.    What are technical analysts CPEs?

15       A.    CPE is -- I believe that is training, I

16   forget what the acronym stands for exactly but she

17   prepared training there.

18       Q.    Technical analyst program, advice and assist

19   technical analysts and regional analysts.  What

20   duties are technical analysts and regional analysts

21   typically performing?

22       A.    I don't know.  I would have to know what

1   kind of analyst it was.  If it was an analyst like

2   herself, there were analysts below her administering

3   more programs and she was assisting people.

4        Q.   Do some technical analysts perform

5   accounting functions?

6        A.   I don't know.

7        Q.   What is the barred statute report?

8        A.   Where are you referencing?

9        Q.   Mid page on 72.

10       A.   I don't know.

11       Q.   Is that an application of tax law?

12       A.   I don't know.

13       Q.   Would resolving disputes between chief

14   counsel attorneys and field personnel involve

15   application of tax law?

16       A.   Definitely not.  In looking more detail at

17   the barred statute report, if you look toward the

18   bottom, you can see -- it is a collection procedure.

19   They are trying to figure out, if the statute wasn't

20   barred, how much money they could collect.

21       Q.   Looking at page 73, is this a position you

22   considered?

1           THE WITNESS:  I couldn't answer without

2    seeing how they wrote the position description for

3    the 343.  Not all 343s are the same.  If they wrote

4    that the 343 was doing this job, she still wouldn't

5    qualify for it.  Now, it would be very weird if a 343

6    was doing this job.  You would have it as a 512.

7    That would stink a little bit.  But if it was the 343

8    doing the kinds of things she described in her

9    application, then, yes, she would have qualified for

10   it.

11          BY MR. DAY:

12     Q.   Would it have any bearing on your analysis

13   if this job had previously been classified as a 343?

14          MR. NEBEKER:  Objection, vague.

15          THE WITNESS:  I wouldn't know that.  I guess

16   there is no way for me to know how it would be

17   previously classified.

18          BY  MR. DAY:

19     Q.   If you were told it had previously been

20   classified as a 343, would that have any bearing on

21   your analysis?

22          MR. NEBEKER:  Objection, vague.

77

1   document?

2        A.   I do.

3        Q.   What is it?

4        A.   This is what applicant Sheila Jones sent to

5   us, so this is her copy -- this is a copy of her

6   copy.  So what we have at the top is -- she wanted

7   proof that we got her application, that looks like

8   that was the fax sheet, and this is what she faxed to

9   us, including her original departure appraisal, which

10  is the appraisal we did not request and requested a

11  rating from her supervisor.

12       Q.   Do you know why this was not in the file?

13       A.   Yes, because this is property of the

14  applicant.

15       Q.   Do you have an explanation for why a copy or

16  a version of the departure appraisal is not in the

17  merit promotion file?

18       A.   I don't.  It should be, because we got it.

19  It wouldn't have been forwarded, but we should still

20  have it in the materials in the back.

21       Q.   Turning to the top page of the appraisal,

22  line 16 C, can you please tell me what date is on

78

1   that line?

2       A.   3/24/03.

3       Q.   And that is March 24, 2003?

4       A.   Yes.

5       Q.   And this -- is there any signature noting --

6   contained on this document referencing David Geber?

7       A.   No.

8       Q.   Is there any signature referencing Beverly

9   Babers?

10      A.   No.

11      Q.   If you can turn back to Exhibit 8, please.

12      A.   Got it.

13      Q.   The notation at the top qualifications

14  record page, under the columns, can you please read

15  for us what that notation says?

16      A.   Departure submitted, left message, LM,

17  manager, 6/2.  L M was my shorthand for left message.

18      Q.   And when did you leave that message?

19      A.   6/2.

20      Q.   And that would be --

21      A.   June 2.

22      Q.   Can you refer to the rating performance

79

1    appraisal in Exhibit 8?  Please tell me what date is

2    on line 16 C of this document?

3        A.   6/04/03, so June 4, 2003.

4        Q.   And is this document signed by David Geber?

5        A.   Yes, it is.

6        Q.   And is it signed by Beverly Babers?

7        A.   It is.  So what that means is -- the

8    departure rating, the one from --

9        Q.   There is no question posed.

10            If you can turn to the front of Exhibit 8.

11   What is the date next to your signature on that line?

12       A.   6/2/03.

13       Q.   And that would be what date?

14       A.   June 2, 2003.

15       Q.   And if you would, could you please turn to

16   Exhibit 6.  This is the merit promotion folder

17   checklist?

