**EXHIBIT 7**

1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA


- - - - - - - - - - - - - - - x
                              :
PAMULA ROBINSON,              :
                              :
        Plaintiff,            :
                              :
    vs.                       : Civil Action
                              :
JOHN W. SNOW, SECRETARY OF THE : No. 05-1212
TREASURY,                     :
                              :
        Defendant.            :
                              :
- - - - - - - - - - - - - - - x


                    Washington, D.C.
                    Wednesday, October 11, 2006


        The deposition of BEVERLY ORTEGA BABERS,

called for examination by counsel for Plaintiff in

the above-entitled matter, pursuant to Notice, in the

offices of Gerhardt & Associates, 1101 Seventeenth

Street N.W., Washington, D.C., convened at 9:05 a.m.,

before Cathy Jardim, a notary public in and for the

District of Columbia, when were present on behalf of

the parties:

18

1    Q.   Are there any other areas you can think of

2  where you felt your attention was warranted in terms

3  of hands-on attention?

4    A.   Those are the primary areas.

5    Q.   You indicated you surrounded yourself with

6  managers.  On what matters did you rely on those

7  managers for?

8    A.   Generally -- well, when I was in appeals, I

9  am trying to remember if I had a staff, so to speak.

10  I had a secretary, and I may have had a technical

11  advisor, but beyond that, the organization was run,

12  and I think that organization was about -- when I

13  first got to appeals, it was about 1400 folks, and

14  then when I was director of technical services it was

15  about 600 folks.  The organization itself was run by

16  people who were direct reports to me and, so, I

17  relied on them really to run the operations of the

18  place.

19    Q.   Did that include personnel matters?

20    A.   Yes.

21    Q.   Including selection, hiring and management

22  of personnel?

1     A.    Correct.

2     Q.    Can you tell us who were your direct

3   subordinates in technical services?

4     A.    This is going to be very difficult because

5   I -- unfortunately my memory is not that good.  There

6   was a woman named Falice Eisen, who reported to me.

7   There was a woman -- a guy by the name of Jeffrey

8   Allison.  There was -- at different times there was a

9   gentleman by the name of Dave Geber who reported to

10  me.  There was a woman by the name of Annette

11  Streeter who reported to me.  Those are all that I

12  recall offhand.

13    Q.    Which subdivision of technical services was

14  David Geber responsible for?

15          MR. NEBEKER:  Objection, vague as to time.

16          THE WITNESS:  I don't remember the title.

17  Generally though, when technical services was

18  created, it brought together folks who are

19  responsible for an enlarged case program and then

20  folks who are responsible for small businesses, tax-

21  exempt, wage and investment employees -- or

22  taxpayers.  Dave had been affiliated, prior to

1   technical services, with the large case program, and

2   my best guess is that he would have come over as part

3   of the -- the integration of the large case with the

4   rest.

5        Q.   And who was responsible for preparing hiring

6   projections and needs within large case?

7        A.   I don't know.  I don't know that that was

8   done outside of the HR shop.  We had an HR shop that

9   did not report to me -- when you say hiring

10  projections and loads, I am thinking of work force

11  planning.  Is that what you are talking about?

12       Q.   Yes.  Also processing vacancy announcements,

13  predicting needs, filling positions in large case,

14  was Mr. Geber in charge of those?

15            MR. NEBEKER:  Objection, compound.

16            THE WITNESS:  To the extent that there were

17  functions within the division Mr. Geber oversaw,

18  then, yes, it would have been up to him to assess

19  whether or not the vacancy needed to be filled, if

20  so, how, when, and to initiate contact with our HR

21  shop which would have done the work to implement.

22            BY MR. DANN:

21

1    Q.    What role, if any, would you have played in

2    this process?

3    A.    Depending on the level of the hire --

4    usually you have a first-level manager, and that

5    manager would make a recommendation for a hire to the

6    second-level manager.  So depending on the level,

7    there were occasions where I was the second-level

8    manager in that process.

9    Q.    Did that happen often?

10    A.    Often.

11    Q.    How often did it happen in a given year?

12    A.    A handful or less.  It wasn't every week.

13    It wasn't every month.

14    Q.    Would you rely on the recommendation of the

15    official directly below you in making the decision?

