## Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - x
PAMULA ROBINSON,             :
                             :
         Plaintiff,          :
                             :
vs.                          : Civil Action
                             :
JOHN W. SNOW, SECRETARY OF THE : No. 05-1212
TREASURY,                    :
                             :
         Defendant.          :
                             :
- - - - - - - - - - - - - - - - x

Washington, D.C.
Wednesday, October 11, 2006

The deposition of DAVID GEBER, called for examination by counsel for Plaintiff in the above-entitled matter, pursuant to Notice, in the offices of Gerhardt & Associates, 1101 Seventeenth Street N.W., Washington, D.C., convened at 2:05 p.m., before Cathy Jardim, a notary public in and for the District of Columbia, when were present on behalf of the parties:

## Page 2

APPEARANCES:

On behalf of the Plaintiff:

MARK DANN, ESQ.
CHARLES WILLIAM DAY, ESQ.
Gebhardt & Associates, LLP
Suite 807
1101 17th Street, N.W.
Washington, D.C. 20036
(202)496-0400

On behalf of the Defendant:

W. MARK NEBEKER, ESQ.
Assistant United States Attorney
10th Floor
555 4th Street, N.W.
Washington, D.C. 20530
(202)514-7230

JENNIFER L. VERGNE, ESQ.
Office of Chief Counsel
Internal Revenue Service
950 L'Enfant Plaza S.W.
Washington, D.C. 20024
(202)283-7900

## Page 3

C O N T E N T S

| WITNESS | EXAMINATION BY COUNSEL FOR | |
|---|---|---|
| | PLAINTIFF | DEFENDANT |
| DAVID GEBER | 4 | 92 |
| FURTHER | 94 | -- |

E X H I B I T S

| Geber Deposition Exhibits | MARKED |
|---|---|
| No. 1 | 6 |
| No. 2 | 33 |
| No. 3 | 37 |
| No. 4 | 39 |
| No. 5 | 49 |
| No. 6 | 52 |
| No. 7 | 58 |
| No. 8 | 66 |
| No. 9 | 67 |
| No. 10 | 74 |
| No. 11 | 79 |
| No. 12 | 81 |
| No. 13 | 83 |

## Page 4

P R O C E E D I N G S

Whereupon,

DAVID GEBER

was called for examination by counsel for Plaintiff and, having been first duly sworn by the notary public, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR PLAINTIFF

BY MR. DANN:

Q. Good afternoon. My name is Mark Dann and I will be taking the deposition today.

Can you please tell us your full name and spell your last name?

A. It is David, middle initial M, Geber, G-E-B-E-R.

Q. And have you ever given a deposition before?

A. If I have, it has been many, many years ago.

Q. I am going to outline some basic ground rules for the next little bit. Generally speaking, a deposition is an opportunity for parties in a civil action to exchange information. We do it through several different ways. There are written exchanges, document exchanges, and this is an opportunity for us

**41**

cover?

A. May 1, '02, to April 30, '03.

Q. But you were not her supervisor during this entire period, were you?

A. No, but I got input from her prior supervisor and used whatever notations happened to be in the file.

Q. At the time you completed this performance appraisal, you were aware that Ms. Jones had applied for the position at issue in this case?

A. That is correct.

Q. You can put that aside. Actually, sorry. Can you take a look at the second page of this document? I asked you earlier what series Ms. Jones was in when she was performing the temporary duties of the position at issue in this case. You indicated that you weren't certain. Does this refresh your recollection?

A. She was a temporary 14 because she had been temporarily promoted to a 14-343 and then was returned to the 512 position, and I thought she had stuck around.

**42**

Q. During the period in which she performed the position, she was in a 343 series?

A. That is correct.

Q. When did she obtain that 343 promotion?

A. I don't have those dates available to me.

Q. It would have been during the rating period which this document memorializes, correct?

A. Well, I am just looking. Since the previous program analyst was leaving at the end of October, transition began in August to move responsibilities, so she couldn't have gotten the temporary until Mr. Schoonda left, and my recollection is that Mr. Schoonda left sometime in November of '02.

Q. Is it possible she got the promotion in October of '02?

A. It is possible.

Q. You mentioned earlier that there was a directive that came from the commissioner's office. Do you know when that directive was instituted?

A. No, I really don't recall.

Q. Is it possible that that was done in February of 2002?

**43**

1  A. It is possible.
2  Q. So Ms. Jones would have obtained a 343
3  position during this freeze period?
4  A. Not to my knowledge. That temporary
5  promotion may have been later. If you have access to
6  human resources, you can get the exact dates. I
7  cannot certify to the exact dates one way or another.
8  Q. You can put it aside.
9  A. If she was a temporary until December of
10 2002, then to me that would indicate that possibly --
11 but when she got it, I don't know. I have no idea
12 and I was not involved in that action.
13 Q. During this period, the period in which this
14 position was being announced, you were generally
15 aware that Ms. Robinson was interested in positions
16 at the GS-14 level, weren't you?
17 A. When I think back, yes -- any GS-13 would be
18 interested in a GS-14 position for promotion.
19 Q. And you knew that she had applied for GS-14
20 positions?
21 A. I believe I was aware of that fact, yes.
22 Q. You also knew Ms. Robinson had not held a GS

**44**

1  series 512 position prior to joining the office of
2  appeals; is that correct?
3  A. That is correct.
4  Q. During your tenure as a manager in appeals,
5  you inquired on behalf of your own subordinates as to
6  eligibility of employees for conversions from series
7  343 to 512 positions; isn't that correct?
8  A. I checked with human resources to see what
9  the requirements were for the 512 series, and then
10 when I had that information, I spoke to each of my
11 343's and said, are you qualified, do you qualify?
12 If so, do you have any objection to being converted
13 since the commissioner wants to reduce the number of
14 343's?
15 Q. And when did you do this?
16 A. It would have been prior to -- either prior
17 to the announcement of this position or concurrent
18 with -- probably prior to -- in fact, I would be
19 almost positive it was prior to. That is why I would
20 have announced this as a 512.
21 Q. Who is Teresa D'Angelis?
22 A. A human resource specialist in Philadelphia.

45

Q. How do you know her?

A. She used to work years ago in regional director of appeals office in Philadelphia, while I was in the field office, and I knew her when she switched over to human resources.

Q. How would you characterize your relationship with her?

A. Co-workers.

Q. Were you friends?

A. We were not enemies.

Q. How much interaction did you have with Ms. D'Angelis as director of large cases?

A. Maybe three or four times at most, when I needed to announce positions or needed advice on something.

Q. And what would you do when you needed to do that?

A. I would telephone her or occasionally send her an e-mail.

Q. For what purpose?

A. To announce -- if it was something she needed to do and needed on record, I would send her

46

an e-mail.