18       A.   Yes.

19       Q.   Under last evaluation, missing material

20   received, what is the date?

21       A.   6/4/03, June 4, 2003.

22       Q.   Are you sure --

```
 1      Q.   Let the record note that this exhibit is

 2   also contained in the large Exhibit 5 merit promotion

 3   file.

 4           MR. NEBEKER:  If you ask the witness to

 5   confirm whether it is signed in the large file, I

 6   would appreciate that.

 7           BY MR. DANN:

 8      Q.   Are these the same documents?

 9      A.   Yes, they are, but one is signed and one is

10   not.

11      Q.   And which is signed?

12      A.   Exhibit 14.

13      Q.   And what is the date?

14      A.   June 7, 2003.

15      Q.   And who signed it?

16      A.   Myself.

17      Q.   Do you have an explanation for why this

18   exhibit is signed and yet Exhibit 9 is not signed by

19   you?

20      A.   I don't.

21      Q.   Do you have an explanation for why this

22   exhibit is dated and Exhibit 9 as not dated?
```

82

1      A.   I don't.

2           MR. DANN:  That is all we have for you,

3    Mr. Sprott.  I believe Mr. Nebeker may have questions

4    for you.

5           MR. NEBEKER:  I have a couple.

6           EXAMINATION BY COUNSEL FOR DEFENDANT

7           BY MR. NEBEKER:

8      Q.   Exhibit 14, it seems to have at the bottom,

9    upside down, a fax line?

10     A.   Yes.

11     Q.   A line showing when it was faxed?

12     A.   Yes.

13     Q.   Do you recognize any of that?

14     A.   I don't.  July 10 of this year, I think I

15   was in Hawaii and I was definitely not working for

16   the IRS at the time.

17          512, is that Chicago?  I don't even know

18   where that is.

19     Q.   Is that the area code you are looking at?

20     A.   Yes.

21     Q.   In making your assessment regarding whether

22   or not Ms. Pamula Robinson or Ms. Sheila Jones was

1    their name on the IRS and it will tell you the full

2    reporting lines just by clicking on the right codes.

3         Q.    If you look at your checklist?

4         A.    Exhibit 6?

5         Q.    Exhibit 6.  I was trying to figure out how

6    the Exhibit 8, page 56, was prepared in June of '03,

7    and you have on the line of the checklist, last

8    evaluation slash missing material received, 5/14/03.

9         A.    As I mentioned earlier in this deposition,

10   where it is typed in, even though my initials are

11   typed in, I certainly did those things, my assistant

12   typed in everything that was typed in on the sheet

13   and it looks like she was sloppy and just pasted 5/14

14   over and over and pasted it one too far, because this

15   announcement was still open on 5/14 so there is no

16   way last evaluation could have been received because

17   we were still accepting applications at the time.

18        Q.    What is the significance of the line "to

19   ranking, name of manager, David Geber?

20        A.    That is who we sent the package to for

21   ranking, so it was up to him to assemble the ranking

22   panel.  The selecting official cannot be on the

88

1    which it was.

2        Q.   Can you please define what you meant by

3    rating of record?

4        A.   Your rating of record is the performance

5    appraisal that stands for a year.  As I mentioned

6    earlier, there are a couple of appraisals can get and

7    they are in the contract.  There is departure rating,

8    and a 90-day temp rating, if you have a detail for 90

9    days, but your rating of record is your annual

10   appraisal, unless the departure rating is accepted.

11       Q.   Were you speculating when you testified

12   about Ms. McDonald's sloppiness?

13       A.   I would have to be.

14       Q.   That is all we have.

15            FURTHER EXAMINATION BY COUNSEL FOR DEFENDANT

16            MR. NEBEKER:  Let's mark this as 15.  I

17   don't have an extra copy.

18                      (Sprott Exhibit No. 15 was.

19                       marked for identification.)

20            BY MR. NEBEKER:

21       Q.   Would you look at what has been marked as

22   Exhibit 15.  I think you testified in your deposition