16    A.    Yes.

17    Q.    Who is David B. Robeson?

18    A.    Dave was the national chief of appeals for

19    the majority of the time I was in appeals, which

20    means he oversaw the whole appeals function.

21    Q.    And what supervisory connection would he

22    have had to you?

23

1          MR. NEBEKER:  Objection, vague.

2          THE WITNESS:  I am not sure who you are

3     talking about.

4          BY MR. DANN:

5     Q.    When Mr. Robeson's office issued memos

6     relative to human resources, personnel needs and

7     projections, if his office produced documents akin to

8     that, would you relay that information or the

9     documents themselves to your subordinates?

10          MR. NEBEKER:  Same objection.

11          THE WITNESS:  His office didn't generally

12     produce those kinds of documents.  They would have

13     come from the HR function, and to the extent I got

14     them -- it was a small enough organization, the

15     leaders of the organization tended to be on one

16     floor.  We met in a conference room regularly and

17     that information was relayed as the subject of an

18     agenda topic, if it was a significant change in

19     policy or something like that.

20          To the extent that it was relevant for my

21     subordinate managers, I would generally either

22     forward the document to them, if there was a

24

1    document, or raise it in my own staff meetings as a

2    topic of discussion.

3        Q.    And how often did you have staff meetings?

4        A.    Either weekly -- in my career I have had

5    staff meetings either weekly or every two weeks.  I

6    don't recall specifically, this job, how often I had

7    them.

8        Q.    Generally speaking, most of the questions

9    will be related to your tenure as technical services

10   and so do me a favor, respond accordingly, and if you

11   are going to go beyond, reference your career in

12   general, as you just did.

13          Where was Mr. Geber's office in relation to

14   your office?

15       A.    On the same floor, sort of catty-cornered in

16   the opposite direction.  I did not have a corner

17   office, but if I did, it would have been the

18   opposite.

19       Q.    Where was your office in relation to

20   Mr. Robeson's office?

21       A.    If I looked out of my door, I could see his

22   door.

25

```
1        Q.    Do you know Pamula Robinson?

2        A.    Yes.

3        Q.    How do you know Ms. Robinson?

4        A.    She too was an employee on that floor, and I

5   believe the whole time that I was in appeals, she was

6   a subordinate employee within one of my

7   organizations.

8        Q.    Other than knowing that she was one of your

9   subordinates, did you have an opportunity to interact

10  with Ms. Robinson?

11       A.    Yes.

12       Q.    Can you tell us about those interactions?

13       A.    I recall seeing her, because, of course, you

14  did see people that were there, and so beyond the

15  normal "hi" kind of interactions, she was very

16  infrequently in a meeting that I might be in, and

17  very infrequently meaning I am sure less than a

18  handful over the course of the time I was there.

19       Q.    And do you know Sheila E. Jones?

20       A.    No.  I know who she is, but I do not know

21  her.

22       Q.    Have you ever spoken to Ms. Jones on the
```

1   telephone?

2        A.    No.

3        Q.    Have you ever corresponded with her by

4   e-mail?

5        A.    No.

6        Q.    And I assume from your answer you have never

7   met her face-to-face.

8        A.    That is correct.

9        Q.    Now, you are aware of Ms. Jones, you

10  indicated.  Can you tell me how you are aware who she

11  is?

12       A.    I am aware, through these proceedings -- I

13  have become aware that she was the employee selected

14  for a job that is the subject of these proceedings.

15       Q.    Did you ever serve as Ms. Jones' supervisor?

16       A.    She was in my organization at some point,

17  when I was in appeals.  From reading the materials

18  associated with this case, it seems that she was

19  moved into the organization around the time that Dave

20  Geber came over as part of that large case

21  integration with the rest of the organization.  If

22  that is the case, if that is accurate, piecing

27

1  together kind of what happened, then at that point

2  she became a part of my organization.

3      Q.   So to your knowledge, she was a subordinate

4  of Mr. Geber's?