Q. Who is Carson Sprott?

A. He is also in human resources -- human resource specialist.

Q. So you know Mr. Sprott?

A. I know of Mr. Sprott. I have seen his name. I don't recall ever communicating with him, or if I did, it was like a one-time deal.

Q. How are you aware of Mr. Sprott?

A. His name appeared -- how am I aware of Mr. Sprott? He may have been -- his name may have been in another package I worked on.

Q. By package, what do you mean?

A. Vacancy announcements, promotion packages.

Q. How many such packages have you had occasion to work on?

A. In what time period?

Q. During your tenure as director of large cases?

A. It was only two, actually, for my group. There were many times that I was pulled into a promotion package either to be a ranking official or

47

1  a member of a panel. Sometimes I felt like I was
2  being pulled off the street when she needed somebody,
3  but it would probably be in one of those
4  circumstances where I saw Mr. Sprott.
5     Q. What about prior to your tenure as director,
6  how often did you work on vacancy packages?
7     MR. NEBEKER: Objection, vague as to the
8  term worked on.
9     You can answer if you understand the
10 question and have an answer.
11    THE WITNESS: Whenever asked. When I was
12 asked, I did it. It was normally when I was in an
13 acting capacity. There were a couple of occasions
14 where I was asked if I would do it in my capacity as
15 a senior analyst.
16    BY MR. DANN:
17    Q. Do you know who Richard Bell is?
18    A. No.
19    Q. Do you know who Angelica Stevens is?
20    A. Yes.
21    Q. Who is she?
22    A. The staff assistant to Beverly Babers.

48

1    Q. And what kind of interactions did you have
2  with Ms. Stevens?
3     A. I would go through her when I needed to have
4  an appointment with Ms. Babers. Also for a period
5  when I did not have a secretary, she assisted me with
6  some secretarial work.
7     Q. Do you know Cathy Labayog, L-A-B-A-Y-O-G?
8     A. No.
9     Q. Do you know Michelle McDonald?
10    A. I know the name because that is the one that
11 appeared on vacancy announcements to send
12 applications to, some vacancy announcements.
13    Q. Vacancy announcements you worked on?
14    A. Vacancy announcements I worked on or was
15 involved in as a panel member. If you look up
16 vacancy part of the Web site, there were
17 announcements every week or so, and they were
18 required to send the paperwork to Ms. McDonald.
19    Q. Did you monitor the postings within appeals?
20    A. Not as a practice. On occasion.
21    Q. On occasion you were aware of them?
22    A. On occasion.

### 49

Q. Other than the position at issue in this case, did you ever have occasion to be involved in a position in which Ms. Robinson applied?

A. If I did, I do not recall it.

Q. Other than this --

A. I may have been on the panel that originally selected her to come into the field office of appeals.

Q. Are you aware if you were ever involved in an application or a vacancy that Ms. Jones applied for other than the one at issue?

A. No, I don't believe I was.

(Geber Exhibit No. 5 was marked for identification.)

BY MR. DANN:

Q. Mr. Geber, you have been handed what has been marked as Exhibit 5. Do you recognize this document?

A. This is the announcement for this position.

Q. Who requested that this position be posted?

A. I did.

Q. And why did you -- strike that.

### 50

What was the opening date for this vacancy?

A. May 4.

Q. What was the closing date?

A. May 19, my birthday.

Q. Why did you announce this position?

A. We had a vacancy in the group. We needed somebody to fill it who could do the work.

Q. And the vacancy, was that as a result of Mr. Schoonda's departure?

A. It may have been, or there may have been another vacancy in the group. I don't recall. In fact, I think there were a couple at that time.

Q. The vacancies that occurred, what series were those vacancies?

A. One was announced as a 512 --

Q. I want to know what the occupant prior to the departure was.

A. 343.

Q. Why did you announce this position as a 512?

A. I announced it as a 512 because under the Commissioner's mandate and directives from Mr. Robeson, we were not to announce 343's, there was

### 51

a freeze on 343's, and as I mentioned, I believe, prior to this, I had converted my other 343's into 512 positions, and this was to be consistent with that and to satisfy the mandate of Commissioner Risotti and the directive from a national director.

Q. Who had you converted from a 343 to a 512?

A. Gene Perdue, Sandy Cohen, Michelle Topel, possibly, I am not positive, Jacqueline Harris.

Q. What race are those individuals?

A. Three are white, Jacqueline Harris is black female.

Q. When did these conversations occur?

A. I do not have the dates available.

Q. How can a person be converted from a 343 to a 512 position?

A. 512 requires a certain level of accounting education and it also requires some specialized experience at the 512, normally at least one year at the 512-13 level.

Q. If these individuals had had 343's, how were they eligible?

A. They were revenue agents prior to becoming

### 52

343's.

Q. At what grade level had they been --

A. Grade 13 and higher, possibly.

Q. And this was true of all of them?

A. All the ones I converted, yes.

Q. Were there employees you did not convert to a 512?

A. The only one I would not have converted would have been Yvonne Bellany, who was a 592 and doing work that was really unrelated to large case specifically. She was in the processing area.

Q. Who assisted you with these conversions?

A. My recollection is that I contacted Terry D'Angelis and asked her to submit the conversions. I really don't recall at this point.

Q. Was Ms. Babers involved in processing these conversions?

A. Only -- well, I can't say. I really don't remember.

(Geber Exhibit No. 6 was marked for identification.)

BY MR. DANN:

### 53

Q. Mr. Geber, you have been given what has been marked as Exhibit 6. Do you recognize this document?

A. This would have been the form 52 which requested a personnel action.

Q. And this is the request for the promotion at issue in this case, correct?

A. That is correct.

Q. And who is identified as the requesting official?

A. I am.

Q. You can set this aside.

A. But may I say something about this announcement?

Q. Yes.

A. Or about this document?

Q. Actually, no, there is no question on the table. Mr. Nebeker will give you an opportunity if you need to address it.

MR. NEBEKER: Remember what it was you were going to say.

THE WITNESS: I will try to.

BY MR. DANN:

### 54

Q. Generally speaking, what were the responsibilities of the person -- strike that.

This was the only 512 level 14 position announced during your tenure as director of large cases; isn't that true?

A. I believe that is correct.

Q. And this position, the person who was selected for this position was going to take over the tax computation program or technical analyst program?