5      A.   To my knowledge, yes.  Certainly after she

6  was selected for the position at issue, and prior to

7  it, that would be my guess based on just paperwork I

8  have looked at for this.

9      Q.   Do you recall ever being involved in rating

10 Ms. Jones' performance?

11     A.   I do not recall that, but I understand that

12 I was from this case.

13     Q.   Not recalling precisely your involvement,

14 who do you believe -- who typically, while you were

15 serving in technical services, would conduct

16 performance ratings and issue performance ratings for

17 your second-level subordinates?

18     A.   Their direct manager would rate them as

19 the -- I don't know the term that is used but would

20 rate them and the second-level manager would approve

21 the rating, and so I would have been that

22 second-level manager.

1    Q.    How did you go about approving ratings?

2    A.    Usually --

3          MR. NEBEKER:  Objection, vague.

4          THE WITNESS:  I would get a document for my

5    signature.  I would -- with a signature block, and if

6    I had no follow-up or questions, I would sign it.  If

7    I did, I would generally track down the manager and

8    have a discussion before signing it.

9          BY MR. DANN:

10   Q.    Did you ever disapprove a rating or proposed

11   rating of a first-level supervisor?

12   A.    Not to my knowledge.

13   Q.    You spoke earlier about relying on

14   first-level supervisor, your first-level subordinates

15   in terms of their recommendations generally speaking.

16   Can you ever recall of an instance where you

17   disapproved the recommendation of an official

18   relative to the selection of a vacancy?

19   A.    Well, the answer is no, but the question

20   assumes -- the question assumes something which may

21   not be accurate.  If there was a decision to make

22   with respect to a selectee, if -- hypothetically

1    there were two positions and two selectees, not much

2    discussion.

3           Sometimes there were more than one selectee,

4    a potential candidate, and the manager might come to

5    me and say, I have three great people.  I can only

6    pick two -- usually they were trying to get me to

7    approve to approve all three, and I might say, pick

8    your top two, or these people have expertise in the

9    same area, it would be better to spread it around.

10   So I might influence it in that way.  When I got a

11   piece of paper, there wasn't generally at that point

12   in the process a need to disapprove because we would

13   have had that discussion prior.

14      Q.   Assuming the recommendation is clear, have

15   you ever disapproved the recommendation of a

16   subordinate with respect to the selection?

17           MR. NEBEKER:  Objection, vague.

18           THE WITNESS:  I am not able to answer that

19   question.  I don't understand.

20           BY MR. DANN:

21      Q.   You gave an illustration of three good

22   candidates, and the subordinate, as I understand your

1  example, wanted or was hoping to select all three, or

2  thought all three were qualified.  Setting that

3  aside, where the first-level subordinate makes a

4  distinct recommendation to you, have you ever

5  disapproved it?

6      A.   When the paperwork comes to me and there is

7  a distinct recommendation, in technical services, I

8  don't believe I ever disapproved it.

9                    (Babers Exhibit No. 2

10                    was marked for identification.)

11           BY MR. DANN:

12      Q.   Ms. Babers, you have been given what has

13  been marked as Exhibit 2.  Do you recognize this

14  document?

15      A.   I recognize the form, yes.

16      Q.   But you don't recognize the actual document?

17      A.   I have seen the document before, yes.

18      Q.   And what is it?

19      A.   This is an employee performance appraisal.

20      Q.   And for which employee?

21      A.   Sheila Jones.

22      Q.   And this is for what rating period?

1    A.    This would have been period ending April 30,

2    2003.

3    Q.    And in line 16B, is that your signature?

4    A.    Yes.

5    Q.    And what is the date of that signature?

6    A.    June 4, 2003.

7    Q.    If you would, take a moment to look through

8    the document briefly.  There are about eight pages of

9    typewritten information following the first page.

10   Did you prepare that information?

11   A.    No.

12   Q.    To your knowledge, who did?

13   A.    It appears that it was prepared by or on

14   behalf of David Geber.

15   Q.    Did you have any input in the content of

16   this information?

17   A.    No.

18   Q.    You indicated earlier that one of your

19   subordinates was Falice Eisen; is that correct?

20   A.    Yes.

21   Q.    Can you tell me who she is?

22   A.    Falice Eisen is a long-time appeals

35

1    issue in this case?