A. That is what was anticipated at the time, but it was not carved in stone. We can shift programs at any time.

Q. What other programs could that person have been responsible for?

A. At that point I had ex parte communications which arose out of revenue, the RR 98. We had fast-track mediation. We had fast-track settlement. We had straight mediation and arbitration that we were dealing with. We had various people working on sections of the Internal Revenue manual. That is just a small number. There were lots of programs in the group. We had a tax-exempt organizations

### 55

1  program. I am trying to remember what else we had.
2  That is all I can recall.
3    Q. So it is possible that the selectee for this
4  position would not have been exclusively responsible
5  for tax computation programs?
6    A. I don't think any of my analysts were
7  exclusively responsible for one program.
8    Q. These other programs you mentioned, did they
9  involve accounting duties?
10   A. What they involved was coordination with the
11 field and often with revenue agents in the field
12 concerning issues that may have involved accounting
13 issues.
14   Q. Backing up for a moment, when you converted
15 some of your employees to the 512 series, why did you
16 not convert them to 930 positions?
17   A. The direction I got at that time was that
18 the analysts in similar situations in the examination
19 division were being converted to 512 and that if my
20 people were eligible, that I should convert them to
21 512 as well.
22   Q. Who directed you to do so?

### 56

1    A. It would have been Mr. Robeson.
2    Q. So you had direct communications with
3  Mr. Robeson regarding personnel matters such as this?
4    A. I did on occasion.
5    Q. And who classified the positions for the
6  conversions?
7    A. Someone up in human resources.
8    Q. What is the difference between a 343 series
9  and a 512 series position?
10      MR. NEBEKER: Objection, vague.
11      THE WITNESS: Primarily the accounting
12 requirement, but having been out of the game since
13 2003, I would have to take a look at PDs to be able
14 to answer that question with any degree of accuracy.
15      BY MR. DANN:
16   Q. So a person who had served as a 343 and had
17 that accounting experience would have been eligible
18 for a 512?
19   A. A person who had served as a 343 and had at
20 least a year of specialized experience at the 13
21 level, at least at the 13 level, would have qualified
22 for the 512-14.

## 57

1   Q. Who was involved other than yourself in
2 announcing this vacancy?
3   A. Teresa D'Angelis did the announcement.
4 Based on something you showed me before, I guess,
5 Michelle McDonald was the receiver of the
6 applications.
7     Someone in human resources was responsible
8 for reviewing the applications to make certain that
9 they were -- that the people who applied met the
10 qualifications. Then the package was sent down to
11 me. Since Sheila was the only one on the list, and I
12 was not able to do the ranking myself because the
13 union contract said that if you are the manager of
14 the position and you are the manager of an employee
15 who applies for the position, you cannot be the
16 ranking official, I asked Tom Roley to rank the
17 package. He ranked the package, got it back to me,
18 and then I went to Beverly and recommended that
19 Sheila be selected, and then it was sent back to
20 human resources to process.
21   Q. Teresa D'Angelis was not involved in the
22 decision as to what series the position would be?

## 58

1   A. No.
2   Q. That decision was made by you?
3   A. No -- well, it was made by me -- yes, the
4 512 was made by me, yes.
5     (Geber Exhibit No. 7
6     was marked for identification.)
7 BY MR. DANN:
8   Q. Mr. Geber, you have been given a document
9 marked as Exhibit 7. Do you recognize this document?
10   A. Only because it has my name at the top.
11   Q. What is this document?
12   A. This is a message to Teresa D'Angelis asking
13 her to process vacancy announcements for two
14 positions in my group.
15   Q. And this is from who?
16   A. This is from me.
17   Q. And what is the date of this e-mail?
18   A. April 22, 2003.
19   Q. Now, there are three preceding e-mails
20 attached to this, correct?
21   A. I think there were only two.
22   Q. Looking at the second e-mail dated April

## 59

1 18, 2003 at 1:03 p.m., who sent that e-mail?
2   A. I did.
3   Q. And who is it addressed to?
4   A. Beverly Babers, Falice Eisen, Diane Ryan and
5 Annette Streeter.
6   Q. What is the title?
7   A. "Vacancies in Technical Services."
8   Q. Turning to the bottom paragraph, third
9 sentence, Sheila Jones would just be moving from a 13
10 to 14, so that is not a new position and I could
11 replace myself. Did I read that correctly?
12   A. That is what it says.
13   Q. Bottom line is that I think we are okay.
14 Did I read that correctly?
15   A. Yes, you did.
16   Q. And then the next sentence reads: I am
17 going to check with an old friend in the Philly
18 office about the likelihood that he could get one of
19 his good 14's to apply for the analyst slot?
20   A. That is correct.
21   Q. Why was this position considered not a new
22 position?

## 60

1   A. In one case I was replacing myself since I
2 had become the manager, and the other position was
3 the one that had been occupied by Jim Schoonda.
4   Q. Who was the friend in the Philly office you
5 were referring to?
6   A. He was a manager, associate chief, whose
7 name I cannot recall. If you have a list of the
8 personnel, I could pick it out, or maybe I will think
9 about it.
10   Q. Are you familiar with the term preselection?
11   A. I am.
12   Q. What does it mean?
13   A. It means that somebody is already slotted
14 for a position even before you announce it.
15   Q. Are you aware that the IRS considered such
16 an action illegal?
17   A. I do.
18   Q. The position for which you are referring to
19 for Sheila Jones, that is the position at issue in
20 this case, correct?
21   A. I am not certain that it is. It may be.
22   Q. You can put that document aside. In your

**61**

1 experience working on vacancies, is it unusual, or
2 was it unusual in your experience for there to be
3 only one candidate for a position?
4   A.  It was unusual but certainly not unheard of.
5   Q.  I would like to take a five-minute break.
6       (Discussion off the record.)
7       (Brief recess.)
8   BY MR. DANN:
9   Q.  Mr. Geber, you were just reviewing some
10 documents. What were those documents?
11  A.  The documents just now, I was given
12 documents he had to see if I could read a signature,
13 which I couldn't.
14  Q.  The duties of the employees at the
15 headquarters, if I understand correctly, and in
16 particular, large case, were responsible for
17 supporting front-line revenue agents; is that
18 correct?
19  A.  They were responsible for supporting
20 front-line appeals officer and, in the case of large
21 case, team chiefs, which is a term we have not used
22 before.