2         A.    I will presume that.  I am not absolutely

3    sure.

4         Q.    This document, what is the announce and

5    closing dates?

6         A.    This was announced May 5, 2003, and closed

7    on May 19, 2003.

8         Q.    And who was responsible -- you can set that

9    aside.

10              Who is responsible for requesting the

11   vacancy at issue in this case?

12              MR. NEBEKER:  Objection, vague.

13              THE WITNESS:  If it is the vacancy at issue

14   in this case, that means it was in Dave Geber's area

15   of responsibility, and if that is the case, then Dave

16   likely would have talked to our HR shop and asked the

17   HR shop in appeals to issue a vacancy announcement.

18              BY MR. DANN:

19        Q.    Do you know why this position was announced

20   as a GS series 512 position?

21        A.    I can speculate as to why.

22        Q.    I would like to first have you answer

1    whether you actually know, without referring to a

2    document, please.

3        A.    No.    I have no personal knowledge.

4        Q.    Can you speculate as to why it was announced

5    as a 512 series position?

6              MR. NEBEKER:    Objection.    Speculative.    She

7    can answer.

8              MR. DANN:    With all due respect, she invited

9    it.

10             THE WITNESS:    Sure.    The 343 series is a

11   series that is a general series that doesn't require

12   particular technical expertise in order to qualify.

13             The IRS at the time was moving toward

14   ensuring that analysts had the technical skills and

15   experience and training, education in some cases,

16   necessary to do particular jobs, and so this

17   announcement coincided with that time period, where

18   there was a real press on to announce jobs within a

19   technical series such as 512.

20             BY MR. DANN:

21       Q.    For the sake of aligning our terminology, we

22   have the technical services division, and you are

1    referring to technical skills.  Is there a

2    distinction between your usage of the term technical?

3        A.    When I refer to technical with respect to

4    the announcement, I mean a precise area of expertise

5    for which particular education or experience may be

6    required.

7        Q.    Do you know who occupied the position at

8    issue in this case prior to the selection of Sheila

9    Jones?

10       A.    No.

11       Q.    What is your understanding of the

12   responsibilities and duties and program

13   responsibilities of the position at issue?

14       A.    I can only speak generally about analysts

15   within technical services.

16       Q.    So you don't know the precise program

17   responsibilities of this position?

18       A.    I don't recollect.  To the extent that Dave

19   Geber kind of oversaw the large case program areas

20   and they included at that time fast -- areas in which

21   to resolve cases quicker, settle large cases quicker,

22   so there was dispute resolution mechanisms, and fast

39

1   those, too, required appeals' involvement in trying

2   to reach resolution or at times come up with

3   settlement options for taxpayers who may have been

4   involved, and to the extent there were large case

5   implications for that, that would have been on the

6   large case side.

7           Then there were generally efforts to reduce

8   cycle time in the large cases, some of which took

9   years to close.

10      Q.   In terms of understanding the skill set

11  required for the position at issue in this case,

12  would you have relied on Mr. Geber's recommendation?

13          MR. NEBEKER:  Objection, vague.

14          THE WITNESS:  Quite heavily, yes.

15          BY MR. DANN:

16      Q.   Can you describe for me the differences

17  between a 343 series and a 512 series position?

18      A.   The primary difference is that the 512

19  series requires education, accounting, specifically

20  accounting education, certain number of credits, in

21  order to qualify; 343 is -- does not.

22      Q.   I am sorry.  What was that?

40

 1     A.    Does not, 343 does not require that.

 2     Q.    Other than educational distinctions between

 3   the positions, can you identify any other

 4   differences?

 5     A.    The 512 -- if you are in a 512 series, it

 6   means that you are supporting the work of revenue

 7   agents or people who are senior, say, senior -- it is

 8   not senior necessarily -- the people on the front

 9   lines interfacing with taxpayers as revenue agents.

10   It means you are somehow involved in kind of

11   supporting them, their programs, their efforts,

12   because it is a similar -- it is the same track,

13   career track.

14     Q.    You indicated earlier that there was a

15   review of 343 series positions within appeals at the

16   time.