**62**

1   Q.  And those appeals agents, they were the
2 front-line people that would interact and do the
3 actual accounting, for example, and reviews of tax
4 issues?
5   A.  That is correct.
6   Q.  So your employees, those employees within
7 the headquarters and in large case in particular were
8 not responsible for directly working on claims?
9   A.  No, they were not.
10  Q.  They were responsible, for example, for
11 updating and maintaining relevant manuals?
12  A.  Absolutely.
13  Q.  Thank you. I just wanted to clarify the
14 general position responsibilities.
15  A.  Also, they had contact with managers in the
16 field as well as the appeals officers and team
17 chiefs.
18  Q.  And that contact was for what purpose?
19  A.  That could have been for any purpose at all,
20 whether it was to discuss -- say we got a complaint
21 about a case and it involved something that that
22 particular analyst was familiar with. It could have

**63**

1 been to discuss that case with the manager, it could
2 have been to discuss why a case wasn't moving as well
3 as it should have been moving, could have been for
4 any reason whatsoever.
5   Q.  Turning back to the conversions very
6 briefly, if the conversions were appropriate, and
7 that it was appropriate to convert them to 512 series
8 positions, why were those people not previously
9 designated as such?
10  A.  The analyst positions have traditionally
11 been 343, long before I got involved and long before
12 the commissioner said we don't like the 343 anymore.
13 So, I have no insight into the answer to your
14 question.
15  Q.  So it was a matter of practice that analysts
16 in the headquarters were 343's?
17  A.  They were.
18  Q.  And your decision to convert them to a 512
19 was motivated by what factors?
20  A.  It was motivated by the fact that the
21 commissioner put a freeze on 343's and said that the
22 areas should reduce the 343's. That wasn't just

**64**

1 appeals; that was service wide, reduce the 343's, and
2 in appeals, the directive was if you can convert
3 these people to 512.
4   Q.  Who made that directive?
5   A.  The director of appeals, Dave Robeson.
6   Q.  And why did he direct you to convert them to
7 512 in particular?
8   A.  I believe because the analysts in the
9 examination division had already been converted to
10 512s, and he was keeping parity with them.
11  Q.  Were there any other reasons for the
12 conversions to 512?
13  A.  Not that I am aware of. It fit especially
14 when you are dealing with large case. You were
15 dealing with the most complicated and complex cases
16 in the country.
17  Q.  What was the goal of the freeze?
18  A.  It is my understanding that the 343 series
19 was deemed to be too general, and let's get these
20 people into a series that is more specific and better
21 reflects the work that they are expected to do. To
22 some extent, it could have been to get more out of

65

1 them, hey, you are 512's, you need to do more
2 accounting work, and this is an overall thing that I
3 am talking about, not in my area.
4   Q.   What about in your area?
5   A.   In my area, I was ambivalent as to what
6 series they were, as long as they got their jobs
7 done.
8   Q.   And what jobs were they responsible for
9 doing?
10   A.   We have been over that many times. They
11 were responsible for administering, devising,
12 monitoring various cases that involved large case.
13   Q.   And were your employees doing so to your
14 satisfaction?
15   A.   They were.
16   Q.   Irrespective of their series identification?
17   A.   Yes, irrespective of their series
18 identification.
19   Q.   Who was responsible during the freeze for
20 preparing the authorized staffing patterns within
21 large case?
22   A.   Within large case appeals?

66

1   Q.   Yes.
2   A.   There was something called a Philadelphia
3 group, and I don't remember how exactly this worked.
4 A bunch of the bigwigs got together in Philadelphia
5 and they came back and said this is what you are
6 authorized, and that is all I remember.
7   Q.   Please don't look at the documents unless we
8 need to. If you need to, Mr. Nebeker will allow you
9 to.
10         (Geber Exhibit No. 8
11          was marked for identification.)
12   BY MR. DANN:
13   Q.   You have been given what has been marked as
14 Exhibit 8. Can you take a moment to review it?
15   A.   I don't think I ever saw this one.
16         (Pause.)
17   BY MR. DANN:
18   Q.   Do you recognize this document?
19   A.   No. This is the first time I have ever seen
20 it.
21   Q.   Are you familiar with the information in the
22 document?

67

1   A.   To the extent that it froze vacant positions
2 and filling positions in the 343 series, yes. The
3 rest of it is Greek to me.
4   Q.   But you were aware as the director of large
5 case of the ASPs for 343 series positions within
6 large case?
7   A.   Within large case, yes.
8   Q.   You can put this to the side.
9   Q.   What was the ASP for 343 series positions
10 during your tenure as director?
11   A.   Shortly after I got there it was nothing --
12 I have no idea at this point what it was.
13   Q.   Can you give an estimate?
14   A.   Prior to the conversions, it might have been
15 seven, eight.
16   Q.   And subsequent to the conversions?
17   A.   It was zero for 343's.
18   Q.   Did you retain a copy of the ASP for the
19 period at issue in this case?
20   A.   I retained nothing when I retired.
21   Q.   Are you aware if the GS-14-512 position was
22 memorialized in the ASP for 2002?

68

1   A.   I am not aware.
2         (Geber Exhibit No. 9
3          was marked for identification.)
4   BY MR. DANN:
5   Q.   Before you look at that document, when were
6 you expected to propose the number of ASPs within
7 large case?
8   A.   I don't recall that either.
9   Q.   You have been handed what has been marked as
10 Exhibit 9. Do you recognize this document?
11   A.   No. Never saw it.
12   Q.   Were you aware that there was a process for
13 obtaining exceptions to the freeze?
14   A.   I remember hearing that.
15   Q.   And from whom did you hear that?
16   A.   Probably in a meeting with the lady whose
17 names is on this, Falice Eisen, who was the director
18 in the small business and wage.
19   Q.   What did you understand the process to be?
20   A.   You had to file a request for an exception,
21 and lots of luck.
22   Q.   Did you ever have occasion to file a request

## 69

1  for an exception?
2  A.  No.
3  Q.  Why not?
4  A.  I had no need to.
5  Q.  Why did you not need to?
6  A.  The people all qualified for the 512 series.
7  And if I announced a position in the 512 or 930 at
8  the 14 level, there was no problem. I didn't need a
9  343. I wanted to -- how shall I say this? I wanted
10 to comply with the directive to reduce the 343's.
11 Q.  Could you have complied by announcing this
12 position as a 930? You just mentioned 930 --
13 A.  I don't know. At that time I think the
14 request was to do it as a 343. The one 930 I
15 announced was under different circumstances.
16 Q.  Why could this position have not been
17 announced as a 930?
18 A.  I don't know that it couldn't have.
19 Q.  So it could have?
20 A.  I don't know. I don't know if it would have
21 been -- if I could have announced it as a 930 or not.
22 Q.  What did you do to decide -- what steps did

## 70

1  you take to decide how to announce the position?
2  A.  All right, let's go back a minute. The 512
3  was what -- the decision I made, originally
4  consistent with everybody else I had converted to
5  512. The 930 came about because based on a staffing
6  analysis, there was excess staffing in the
7  Philadelphia appeals office at the 14 level.
8     I had a vacancy. Mr. Robeson said you can
9  fill that vacancy if you can pull one of the 14's
10 that is in Philadelphia -- if you can select one of
11 the 14's that is in Philadelphia. So that position
12 was announced as a 930 in the hopes there would be
13 a --
14 Q.  But there was nothing preventing you from
15 announcing this as a 930?
16 A.  I never considered it.
17 Q.  But there was nothing preventing you --
18 A.  I can't say. I don't know.
19 Q.  Can you state anything that would have
20 prevented you --
21 A.  I didn't consider it.
22 Q.  Is there anything that prevented you, or