17     A.    I didn't say that.

18     Q.    Was there a review of 343 series positions

19   during the relevant period?

20     A.    There was a requirement that the number of

21   343 positions remain at a certain level.  I believe

22   to the extent there was a review, I believe it

41

1    happened prior to 2003.

2         Q.    Do you know when it occurred?

3         A.    Not from personal knowledge.

4         Q.    Were individuals within 343 series positions

5    ever placed in a position where they were responsible

6    for supporting front-line personnel?

7         A.    Did 343 support front line?  I cannot say no

8    to that because there has to be a time when it has

9    happened.  So, yes.

10            And your prior question was -- I am trying

11   to remember what it was, about the review in appeals.

12   I don't have personal knowledge of a review in

13   appeals.  I was at the IRS, in the commissioner's

14   office, when there was this review of 343 positions

15   generally throughout the IRS.  So I have knowledge of

16   that occurring, just not in my role as an appeals

17   person.

18        Q.    And when did you move from the

19   commissioner's office to appeals?

20        A.    2002.

21        Q.    Can you be more specific as to the date?

22        A.    It was in the beginning of the year, so,

44

1    deck design, and looked at his and others' current

2    number of employees and then determined that there

3    were some vacancies.

4        Q.    You said current number.  Which column would

5    reflect the current numbers?

6        A.    On board.

7        Q.    And what is the design column?

8        A.    The reference here is to the Philadelphia

9    deck design, which I am presuming would have been

10   the -- would have contained the authorized staffing

11   pattern for the appeals function and these particular

12   functions that was in effect at the time, whatever

13   the authorized pattern for staffing was at the time,

14   was the design.

15       Q.    So the design, based on your statement, is

16   the available openings or projected availabilities

17   within technical services?

18       A.    Would have been what was authorized and

19   funded to be filled.

20       Q.    And the on board is the actual number of

21   personnel currently in the positions?

22       A.    Correct.

45

1     Q.    And what does the vacancy column represent?

2     A.    It would represent the difference between

3     the design and on board.

4     Q.    And all of those functions were within what

5     subdivision of technical services?

6     A.    They appear to be in three different

7     functions: processing services, which I believe

8     Annette Streeter headed up at the time; TPP, that is

9     Dave, tax policy and procedure; and then technical

10    guidance, which I guess was Falice Eisen based on the

11    e-mail.

12    Q.    And why was Mr. Geber providing this

13    information to you?

14    A.    One of the first -- if someone wants to

15    hire -- at the time if someone wanted to hire

16    someone, one of the first things, I guess, that they

17    would routinely do is show that they had a vacancy,

18    legitimate vacancy under the authorized staffing

19    pattern.

20    Q.    And the next e-mail following the April 18

21    e-mail is another one from Mr. Geber dated April 21,

22    2003; is that correct?

46

1      A.   Yes.

2      Q.   And then the next following e-mail is

3  another e-mail on that same date at 9:55 a.m.; is

4  that correct?

5      A.   That is correct.

6      Q.   And that is from who?

7      A.   Me to Mr. Geber.

8      Q.   And what do you state in that e-mail?

9      A.   Please proceed as you described.  Thanks,

10 Bev.

11     Q.   And then the top e-mail dated April 22,

12 2003, what is that?

13     A.   This is then Dave going to -- my guess is

14 Teresa D'Angelis would have been an HR person who

15 Dave was saying, hey, I have all the necessary

16 approvals in place, so now can you announce these

17 positions.

18     Q.   And do you know why you were cc'd on that?

19     A.   I presume it would have been a standard

20 thing to do, just to copy your boss when you go to

21 announce positions.

22     Q.   Thank you.  You can set that aside.  In

49

1    staff who kind of went through with each business

2    unit, identified their authorized number of 343's,

3    and then that set off actions that business units

4    took in order to achieve their number.

5        Q.    Were 343 series positions viewed as broad or

6    versatile?

7        A.    343 series positions were viewed as broad,

8    yes, non-technical, yes, and in that respect their

9    versatility was probably limited in that you didn't

10   necessarily get the technical skills, but, yes, you

11   had someone that without limitation could do a range

12   of things.