## 71

1  would have prevented you, from announcing this as a
2  930?
3  A.  Again, I don't know.
4  Q.  What did you understand the process to be
5  for requesting exceptions?
6  A.  You have to file a memo. I don't know
7  where. Is it in this memo? I will read it and
8  learn. This involved bargaining unit and
9  non-bargaining unit. Our positions were all
10 bargaining unit. I am not sure this applied.
11 Q.  If you had wanted to announce a position as
12 a 343, if you had wanted to obtain an exception, what
13 would you have done?
14 A.  I would have spoken to my immediate
15 supervisor, and if my immediate supervisor concurred,
16 I would have prepared the documents needed for an
17 exception.
18 Q.  You mentioned earlier that you had announced
19 the position as a 930 in hopes of drawing someone
20 from the Philadelphia office. Did I understand you
21 correctly?
22 A.  That was the second position.

## 72

1  Q.  Is that consistent with merit promotion
2  principles, to draw from a single office?
3  A.  It is consistent with staffing principles,
4  to get staffing in better balance. It is not unusual
5  to announce with a POD at a set location.
6  Q.  And I am sorry, you used an acronym. What
7  does that stand for?
8  A.  POD, posts of duty.
9  Q.  And that is the position the applicant
10 currently occupies?
11 A.  No, that is the location where the position
12 will be for the selectee.
13 Q.  But my question went to whether it was
14 consistent to draw applicants from a particular
15 office, not assign them to a particular office?
16 A.  I am not sure I understand the distinction.
17 If you want to hire someone, why make them to go to a
18 particular office from wherever they are rather than
19 announce this is the office you need to draw from?
20 Q.  I am confused here.
21 A.  So am I.
22 Q.  Had you had occasion to work on vacancies

## Page 73

1  prior to this 930 one we are speaking about, in which
2  you targeted employees in a particular office?
3    A.  I have not, but I know there have been other
4  vacancy announcements where the POD was set at a
5  particular location, whether for this purpose or some
6  other purpose.
7    Q.  And the POD is the --
8    A.  Post of duty where the position will be
9  located, where the selectee will work.
10   Q.  I understand that in many cases you will
11 assign a person to a particular place.  My question
12 goes to drawing people from a particular office, not
13 directing them to a particular office.  Is that
14 something that you had had occasion to do in the
15 past?
16   A.  No, it is not.  This is the first time I had
17 occasion to do that.
18   Q.  And is that, is doing that consistent with
19 merit promotion principles, restricting the pool of
20 applicants, in effect --
21   A.  We didn't restrict the pool of applicants.
22 We stated the post of duty would be Philadelphia.

## Page 74

1  That did not restrict someone else from applying,
2  although admittedly the thought was, based on
3  Mr. Robeson's -- the staffing analysis, that we would
4  try to select it from Philadelphia.
5    Q.  So you were targeting with an objective of
6  hiring from a limited group?
7    A.  That is correct, in that particular
8  situation.
9    Q.  And you also restricted that position to
10 avoid having promotions; isn't that correct?
11   A.  I believe that that one did say they wanted
12 a grade 14 because that is where -- where there was
13 overstaffing in the Philadelphia office.
14   Q.  And the POD for this position would have
15 been what office?
16   A.  For what position?
17   Q.  For the 930 we are talking about?
18   A.  Philadelphia.
19   Q.  Are you aware of any requests filed by
20 anyone in appeals for exceptions or exemptions to the
21 freeze?
22   A.  I believe that someone, Falice Eisen or her

## Page 75

1  successor, may have requested exceptions.
2    Q.  So you knew it was possible to obtain
3  exceptions?
4    A.  Yes, I did.
5        (Geber Exhibit No. 10
6         was marked for identification.)
7  BY MR. DANN:
8    Q.  Before you look at the document you have
9  just been handed, you indicated you are not certain
10 of the particular ASP or appeals of the 343
11 positions; is that correct?
12   A.  That is correct.
13   Q.  Do you know when the ASP was met, when the
14 objectives of the freeze were accomplished?
15   A.  I don't.
16   Q.  Can you look at what has been marked as
17 Exhibit 10?
18   A.  This is not a very good copy.
19       (Pause.)
20 BY MR. DANN:
21   Q.  You testified that the objective of the
22 freeze was to reduce the number of 343 positions in

## Page 76

1  appeals; is that correct?
2    A.  That is correct, that is --
3    Q.  And the appeals section set a particular
4  SSP --
5    MR. NEBEKER:  Sorry.  Are you going to allow
6  the witness to finish the answer?
7  BY MR. DANN:
8    Q.  I was moving forward and I thought he was
9  finished.
10   MR. NEBEKER:  Was the purpose of the freeze
11 to reduce --
12   THE WITNESS:  It was to reduce the number of
13 343's throughout the service.
14 BY MR. DANN:
15   Q.  Including appeals?
16   A.  Including appeals.
17       Thank you.
18   Q.  And to reduce that number to a particular
19 ASP?
20   A.  Well, according to this, it said 75.  I did
21 not know that.
22   Q.  Do you recognize this document?

## 77

1  A.  I do not recall ever seeing this document.
2  Q.  Are you familiar with the information
3  contained therein?
4  A.  To the extent that I can read it -- I really
5  wasn't aware that there -- I knew there was one
6  exception requested, and I did not know there were
7  this many exceptions.  I had been in a meeting where
8  one was going to be requested, I believe it was the
9  collections analyst, but that is all I was aware of.
10  Q.  According to this document, the ASP for
11  appeals, for the 343's, was 75?
12  A.  That is what it says.
13  Q.  And that number had been achieved as of the
14  date of this memo, correct?
15  A.  Not correct.  After actions processed last
16  week we will be down to 85, and we are getting closer
17  to our target of 75.
18  Q.  Reading the last paragraph, these actions
19  along with plans to move six grade 15 type employees
20  into permanent positions will bring us under our new
21  ASP of 75 and accommodate the exceptions requested in
22  this memo.  Did I read that correctly?

## 78

1  A.  I think you left out the word transition.
2  Q.  Thank you.  Other than that, did I read it
3  correctly?
4  A.  I believe so.
5  Q.  What can we understand from this document?
6  A.  That we will work and reduce it to the
7  number that we were authorized.
8  Q.  And they had already had plans to meet that
9  objective, correct?
10  A.  It sounds like it.
11  Q.  And in fact, surpass that objective,
12  correct?
13  A.  I don't know.
14  Q.  What is the date of this memo?
15  A.  April 7, 2003.
16  Q.  And was this exception granted?
17  A.  It appears that it was.
18  Q.  What date?
19  A.  April 8, 2003.
20  Q.  And the vacancy period for the position at
21  issue in this case was May 5 through the 19th,
22  correct?