13       Q.    What is an authorized staffing pattern, an

14   ASP?

15       A.    An ASP is -- ideally, you would give

16   managers latitude to run their own shops.  In order

17   to do that, you have to have an understanding as to

18   what the parameters are.  The authorizing staffing

19   pattern creates the parameter for people and

20   positions, how many can you have.

21             Oftentimes, depending on how precisely they

22   are they can be locked into series and grades,

1   organizations do it differently, and at some point

2   during the fiscal year you have to marry that with

3   your budget.  So you might fine tune depending on the

4   realities of your budget.

5       Q.   Did you give your managers parameters to run

6   their own shops?

7       A.   When I was in appeals --

8            MR. NEBEKER:  Objection, vague.

9            THE WITNESS:  Did we have ASPs?  My

10  organization, technical services, had an ASP.  It

11  would have been my practice to drive that ASP as low

12  as I could.  So it would have been my practice to

13  establish those kinds of parameters with my

14  subordinate managers.

15           BY MR. DANN:

16      Q.   Would you have worked with your subordinate

17  managers in developing the ASP?

18      A.   I would ask for them -- generally I would

19  ask for them to do it, for their particular

20  functions, and if things came in not exceeding what

21  the organizational was, that would have been cool.

22  Had things had -- a particular function exceeded what

52

1   document?

2       A.   My guess is, yes, I would have seen this

3   document.

4       Q.   What is it?

5       A.   This is a memo from the deputy commissioner

6   to the heads of the various business units --

7       Q.   And what is the subject?

8       A.   Oversight and management of analyst and

9   related positions.

10      Q.   And just for the record, there are no

11  attachments to this document; is that correct?

12      A.   Not in my hand, no.

13      Q.   I would ask, if you would, when we leave

14  today, if you can go through your files and see if

15  you have ever -- if you retained a version of this

16  document, and specifically whether you retained a

17  version with the two attachments that are referenced

18  therein?

19      A.   Okay.

20      Q.   I would also ask the agency if they would

21  review their records because it indicates there are

22  attachments, but none are actually attached.

53

1          MR. NEBEKER:  I will talk to Ms. Vergne

2    after the deposition.

3          THE WITNESS:  This particular document is

4    not dated and it is not signed, so while this

5    validates for me what was going on, I can't verify

6    that this is a precise document that would have been

7    issued.

8          BY MR. DANN:

9     Q.   Can you turn to the second page?  Does this

10    document indicate when the ASP for 343, 301 positions

11    were expected to be provided to the commissioner's

12    office?

13     A.   No later than October 15, 2002.

14     Q.   Was it your practice to comply with

15    deadlines?

16     A.   Yes.

17     Q.   Do you know whether you complied with this

18    deadline?

19     A.   The appeals function complied with the

20    deadline.

21     Q.   Can you read for me the first sentence on

22    the second paragraph of page 2?

54

1      A.   ASP should be committed to my office for

2   review no later than October 15, 2002, with final

3   approval expected within two weeks of submission.

4      Q.   And what does final approval mean?

5      A.   I read this to mean that the deputy

6   commissioner would have issued some kind of approval

7   of those ASPs that were submitted.

8      Q.   Can you please read for me the first

9   sentence of the last paragraph?

10     A.   Once your ASP has been approved, you will be

11  able to fill analysts and related positions as

12  provided therein.

13     Q.   What do you take that sentence to mean?

14     A.   That the deputy commissioner would give

15  latitude to the heads of the various organizations to

16  fill positions within the parameters of the ASP.

17     Q.   Now, this document is referencing repeatedly

18  the freeze; is that correct?

19     A.   The document -- yes, it references a freeze

20  that the deputy commissioner imposed on all vacant

21  analysts and related positions.

22     Q.   Do you know when the ASP for appeals was

55

1   approved?

2       A.   No, I don't know that.

3       Q.   Can you make an assumption based on this

4   memo?

5            MR. NEBEKER:  Objection.  She has not

6   authenticated the memo, and it would be speculative.

7            THE WITNESS:  Taking at face value what this

8   document says, it would have occurred within two

9   weeks of October 15, 2002.