## 79

1  A.  Correct.
2  Q.  This memo indicates that 27 employees were
3  to be moved out of the series.  Would that have
4  included the conversions we spoke about before?
5  A.  I expect so.
6  Q.  So that was part of the plan and would have
7  led to appeals obtaining the ASP of 75, correct?
8  A.  Correct.
9  Q.  Do you know when the freeze was listed?
10  A.  No, I don't.
11       (Geber Exhibit No. 11
12        was marked for identification.)
13  BY MR. DANN:
14  Q.  This is Exhibit 11.  What is this?
15  A.  Request for exclusion from hiring freeze
16  restrictions for analysts and related positions.
17  Q.  Who authored this?
18  A.  Dave Robeson.
19  Q.  Does this refresh your recollection as to
20  the date the freeze was lifted?
21  A.  It gives me the answer.  I didn't know it.
22  Q.  What is the date?

## 80

1  A.  May 23, 2003.
2  Q.  So this request would have been made prior
3  to the selection for the position at issue in this
4  case; isn't that true?
5  A.  Correct.
6  Q.  What was the date on which the exclusion or
7  release from the freeze was granted?
8  A.  The memo would indicate June 9 of '03.
9  Q.  And that too was prior to the selection in
10  this case; isn't that a fact?
11  A.  That is correct.
12  Q.  Does this document indicate whether appeals
13  met its ASP?
14  A.  It appears that appeals did meet its target.
15  Q.  You can place that to the aside.
16       Mr. Geber, I know we discussed this before,
17  but you knew Ms. Robinson was looking for a promotion
18  to a GS-14?
19  A.  I was aware that any grade 13 was looking
20  for a grade 14, and Ms. Robinson, being a GS-13,
21  would have been looking for a 14.
22  Q.  And she had applied for GS-14 positions; you

89

1  A.  About the same, about a month or two.
2  Q.  So you had about two to four months as her
3  supervisor?
4  A.  Right.
5  Q.  And you didn't have many interactions with
6  her?
7  A.  This was back in 1996 or 1998. I really
8  don't recall. You know, if I had an assignment to
9  give her, obviously we had interaction. If she was
10 bringing the assignment in to me completed, we had
11 interaction. If I needed her to follow up on
12 something, we had interaction.
13 Q.  As a manager and a supervisor in the federal
14 government, did you have a practice of being aware
15 and familiar with your subordinates' skill sets and
16 background?
17 A.  Yes.
18 Q.  Would that have been true of Ms. Robinson?
19 A.  Probably not as much as somebody who was in
20 my group on a permanent basis or that I was managing
21 on a permanent basis.
22 Q.  But even for a temporary period?

90

1  A.  For a temporary period, I would look into
2  the personnel files and see -- usually that did not
3  have a history. It just had maybe the last year's
4  information and notes and maybe the appraisal from --
5  the last appraisal.
6  Q.  Would you be able to garnish that
7  information from interactions with the person?
8  A.  Garnish what information?
9  Q.  Their background, their skill set, their
10 experience?
11 A.  Yes, you could.
12 Q.  Would you make it a practice of doing so for
13 people you are supervising?
14 A.  For those people that I was supervising on a
15 permanent basis, it would be one-on-one in the
16 beginning. Well, the group that I took over, I knew
17 most of the people and I knew what their skill sets
18 were. When I am in a group on a temporary basis, it
19 would vary, it depended.
20 Q.  Did you ever have occasion to meet or spoke
21 with Ms. Robinson in a more social setting outside of
22 work?

91

1  A.  I am sure that we both attended retirement
2  parties and the like, but that would be about it.
3  Q.  In terms of making assignments or giving
4  assignments to subordinates, how relevant is a
5  person's background and experience and skill set?
6  A.  Very important, unless what you are trying
7  to do is bring them along and prepare them and help
8  them acquire a new skill set.
9  Q.  And you did assign Ms. Robinson duties and
10 projects and tasks while you served as her
11 supervisor?
12 A.  During that brief period, yes.
13 Q.  How relevant is experience as a revenue
14 officer to making the types of assignments you did --
15 A.  Revenue officer?
16    MR. NEBEKER: Objection, vague as to time.
17    BY MR. DANN:
18 Q.  I was in the middle of saying -- I will
19 rephrase it. While at the headquarters during your
20 tenure as director of large case, how relevant would
21 experience as a revenue officer have been to the
22 types of assignments you gave to your analysts?

92

1  A.  I did not have analysts who had revenue
2  officer type experience. Revenue officer is a
3  collection agent.
4  Q.  What about revenue agents?
5  A.  If the assignment that I had involved
6  accounting, yes, I would want somebody that was
7  familiar with it. If I -- if it was work on a
8  particular case, to support the field, and depending
9  on the case, the revenue agent experience would be
10 relevant.
11 Q.  How often would those circumstances arise?
12 A.  I really could not recall, occasionally.
13 Q.  Occasionally, but not often?
14 A.  Not every day.
15    MR. DANN: I think that is all we have. I
16 will yield to Mr. Nebeker.
17    MR. NEBEKER: I have a few follow-up
18 questions.
19    EXAMINATION BY COUNSEL FOR DEFENDANT
20    BY MR. NEBEKER:
21 Q.  Would you pull out Exhibit 7. I believe
22 that is the exhibit you were looking at when I was

Page 93

1  invited to ask you questions about what you were
2  going to say.
3     A.  Exhibit 6.
4     Q.  Do you have Exhibit 6?
5     A.  Yes.
6     Q.  Do you recall what it was that you were
7  trying to convey in your direct testimony?
8     A.  Yes. The position was announced and opened
9  on May 4. This reflects the effective date of the
10 selection as July 13.
11         I just wanted to make sure that it was
12 not -- I wanted to clear up any potential
13 misunderstanding with respect to the announcement --
14 the request for announcement and the actual selection
15 and when this name would have been inserted.
16         It would not have been inserted -- Sheila
17 Jones' name would not have been inserted until after
18 the selecting official, Ms. Babers, signed off and we
19 sent it back to human resources.
20    Q.  Do I understand that you made the decision
21 to advertise vacancy announcement APB 03-138MM in a
22 series -- as a series 512 position?