10           BY MR. DANN:

11      Q.   Do you have a copy of the ASP for the

12  appeals division in 2002?

13      A.   No.

14      Q.   Do you know whether the ASP for appeals --

15  strike that.

16           To your knowledge, what did the ASP for

17  appeals conclude would be the appropriate number of

18  343 series analysts in the tax and policies

19  procedures division?

20      A.   I don't know that number.

21      Q.   To your knowledge, did the ASP for appeals

22  division provide for the GS-14 senior program analyst

56

1    position at issue in this case?

2        A.    I don't know the answer to that.

3        Q.    You can set that aside.

4              Do you know whether there was a procedure

5    for obtaining exceptions to the freeze?

6        A.    Yes, I believe there was.

7        Q.    Can you please tell us?

8        A.    I recall a procedure where you could go to

9    the deputy commissioner, and only the deputy

10   commissioner had authority to do this, and request

11   that the freeze be listed for your particular

12   organization because you have met the requirements --

13   you have come within the ASP parameters.  In

14   addition, I believe you could also petition the

15   deputy commissioner if there was -- kind of an urgent

16   need that needed to be met while this -- while the

17   ASP parameters were being dealt with.

18       Q.    Who had the authority within appeals to make

19   a request for an exception?

20       A.    Dave Robeson.

21       Q.    Did you have authority to petition for an

22   exception?

57

```
 1      A.   Only to Dave.

 2      Q.   Did Mr. Geber have authority to request an

 3 exception be made to you?

 4      A.   He could have asked me to make a request,

 5 and then I would have determined whether to forward

 6 it to Dave.

 7                    (Babers Exhibit No. 6

 8                    was marked for identification.)

 9           BY MR. DANN:

10      Q.   Ms. Babers, you have been given a document

11 marked as Exhibit 6.  Can you take a moment to review

12 that, briefly.

13           (Pause.)

14           THE WITNESS:  I have reviewed it.

15           BY MR. DANN:

16      Q.   What is this document?

17      A.   This is a memo from Ron Sanders, who is the

18 chief HR at this time period, to the heads of the

19 business units.

20      Q.   What does the document indicate, generally

21 speaking?

22      A.   He is setting out a process by which
```

60

```
 1       A.   Four.

 2       Q.   And what were these positions?

 3       A.   One interest and penalty analyst at the

 4  343-13 level, two collection analysts, 343-14s, and

 5  one strategic planning analyst, 343-14.

 6       Q.   And what is the date of this memo?

 7       A.   April 7, 2003.

 8       Q.   Looking at the last paragraph on the first

 9  page, does this -- I apologize, the third paragraph,

10  these vacancies are within appeals authorized staff

11  plan.  Did I read that correctly?

12       A.   Yes.

13       Q.   What was the ASP goal for appeals as of this

14  date?

15       A.   I don't know.

16       Q.   If you refer to the next paragraph:  We are

17  getting closer to our target of 75.

18            Did I read that correctly?

19       A.   Yes.

20       Q.   And at the bottom paragraph, it indicates:

21  Permanent positions will bring us under our ASP of

22  75; is that correct?
```

61

1      A.    Yes.

2      Q.    Does that help refresh your recollection as

3   to ASP for appeals at this time?

4      A.    No.   Appeals had 2400 employees or

5   something, so I don't know what the appeals

6   authorized staffing plan would have been.   This seems

7   to refer to 343 series, in particular, and it appears

8   that that particular ASP was 75.

9      Q.    Does this memo indicate that even with these

10  positions, appeals would have been under its ASP

11  goals?   It says these vacancies are within appeals'

12  authorized staffing plan, and I will refer you to the

13  last paragraph on page 1.

14     A.    It says, these actions along with plans to

15  move six Grade 15 transition type-employees into

16  permanent positions will bring us under our new ASP

17  of 75 and accommodate the exceptions requested in

18  this memo.

19     Q.    And what does the next sentence read?

20     A.    If the exemptions are granted, and the

21  positions are filled, appeals will remain within its

22  overall staffing level for analysts.