Page 94

1     A.  Yes.
2     Q.  And why was it that you chose to have it
3  advertised in the 512 series?
4     A.  We talked before about the freeze on 343.
5  It was my understanding that the examination division
6  had converted its 343 analysts to 512. Mr. Robeson
7  said that was a good fit for us and told me to
8  convert ours too, to the extent that they were
9  qualified.
10    Q.  Did the race of any applicant or potential
11 applicant for the position play any role in your
12 decision to advertise that position as a 512 series
13 position?
14    A.  No. When you announce a position, you don't
15 know who is going to apply, and you really -- I
16 figured Ms. Jones was going to apply because
17 Ms. Jones was in my group and I had some daily
18 contact with her. Beyond that, I had no idea who
19 would apply, and race certainly did not enter into my
20 decision to advertise it as a 512.
21    MR. NEBEKER: I have nothing further.
22    FURTHER EXAMINATION BY COUNSEL FOR PLAINTIFF

Page 95

1     BY MR. DANN:
2     Q.  Mr. Geber, if you could return to Exhibit 6.
3  What is Ms. Jones' date of birth?
4     A.  Is it on here?
5     Q.  Box number 3, part B?
6     MR. NEBEKER: Counsel --
7     THE WITNESS: Excuse me. Box 3 is Terry
8  D'Angelis -- pardon me. Part B. 9/22/54.
9     MR. DANN: That is the only question.
10    MR. NEBEKER: If you intend to file this on
11 the public record, you redact the date of birth.
12    MR. DANN: I did redact the Social Security
13 number, but, yes, I will redact the date of birth.
14         That is all we have.
15    (Whereupon, at 4:29 p.m., the taking of the
16 deposition was concluded.)
17    (Signature not waived.)
18              - - -

Page 96

CERTIFICATE OF NOTARY PUBLIC

I, CATHY JARDIM, the officer before whom the foregoing deposition was taken, do hereby testify that the witness whose testimony appears in the foregoing deposition was duly sworn by me; that the testimony of said witness was taken by me stenographically and thereafter reduced to a transcript under my direction; that said deposition is a true record of the testimony given by the witness; that I am neither counsel for, nor related to, nor employed by any of the parties to the action in which this deposition was taken; and further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto nor financially or otherwise interested in the outcome of the action.

_____
Cathy Jardim

Notary Public in and for the
District of Columbia

My commission expires:
July 31, 2007

```
                                                                    512 460 2565    P.009
Standard Form 52
Rev. 7/1/91                                                         04/29/2003  14:32
U.S. Office of Personnel Management        REQUEST FOR PERSONNEL ACTION                0
FPM Supp. 296-33, Subch. 3
```

## PART A - Requesting Office (Also complete Part B, Items 1, 7-22, 32, 33, 36 and 39.)

| 1. Actions Requested | 2. Request Number |
|---|---|
| ROMOTION COMP | 3157508 |

| 3. For Additional Information Call (Name and Telephone Number) | 4. Proposed Effective Date |
|---|---|
| TERRI DEANGELIS (215)597-2177 | 07/12/2003 |

| 5. Action Requested By (Typed Name, Title, Signature, and Request Date) | 6. Action Authorized By (Typed Name, Title, Signature, and Concurrence Date) |
|---|---|
| DAVID M GEBER, SUPV PROG AN TAX POLICY/PROC (LM/TE)  04/29/2003 | TERESA A DEANGELIS, SUPV PROG AN TAX POLICY/PROC (LM/TE)  04/29/2003 |

### PART B - For Preparation of SF 50 (Use only codes in FPM Supplement 292-1. Show all dates in month-day-year order.)

| 1. Name (Last, First, Middle) | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|
| JONES   SHEILA   E | [redacted] | 09/22/1954 | 07/13/2003 |

| FIRST ACTION | | SECOND ACTION | |
|---|---|---|---|
| 5-A. Code | 5-B. Nature of Action | 6-A. Code | 6-B. Nature of Action |
| 702 | PROMOTION COMP | | |
| 5-C. Code | 5-D. Legal Authority | 6-C. Code | 6-D. Legal Authority |
| N3M | Reg. 335.102 Comp | | |
| 5-E. Code | 5-F. Legal Authority | 6-E. Code | 6-F. Legal Authority |

| 7. FROM: Position Title and Number | 15. TO: Position Title and Number |
|---|---|
| INTERNAL REVENUE AGENT  92060A 92060030  IRA APPL ANL | INTERNAL REVENUE AGENT  94621A 94621001  IRA |

| 8. Pay Plan | 9. Occ. Code | 10. Grade or Level | 11. Step or Rate | 12. Total Salary | 13. Pay Basis | 16. Pay Plan | 17. Occ. Code | 18. Grade or Level | 19. Step or Rate | 20. Total Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| GS | 0512 | 13 | 10 | 87584.00 | PA | GS | 0512 | 14 | 06 | 95204.00 | PA |

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay | 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|---|---|---|---|
| 79629.00 | 7955.00 | 87584.00 | 0.00 | 84446.00 | 10758.00 | 95204.00 | 0.00 |

| 14. Name and Location of Position's Organization | 22. Name and Location of Position's Organization |
|---|---|
| INTERNAL REVENUE SERVICE TECHNICAL SERVICES TAX POLICY/PROC (LM/TE)   16730 | INTERNAL REVENUE SERVICE TECHNICAL SERVICES TAX POLICY/PROC (LM/TE)   16730 |

### EMPLOYEE DATA

| 23. Veterans Preference | 24. Tenure | 25. Agency Use | 26. Veterans Preference for RIF |
|---|---|---|---|
| 1  1-None  3-10-Point/Disability  5-10-Point/Other  2-5-Point  4-10-Point/Compensable  6-10-Point/Compensable/30% | 1  0-None  2-Conditional  1-Permanent  3-Indefinite | | YES  [X] NO |

| 27. FEGLI | 28. Annuitant Indicator | 29. Pay Rate Determinant |
|---|---|---|
| N | | 0 |

| 30. Retirement Plan | 31. Service Comp. Date (Leave) | 32. Work Schedule | 33. Part-Time Hours Per Biweekly Pay Period |
|---|---|---|---|
| 1 | 06/20/1974 | F   FULL TIME PERMANENT | |

### POSITION DATA

| 34. Position Occupied | 35. FLSA Category | 36. Appropriation Code | 37. Bargaining Unit Status |
|---|---|---|---|
| 1  1-Competitive Service  3-SES General  2-Excepted Service  4-SES Career Reserved | E  E-Exempt  N-Nonexempt | 16730 | 0337 |

| 38. Duty Station Code | 39. Duty Station (City - County - State or Overseas Location) |
|---|---|
| 110010001 | WASHINGTON, WASHINGTON DC DC |

| 40. Agency Data | 41. | 42. | 43. | 44. |
|---|---|---|---|---|
| TOD 0800M45 | PS 5 | T&A 16730 | FWL 14 | 93 89 83 8302 00 00 00 00 |

| 45. Educational Level | 46. Year Degree Attained | 47. Academic Discipline | 48. Functional Class | 49. Citizenship | 50. Veterans Status | 51. Supervisory Status |
|---|---|---|---|---|---|---|
| 10 | 0000 | 000000 | | 1 1-USA 8-Other | N | 8 |

### PART C - Reviews and Approvals (Not to be used by requesting office.)

| 1. Office/Function | Initials/Signature | Date | Office/Function | Initials/Signature | Date |
|---|---|---|---|---|---|
| A. | | | D. | | |
| B. | D. 03 0/30/03 | | E. | | |
| | | | F. | Geber  EXHIBIT NO. 6  10/11/06  C. Jordan | |

2. Approval: I certify that the information entered on this form is accurate and that the proposed action is in compliance with statutory and regulatory requirements.