62

1    Q.    This memo also indicates that the division

2    intended to move 27 employees out of the series?

3    A.    Yes.

4    Q.    Are you familiar with that action?

5    A.    I recall that there was a service-wide

6    effort, which would have been done in appeals as

7    well, to reclassify analysts who met technical

8    qualifications to be in series other than 343, into

9    the more technical series, and it appears that this,

10    for 27 employees within appeals, that is what they

11    are in the process of doing.

12    Q.    Do you know what those 27 employees -- what

13    series those 27 employees were converted into?

14    A.    No.

15    Q.    Do you know whether it was a 930 series --

16    whether 930 series conversions occurred during this

17    period?

18    A.    No, although we had 930's within appeals, so

19    it would not have been out of the norm to have 930's.

20    I just don't know whether any of these 27 were

21    converted and, indeed, if any conversions occurred in

22    this time period.

63

1    Q.   Was this request for exception granted?

2    A.   Yes, it was approved.

3    Q.   And what date was it approved?

4    A.   April 8, 2003.

5    Q.   Now, turning back for a moment to

6  conversions, what was the process used for converting

7  people from one series to another?

8    A.   Besides having the conversation with the

9  employee and doing what you needed to do with that

10  particular employee, it was a paperwork exercise.

11    Q.   Who would have had the conversation with the

12  employee?

13    A.   That person's boss.

14    Q.   First-level supervisor?

15    A.   That person's first-level supervisor.

16    Q.   Were you involved in any conversions during

17  your tenure in technical services?

18    A.   I didn't have any discussions with any

19  employees regarding -- I am sure there were employees

20  within my organization that were converted.

21    Q.   Do you know if there were any policies or

22  procedures or rules in place for conversions?

65

1              (Pause.)

2              THE WITNESS:  Okay.

3              BY MR. DANN:

4        Q.    Do you recognize this document?

5        A.    I don't believe I have seen the document

6    before.

7        Q.    Are you familiar with the information

8    contained therein?

9        A.    Yes.

10       Q.    What is this document?

11       A.    It is a memo from Dave Robeson to the deputy

12   commissioner asking that appeals -- the freeze be

13   lifted for appeals.

14       Q.    And what is the date of the memo?

15       A.    May 23, 2003.

16       Q.    Does this memo indicate whether appeals met

17   its target ASP?

18       A.    Yes.  In the memo, Dave states that appeals

19   met its targeted rate of 75 or below.

20       Q.    And that is the target rate for 343, 301

21   positions; is that correct?

22       A.    According to a prior memo and this memo,

66

1    yes.

2        Q.    And was this request for exclusion from the

3    freeze granted?

4        A.    Yes?

5        Q.    What date was it granted?

6        A.    June 9, 2003.

7        Q.    Can you tell us what your role was in the

8    selection for the position at issue in this case?

9        A.    I was the approval official.

10        Q.    And what does that mean?

11        A.    I was the second-level supervisor to whom

12    Dave made a recommendation for the filling of the

13    position.

14        Q.    Can you expand on what you did with that

15    recommendation or, more precisely, what your roles

16    were in the selection?

17        A.    I was the selecting official, which means I

18    am the one that signed the certificate or the formal

19    document authorizing the hire, the selection.

20        Q.    Other than signing the document, were you

21    involved in any other way in the selection?

22        A.    No.

67

```
 1                    (Babers Exhibit No. 9

 2                     was marked for identification.)

 3          BY MR. DANN:

 4     Q.   You have been given what has been marked as

 5   Exhibit 9.  Do you recognize this document?

 6     A.   Yes.

 7     Q.   What is it?

 8     A.   This is a selection certificate that I

 9   signed to select Sheila Jones for this 512 GS-14

10   position.

11     Q.   And on what date did you make the selection?

12     A.   June 20, 2003.

13     Q.   Did you conduct an interview for the

14   position?

15     A.   No.

16          MR. DANN:  Can we take a brief five-minute

17   break?

18          (Discussion off the record.)

19          (Brief recess.)

20          MR. DANN:  Ms. Babers, thank you.  That

21   actually was the last question we had.

22          MR. NEBEKER:  I just had a couple of
```