Signature                                                          Approval Date

CONTINUED ON REVERSE SIDE
52-119                                OVER               Editions Prior to 7/1991 Are Not Usable After 6/30/1993
                                                                         NSN 7540-01-333-6239

## PART D - Remarks by Requesting Office

(Note to Supervisors: Do you know of additional or conflicting reasons for the employee's resignation/retirement? If "YES", please state these facts on a separate sheet and attach to SF 52.)   ☐ YES   ☐ NO

```
     perm position.  POD can be any of the following:Washington
 .. Louis, MO or Los Angeles, CA.  No moving expenses.
Liklihood of filling at any POD is Medium. Appeals Tax Comp
Specialist experience is highly desirable.  Some travel is
required. Additional info available via Fax Vault.
```

## PART E - Employee Resignation/Retirement

**Privacy Act Statement**

You are requested to furnish a specific reason for your resignation or retirement and a forwarding address. Your reason may be considered in any future decision regarding your re-employment in the Federal service and may also be used to determine your eligibility for unemployment compensation benefits. Your forwarding address will be used primarily to mail you copies of any documents you should have or any pay of compensation to which you are entitled.

This information is requested under authority of sections 301, 3301, and 8506 of title 5, U.S. Code. Sections 301 and 3301 authorize OPM and agencies to issue regulations with regard to employment of individuals in the Federal service and their records, while section 8506 requires agencies to furnish the specific reason for termination of Federal service to the Secretary of Labor or a State agency in connection with administration of unemployment compensation programs.

The furnishing of this information is voluntary; however, failure to provide it may result in your not receiving: (1) your copies of those documents you should have; (2) pay or other compensation due you; and (3) any unemployment compensation benefits to which you may be entitled.

1. Reasons for Resignation/Retirement (NOTE: Your reasons are used in determining possible unemployment benefits. Please be specific and avoid generalizations. Your resignation/retirement is effective at the end of the day - midnight - unless you specify otherwise.)

```
STEP cleared 5/19/03 -CS Oakland Personnel
```

| 2. Effective Date | 3. Your Signature | 4. Date Signed | 5. Forwarding Address (Number, Street, City, State, ZIP Code) |
|---|---|---|---|
|  |  |  |  |

## PART F - Remarks for SF 50

```
ZA5-SF-52#:                                3157508

K12-SELECTED FROM APB-03-138MM         DATED 6/11/2003

K18-POSITION IS AT THE FULL PERFORMANCE LEVEL.
```

04/08/2003 09:57 FAX                                                     ☒001

cc: Brou



DEPARTMENT OF THE TREASURY
WASHINGTON, D.C. 20224

APR 07 2003

MEMORANDUM FOR ACTING COMMISSIONER

FROM:      David B. Robison       *DavBRob*
           Chief, Appeals

SUBJECT:   Request for Exceptions to Hiring Freeze

Appeals is requesting exemptions to the hiring freeze on analyst and related positions for the following:

Interest and Penalties Analyst - GS-343-13
Collection Analyst - GS-343-14 - (two positions)
Strategic Planning Analyst - GS-343-14 - (two positions)

These vacancies are within Appeals' authorized staffing plan for the newly refined Appeals structure. We expect all positions to be internal hires from current 343 series with only the two collection analysts as additions to the series.

Appeals began the freeze with an on-rolls count of 112. After actions processed last week, we will be down to 85, and we are getting closer to our target of 75. Actions taken to date include:

- returned employees on detail in the 343 series to their home positions,
- initiated paperwork to move 27 employees out of the series, and
- developed 2 new position descriptions that have been classified and will be used for approximately 15 employees currently in the 343 series.

These actions along with plans to move six grade 15 transition type employees into permanent positions will bring us under our new ASP of 75 and accommodate the exceptions requested in this memo. If the exceptions are granted and the positions are filled, Appeals will remain within its overall authorized staffing levels for analysts.


EXHIBIT NO. 10
10-11-06
C. Jordan

APR-10-2003 18:27   IRS APPEALS   1 215 597 7827   P.03/03

04/09/2003 09:37 FAX   ⌀002

2

We appreciate your review and consideration to our requests. If you have any questions, please call me at (202) 694-1800.

Approved:

_____   _4/8/03_____
Bob Wenzel                              Date
Acting Commissioner

APR-10-2003 18:27   IRS APPEALS   1 215 597 7827   P.03/03

DEPARTMENT OF THE TREASURY
INTERNAL REVENUE SERVICE
WASHINGTON, D.G. 20224

May, 23, 2003

MEMORANDUM FOR DEPUTY COMMISSIONER

FROM: /s/
David B. Robison
Chief, Appeals

SUBJECT: *Request for Exclusion from Hiring Freeze Restrictions for*
Analyst and Related Positions

The Appeals design reduced both senior level positions and non supervisory, non-technical GS-13/14/15 positions in headquarters by shifting these resources to the field. The new structure reduced the number of senior manager positions by one and the number of headquarters analysts' positions by seven. Eleven (11) technical staff positions were redirected from headquarters to the field structure, along with two GS-15 non-technical positions. Additionally, seven GS-15 positions have been identified for movement from non-technical to technical field positions.

At the implementation of the Commissioner's hiring freeze for all analyst positions in the GS-343 and/or related occupations (i.e., 301), Appeals had an onboard count of 112 incumbents. Appeals has met its targeted occupancy *rate of* 75 or below by reducing the *number of employees in* these *series* positions.

As a result, we are requesting that Appeals be granted an exclusion from the Commissioner's hiring freeze for analyst and related positions in order to have maximum flexibility to manage the organization, including announcing key vacancies that may occur while remaining within our authorization of 75 positions.

Your signature below authorizes Appeals to be removed from the provisions of the Servicewide hiring freeze. I am available to discuss this request at your convenience or your staff may contact Annie D. Brown at (202) 694-1810.

Approved:

/s/
Bob Wenzel
Deputy Commissioner

6/9/03
Date

EXHIBIT NO. 11
10-11-06
C. Jardim